Melisa A. Rosadini-Knott
mrosadini@peifferwolf.com
(California Bar No. 316369)
**PEIFFER WOLF CARR
KANE CONWAY & WISE LLP**
3435 Wilshire Blvd., Ste. 1400
Los Angeles, CA 90010-1923
323-982-4109

*Counsel for Plaintiffs and the Proposed Class*

[*additional counsel listed on signature page*]

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICOLE REISBERG, on behalf of her minor children M.C. 1 and M.C. 2, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>RENAISSANCE LEARNING, INC.<br><br>        Defendant. | Civ. No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF:**<br><br>1. **Violation of 42 U.S.C. § 1983**<br>2. **Violation of 42 U.S.C. § 1983**<br>3. **Violation of 18 U.S.C. § 2510**<br>4. **Violation of Cal. Penal Code §§ 631, 632**<br>5. **Violation of Cal. Penal Code §§ 502,** *et seq.*<br>6. **Violation of §§ 17200,** *et seq.*<br>7. **Invasion of Privacy—Public Disclosure of Private Facts**<br>8. **Intrusion Upon Seclusion**<br>9. **Violation Wis. Stat. § 968.31**<br>10. **Violation of Wis. Stat. § 100.18**<br>11. **Unjust Enrichment**<br><br>**JURY TRIAL DEMANDED** |

1

*"Above all things I hope the education of the common people will be attended to, convinced that on their good sense we may rely with the most security for the preservation of a due degree of liberty."*

**- Thomas Jefferson to James Madison, 1787**

*"Education is the world's most data-mineable industry by far."*

**- Jose Ferreira, EdTech CEO, May 2014**

*"[Education technology] companies' mission isn't a social mission. They're there to create return."*

**- Michael Moe, EdTech investor, May 2014**

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................. 7

JURISDICTION AND VENUE ........................................................ 10

THE PARTIES ................................................................................. 10

FACTUAL ALLEGATIONS ............................................................ 11

I.    Today's digital products and services profit by monetizing user data ... 11

A. The modern internet is built on the surveillance business model ..... 11

B. Education is "the world's most data-mineable industry by far" ....... 12

II.   Renaissance profits enormously from its generation, collection, use,
and disclosure of the personal information of millions of school-aged
children ................................................................................. 14

A. Renaissance is a state actor ............................................... 14

B. Renaissance amasses vast troves of student data through its K-12-
marketed products, corporate acquisitions, and date-sharing
agreements ....................................................................... 16

1.  Renaissance generates and collects student data through its
Own products.............................................................. 17

2.  Renaissance obtains student data through corporate
acquisitions .............................................................. 22

C. Renaissance uses and discloses students' personal information
for a variety of commercial purposes ................................. 23

1.  Renaissance uses the Stolen Information to develop products
for, and market and deliver those products to, current and
potential customers ................................................... 24

2.  Renaissance discloses the Stolen Information to
third parties............................................................... 27

3.  Renaissance both obtains and discloses student data through third-party data-sharing agreements ............................................34

III.  Renaissance fails to obtain effective consent for its generation, extraction, use, and disclosure of children's personal and private information..................................................................................56

A. Any consent is not informed: Renaissance fails to Provide sufficient, comprehensible information to support informed consent .........................................................................56

B. Consent is not obtained from a person with authority: Renaissance does not obtain parental consent before it generates, collects, uses and discloses children's personal information..................................59

C. Consent is not voluntary: Students' use of Renaissance's products is not voluntary as would be necessary to support their agreement to Renaissance's data practices ...............................................61

D. Consent is not supported by consideration: Renaissance does not provide students with sufficient consideration necessary to support any agreement to its data practices .....................................62

IV.  Renaissances makes false and misleading statements about its Data practices on which it attends the public, school personnel, and parents to rely.....................................................................................63

A. Renaissance falsely states that it prioritizes privacy.........................63

B. Renaissance falsely states that its products may be used in compliance with FERPA....................................................63

C. Renaissance falsely states that it is COPPA compliant.....................64

D. Renaissance intends that the public rely on its misrepresentations ..65

V.  Renaissance's nonconsensual data practices harm children .................66

A. Renaissance harms children by invading their privacy ...................66

4

B.  Renaissance harms children by persistently surveilling them .......... 67

C.  Renaissance harms children by compromising the security of their personal and private information ...................................................... 68

D.  Renaissance harms children by affecting their access to Information and opportunities through algorithmic profiling .......... 70

E.  Renaissance harms families by denying them access to their data and subjecting them to practices that are opaque, unreviewable, and unappealable ....................................................................... 71

F.  Renaissance harms children by failing to compensate them for their property and labor ................................................................... 72

G.  Renaissance harms children by forcing them to choose between their right to an education and other fundamental rights ................. 74

H.  Renaissance's nonconsensual data practices are unfair and unlawful ......................................................................................... 75

VI.  Plaintiff-specific allegations ........................................................ 76

A.  Plaintiffs used Renaissance products, which widely generated, collected, use, and share Plaintiffs' personal information ............... 76

B.  Plaintiffs have never consented to Renaissance's collection and use of their data ............................................................................. 77

C.  Renaissance denied Plaintiffs access to, review of, and control over their data .............................................................................. 77

D.  Plaintiffs were harmed by Renaissance's collection and use of their data ...................................................................................... 78

E.  Plaintiff Reisberg is a long-time advocate for children and parents .................................................................................... 79

CLASS ACTION ALLEGATIONS ....................................................... 79

    A. Tolling of the statute of limitations .................................... 84

       1. Discovery rule ............................................................... 84

       2. Fraudulent concealment ............................................... 85

CAUSES OF ACTION ......................................................................... 86

   Count I: Violation of 42 U.S.C. § 1983 – Fourth Amendment ......................... 86

   Count II: Violation of 42 U.S.C. § 1983 – Fourteenth Amendment ............... 88

   Count III: Violation of the Federal Wiretap Act, 18 U.S.C. § 2510, *et seq* ...... 92

   Count IV: Violation of the California Invasion of Privacy Act (CIPA) Cal. Penal Code §§ 631, 632 ................................................................ 94

   Count V: Violation of the Comprehensive Computer Data Access and Fraud Act (CDAFA), Cal. Penal §§ 502, *et seq.* ............................................... 96

   Count VI: Violation of California's Unfair Competition Law (UCL) Cal. Bus. Of Prof. Code § 17200, *et seq.* ........................................................... 98

   Count VII: Invasion of Privacy – Public Disclosure of Private Fact ............ 100

   Count VIII: Intrusion Upon Seclusion ............................................................ 102

   Count IX: Violation of the Wisconsin Electronic Surveillance Control Law, Wis. Stat. § 968.31 ............................................................................... 104

   Count X: Violation of Wisconsin's Deceptive Trade Practices Act (DTPA) Wis. Stat. § 100.18 ............................................................................... 107

   Count XI: Unjust Enrichment ............................................................ 109

RELIEF REQUESTED ................................................................................. 110

## **INTRODUCTION**

1.     Nicole Reisberg, on behalf of, and as parent and guardian of, her minor children, M.C. 1 and M.C. 2 ("Plaintiffs"), as well as on behalf of all other similarly situated individuals, by and through her attorneys, brings this class action complaint for injunctive and monetary relief against Defendant Renaissance Learning, Inc. ("Renaissance") and makes the following allegations based upon her and her children's knowledge and her counsel's investigation, and upon information and belief as to all other matters.

2.     Renaissance has built a multibillion-dollar empire by monetizing vast troves of personal information from individual users of its products—including millions of school-aged children—without effective consent.

3.     Renaissance markets itself as an education technology company, but its core business is generating, extracting, and analyzing as much information as possible about its users and monetizing that information.

4.     The products it markets for use by children in K-12 education[1] are no exception. Through an ever-growing suite of digital-technology products, Renaissance generates and extracts personal information from school-aged children. It then provides that information to its customers, among which are schools and school districts, but also a host of private companies. Renaissance and its customers convert that information into intimately detailed profiles on children, which they use to develop and market products and services, manipulate how children think and act, shape their information environment, and make significant decisions affecting their lives and their futures, all without students or their parents[2] ever knowing, let alone consenting.

5.     Renaissance's massive data-harvesting apparatus exposes children to

---

[1] "K-12 education" or "K-12" refers to Kindergarten through senior year of compulsory education.
[2] The term "parent" as used herein refers broadly to a child's parent or legal guardian.

serious and irreversible risks to their privacy, property, and autonomy, and harms them in ways that are both concealed and profound.

6.     Neither students nor their parents have agreed to this arrangement. To be effective, an agreement must be supported by informed, voluntary consent, by a person with authority to do so, in exchange for sufficient consideration.

7.     None of those elements are met here.

8.     First, any purported agreement between Renaissance and students is not informed: Renaissance does not adequately disclose to students, parents, or schools what information it collects and what it does with that information in a reasonably understandable manner. Instead, Renaissance materially misrepresents its data practices, for example, by falsely touting its commitment to student privacy, stating that it can be used in a manner compliant with Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, and representing that it complies with the Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. §§ 6501, *et seq*.

9.     Second, any purported agreement is not voluntary: because children are required to attend school, they are coerced into submitting to Renaissance's data practices.

10.     Third, any purported agreement lacks sufficient consideration: because children are already entitled to an education—which includes the right to use educational products and services provided by the school—Renaissance provides them no additional benefit that would support any purported agreement.

11.     Finally, any purported consent was not provided by a person with authority to do so: Renaissance's student users are minors. As such, Renaissance must obtain their parents' consent before taking and using their personal and private information. However, Renaissance does not seek parental consent. Instead, it relies on the consent of school personnel alone. School personnel, however, do not have authority to provide such consent in lieu of parents. Thus, even if school personnel

purport to have given consent on behalf of children, any such consent is ineffective.

12.    Schools have always collected certain personal information belonging to students and their parents in order to provide educational services, and they must be able to continue to do so—within the bounds of the law.[3] Until recently, that collection was transparent and limited: parents generally knew what information was collected, by whom, and for what purpose. But times—and technology—have changed.

13.    Schools no longer do the collecting; corporate third parties do. The information taken is not only traditional education records, but thousands of data points that span a child's life. That information is not used exclusively for educational purposes; it is used by myriad unknown entities for commercial purposes. And the data-extractive business model does not prioritize positive student outcomes; it prizes "measurability," "scalability," and other corporate imperatives that are often unaligned with, and are even adversarial to, children's privacy and healthy development. Companies may not deny parents the ability to guide their children's lives by marketing to schools and concealing their practices behind opaque technology and false promises of improving education.

14.    Privacy is a fundamental right. Renaissance may not require that children entirely forgo that right in order to receive the education to which they are legally entitled. And parents, by sending their children to school as is their right and duty, do not surrender their authority to decide what personal information may be collected about their children, who may access it, and how it may be used. Renaissance must be held to account for operating as though the fundamental rights of children and their parents do not exist.

---

[3] By this lawsuit, Plaintiffs do not seek to prevent schools from collecting and using legally permissible information about their students in a legally permissible manner, such as contemplated under the FERPA.

## JURISDICTION AND VENUE

15.    This Court has original jurisdiction over the action under the Class Action Fairness Act ("CAFA") of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative Class members exceed $5 million, exclusive of interests and costs, and at least one member of the proposed Class is a citizen of a different state than Defendant Renaissance. This Court also has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges question of federal laws under 42 U.S.C. § 1983 and the Federal Wiretap Act, 18 U.S.C. § 2510, *et seq*. (ECPA).

16.    Venue is proper in this District under 28 U.S.C. § 1391 because Renaissance is subject to personal jurisdiction here, and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

17.    Further, the unlawful conduct alleged in this Class Action Complaint occurred in, was directed to and/or emanated in part from this District. Sufficient minimum contacts with this state and/or sufficiently avails itself of the markets of this state through its promotion, sales, licensing, activities and marketing within this state. Renaissance purposely availed itself of the laws of California, and engaged and is engaging in conduct that has and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to persons throughout the United States, including persons Renaissance knew or had reason to know are located in California, including in this District.

## THE PARTIES

18.    M.C. 1 is a minor. At all relevant times, she has been a citizen of the state of California. M.C. 1 attended school in an Orange County, California school district. As part of her schooling, she was required to access and use Renaissance products and services, which she accessed and used from her school-issued device.

19.    M.C. 2 is a minor. At all relevant times, he has been a citizen of the state of California. M.C. 2 attended school in an Orange County, California school district. As part of his schooling, he was required to access and use Renaissance products and services, which he has accessed and used from his school-issued device.

20.    Plaintiff Nicole Reisberg is the mother and legal guardian of Plaintiffs M.C. 1 and M.C. 2. At all relevant times, she has been a citizen of the state of California.

21.    Defendant Renaissance is a Wisconsin Corporation. Its headquarters are located at 2911 Peach Street Wisconsin Rapids, Wisconsin, 54494.

## FACTUAL ALLEGATIONS

**I.    Today's digital products and services profit by monetizing user data.**

**A.    The modern internet is built on the surveillance business model.**

22.    For two decades, vast numbers of consumer-facing technology companies have built their businesses according to a model that Harvard Business School professor emerita Shoshana Zuboff, among others, has described as "surveillance capitalism."[4] At the heart of that model is an "extraction imperative" that prioritizes maximal collection and monetization of user data.

23.    As Professor Zuboff explains, under surveillance capitalism, a technology provider is incentivized to:

    a. generate and collect as much data as possible about a user through the user's interaction with the technology provider's platform;

    b. use the data the technology provider generates and collects about the user to make predictions about that user's future behavior, frequently referred to in the industry as "insights," which the technology provider uses to build its own products and services and shares with third parties seeking to profit from that user;

---

[4] The Age of Surveillance Capitalism: The Fight for a Human Future at the New Frontier of Power, Shoshana Zuboff (2019).

    c.  surreptitiously influence the user's behavior using what it knows about the user—both to keep the user on the platform longer (increasing the volume of information available to collect) and to coerce the user to act as the technology provider has predicted (increasing the value of the provider's insights); and

    d.  enable third parties to make significant decisions about the user that can affect their life and future.

24.    Submission to this arrangement has become the cost of being online: in order to use the internet, an individual must "consent" to having these intimate dossiers built about them, which are used by countless entities to identify and target them, make predictions about them, manipulate their behavior, and influence decision-making.

25.    Given the extractive and exploitative nature of the surveillance business model, its viability depends on keeping the public in the dark. Companies thus employ numerous tactics to keep users unaware of their data practices, such as opaque terms of service, contracts of adhesion, hidden data-generation and data-collection technologies, and coercive design techniques.

26.    The practices of surveillance capitalism have become commonplace—not just in technology domains like search, ecommerce, and social media—but also in more traditional domains such as healthcare, employment, lending, and insurance. Courts have routinely found undisclosed corporate practices in these domains to be unlawful. And if the surveillance business model is unfair when used against adults in ostensibly voluntary consumer contexts, it is unconscionable when used against school-aged children in the compulsory setting of education.

**B.    Education is "the world's most data-mineable industry by far."**

27.    The surveillance business model also underpins digital-technology platforms used in elementary, middle, and high schools across the United States.

28.    Simply by attending school as is their legal right and obligation, children are subjected to the same intrusive and exploitative data practices as adults in non-

compulsory settings: reams of their personal information are harvested to build intimately detailed profiles about them, which are then used by the collecting company, schools, and a host of other third parties to identify, target, manipulate, and influence decision-making about them.

29.    By collecting and monetizing children's information, education technology, or "EdTech,"[5] has become a $250 billion global industry that is projected to nearly triple by 2027.[6]

30.    Investors have taken note. Investments in EdTech have surged from $500 million in 2010 to $16.1 billion in 2021.[7]

31.    Rather than describing a defining feature of any digital-technology service or product, "EdTech" describes the *market* that these companies target, namely, schools and school districts. In that sense, any technology company that markets to schools can be considered an EdTech company.

32.    Education has been described by a leading executive as "the world's most data-mineable industry by far."[8]

33.    As one leading EdTech investor explained, these investments are not

---

[5] Although the term "educational technology" can be defined broadly to include purely theoretical or pedagogical practices, this Complaint uses "EdTech" to refer generally to "all the privately owned companies currently involved in the financing, production and distribution of commercial hardware, software, cultural goods, services and platforms for the educational market with the goal of turning a profit." *EdTech Inc.: Selling, Automating and Globalizing Higher Education in the Digital Age*, Tanner Mirrlees and Shahid Alvi (2019).

[6] Louise Hooper, et al., *Problems with Data Governance in UK Schools*, Digital Futures Commission, 5Rights Foundation (2022), https://digitalfuturescommission.org.uk/wp-content/uploads/2022/08/Problems-with-data-governance-in-UK-schools.pdf.

[7] Alex Yelenevych, *The Future of EdTech*, Forbes (December 26, 2022), https://www.forbes.com/sites/forbesbusinesscouncil/2022/12/26/the-future-of-edtech/?sh=7c2924676c2f.

[8] Stephanie Simon, *The big biz of spying on little kids*, Politico (May 15, 2014), https://www.politico.com/story/2014/05/data-mining-your-children-106676.

philanthropic: the purpose of these private EdTech ventures "isn't a social mission . . . . They're there to create return."[9]

34.     The result is that EdTech has overtaken K-12 education. School districts access an average of nearly 3,000 EdTech tools during a schoolyear. A single student accesses nearly fifty EdTech tools per year. The influence and effect this industry has had on education and school-aged children thus cannot be overstated.

## II.     Renaissance profits enormously from its generation, collection, use, and disclosure of the personal information of millions of school-aged children.

35.     Renaissance contracts with schools and school districts to provide a host of services ranging from assessment creation and administration; personalized instruction and practice; and student-data analytics.

36.     Renaissance does not provide schools products that merely serve as a kind of digital filing cabinet in which K-12 schools may store education records or student assessments.

37.     Rather, Renaissance is an EdTech company specializing in the generation, collection, storage, and analysis of student data. Its data practices are core to its surveillance business model.

38.     In fact, Renaissance obtains student data from over 40 percent of schools in the United States. According to Renaissance, it has amassed over 2.8 billion "real-world student data points" that it uses to develop its assessments.

39.     Given the value of student data in today's data economy, numerous private investment firms have made significant investments in Renaissance.

40.     For example, in March 2014, Renaissance was sold to the equity investment firm Hellman & Friedman for $1.1 billion dollars. Since then, Renaissance has raised billions of dollars from a host of investment firms, including Francisco Partners, TPG, and Blackstone.

---

[9] *Id.*

**A.      Renaissance is a state actor.**

41.      Among Renaissance's customers are public schools and public school districts.

42.      These public entities have delegated significant aspects of the public function of administration of public education to Renaissance, including administration and management of student information and pedagogy.

43.      Renaissance contracts directly with public entities for provision of its services. Parents and students are not parties to those contracts.

44.      Renaissance's customers are schools, not parents or students.

45.      Students only interact with Renaissance because of their obligation to attend school.

46.      Renaissance's contracts with schools purportedly govern Renaissance's data practices, including the collection, use, and disclosure of student data.

47.      Schools use public funds to procure Renaissance's services.

48.      Schools benefit from Renaissance's data practices.

49.      Renaissance's contracts with public entities are long-term contracts typically spanning years rather than short-term contracts.

50.      Renaissance obtains access to student data only through its contracts with public entities.

51.      By such contracts, schools agree or ostensibly agree to wide-ranging collection, use, and disclosure of student data.

52.      Renaissance states that it "act[s] as a processor" of student information on behalf of schools, and that its data practices are governed exclusively by its agreements with schools.

53.      Renaissance states that schools "act as the controllers" of student data collected by Renaissance.

54.      Renaissance states that it only collects, uses, and discloses student

information as authorized by a school.

55.    Renaissance purports to provide schools robust tools for accessing and controlling the data it collects.

56.    Renaissance states that it may not directly communicate with parents regarding their rights or their children's rights to student data, and that all such communications must go through their school.

57.    The division of responsibility between Renaissance and schools for the protection of student data and legal compliance is complex and dynamic. It depends on a number of factors, including the area of security (e.g., platform, network, identity and access management); the type of function within that area (e.g., data transfer services, security testing, risk detection); and the role of any number of "subprocessors" in a given function (e.g., hosting services, engineering support, security).

58.    Renaissance holds itself out as "school official" under FERPA for purposes of its data practices. It thereby admits that, at least ostensibly, it performs a function for the school for which the school would otherwise use employees; it is under the direct control of the school for maintenance and use of education records; and the school determines whether it has a legitimate educational interest in education records.

59.    Renaissance purports to stand in the shoes of schools for purposes of redisclosing student info to third parties without obtaining prior parental consent.

60.    Renaissance states that it need not comply with federal privacy law, namely FERPA and COPPA, because it provides services to schools, and it purports to shift its obligations under those laws to schools.

61.    Thus, according to Renaissance's own admissions, it acts under color of law with respect to the collection, use, and disclosure of student data, and its relevant policies and functions are inextricably entwined with those of schools.

**B.    Renaissance amasses vast troves of student data through its K-12-marketed products, corporate acquisitions, and data-sharing agreements.**

62.    Acting under color of law, Renaissance generates, collects, and otherwise obtains personal information belonging to, from, and about tens of millions of school-aged children in the United States.

63.    Renaissance obtains student personal information through its own products, corporate acquisitions, and third-party data-sharing agreements.

**1.    Renaissance generates and collects student data through its own products.**

64.    Renaissance's primary customers are schools and school districts.

65.    By persuading those customers to implement its products in schools, Renaissance gains virtually unfettered access to the data of the children who attend those schools.

66.    Renaissance claims to serve 40 percent of schools in the United States.

67.    Renaissance provides its customers access to "insights" and "data" to "provide administrators with x-ray vision into what's happening in their schools."

68.    Renaissance does not publicly disclose the full extent of what data—or even categories of data—it generates and collects from school-aged children or their families.

69.    Renaissance refuses to make the data it generates and collects from children—or the information it creates using that data—available to children or their parents for review.

70.    At minimum, Renaissance states that it collects the following information from and about students through its products:

**a.  Student Personal Identifiers:**

      i.    Full Name

      ii.    School District-Assigned ID

       iii.    Application-Specific Student Username

       iv.    Student Application Passwords

**b. Student Demographic Information:**

       i.    Date of Birth

       ii.    Place of Birth

       iii.    Gender Identity / Assigned Sex

       iv.    Race or Ethnicity

**c. Student Enrollment & Scheduling:**

       i.    Student Current School Enrollment Status

       ii.    Student Current Grade Level

       iii.    Student Assigned Homeroom

       iv.    Student's Scheduled Courses

       v.    Anticipated Year of Graduation

       vi.    General Enrollment Details

**d. Student Academic Performance & Progress:**

       i.    Student Assessment Performance Scores

       ii.    Detailed Student Responses to School-Administered Surveys or Questionnaires

       iii.    Specific Course Data (e.g., assignments, completed work, learning paths)

       iv.    Student Course Grades

**e. Student Attendance & Behavior:**

       i.    Daily School Attendance Records

       ii.    Individual Class Attendance Records

  iii. Recorded Conduct or Behavioral Data (e.g., disciplinary incidents, positive behaviors)

**f. Special Needs & Support Services:**

  i. Specialized Education Services Received (e.g., IEP, 504 plan)

  ii. Student Disability Information (e.g., specific learning disabilities, physical disabilities)

**g. Socioeconomic & Living Conditions:**

  i. Low-Income Status (SES Free and Reduced - Socioeconomic Status based on Free and Reduced Lunch eligibility)

  ii. Living Situations (e.g., homelessness, foster care status)

**h. Language & Communication:**

  i. Primary Language Information (e.g., English Language Learner status, home language)

**i. Student Contact Information:**

  i. Student Email Address

  ii. Student Residential Address

**j. Parent/Guardian Contact Information:**

  i. Parent/Guardian First and/or Last Name

  ii. Parent/Guardian Email Address

  iii. Parent/Guardian Residential Address

  iv. Parent/Guardian Phone Number

**k. Student's Teacher/Counselor Information:**

  i. Teacher Names

  ii. Teacher Email Addresses

  iii. Guidance Counselor Name

19

**l.  Student Device & Network Identifiers & Location:**

  i.   IP Addresses of Users (or other unique identifiers for any computer, mobile phone, or other device used to access the products)

  ii.  Physical Location of Device Used to Access Renaissance Products (e.g., GPS, IP-based geo-location)

  iii. Internet Service Provider (ISP)

**m. Application & Interaction Data:**

  i.    Use of Cookies (e.g., session cookies, persistent cookies, unique cookie IDs)

  ii.   "Other application technology metadata"

  iii.  General Metadata on User Interaction with Application (e.g., session duration, number of logins)

  iv.   Specific Areas Within Renaissance Products that Users Visit (e.g., specific pages, features used)

  v.    Links Users Click within the application

  vi.   Search Terms entered within the application

  vii.  Time of Day Products are Used

  viii. Information Collected Through "Other Tracking Technologies" (beyond cookies, e.g., web beacons, pixels, local storage, device fingerprinting)

  ix.   "Other information"

**n.  Session & Environment Details:**

  i.   Testing Environment (e.g., specific software version, device configuration for assessments)

  ii.  Date and Time of User's Visit

iii.   Browser Language

iv.   Browser Type (e.g., Chrome, Firefox, Edge)

v.   Referring Pages and Exit Pages/URLs (the website they came from and the one they went to after leaving the product)

vi.   Amount of Time Spent on Particular Pages

vii.   Operating System (e.g., chrome, Windows, macs, iOS, Android)

viii.   Traffic and Related Statistics (e.g., data volume transferred)

ix.   Keywords (if distinct from search terms, possibly for content accessed)

x.   Other general browser or usage information depending on a user's mobile service provider.

71.   The personal and private information taken from students by Renaissance without effective consent is referred to as the "Stolen Information" herein.

72.   The Stolen Information far exceeds what is legally or traditionally characterized as "education records."

73.   Even if certain Stolen Information could be characterized as education records, children and their parents retain significant rights over the personal and private information contained in such records.

74.   The Stolen Information, including information from and about children under 13, far exceeds that reasonably necessary for children to participate in any school activity facilitated by Renaissance in violation of COPPA. *See* 15 U.S.C. § 6502; 16 C.F.R. § 312.7.

75.   Renaissance could design the products it markets and sells to K-12 education institutions to minimize the amount of data it collects from children, but instead it optimizes its products for data extraction.

76.   That Renaissance's school-marketed products are not designed to

optimize for student privacy is an intentional, self-interested choice that comes at the expense of children's privacy, safety, and wellness.

### 2. Renaissance obtains student data through corporate acquisitions.

77.    Renaissance has also obtained substantial amounts of student data through a series of strategic corporate acquisitions. That data is a valuable—perhaps the most valuable—asset of an acquisition target.

78.    Since 2015, Renaissance has acquired nearly a dozen companies, which it has fully integrated into its data and data-derivative ecosystem.

79.    Some of these acquisitions include the 2019 purchases of (1) Freckle, "a company that provides a differentiation platform for math, social studies, science and English language arts;" (2) Schoolzilla, "a company known for its data-driven dashboards that integrate multiple sources of student data;" and (3) Early Learning Labs, a company offering "progress monitoring, assessments, and reporting tools to track literacy, early numeracy, early social-emotional learning, and more through its myIGDIs platform."

80.    Additional acquisitions include the 2013 acquisition of Subtext, a digital reading service; the 2015 acquisition of UClass, providing cloud storage and content management; the 2018 acquisition of myON, a digital literacy solutions provider; the 2021 acquisition of Nearpod, a company offering an interactive instructional platform that merges real-time formative assessment and dynamic media, for $650 million dollars; the 2021 acquisition of Lalilo, a research-based foundational literacy program; the 2022 acquisition of Illuminate Education, an EdTech company that "has been the recipient of major criticism over data-privacy breaches involving students"; and the 2023 acquisition of GL Education, a provider of formative assessments for schools and school groups.

81.    Renaissance's data trove now includes data from the many platforms it

22

has acquired, such as comprehensive student data from Schoolzilla; demographic and other personal information from Illuminate Education; and student engagement and performance data from Nearpod.

82.    These acquisitions—and the data Renaissance gains as a result—are essential to Renaissance's data-monetization business model.

## C.    Renaissance uses and discloses students' personal information for a variety of commercial purposes.

83.    Renaissance uses and discloses the personal information it generates, extracts, and collects from children for a host of purposes, including commercial purposes.

84.    By its own terms, Renaissance uses the Stolen Information in at least the following ways:

     a.  To develop and deliver its products;

     b.  To maintain and improve its products;

     c.  For analytics and reporting;

     d.  For general research;

     e.  To develop new technologies;

     f.  To develop and improve educational sites, products, and services;

     g.   To enforce its terms and conditions;

     h.  To protect its own rights, privacy, safety, and property;

     i.  To comply as it believes necessary with applicable laws, lawful requests, and legal processes such as responding to subpoenas or requests from governmental authorities;

     j.  With consent from schools "for purposes not identified here"; and

     k.  With consent from parents "for purposes not identified here."

85.    The following elaborates on just a few of these uses and disclosures.

**1.    Renaissance uses the Stolen Information to develop products for, and market and deliver those products to, current and potential customers.**

86.    Like most surveillance-technology companies, Renaissance does not generate and collect user data for the primary purpose of providing the raw data itself to third parties, nor for the limited purpose of assisting parents and their children with their educational pursuits. Instead, it generates, collects, combines, and analyzes user data for the purpose of building highly detailed and intimately personal dossiers of children, including their preferences, behaviors, and aptitudes, which they use to generate myriad purported predictions about a child's life.[10]

87.    Renaissance shares predictions concerning a wide range of a child's attributes and behaviors, such as her future academic performance, skill mastery, learning comprehension, and more. These predictions are variously described as "insights," "analytics," "diagnostics," "assessments," "products," "offerings," "solutions," "guidance," and other such intentionally esoteric, anodyne terms.[11]

88.    Renaissance's third-party customers use those products to identify, target, manipulate, make decisions about, and otherwise control or monetize children and their personal information.

89.    For Renaissance's school customers, such purposes include, without limitation, automating learning evaluation methods (such as aptitude), comprehension testing, development of "personalized" curricula or "learning paths," student management and oversight, and other aspects of school administration and education, all under the guise of improving education.

90.    Although Renaissance markets these products as conferring

---

[10] Alyson Klein, Education Week, "Most Tech Companies Profit Off Student Data, Even If They Say Otherwise, Report Finds" (July 18, 2023).

[11] *See, e.g.*, Cathy O'Neil, *Weapons of Math Destruction*, (2016); Zuboff, *The Age of Surveillance Capitalism*.

administrative and pedagogical benefits to schools and school districts, they are undeniably commercial, for-profit products that have enabled Renaissance to build a multibillion-dollar surveillance-technology empire at the expense of student privacy.

91.    Renaissance's products are designed to work synergistically to collect data on every aspect of a student's persona and then manipulate that data to influence the student. The data is then marketed to Renaissance's current and prospective customers to increase profits for Renaissance.

92.    Renaissance states that it uses student data in the following ways:

    a.  To provide them access to its products;

    b.  To communicate with authorized users;

    c.  To market to schools;

    d.  To enforce its own rights arising from its terms of service and license agreement;

    e.  To estimate school size and student usage patterns;

    f.  To customize its products;

    g.  To maintain and improve its products;

    h.  To "demonstrate the effectiveness of," or market, its products;

    i.  For reporting and analytics;

    j.  For general research and development of new technologies;

    k.  To improve and develop sites, services, and products;

    l.  To support any of the above uses; and

    m. For "any other legitimate business purpose."

93.    Data flows freely between products in support of what Renaissance calls its Renaissance "ecosystem."

94.    Fueled by its ever-growing trove of student data, Renaissance's suite of cloud-based online products now includes numerous data-derived products, including, but not limited to, the following:

a. **Freckle** – a differentiation platform for math, social studies, science and English language arts.

b. **Schoolzilla** – providing dashboards that integrate multiple sources of student data.

c. **Fastbridge** – assessment platform that assists educators in identifying student needs in reading, math, and social-emotional behavior.

d. **Star Assessments** – computer-adaptive tests designed to measure student proficiency and growth.

e. **Saebrs** – tool used to assess and identify students at risk for social-emotional behavior problems.

f. **Renaissance Next** – provides teachers and administrators with a comprehensive view of student data and insights across Renaissance's products.

g. **Renaissance Fundamentals** – a survey-based tool that helps educators identify and address non-academic barriers to student learning and success by collecting information on their feelings about their school and themselves.

h. **DnA** – a platform for Data and Assessments.

i. **Nearpod** – an interactive instructional platform allowing educators to create lessons with real-time student participation and feedback.

j. **Star Phonics** – a technology-based Phonics Screener and Diagnostic Assessment tool.

95.   Renaissance also uses the Stolen Information to develop its artificial intelligence technologies, which Renaissance has incorporated and continues to incorporate into its suite of products. For example, in July 2024, Renaissance announced the launch of Renaissance Next, an "AI-powered tool" that Renaissance's Chief Product Officer, Todd Brekhus, claimed draws on the "rich resource" of the "Renaissance database" that "incorporates over 38 years of real student and teacher data and insights."

96.    To power its massive and growing suite of data-derivative products and provide its customers access to granular student analytics, Renaissance compiles the data it generates and takes through each of its platforms and uses it to build, improve, and market its suite of products to third parties.

### 2.    Renaissance discloses the Stolen Information to third parties.

97.    Renaissance discloses the Stolen Information to a host of third parties.

98.    Renaissance discloses the Stolen Information to schools and educators.

99.    Renaissance discloses the Stolen Information to and under the following circumstances, without student, parent, or school consent:

    a.  governmental entities, including law enforcement;

    b.  personnel in legal proceedings;

    c.  "when required by law";

    d.  in response to bankruptcy proceedings;

    e.  when necessary to defend its rights;

    f.  to provide information to a claimed owner of intellectual property who claims that content a Child has provided to Renaissance infringes on their rights;

    g.  upon request of or as otherwise authorized by an academic institution connected to an investigation into academic integrity;

    h.  to protect and/or defend its Terms of Service agreement or other policies applicable to its products;

    i.  to protect the personal safety, rights, property or security of any organization or individual; and

    j.  to identify users, including in cooperation with copyright owners, Internet service providers, wireless service providers or law enforcement agencies in our discretion.

100.    Renaissance discloses the Stolen Information to a parent entity of Renaissance for business and operational purposes.

101.    Renaissance discloses the Stolen Information to affiliates of Renaissance for business and operational purposes.

102.    Renaissance discloses the Stolen Information to investors of Renaissance for business and operational purposes.

103.    Renaissance will disclose the Stolen Information in the event of a business transition such as a merger, acquisition, or sale of all or a portion of Renaissance's assets, bankruptcy, "other corporate change (including, without limitation, during the course of any due diligence process)."

104.    Renaissance also discloses the Stolen Information with myriad entities that it variously describes as "service providers," "sub-processors," or "vendors" for a host of purposes, including:

    a.  hosting;

    b.  information technology;

    c.  customer support;

    d.  data security;

    e.  consumer research services;

    f.  educational research services;

    g.  to obtain analytics and other information regarding traffic on its products; and

    h.  to obtain analytics and other information regarding traffic on its products.

105.    Renaissance does not describe what data is shared with each vendor.

106.    Renaissance amends its list of purported subprocessors without notice to parents in violation of COPPA.

107.    Renaissance does not adequately describe who those entities are, what

those entities do with student data, what types of student data they collect, how they collect student data, or why student data is shared with those entities.

108.   As of the date of this filing, Renaissance lists dozens of "vendors," along with a generic description of the purpose of sharing, as follows (description not included in Renaissance's disclosures but added for clarity):

| Vendor Name | Stated Purpose for Data Sharing | Vendor Description |
|---|---|---|
| 1. Amazon Web Services (AWS) | Hosting, Engineering and Product Support and Development | The world's most comprehensive and broadly adopted cloud platform, offering over 200 fully featured services from data centers globally. It provides computing power, database storage, content delivery, and other functionalities. |
| 2. Microsoft Azure | Hosting | Microsoft's cloud computing platform, offering a wide range of cloud services, including computing, analytics, storage, and networking, for building, deploying, and managing applications and services. |
| 3. Amazon Web Services (Singapore) | Hosting | This is a specific geographical region for Amazon Web Services, indicating data centers and services located in Singapore to serve customers in the Asia-Pacific region with lower latency. Functionally, it's part of the broader AWS. |
| 4. Hexacta | Engineering Support | An Argentina-based software development and IT consulting company that provides custom software development, UX/UI design, quality assurance, and digital transformation services. |

| 5. Pendio.io | Product Analytics and In-Product Notification | A data platform company that focuses on simplifying data integration and management for businesses, often enabling them to connect various data sources and prepare data for analytics. |
|---|---|---|
| 6. Snowflake | Cloud Data Platform | A cloud-based data warehousing company that provides a "Data Cloud" platform, allowing organizations to store, process, and analyze vast amounts of data using a single, integrated service. |
| 7. Datadog | Engineering Support | A monitoring and analytics platform for cloud-scale applications, providing end-to-end visibility across infrastructure, applications, and logs, helping organizations identify and resolve performance issues. |
| 8. Fivetran | Engineering Support | A data integration company that automates the extraction, loading, and transformation (ELT) of data from various sources into cloud data warehouses, simplifying the data pipeline for analytics. |
| 9. EPAM Systems | Engineering Support and Product Development | A global provider of digital platform engineering and software development services, offering IT consulting, product development, and digital transformation solutions across various industries. |
| 10. BristleCone | Software Development | A global supply chain and analytics consulting firm that helps companies optimize their supply chain processes, implement technology solutions, and leverage data for better decision-making. |

| | | |
|---|---|---|
| 11.R Systems | Product Development | An India-based global technology and analytics services company providing digital transformation, product engineering, and intelligent automation solutions |
| 12.Cardinal Integrated Technologies | Product Development | A company that typically provides integrated technology solutions, often specializing in areas like automation, control systems, and IT infrastructure for industrial or commercial clients. |
| 13.MentorMate | Software Development | A custom software development company that offers full-cycle product development, including strategy, design, and engineering, for mobile, web, and cloud applications. |
| 14.Technisoft Consulting | Software Development | A consulting firm specializing in technology solutions, software implementation, or IT strategy for businesses. |
| 15.DKI Management | Software Development/Consultant | A company involved in disaster restoration and recovery services, often managing a network of contractors to help businesses and homeowners after events like floods or fires. |
| 16.Software Consulting, Inc. | Software Development/Consultant | A general software consulting firm that provides various services such as custom software development, system integration, IT strategy, and technology implementation for businesses. |
| 17.Sisense | Engineering Support | A business intelligence and analytics platform that enables users to combine diverse data sources, create interactive dashboards, and share insights within their organizations. |

31

| 18. SendGrid | Customer Communication Platform | (Now part of Twilio) A cloud-based email platform that provides developers and marketers with tools for sending transactional and marketing emails at scale, ensuring deliverability. |
|---|---|---|
| 19. SuperAnnotate | Audio Transcription Service | An AI data annotation platform that helps businesses create high-quality training datasets for computer vision and natural language processing (NLP) models by providing tools for image, video, and text annotation. |
| 20. Mailchimp | Customer Communication Platform | A popular email marketing and marketing automation platform that helps small businesses manage their email lists, design campaigns, and automate their marketing efforts. |
| 21. Mixpanel | Software Development | A product analytics platform that helps businesses understand how users interact with their web and mobile applications, providing insights into user behavior, feature usage, and retention. |
| 22. PopSQL | Engineering Support | A collaborative SQL editor and data visualization tool that allows data teams to write, share, and organize SQL queries and create charts directly from their databases. |
| 23. Intercom | User Support | A customer messaging platform that helps businesses communicate with their customers through live chat, chatbots, email, and in-app messages for support, sales, and marketing. |

| 24. Google Cloud Platform | Identity Management/Access Management | Google's suite of cloud computing services that runs on the same infrastructure Google uses internally. It offers services for computing, data storage, analytics, machine learning, and networking. |
|---|---|---|
| 25. Cloudflare | DNS, CDN, and Application Security | A web infrastructure and website security company that provides content delivery network (CDN) services, DDoS mitigation, internet security, and distributed domain name server (DNS) services. |
| 26. Providigi | Engineering Support | A digital solutions company often focusing on digital marketing, web development, and e-commerce solutions for businesses. |
| 27. Mandrill | Transactional and Triggered Emails | (Now part of Mailchimp) A transactional email API for developers that provides a scalable and reliable way to send automated, data-driven emails (like password resets, order confirmations, etc.). |
| 28. Chameleon Intelligent Tech | In-App Communication | A company specializing in adaptive or personalized technology solutions, potentially leveraging AI to tailor user experiences or system behaviors. |

109.   The information Renaissance provides has little meaning to the average person. It does not adequately notify parents of Renaissance's data practices.

110.   Renaissance provides no links to any of its vendors' terms of use or privacy policies.

111.   On information and belief, student data collected through Renaissance's

platforms is not segregated, and the collection and use of that data is not limited to only the platforms and products licensed by schools. Rather, Renaissance consolidates all of the data it collects from schools and directly from students to enhance its suite of products to facilitate deeper and more individualized analytics, which are marketed to third parties as enabling greater targeting of, and decision-making about, students.

112.    This aggregation and sharing of data is core to Renaissance's data-monetization business model.

### 3.    Renaissance both obtains and discloses student data through third-party data-sharing agreements.

113.    Renaissance also obtains and discloses student data through expansive data-sharing agreements with numerous companies.

114.    These partners include integration partners, service partners, and sales and marketing partners.

115.    Renaissance shares the Stolen Information for its own commercial benefit and the commercial benefit of its partners.

116.    Its primary value to third-party partners depends on maximizing access to student data.

117.    Data exchanged through these partnerships—including children's personal information—enables Renaissance and participating partners to develop, improve, expand, deliver, support, market, and sell their products and services. For example, Classworks, a Renaissance Growth Alliance Partner, is provided access to Star assessment data for the purpose of "generating individualized Learning Paths."

118.    Renaissance markets to its partners "open interoperability," that allows data integration "via our open architecture design and customization capabilities."

119.    Renaissance shares data directly with its partners through its "robust API [Application Programming Interfaces] technology." It "support[s] a vast range of integrations—including SSO [single sign-on] and data exchanges[.]"

120.    Renaissance also shares data through custom Zapier ("Zap") codes—a type of automated workflow used to connect and facilitate data sharing between apps—and single-sign-on integrations.

121.    Through just one of its products—eSchoolData, Renaissance's Student Information System product—Renaissance provides nearly *one hundred third-party entities* access to the Stolen Information as follows:

| Integration | Custom Zap | | API Integration | | Single-Sign On |
|---|---|---|---|---|---|
| | Export | Import | Push | Pull | |
| 1.  Acadience Learning Online | ✓ | | | | |
| 2.  Achieve 3000 | ✓ | | | | |
| 3.  Allergies and Medical Conditions Information | ✓ | | | | |
| 4.  Apple School Messenger | ✓ | | | | |
| 5.  Appetgy | ✓ | | | | |
| 6.  BARS | | | | ✓ | |
| 7.  Blackboard Version 5i Mass Notifications | | | | ✓ | |
| 8.  Blackboard Mobile Communications | | | | ✓ | |
| 9.  Blackboard Mobile Notifications | | | | ✓ | |
| 10. BusBoss (PA Only) | ✓ | | | | |
| 11. Calling System | ✓ | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 12. Canvas | ✓ | ✓ | | | |
| 13. Castle Learning | ✓ | | | | |
| 14. ClassFlow | ✓ | | | | |
| 15. ClassLink | ✓ | | | ✓ | |
| 16. ClassLink - iReady Link | ✓ | | | | |
| 17. Clever | ✓ | | | | |
| 18. Destiny Library Manager | ✓ | | | | |
| 19. eDoctrina (Frontline) | | | ✓ | ✓ | |
| 20. edInsight On Hand (PA Only) | ✓ | | | | ✓ |
| 21. Educational Vistas | | | ✓ | ✓ | |
| 22. Ellevation | ✓ | | | | |
| 23. EPIC Track | ✓ | | | | |
| 24. FastBridge | ✓ | | | | |
| 25. FitnessGram | ✓ | | | | |
| 26. Food Service Solutions | ✓ | | | | |
| 27. Frontline | ✓ | | | | |
| 28. Frontline Health | | ✓ | | | |
| 29. Frontline RTI-Link | ✓ | | | | |
| 30. Frontline: School Health Management | ✓ | | | | |
| 31. Gaggle | ✓ | | | | |

| | | | | |
|---|---|---|---|---|
| 32. Google | ✓ | | | | |
| 33. Hero | ✓ | | | | |
| 34. Houghton Mifflin Harcourt | ✓ | | | | |
| 35. i-Ready | ✓ | | | | |
| 36. i-Ready PA | ✓ | | | | |
| 37. IEP Writer (PA Only) | ✓ | | | | |
| 38. Illuminate (Assessments - DnA) | ✓ | | | | |
| 39. K-12 Alerts | ✓ | | | | |
| 40. Kickboard | ✓ | | | | |
| 41. Learning A-Z | ✓ | | | | |
| 42. Level Data | ✓ | | | | |
| 43. Linkit! | ✓ | | | | |
| 44. Literably | ✓ | | | | |
| 45. Little SIS for Classroom | ✓ | | | | |
| 46. Microsoft | ✓ | | | | |
| 47. McGraw-Hill Education | | | | ✓ | |
| 48. Mosiac | ✓ | | | | |
| 49. Naviance | ✓ | | | | |
| 50. Nutrikids | ✓ | ✓ | | | |
| 51. NWEA | ✓ | | | | |

| | | | | |
|---|---|---|---|---|
| 52. One-to-One Plus | ✓ | | | |
| 53. OneRoster Zap | ✓ | | | |
| 54. OneRoster API | | | ✓ | |
| 55. Orbit Software - Bus Boss | | | ✓ | |
| 56. Operoo | | | ✓ | |
| 57. ParentSquare | | | ✓ | |
| 58. PCS Revenue Control Sys | ✓ | | | |
| 59. Pearson EasyBridge | ✓ | | | |
| 60. Predictive Enrollment Analytics | ✓ | | | |
| 61. PrimeroEdgeFull | ✓ | | | |
| 62. PrimeroEdgeLite | ✓ | | | |
| 63. Relaxx | ✓ | | | |
| 64. Remind | ✓ | | | |
| 65. RightPath by Right Reason Technologies (RRT) | ✓ | | | |
| 66. Routefinder Plus | ✓ | | | |
| 67. Scholarchip | | ✓ | ✓ | |
| 68. School Dismissal Manager | ✓ | | | |
| 69. SchoolMessenger | ✓ | | | |

| | | | | |
|---|---|---|---|---|
| 70. SchoolMessengerRoster | ✓ | | | | |
| 71. SchooLink | ✓ | | | | |
| 72. Schoology | ✓ | ✓ | | | |
| 73. Schoolvision | ✓ | | | | |
| 74. SNAP Health Center | ✓ | | | | |
| 75. Star Renaissance | ✓ | | | | |
| 76. Student Medical Conditions | | ✓ | | | |
| 77. Study Island | ✓ | | | | |
| 78. Tardy Calculator | | | | ✓ | |
| 79. Titan | ✓ | | | | |
| 80. TOOLS4EVER | | | ✓ | ✓ | |
| 81. Transfinder (Routefinder) | ✓ | ✓ | | | |
| 82. Transvera - Tyler | ✓ | | | | |
| 83. Versatrans | ✓ | ✓ | | | |
| 84. Xello | ✓ | | | | |

122.   Renaissance's eSD GURU, a component of eSchoolData, "is both an analytics tool that presents real time data in meaningful ways . . . and a dataflow automation tool that can share data with authorized third-party products."

123.   By way of just *one* example of the 84 companies listed above, Renaissance shares student data with Acadience Learning Online, a data-management platform related to administration, scoring, and reporting of Acadience assessments, as

follows:

| Column Name | Constraints | Description | eSD Business Rules |
|---|---|---|---|
| ID | Required, unique, alphanumeric | Unique identifier of the student. This ID will be referenced in other import files and must be consistent across imports. | Student's assigned ID number |
| Primary ID | Required, unique, alphanumeric | Student's unique Primary ID, usually a district-issued ID. | Student's assigned ID number |
| Secondary ID | Optional, unique, alphanumeric | Secondary ID for a student, sometimes a state-issued ID or other ID that is different from the student's Primary ID. | Student's state ID number if available |
| Last Name | Required, alphanumeric | The student's last name | Student's last name |
| First Name | Required, alphanumeric | The student's first name | Student's first name |
| Nickname | Optional, alphanumeric | A nickname for the student, useful to distinguish students who have the same name | Student's nickname if available |
| Email | Optional, unique, valid email | The student's email address | Student's email address if available |

| DOB | Required, date | The student's date of birth, formatted mm/dd/yyyy | Student's date of birth in MM/DD/YYYY format |
|---|---|---|---|
| Grade Level | Required, alphanumeric | The current grade level in which the student is enrolled. Must be K or 1-6. | Student's current grade level. If the student's current grade level starts with "K" (such as "KA" and "K5A"), "K" will be pulled instead. |
| Teacher ID | Optional, alphanumeric | The ID of the student's teacher of record. If included, this value must match the ID of a teacher in the Staff.csv import file. | Primary key of the student's assigned homeroom teacher if available |
| Gender | Optional, alphanumeric | Allowed values:<br>• Female<br>• Male<br>• Nonbinary | Pull student's identified gender if available ("X" in eSD will be listed as "Nonbinary" in this file), else pull student's birth gender. |
| Race/Ethnicity | Optional, alphanumeric | Allowed values:<br>• American Indian/Alaskan Native<br>• Asian<br>• Black or African American<br>• Hispanic or Latino<br>• Native Hawaiian/Pacific Islander<br>• White non-Hispanic<br>• Two or more races | Pull "Hispanic or Latino" if the student has Hispanic Indicator checked yes. If Hispanic Indicator is not checked yes, pull the following as per the assigned race:<br><br>American Indian/Alaska Native: List "American Indian/Alaskan Native"<br>Asian: List "Asian"<br>Black/African American: |

41

| | | | List "Black or African American"<br>Native Hawaiian/Other Pacific Islander: List "Native Hawaiian/Pacific Islander"<br>White: List "White non-Hispanic"<br>Multiracial: List "Two or more races" |
|---|---|---|---|
| ELL Status | Optional, alphanumeric | Allowed values:<br>• English Speaking/Fluent English Proficient<br>• ELL/LEP | Pull "ELL/LEP" if student has an open 0231 status, else pull "English Speaking/Fluent English Proficient" |
| Section 504 | Optional, alphanumeric | Allowed values:<br>• Yes<br>• No | Pull "Yes" if student has an open 0264 status, else pull "No" |
| Special Education | Optional, alphanumeric | Allowed values:<br>• Yes<br>• No | Pull "Yes" if student has an open SE status or would have a value provided in the "Special Education Category" column, else pull "No" |
| Special Education Category | Optional, alphanumeric | Allowed values:<br>• Autism<br>• Developmental Delay<br>• Deaf-Blindness<br>• Emotional Disturbance<br>• Hearing Impairment<br>• Intellectual Disability<br>• Multiple Disabilities<br>• Orthopedic | Pull value for one of the following open statuses:<br>0352 (Autism) – "Autism"<br>0407 (Deaf) – "Other Health Impairment" (No value for specifically "Deaf" exists in the specs)<br>0484 (Deaf-Blindness) – "Deaf-Blindness"<br>0363 (Emotional |

| | | Impairment<br>• Other Health Impairment<br>• Specific Learning Disability<br>• Speech or Language Impairment<br>• Traumatic Brain Injury<br>• Visual Impairment Including Blindness | Disturbance) – "Emotional Disturbance"<br>0418 (Hearing Impairment) – "Hearing Impairment"<br>0396 (Intellectual Disability) – "Intellectual Disability"<br>0385 (Learning Disability) – "Specific Learning Disability"<br>0473 (Multiple Disabilities) – "Multiple Disabilities"<br>0451 (Orthopedic Impairment) – "Orthopedic Impairment"<br>0462 (Other Health Impairment) – "Other Health Impairment"<br>0429 (Speech or Language Impairment) – "Speech or Language Impairment"<br>0495 (Traumatic Brain Injury) – "Traumatic Brain Injury"<br>0440 (Visual Impairment) – "Visual Impairment Including Blindness"<br><br>"Developmental Delay" will be left unused since there is no appropriate special education status to match it to<br><br>If a student has more than |

| | | | one applicable open status, "Multiple Disabilities" will be pulled |
|---|---|---|---|
| Title 1 Reading | Optional, alphanumeric | Allowed values:<br>• Yes<br>• No | Pull "Yes" if student has an open 0803 status, else pull "No" |
| Title 1 Math | Optional, alphanumeric | Allowed values:<br>• Yes<br>• No | Pull "Yes" if student has an open 0814 status, else pull "No" |

124.    Renaissance also shares data with Acadience Learning Online relating to a student's school, classes, staff, and enrollments.

125.    That level of data sharing is not unique to Acadience Learning Online. By way of another example, below is the student data Renaissance makes available to Ellevation, an EdTech platform owned by Curriculum Associates that provides services related to English Language Learners ("ELLs"):

| Field Headers | Current eSD Business Rules |
|---|---|
| FirstName | First name of student |
| MiddleName | Middle name of student |
| LastName | Last name of student |
| ActiveStatus | Always "Yes" |
| SchoolCode | If GURU's Source Year is the current year, display the location code of the student's current school<br>If GURU's Source Year is the next year, display the location code of the student's scheduling school |

| SchoolName | If GURU's Source Year is the current year, display the school name of the student's current school<br>If GURU's Source Year is the next year, display the school name of the student's scheduling school |
|---|---|
| AlternateSchool | Blank |
| ESLTeacher | Blank |
| StudentID | Student's ID number |
| StudentStateID | Student's ID number |
| GradeLevel | If GURU's Source Year is the current year, check the student's current grade<br>If GURU's Source Year is the next year, check the student's scheduling grade<br><br>1. If the grade starts with "P", display "Pre-K."<br>2. Else display the grade as is. |
| Gender | The gender code of the student. |
| BirthDate | The student's date of birth in MM/DD/YYYY format. |
| AddressLine1 | Display the student's household's mailing street number, street suffix, and street name together. |
| AddressLine2 | Display the student's household's mailing apartment with "Apt:" added at the start, and the student's household's mailing condo/community with "Unit:" added at the start. |
| City | Student's household's mailing city. |

45

| State | Student's household's mailing state abbreviation |
|---|---|
| ZipCode | Student's household's mailing zip |
| HomePhone | Student's household phone number |
| CellPhone | Student's cell phone number |
| BirthCity | Student's birth city |
| BirthCountry | Student's birth country name |
| BirthCountryCode | Student's birth country code (SIF codes) |
| NativeLanguage | Student's language name |
| NativeLanguageCode | Student's language code (SIF codes) |
| HomeLanguage | Student's household's language name |
| HomeLanguageCode | Student's household's language code (SIF codes) |
| Ethnicity | If the student's Hispanic Indicator flag is on, display "Hispanic/Latino", else display "Not Hispanic/Latino" |
| RaceAmericanIndian | Display "Yes" if the student's race is American Indian/Alaska Native or has a multiracial selection for American Indian/Alaska Native |
| RaceAsian | Display "Yes" if the student's race is Asian or has a multiracial selection for Asian |
| RaceBlack | Display "Yes" if the student's race is Black/African American or has a multiracial selection for Black/African American |
| RaceWhite | Display "Yes" if the student's race is White or has a multiracial selection for White |

| | |
|---|---|
| RacePacific | Display "Yes" if the student's race is Native Hawaiian/Other Pacific Islander or has a multiracial selection for Native Hawaiian/Other Pacific Islander |
| ELPDesignation | Display "ELL" |
| LEPStatus | 1. If the student has a current 0231 or 8239 student status, display "Current ELL"<br>2. If the student has a 0231 or 8239 status that has ended less then or at 730 days ago as of today, display "Monitored"<br>3. If the student has a 0231 or 8239 status that has ended more then 730 days ago as of today, display "Fully Exited" |
| CurrentTier | Blank |
| MonitoringStatus | 1. If the student has a 0231 or 8239 status that has ended less then 365 days ago as of today, display "Monitoring Year 1"<br>2. If the student has a 0231 or 8239 status that has ended more then 365 days ago and less than 730 days ago as of today, display "Monitoring Year 2"<br>3. Else display "Not Monitored" |
| ESLProgram | Blank |
| BilingualProgram | Blank |
| ReceivesESLServices | If the student has the following Program Service codes that are current or has ended, display "Yes", else display "No":<br>1. 5698 - (*Last used 2015-2016) LEP Other Program<br>2. 5709 - English as a New Language<br>3. 5687 - One Way or Two Way Dual Language Program |

| | |
|---|---|
| | 4. 5676 - Transitional Bilingual Education (TBE) Program |
| YearsInUSSchools | Display the number of years the student has been enrolled in eSD by their enrollment records, excluding enrollment records where the student has been in a grade level starting with P (PA, PK, PKA, PKF, PKH, PKP, PP, PS, PS2), plus the number of years set in the student's "Years in US Schools (Prior to this System)" |
| DateEnteredUS | Student's Date Enter USA in MM/DD/YYYY format |
| DateEnrolledInUS | Blank |
| DateEnrolledInDistrict | Student's Enrollment Date in MM/DD/YYYY format |
| HomeLanguageSurvey | Blank |
| ParentGrantedPermission | Blank |
| ParentDeniedPermission | Blank |
| DateWithdrawn | Blank |
| DateGraduated | Always blank since the output only sends out active students and a student cannot simultaneously be active and graduated |
| DateDroppedOut | Always blank since the output only sends out active students and a student cannot simultaneously be active and dropped out |
| DateEnteredLEP | Display the start date of the student's 0231 or 8239 status code in MM/DD/YYYY format |

| | |
|---|---|
| DateExitedLEP | Display the end date of the student's 0231 or 8239 status code in MM/DD/YYYY format if the status has ended |
| DateMonitoringStarted | Display the end date of the student's 0231 or 8239 status code in MM/DD/YYYY format if the status has ended |
| Homebound | If GURU's Source Year is the current year: 1. If the student has a current grade enrollment with the override flag on, display "Yes" if its location code override is 0777 and display "No" for any other location code. 2. If the student does not have the above and has a current school enrollment with the override flag on, display "Yes" if its location code override is 0777 and display "No" for any other location code. 3. If the student does not have the above two, display "Yes" if the student's current school has a location code of 0777 and display "No" for any other location code.<br><br>If GURU's Source Year is the next year and the student has a scheduling school with the location code 0777, display "Yes", else display "No" |
| IsMigrant | If the student has a currently active Student Status record with the code 0330 (Migrant (NCLB)), display "Migrant", else display "Not Migrant" |
| Immigrant | If the student's Birth Country is United State of America or has no Birth Country assigned, display "No", else display "Yes" |

| NOM | Blank; field is National Origin Minority and is not captured in eSD |
|---|---|
| RefusedESL | Blank |
| DroppedOut | Always "No" since the output only sends out active students and a student cannot simultaneously be active and dropped out |
| Graduated | Always "No" since the output only sends out active students and a student cannot simultaneously be active and graduated |
| Withdrawn | Blank |
| WithdrawnOrGraduated | Blank |
| Deceased | Always "No" since the output only sends out active students and a student cannot simultaneously be active and deceased |
| Homeless | Display "Yes" if the student has a currently active Student Status record with the code HML (Homeless - inactive - use 8262), 8272 (Homeless Unaccompanied Youth Status) or 8262 (Homeless Student Status), else display "No" |
| GiftedAndTalented | Blank |
| Bilingual | Blank |
| DualLanguageProgram | Blank |
| HasIEP | If the student has any of the following Special Education status code that is currently active, display "IEP", else display "Not IEP": 1. 0352 - Autism 2. 0407 - Deaf 3. 0484 - Deaf-Blindness |

|  |  |
|---|---|
|  | 4. 0418 - Hearing Impairment<br>5. 0385 - Learning Disability<br>6. 0396 - Intellectual Disability<br>7. 0473 - Multiple Disabilities<br>8. 0451 - Orthopedic Impairment<br>9. 0462 - Other Health Impairment<br>10. 5786 - Pre-School Student with a Disability<br>11. 0429 - Speech or Language Impairment<br>12. 0495 - Traumatic Brain Injury<br>13. 0440 - Visual Impairment<br>14. SE - Special Education |
| Is504 | If the student has any of the following Special Education status code that is currently active, display "504", else display "Not 504":<br>1. 0264 - 504 Plan in place<br>2. 5775 - Eligible for safety net in All Subjects<br>3. 0550 - 504 w/Safety Net [English] RETIRED 6-30-2018<br>4. 0583 - 504 w/Safety Net [Global H&G] RETIRED 6-30-2018<br>5. 0572 - 504 w/Safety Net [Math] RETIRED 6-30-2018<br>6. 0605 - 504 w/Safety Net [Science] RETIRED 6-30-2018<br>7. 0594 - 504 w/Safety Net [US H&G] RETIRED 6-30-2018 |
| SIFE | If the student has a currently active Student Status record with the code 1232 (Students with Inconsistent/Interrupted Formal Education (SIFE)), display "SIFE", else display "Not SIFE" |
| HomeLanguageSurveyOnRecord | Blank |
| DyslexiaProgram | Blank |

| ParentDeniedBilingualEd | Blank |
|---|---|
| AsyleeOrRefugee | Blank |
| FatherName | First name and last name of the student's contact with the "Father" relationship and either is a Guardian with the correspondence flag on or is an Emergency Contact. If there are multiple "Father" contacts, use the contact first entered in the eSD system. |
| FatherPhone | First entered phone number of the student's contact with the "Father" relationship and either is a Guardian with the correspondence flag on or is an Emergency Contact. If there are multiple "Father" contacts, use the contact first entered in the eSD system. |
| FatherEmail | First entered email of the student's contact with the "Father" relationship and either is a Guardian with the correspondence flag on or is an Emergency Contact. If there are multiple "Father" contacts, use the contact first entered in the eSD system. |
| FatherWorkplace | Employer name of the student's contact with the "Father" relationship and either is a Guardian with the correspondence flag on or is an Emergency Contact. If there are multiple "Father" contacts, use the contact first entered in the eSD system. |
| FatherNeedsInterpreting | If the student's contact with the "Father" relationship and either is a Guardian with the correspondence flag on or is an Emergency Contact is in the same household as the student and the household has the "Language Translation Needed" flag on, display "Yes", else display "No". If there are multiple "Father" |

| | contacts, use the contact first entered in the eSD system. |
|---|---|
| MotherName | First name and last name of the student's contact with the "Mother" relationship and either is a Guardian with the correspondence flag on or is an Emergency Contact. If there are multiple "Mother" contacts, use the contact first entered in the eSD system. |
| MotherPhone | First entered phone number of the student's contact with the "Mother" relationship and either is a Guardian with the correspondence flag on or is an Emergency Contact. If there are multiple "Mother" contacts, use the contact first entered in the eSD system. |
| MotherEmail | First entered email of the student's contact with the "Mother" relationship and either is a Guardian with the correspondence flag on or is an Emergency Contact. If there are multiple "Mother" contacts, use the contact first entered in the eSD system. |
| MotherWorkplace | Employer name of the student's contact with the "Mother" relationship and either is a Guardian with the correspondence flag on or is an Emergency Contact. If there are multiple "Mother" contacts, use the contact first entered in the eSD system. |
| MotherNeedsInterpreting | If the student's contact with the "Mother" relationship and either is a Guardian with the correspondence flag on or is an Emergency Contact is in the same household as the student and the household has the "Language Translation Needed" flag on, display "Yes", else display "No". If there are multiple |

| | |
|---|---|
| | "Mother" contacts, use the contact first entered in the eSD system. |
| EmergencyContactName | First name and last name of the student's Emergency Contact with the highest priority among the student's other Emergency Contacts |
| EmergencyContactPhone | Phone number of the student's Emergency Contact with the highest priority among the student's other Emergency Contacts |
| EmergencyContactEmail | Email of the student's Emergency Contact with the highest priority among the student's other Emergency Contacts |
| EmergencyContactWorkplace | Blank |
| EmergencyContactNeedsInterpreting | Blank |
| GuardianName | First name and last name of the student's Guardian with the Correspondence flag on and with the highest priority among the student's other Guardians |
| GuardianPhone | First entered phone number of the student's Guardian with the Correspondence flag on and with the highest priority among the student's other Guardians |
| GuardianEmail | First entered email of the student's Guardian with the Correspondence flag on and with the highest priority among the student's other Guardians |
| GuardianNeedsInterpreting | If the student's Guardian with the Correspondence flag on and with the highest priority among the student's other Guardians is in the same household as the student and the household has the "Language Translation |

| | |
|---|---|
| | Needed" flag on, display "Yes", else display "No". |
| SpecialEdAndECInfo | If the student has any of the following Special Education status code that is currently active, display one of those status codes, else leave blank<br>1. 0352 - Autism<br>2. 0407 - Deaf<br>3. 0484 - Deaf-Blindness<br>4. 0418 - Hearing Impairment<br>5. 0385 - Learning Disability<br>6. 0396 - Intellectual Disability<br>7. 0473 - Multiple Disabilities<br>8. 0451 - Orthopedic Impairment<br>9. 0462 - Other Health Impairment<br>10. 5786 - Pre-School Student with a Disability<br>11. 0429 - Speech or Language Impairment<br>12. 0495 - Traumatic Brain Injury<br>13. 0440 - Visual Impairment<br>14. SE - Special Education |
| StudentComment | Student's comments as found on their registration page. |

126.   Renaissance states that the Ellevation Zap "includes a wealth of student data fields" and "allows school districts to automatically send their data [collected by Renaissance] to Ellevation on a nightly basis."

127.   The foregoing illustrates data shared with just two of Renaissance's partners, of which *nearly 100* are currently listed. Thus, through its suite of K-12-marketed products, Renaissance and innumerable third parties generate and gain access to an enormous volume of data from and about students.

### III. Renaissance fails to obtain effective consent for its generation, extraction, use, and disclosure of children's personal and private information.

128. Renaissance fails to obtain effective consent for its sweeping generation, collection, and use of users' data, including personal information of students. Specifically, Renaissance fails to (1) provide adequate information to support informed consent, (2) obtain consent from a person with authority to do so, (3) determine whether students' use of its products is voluntary, and (4) provide students proper consideration in exchange for any purported agreement to its data practices.

### A. <u>Any consent is not informed</u>: Renaissance fails to provide sufficient, comprehensible information to support informed consent.

129. Consent is effective only if the aggrieved person consented to the particular conduct, or to substantially the same conduct, and if the alleged tortfeasor did not exceed the scope of that consent.

130. Renaissance is required to provide disclosures regarding its data practices that a reasonable user would understand and know what they were consenting to.

131. Further, before collecting personal information from children under 13, Renaissance is also required to provide parents notice of its data practices that is "clearly and understandably written, complete," and contains "no unrelated, confusing, or contradictory materials." *See* 15 U.S.C. § 6502; 16 C.F.R. § 312.4.

132. Informed consent is not possible because Renaissance does not provide information regarding its data practices necessary to support informed consent.

133. A reasonable user cannot understand Renaissance's data practices by reviewing Renaissance's disclosures.

134. Renaissance fails to provide information that may be reasonably understood as disclosing (1) the data it collects on students; (2) the ways in which it will use such data; (3) the entities that will have access to such data; and (4) the ways in which those entities will use such data.

135.    Renaissance also fails to provide parents of students under 13 notice of its data practices that is clearly and understandably written, complete, and contains no unrelated, confusing, or contradictory materials.

136.    In fact, a reasonable person may not even definitively determine which disclosures govern students' use of Renaissance's products, which are linked throughout its website and which users must access to obtain information about Renaissance's data practices.

137.    Information relating to Renaissance's data practices and those of its third-party partners are scattered across its own sprawling website and others. Such information may be or appears to be found at least at the following locations:

    a.  Notice of Renaissance's Practices Relating to Children's Online Privacy (https://renaissance.widen.net/view/pdf/9hoolemzvy/Renaissance---Childrens-Privacy-Notice.pdf?t.download=true&u=zceria)

    b.  Renaissance Categories of Data Collected by Product (https://renaissance.widen.net/view/pdf/dyg5r6yjs8/Categories-of-Data-Collected-by-Product.pdf?u=zceria&t.download=true)

    c.  Renaissance Terms of Use Agreement (https://www.renaissance.com/terms-of-use/)

    d.  Renaissance Privacy Hub (https://www.renaissance.com/privacy/)

    e.  Renaissance Information Security Overview (https://renaissance.widen.net/view/pdf/9szilnvy9k/Information-Security-Overview.pdf?t.download=true&u=zceria)

    f.  United States Customer Data Protection Agreement (https://renaissance.widen.net/view/pdf/rtvix11tcw/US-Terms-of-Service-and-License---Exhibit-D---Personal-Data-Annex.pdf?u=zceria)

    g.  Renaissance Trust Center (https://trust.renaissance.com/?_gl=1*tuwazp*_gcl_au*MTQ3MDE4Mj

E1Mi4xNzQyNDAxNDA5)

 h. Renaissance Cookie Notice (https://www.renaissance.com/cookie-notice/)

 i. Renaissance List of Vendors (https://renaissance.widen.net/view/pdf/yvg6muiwxr/Vendors---Sub-Processors-Supporting-Renaissance-Products.pdf?t.download=true&u=zceria)

 j. The terms, conditions, privacy policies, and data-sharing agreements of Renaissance's innumerable service providers and data-sharing partners.

138. Further, Renaissance's various terms and policies also reference other materials that are not readily available to parents. For example, the Notice of Renaissance's Practices Relating to Children's Online Privacy states that its use and processing of the personal information it collects is governed by agreements with the schools and that those schools may have their own privacy policies that govern the personal information collected in connection with their use of Renaissance products. The policy also states that "the policies of the applicable school govern how they process and share personal information relating to the products, including with respect to any rights users may have to such personal information."

139. Renaissance also fails to provide public access to a number of other relevant documents, as follows:

 a. Information Security Overview 2025;

 b. Acceptable Use Policy;

 c. Business Continuity Management Policy;

 d. Customer Data Confidentiality Policy;

 e. Incident Response Plan;

 f. Information Security Policy; and

 g. Vendor Management Policy.

140.    Therefore, even if a parent was notified that their child would be using Renaissance products at school, it would be impossible for that parent to understand Renaissance's data practices as necessary to support their informed consent to those practices on behalf of their child.

141.    Indeed, it is impossible for any reasonable person to fully understand the extent of Renaissance's and its partners' generation, collection, aggregation, use, and sharing of personal information belonging to parents or their school-aged children.

142.    Renaissance's disclosures thus fail to meet generally applicable data-privacy standards, as well as the heightened requirements of COPPA. *See* 15 U.S.C. § 6502; 16 C.F.R. § 312.4.

**B.    <u>Consent is not obtained from a person with authority</u>: Renaissance does not obtain parental consent before it generates, collects, uses, and discloses children's personal information.**

143.    Renaissance does not obtain effective parental consent to generate, collect, use, or disclose children's personal and private information.

144.    As previously detailed, Renaissance collects data directly from school-aged children—including their personal and personally identifiable information—through children's use of its products. And Renaissance retains, processes, and shares that data and its data-derivative products with a host of third parties for commercial purposes.

145.    Because minors are not legally competent to provide valid, binding consent, the collection of data from children requires parental consent.

146.    In addition to these general standards governing consent, COPPA contains a heightened parental-consent requirement that Renaissance must meet before it may collect personal information from children under 13. *See* 16 C.F.R. § 312.5. Specifically, COPPA requires that Renaissance "obtain verifiable parental consent before any collection, use, or disclosure of personal information from children,

including consent to any material change in the collection, use, or disclosure practices to which the parent has previously consented." *Id*. § 312.5(a)(1). Renaissance does not obtain such consent and does not meet any of the exceptions to COPPA's consent requirements. *Id*. § 312.5(c).

147. Renaissance at no time obtains effective consent from parents for its generation, collection, or use of children's data as described herein, under generally applicable standards or the heightened standards of COPPA.

148. Instead, for children under 13, Renaissance purports to shift the responsibility to schools of obtaining parental consent for Renaissance's creation, collection, and use of student data without obtaining any manifestation of assent by students or parents themselves.

149. Renaissance's privacy policy also states that "[t]he school may consent to the collection, use or disclosure of Personal Information from Children by agreeing to use or purchase the products." That is false.

150. Schools do not own the personal and private information that Renaissance generates about students or extracts directly from students.

151. School administrators are not legal guardians of students.

152. Students have significant privacy and property rights in their own personal and private information.

153. Schools cannot legally consent—in lieu of parents or over parents' objections—to the collection, use, and disclosure of personal information about and belonging to children by a third party, particularly a privately-owned, for-profit technology company for commercial purposes, even if such collection and use may confer a benefit to schools that is administrative, pedagogical, or otherwise.

154. Schools do not control the generation, collection, storage, use, or disclosure of student data by Renaissance or any third party to which Renaissance grants access to student data.

155.   Students retain significant, legally protected privacy interests in their personal information contained within education records.

156.   Renaissance generates and obtains student data in excess of education records.

157.   Renaissance generates, obtains, and uses student data in excess of legitimate educational interests.

158.   Renaissance rediscloses personal information to a host of third parties without prior parental knowledge or consent.

159.   Schools do not obtain effective parental consent to Renaissance's collection and use of student information as a parent's agent or intermediary, not least because schools lack the information necessary to support informed consent, as described herein.

160.   Parents are entitled to be fully informed of Renaissance's data practices and how those practices will affect their children. Once fully informed, parents have the right to decide whether to subject their children to those risks in exchange for valuable consideration beyond the education services to which children are already entitled.

161.   Renaissance thus collects, uses, and discloses children's personal and private information without obtaining effective consent.

**C.    <u>Consent is not voluntary</u>: Students' use of Renaissance's products is not voluntary as would be necessary to support their agreement to Renaissance's data practices.**

162.   Voluntariness is an essential element of contract formation.

163.   A party seeking to prove the existence of an enforceable contract must prove that it was entered into voluntarily.

164.   Every state has compulsory education laws.

165.   Schools use Renaissance's products to support a host of pedagogical,

administrative, and other functions.

166. Students are not given a choice regarding whether to use Renaissance's products at their school or whether Renaissance may take their personal information.

167. Students are not able to opt out of using Renaissance's products at school.

168. Even if students theoretically could opt out of using Renaissance's products and having Renaissance take their personal and private information, Renaissance may not place students and their parents in the position of having to choose between their rights to privacy and their right to an education, or risk compromising their relationship with school personnel. Such inherently coercive circumstances do not support voluntary consent.

169. Because students and parents lack the ability to decline or avoid use of Renaissance's products and have their personal information taken by Renaissance, any purported agreement by them to Renaissance's terms and policies is ineffective and unenforceable.

**D.** **Consent is not supported by consideration**: **Renaissance does not provide students sufficient consideration necessary to support any agreement to its data practices.**

170. Consideration, or the legal exchange by parties of something of value, is an essential element of contract formation.

171. In order to be enforceable, contracts must be supported by sufficient consideration.

172. Every state has laws guaranteeing children the right to an education.

173. That right includes the right for students to avail themselves of products and services offered by an education institution.

174. Schools use Renaissance's products to support a host of pedagogical, administrative, and other functions.

175. Students' use of Renaissance's products is thus a part of the education to

which they are already legally entitled.

176.    Renaissance does not offer parents or students any additional benefit beyond those to which students are already entitled that might constitute sufficient consideration to support any agreement to Renaissance's terms and policies, including those governing Renaissance's data practices.

177.    Any purported agreement between Renaissance and students or their parents is not supported by the exchange of any new, additional benefit.

178.    Without consideration, Renaissance may not establish the existence of any agreement between Renaissance and the students whose information it generates, takes, and uses for commercial purposes or their parents.

**IV.    Renaissance makes false and misleading statements about its data practices on which it intends the public, school personnel, and parents to rely.**

179.    Renaissance makes false and misleading statements about its data practices and its commitment to privacy on which it intends the public, schools, and parents to rely.

**A.    Renaissance falsely states that it prioritizes privacy.**

180.    Renaissance falsely touts that it is "committed to the privacy and security of your Data."

181.    Renaissance falsely states that it "take[s] your privacy seriously. Truly."

182.    Renaissance misleadingly states that it is "<u>not</u> in the business of selling data," while failing to disclose to decision-makers that it makes the Stolen Information widely available to third parties under expansive data-sharing agreements that are not publicly disclosed.

**B.    Renaissance falsely states that its products may be used in compliance with FERPA.**

183.    In its privacy policies posted on its website, Renaissance falsely states that it complies with FERPA.

184.   Renaissance falsely states that it "has met the criteria for being a 'School Official' with Legitimate Educational Interests" (as those terms are used in FERPA)[.]"

185.   Renaissance falsely states that "it will not redisclose such Education Records or Personally Identifiable Information except with Authorization from Customer[.]"

186.   Renaissance does not meet the definition of "school official" under FERPA.

187.   Schools do not control the maintenance and use of the personal information that Renaissance collects from children, including education records.

188.   Renaissance does not only receive students' personal information from schools: it generates and takes such information directly from students.

189.   Renaissance generates and takes personal and private information of students in excess of "education records" as defined by FERPA.

190.   Renaissance generates, takes, uses, and discloses student data more than legitimate educational interests as contemplated by FERPA.

191.   Renaissance rediscloses the Stolen Information to a host of third parties without prior parental consent, which is expressly prohibited even under the school-official exception. Renaissance may not stand in as the school, and the school may not stand in as the parent.

**C.    Renaissance falsely states that it is COPPA compliant.**

192.   In its privacy policies posted on its website, Renaissance repeatedly and falsely states that it complies with COPPA.

193.   In fact, Renaissance violates numerous provisions of COPPA.

194.   Renaissance fails to provide parents complete, understandable notice of its data practices.

195.   Renaissance fails to obtain parental consent before taking and using children's personal information.

196.   Renaissance fails to provide parents the ability to access and review the data of students under 13 it has generated and collected.

197.   Renaissance falsely states that schools may consent to the taking of children's information on behalf of parents. In fact, COPPA expressly requires parental consent, and specifies that it must be obtained by the *company*, not schools. Lawmakers and regulators have expressly and repeatedly declined to adopt a school exception to COPPA's parental-consent requirements.

198.   Renaissance falsely states that it "only collects information from a Child that is reasonably necessary for the Child to use the Products for purposes authorized by a School." Renaissance obtains far more information than is reasonably necessary to provide children and schools education services, including data obtained to develop and market the products of Renaissance and myriad third parties.

199.   Renaissance falsely states that parents must direct their requests to access their children's data to their child's school. But COPPA does not permit Renaissance to shift its duty to provide parents access to their child's data to a school.

200.   Further, schools are not able to facilitate such requests.

201.   Students and parents thus cannot know the full extent of the data Renaissance obtains about them, whether that data is accurate, how that data is stored, how long that data is retained, who has access to that data, or how that data or data-derivative information or products are used.

**D.    Renaissance intends that the public rely on its misrepresentations.**

202.   Renaissance intends that the public—including school personnel and parents—rely on these statements in determining whether and how to use its products.

203.   Parents rely on these statements either directly or indirectly through their school administrators, who rely on these misrepresentations in deciding to utilize Renaissance's products. If school personnel had not been misled as to Renaissance's data practices, they would not have subjected students—especially young children—

65

to those practices. Schools' use of Renaissance's products thus permits an inference that they relied on Renaissance's material, false representations about its data practices.

204.   Further, these false and misleading statements were likely to mislead and deceive the public and harm the public interest. The public has an interest in protecting children from Renaissance's harmful data practices, especially while attending school and participating in essential school activities, such as completing assignments and communicating with teachers.

## V.   Renaissance's nonconsensual data practices harm children.

205.   Renaissance's surreptitious data practices are not benign. Rather, they harm children in myriad ways that are immediate, long-lasting, substantial, and concealed.

### A.    Renaissance harms children by invading their privacy.

206.   When a person's privacy is invaded, especially a child's privacy, the invasion is the harm.

207.   A person's right to privacy begins with protection from having information created about them in the first instance.

208.   A person's right to privacy also encompasses their right to control information concerning themselves once created. Loss of such control harms their ability to, among other things, manage and minimize risk.

209.   Privacy extends to vital rights such as freedom of thought, freedom from surveillance and coercion, protection of one's reputation, and protection against unreasonable searches and takings.

210.   As former FTC Commissioner Noah Joshua Phillips observed, "[t]he United States has a proud tradition of considering and protecting privacy, dating back

to the drafting of the Constitution itself."[12]

211.   Renaissance uses the Stolen Information in countless ways that infringe upon many time-honored privacy rights of children and their parents.

212.   Renaissance's data practices forever wrest from children and their parents' control over children's personal information, including the right to decide whether such information is created in the first place.

213.   Renaissance even fails to provide children and parents with an understanding of what information it generated and took, who accessed it, and how it was used.

214.   Renaissance generates and collects, for its own commercial benefit, data about public-school children while they use its platform as part of their legally required education. Doing so without parental notice or consent is conduct that is highly offensive to a reasonable person and constitutes an egregious breach of social norms.

**B.    Renaissance harms children by persistently surveilling them.**

215.   Renaissance harms children by persistently surveilling and monitoring them while they use its products.

216.   Research has shown that persistent surveillance decreases opportunities for children to exercise autonomy and independence. Persistent surveillance hinders children's development of self-regulation and decision-making that are crucial to aspects of responsibility and self-identity.[13]

217.   Continuous surveillance can also increase passivity and self-censorship in children rather than genuine expression, compromising their rights to freedom of

---

[12] Noah Joshua Phillips, *Taking Care: The American Approach to Protecting Children's Privacy*, U.S. Federal Trade Commission, Nov. 15, 2018, available at https://www.ftc.gov/system/files/documents/public_statements/1422695/phillips_-_taking_care_11-15-18_0.pdf (last accessed May 1, 2025).

[13] Caroline Stockman and Emma Nottingham, *Surveillance Capitalism in Schools: What's the Problem?*, Digital Culture & Education (2022) at 6.

thought, conscience, communication, creativity, and speech.[14]

218.   Continuous surveillance emphasizes compliance with the current social order instead of the cultivation of identity and dignity.[15]

219.   Persistent surveillance at school normalizes surveillance in other areas of life and trains children not to value their own and others' privacy and autonomy.[16]

220.   It also normalizes the exploitation of children, their personal information, and their educational development for third-party commercial gain without knowledge, consent, or compensation.[17]

221.   The oppressive effect of Renaissance's surveillance practices is proportional to the invisibility and pervasiveness of those practices.[18]

**C.    Renaissance harms children by compromising the security of their personal and private information.**

222.   By collecting and storing a child's personal information—and by creating information about her that did not previously exist—Renaissance forever jeopardizes that information by making it vulnerable to a host of data security risks.

223.   Rates of cybercrime are steadily rising, including mass data breaches.

224.   Schools and school districts have been particularly and increasingly targeted by cybercriminals in recent years, which has resulted in leaks of highly personal and sensitive information about children, some of which perpetrators have made publicly available.

225.   Another major student information system was hacked in December 2024, compromising the personal and private information of tens of millions

---

[14] *Id*.
[15] *Id*.
[16] Stockman, Nottingham, *supra*, at 6.
[17] *Id*. at 7.
[18] *Id*. at 3.

of students spanning decades.[19]

226.   In fact, in August 2022, Renaissance acquired Illuminate Education, a company that had suffered a major data breach just two months earlier. That breach exposed the personal information of nearly a million current and former students. In response, the New York City Department of Education discontinued the use of Illuminate Education's products and instructed schools to do the same. Notably, despite having signed a data privacy and security agreement with the district that required student information to be encrypted, Illuminate Education had failed to implement encryption at the time of the breach.

227.   Exposures like these can have immediate and long-term consequences for children. As explained by one cybersecurity professional, whose son's school was hacked, "It's your future. It's getting into college, getting a job. It's everything."[20]

228.   Moreover, once compromised, cybercriminals can exploit various tools— such as messaging features—on EdTech platforms to carry out nefarious activities targeting its users.

229.   Renaissance's data policies and practices thus unduly compromise the security of the Stolen Information. And the resulting harms and risks of harms are exacerbated by the sheer volume of data generated and collected by Renaissance and the number of entities that receive access to it. Once such data is unlawfully obtained, the harms are irreversible.

230.   Children's data is further compromised by Renaissance's policy and

---

[19] Zack Whittaker, *Malware Stole Internal PowerSchool Passwords From Engineer's Hacked Computer*, TechCrunch, Jan. 17, 2025, available at https://techcrunch.com/2025/01/17/malware-stole-internal-powerschool-passwords-from-engineers-hacked-computer/ (last accessed May 1, 2025).

[20] Natasha Singer, *A Cyberattack Illuminates the Shaky State of Student Privacy*, The New York Times, July 31, 2022, available at https://www.nytimes.com/2022/07/31/business/student-privacy-illuminate-hack.html (last accessed May 1, 2025).

practice of providing access and otherwise sharing that information with an ever-growing multitude of third parties.

231.   In sum, Renaissance's data policies and practices harm families from the moment their personal information is generated and taken by Renaissance. That harm is exacerbated by Renaissance's persistent storage, use, and disclosure of the Stolen Information.

### D.   Renaissance harms children by affecting their access to information and opportunities through algorithmic profiling.

232.   As described herein, Renaissance uses the Stolen Information to create products that purport to analyze and predict student performance and behavior.

233.   Renaissance markets these analytics to its customers for use in wide-ranging decision-making about children, a practice known as algorithmic profiling. Such analytics purport to help teachers and administrators "personalize" a child's curriculum and learning plan, understand a child's strengths and weaknesses, identify a student's individual education goals, formulate plans for reaching those goals, and a host of other predictions and recommendations for purportedly better management of the child.

234.   Renaissance's algorithms attempt to gather children's knowledge, understanding, and potential to reduce them to quantifiable analytics. In doing so, there is an inherent sacrifice of accuracy, nuance, and privacy for efficiency, measurability, and scalability.

235.   These models define their own metrics, which Renaissance uses to justify their results, creating and perpetuating a pernicious and untested feedback loop.

236.   Some of Renaissance's platforms are designed to assist colleges and employers with recruitment by providing them access to data-derived student "insights."

237.   By generating these predictions on which myriad third parties rely in

making consequential decisions affecting children, Renaissance produces and sells the equivalent of credit reports on children in every domain over which Renaissance claims algorithmic expertise.

238.    The datafication of a child and their learning process, for commercial purposes, brings about a social disempowerment that negatively affects the child's education in the moment of learning and, therefore, the future of a free and sustainable society.[21]

### E.    Renaissance harms families by denying them access to their data and subjecting them to practices that are opaque, unreviewable, and unappealable.

239.    Beyond taking and using children's and parents' personal information for purposes of algorithmic profiling, Renaissance denies children and their parents the ability to access and review the data it takes from them and understand how it is used and who has access to it.

240.    Further, the algorithmic models on which Renaissance's products are built are entirely opaque.

241.    Families are thus unable to review the data collected and aggregated about them, the algorithmic models used to generate predictions, or the assumptions on which those models are based or otherwise understand how their data is processed, interpreted, and used.

242.    As previously discussed, schools and other third parties may rely on the data taken by Renaissance and the data-derived products generated by Renaissance to make decisions that affect children's lives now and in the future.

243.    Renaissance's practices harm families by denying them the ability to:

---

[21] *See, e.g.*, Nottingham, Stockman, Burke, *Education in a datafied world: Balancing children's rights and school's responsibilities in the age of COVID 19*, Computer Law & Security Review (July 2022) available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8958095/pdf/main.pdf.

(1) assert their rights by providing—or declining to provide—informed consent before their information is irreversibly compromised; (2) respond effectively to issues involving their personal information; or (3) make meaningful decisions regarding the collection, storage, and use of their information. Families are also unable to know and object to the predictions generated by unknown data and to how third parties might (and do) use those predictions.

244. By denying families the ability to review and understand this information—thereby denying them the ability to identify, assess, and seek redress of attendant harms—these practices are deceptive, unfair, and unconscionable, especially given that Renaissance conscripts children into this opaque corporate apparatus without parental notice or consent in the first instance.

### F. Renaissance harms children by failing to compensate them for their property and labor.

245. Renaissance's data practices also harm students in the form of diminution of the value of their private and personally identifiable data, without compensation.

246. Personal data is a form of currency.

247. There has long been a growing consensus that consumers' sensitive and valuable personal information would become the new frontier of financial exploitation.

248. A robust market exists for user data, especially children's personal information. User data has been analogized to the "oil" of the digital economy.[22]

249. Furthermore, most consumers value their data and their privacy. Accordingly, an overwhelming majority engage in efforts to protect their data: 86 percent of United States consumers report caring about data privacy and wanting more control; 79 percent are willing to spend time and money to protect their data; and nearly

---

[22] *The World's Most Valuable Resource is No Longer Oil, But Data*, The Economist, May 6, 2017, available at https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data (last accessed May 1, 2025).

half have terminated relationships with both online and traditional companies over data-privacy concerns, especially younger consumers.[23]

250.    The EdTech market is valued at nearly a quarter of a trillion dollars.[24] The broader market for data, especially for children's personal information, is larger still.

251.    The Stolen Information at issue has significant economic value.[25]

252.    Renaissance profits from students by acquiring their sensitive and valuable personal information, which includes far more than mere contact information necessary for obtaining consent, such as name, birth date, and email address.

253.    Renaissance then provides access to this data to myriad third parties for a host of unknown purposes, all without the knowledge of students and their parents.

254.    Renaissance further purports to reserve for itself broad, perpetual rights to retain and use students' personal and private information for its own commercial gain without providing consideration or compensation to them or their parents.

255.    By generating, collecting, using, and disclosing the Stolen Information,

---

[23] Cisco, *Consumer Privacy Survey: Building Consumer Confidence Through Transparency and Control* at 5 (2021), https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-cybersecurity-series-2021-cps.pdf (last accessed May 1, 2025).

[24] Louise Hooper, *et al.*, *Problems with Data Governance in UK Schools*, Digital Futures Commission, 5Rights Foundation (2022), https://digitalfuturescommission.org.uk/wp-content/uploads/2022/08/Problems-with-data-governance-in-UK-schools.pdf (last accessed May 1, 2025).

[25] *See, e.g.*, Brendan Hesse, *Get Paid to Watch Ads in the Brave Web Browser*, Life Hacker, Apr. 26, 2019, available at https://lifehacker.com/get-paid-to-watch-ads-in-the-brave-web-browser-1834332279 (last accessed May 1, 2025); *The More You Share, the More You Earn*, Reklaim, available at https://www.reklaimyours.com/how-to-earn (last accessed May 1, 2025); Kevin Mercadante, *10 Apps for Selling Your Data for Cash*, Wallet Hacks, Nov. 18, 2023, available at https://wallethacks.com/apps-for-selling-your-data/ (last accessed April 4, 2025); *Facebook Launches App That Will Pay Users For Their Data*, The Guardian, June 11, 2019, https://www.theguardian.com/technology/2019/jun/11/facebook-user-data-app-privacy-study (last accessed May 1, 2025).

Renaissance has diminished the value of that information and students' future property interest.

256.    Renaissance has also deprived students of their choice whether to participate in the data market at all.

257.    Renaissance's actions have thus caused students economic injury.

**G.    Renaissance harms children by forcing them to choose between their right to an education and other fundamental rights.**

258.    Renaissance forces families into the untenable position of having to choose between their right to an education and other fundamental rights, such as their rights to privacy and property.

259.    Recent research shows that nearly 80 percent of adults reported being very or somewhat concerned about how companies use data collected about adults,[26] and the number of those concerned about their online privacy is growing quickly.

260.    Protective behaviors are on the rise, with 87 percent of adults in the United States using at least one privacy- or security-protecting tool online.[27]

261.    An even greater percentage of parents value protecting their children's personal data, including their identity (90%), location (88%), health data (87%), age (85%), school records (85%), and browsing history (84%).[28]

262.    By inserting itself between schools and families, Renaissance has driven

---

[26] Brooke Auxier, et al., *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, Pew Research Center, Nov. 15, 2019, available at https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/ (last accessed May 1, 2025).

[27] Stephanie Liu, *US Consumer Privacy Attitudes In 2022*, Forrester, Sept. 28, 2022, available at https://www.forrester.com/blogs/us-consumer-privacy-attitudes-in-2022/ (last accessed May 1, 2025).

[28] *Polling Memo: Parents' Views on Children's Digital Privacy and Safety*, Trusted Future (2022), available at https://trustedfuture.org/childrens-digital-privacy-and-safety/ (last accessed May 1, 2025).

a wedge between school personnel and parents, leaving parents reluctant to press their schools for information regarding Renaissance's data practices or request that their children be alternatively accommodated.

263.    Parents fear becoming adversarial with their children's schools and the possible repercussions they or their children might suffer if they are perceived as difficult or meddlesome, including stigmatization or retaliation by school personnel. Renaissance has thus chilled parental efforts to inquire and object to its data practices.

264.    Children and their parents are particularly vulnerable and disempowered to protect themselves against Renaissance's policies and practices.

265.    Renaissance should not be permitted to use schools as a shield against parent inquiry and concern. Rather, Renaissance should be made to account for its data practices directly to the people adversely affected by them.

266.    As such, Renaissance forces children and parents to choose between equal access to education on one hand, and other basic rights, such as rights to privacy and property, on the other conduct and practices, as described in this complaint, irreparably damage students by invading their privacy and their ability to control their own personal rights and data.

**H.    Renaissance's nonconsensual data practices are unfair and unlawful.**

267.    Renaissance has realized massive profit through its generation, collection, and analysis of children's personal information—without effective consent, and without compensating them for actively and passively providing that information.

268.    This one-sided arrangement—whereby Renaissance earns vast revenues each year from the personal information of children gathered through the compelled use of its products, and all children receive in return is an education to which they are already legally entitled—is particularly unjust given the core philanthropic purpose and compulsory nature of education.

269.    Through its false representations and surreptitious data practices,

Renaissance is unjustly enriching itself at the cost of children's privacy, security, and autonomy, when children would otherwise have the ability to choose how they would monetize their own data—or decide not to. School-aged children and their parents should not be made to bear these risks and harms for the benefit of a private, for-profit corporation.

## VI.    Plaintiff-specific allegations.

### A.    Plaintiffs used Renaissance products, which widely generated, collected, use, and share Plaintiffs' personal information.

270.    Plaintiffs used Renaissance products for school purposes.

271.    Plaintiffs' use of Renaissance products was mandatory.

272.    Plaintiffs were unable to opt out of using Renaissance products.

273.    Renaissance has shared and continues to share Plaintiffs' data across its suite of products.

274.    Renaissance processes and uses information generated, uploaded, or stored in Renaissance databases, including data and information about and belonging to Plaintiffs, for commercial purposes.

275.    Renaissance uses this information to develop, improve, and market its products and for other commercial purposes.

276.    Renaissance uses Plaintiffs' data generated and/or provided by schools to develop its analytics tools, which it sells to Plaintiffs' school and school district.

277.    Renaissance has provided third parties personally identifying data belonging to Plaintiffs for commercial purposes, including identification, marketing, targeting, influencing, and decision-making purposes.

278.    Renaissance has enabled third parties to directly collect Plaintiffs' personal information.

**B.    Plaintiffs have never consented to Renaissance's collection and use of their data.**

279.    Plaintiffs did not, and do not, provide effective, informed, voluntary, and ongoing consent to Renaissance's collection and use of their data for any purpose, let alone commercial purposes.

280.    Renaissance never notified Plaintiff Reisberg that Plaintiffs M.C. 1 and M.C. 2 were using Renaissance products.

281.    Plaintiffs were never provided material terms regarding Renaissance's data practices, such as what personal information Renaissance is collecting, how it is used, who else can access and has accessed it, or the risks of harm those practices pose to Plaintiffs.

282.    Plaintiffs were unable to obtain information relating to or arising from Renaissance's collection or use of their data.

283.    Thus, Plaintiffs did not, and do not, consent to Renaissance's data practices or any other terms in Renaissance's contracts of adhesion.

284.    Any purported consent was not informed, was not provided by a person with proper authority, was not voluntary, was not supported by adequate consideration, and was not commensurate with Renaissance's level of surveillance and profiteering.

**C.    Renaissance denied Plaintiffs access to, review of, and control over their data.**

285.    Plaintiffs requested access to the data Renaissance collected from them.

286.    Renaissance refused to provide them access to their own data, instead falsely stating that schools are the gatekeepers of such data.

287.    Plaintiff Reisberg requested that Renaissance provide her access to her children's data. Several weeks later, Renaissance falsely responded that "Renaissance is required to refer parents and guardians to their child's school for support with educational records requests."

288.   Plaintiffs were unable to obtain access to their data through their school.

289.   On information and belief, Renaissance has a policy of denying parents access to the data it collects about children and instead requiring that parents request access through their school administrators.

290.   On information and belief, schools do not have access to or control over all of the data that Renaissance collects from and about students and their families.

291.   Renaissance may not absolve itself of its duty to provide parents access to their children's data by unilaterally purporting to shift that duty to schools.

**D.    Plaintiffs were harmed by Renaissance's collection and use of their data.**

292.   Renaissance's data practices harmed Plaintiffs in a number of material if often opaque or invisible ways. Because Renaissance refuses to disclose information critical to a meaningful understanding of its data practices, discovery is necessary to fully understand and identify the nature and details of these harms.

293.   Renaissance harmed Plaintiffs by invading their privacy.

294.   Renaissance harmed Plaintiffs by diminishing the value of their data.

295.   Renaissance harmed Plaintiffs by denying them access to their own data.

296.   Renaissance harmed Plaintiffs by denying them control over their own data.

297.   Renaissance harmed Plaintiffs by using their data to build intimate digital dossiers about them, and by using and disclosing those dossiers to untold third parties for untold purposes.

298.   Renaissance harmed Plaintiffs by subjecting them to unfair, deceptive practices that have prevented them from understanding the full extent of how they may have been harmed by those practices.

299.   Renaissance harmed Plaintiffs by failing to compensate them for their property or labor, which it has used to fuel its highly lucrative business.

300.    Plaintiffs are not fully aware of how they have been harmed by Renaissance's nonconsensual data practice because Renaissance has denied them access to the information necessary to determine the full extent of those harms.

**E.    Plaintiff Reisberg is a long-time advocate for children and parents.**

301.    Plaintiff Reisberg understands the many harms that data collection and use by private companies for commercial purposes pose to children, including her own children.

302.    Plaintiff Reisberg has advocated for online safety and the digital rights of children and parents for years and has worked to educate parents everywhere about the dangers that data-extractive platforms pose to children.

303.    Plaintiff Reisberg was ultimately forced to withdraw her children from their school district to protect their privacy and wellbeing from data-extractive platforms such as Renaissance's.

304.    Plaintiff Reisberg is now turning to the courts to protect her children and other children from the exploitative, harmful practices described herein.

305.    Despite Plaintiffs M.C. 1 and M.C. 2 being withdrawn from a school district that uses Renaissance products, they are still being harmed by Renaissance's practices on an ongoing basis because Renaissance continues to use and share their information for its own purposes without effective consent.

## CLASS ACTION ALLEGATIONS

306.    Plaintiffs bring this class action pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure on behalf of themselves and all other similarly situated.

307.    Plaintiffs seek to represent a nationwide class of students ("Nationwide Class") defined as:

> All persons in the United States who attend or attended a K-12 school that used any Renaissance product.

308.  Plaintiffs seek to represent a nationwide subclass of students ("Nationwide Class") defined as:

> All persons in the United States who attend or attended a K-12 public school that used any Renaissance product.

309.  Plaintiffs seek to represent a state-only subclass of students ("California Subclass") under the law of the State of California defined as:

> All persons in California who attend or attended a K-12 school that used any Renaissance product.

310.  In addition, and in the alternative to the Nationwide Class, Plaintiffs reserve the right to seek leave to amend the complaint to represent state subclasses under the laws of 50 states.

311.  Plaintiffs reserve the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

312.  The Nationwide Class, Nationwide Subclass, and California Subclass are collectively referred to herein as the "Classes." Members of all Classes are collected referred to herein as "Class members."

313.  Excluded from the Classes are: (1) the Court (including any Judge or Magistrate presiding over this action and any members of their chambers and families); (2) Defendant, its subsidiaries, parents, predecessors, successors and assigns, including any entity in which any of them have a controlling interest and its officers, directors, employees, affiliates, or legal representatives; (3) persons who properly and timely request exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel, Class counsel, and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded person.

314.  **Ascertainability**: Membership of the Classes is defined based on objective criteria and individual members will be identifiable from Renaissance's

records, including from Renaissance's data storage. Based on information readily accessible to it, Renaissance can identify members of the Classes who have used Renaissance's products.

315. **Numerosity**: Members of the Classes are so numerous that joinder of all members is impracticable. Class members may be identified from Renaissance's records.

316. **Typicality**: Plaintiffs' claims are typical of the claims of other Class members, as all members of the Classes were uniformly affected by Renaissance's wrongful conduct in violation of federal and state law as complained of herein.

317. **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the members of the Classes and have retained counsel that is competent and experienced in class action litigation, including nationwide class actions and privacy violations. Plaintiffs and their counsel have no interest that is in conflict with, or otherwise antagonistic to the interests of the other Class members. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and they have the resources to do so.

318. **Commonality**: Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting solely individual members of the Classes. Common questions for the Classes include, but are not limited to, the following:

    a.    Whether Renaissance led Plaintiffs and Class members to believe, either directly or through school personnel, that their data and their privacy would be protected;

    b.    Whether Renaissance represented that Plaintiffs and Class members could control what data were intercepted, received, or collected by Renaissance;

c.  Whether Renaissance actually provided Plaintiffs and Class members any control over what data were intercepted, received, or collected by Renaissance;

d.  Whether Renaissance failed to protect the data and privacy of Plaintiffs and Class members;

e.  Whether Renaissance intercepted, received, or collected data from Plaintiffs and Class members;

f.  Whether Renaissance failed to obtain informed consent to collect data from Plaintiffs and Class members;

g.  Whether Renaissance failed to obtain parental consent to collect data from Plaintiffs and Class members;

h.  Whether Renaissance failed to obtain voluntary consent to collect data from Plaintiffs and Class members;

i.  Whether Renaissance failed to provide sufficient consideration in exchange for consent to collect data from Plaintiffs and Class members;

j.  Whether Renaissance has a policy of intercepting, receiving, or collecting data from Class members;

k.  Whether Renaissance actually intercepted, received, or collected data from Class members;

l.  Whether Renaissance's practice of intercepting, receiving, or collecting users' data violated state and federal privacy laws;

m.  Whether Renaissance's practice of intercepting, receiving, or collecting users' data violated state and federal anti-wiretapping laws;

n.  Whether Renaissance's practice of intercepting, receiving, or collecting users' data violated any other state and federal tort laws;

o.  Whether Renaissance mispresented its commitment to student privacy;

p.  Whether Renaissance mispresented its compliance with various state and federal data privacy laws;

q.  Whether Renaissance mispresented its compliance with various state and federal data privacy laws;

r.  Whether Renaissance's misrepresentation(s) deceived Plaintiffs and Class members, either directly or indirectly through school personnel;

s.  Whether Renaissance mispresented its compliance with various state and federal data privacy laws;

t.  Whether Plaintiffs and Class members are entitled to declaratory and/or injunctive relief to enjoin the unlawful conduct alleged herein; and

u.  Whether Plaintiffs and Class members have sustained damages as a result of Renaissance's conduct and, if so, what is the appropriate measure of damages or restitution.

319.  **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. This proposed class action presents fewer management difficulties than individual litigation and provides the benefits of a single adjudication, economies of scale and comprehensive supervision by a single, able court. Furthermore, as the damages individual Class members have suffered may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in management of this action as a class action.

320.  Plaintiffs reserve the right to revise the foregoing class allegations and

definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## A.   Tolling of the statute of limitations

321.   Any applicable statute(s) of limitations have been tolled by Renaissance's and its affiliates' knowing and active concealment and denial of the facts alleged herein. Plaintiffs and the members of the Class could not have reasonably discovered the true nature of Renaissance's data-harvesting scheme because Renaissance purposely concealed it. Plaintiffs' claims were thus tolled under the discovery rule.

### 1.   Discovery rule

322.   The causes of action alleged herein did not accrue until Plaintiffs and Class members discovered or should have discovered Renaissance's data-harvesting scheme.

323.   As alleged above, Plaintiffs and Class members had no way of knowing about Renaissance's data-harvesting scheme. Renaissance concealed the scheme while simultaneously claiming that it protects student and parent data and privacy. To this day, Renaissance fails to disclose the full extent of, and risks associated with, its data-harvesting scheme.

324.   Within any applicable statutes of limitation, Plaintiffs and Class members could not have discovered, through the exercise of reasonable diligence, that Renaissance was concealing the conduct complained of herein and misrepresenting the nature of its business.

325.   Plaintiffs and Class members did not know facts that would have caused a reasonable person to suspect that there was a data-harvesting scheme that would result in a private corporation collecting, manipulating, and monetizing every aspect of their children's lives and their own interactions with their children's schools and school districts. Renaissance also withheld any and all information that would give a reasonable person knowledge of the data-harvesting scheme and disclaimed that it

unlawfully monetized Plaintiffs' and Class members' data.

326.   For ordinary consumers, the existence of the data-harvesting scheme is still unknown. For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to the claims in this litigation.

### 2.    Fraudulent concealment

327.   As an entity entrusted with sensitive, personal student and parent data, Renaissance was under a continuous duty to disclose to Plaintiffs and Class members the existence of the data-harvesting scheme.

328.   Renaissance was and is under a continuing duty to disclose to Plaintiffs and the Class members what data it tracked, how that data is stored, how long it is retained, with whom it is shared, how it is manipulated, and how it is monetized.

329.   Instead of publicly disclosing this information, Renaissance kept students and parents in the dark about its data-harvesting scheme and purposely misled parents and children, as well as schools and school districts, about how their data and other sensitive information was being collected and used by Renaissance and others.

330.   Class members were not at fault for failing to discover the existence of Renaissance's data-harvesting scheme.

331.   This ignorance of the existence of Renaissance's data-harvesting scheme is common across each Plaintiff and Class member.

332.   Due to Renaissance's active concealment throughout the time period relevant to this action, all applicable statutes of limitation have been tolled.

333.   Renaissance was and is under a continuous duty to disclose to Plaintiffs and Class members its data-harvesting scheme. Renaissance failed to disclose the existence of its data-harvesting scheme and actively concealed how it was using Plaintiffs' and Class members' data and other sensitive information. Plaintiffs and Class members reasonably relied upon Renaissance's knowing and affirmative representations and/or active concealment of these facts. Based on the foregoing,

Renaissance is estopped from relying on any statutes of limitation in defense of this action.

## CAUSES OF ACTION

### Count I: Violation of 42 U.S.C. § 1983 – Fourth Amendment
### *(On behalf of Plaintiffs and the Nationwide Subclass)*

334.  Plaintiffs incorporate by reference paragraphs 1 through 333 as though fully set forth herein.

335.  To state a claim under 42 United States Code section 1983, a plaintiff must allege that the defendant, acting under color of law, deprived the plaintiff of a federally protected right.

336.  The ultimate issue in determining whether a person is subject to suit under section 1983 is the same question posed in cases arising under the Fourteenth Amendment, which is whether the alleged infringement of federal rights is fairly attributable to the government.

337.  Renaissance deems itself a "school official" under federal law for purposes of the conduct described here. It thereby admits that it performs a function for the school for which the school would otherwise use employees; it is under the direct control of the school for maintenance and use of education records; and the school determines whether it has a legitimate educational interest in education records.

338.  Renaissance has been authorized by governmental entities to perform a function that is traditionally and exclusively a public function performed by the government, namely, collecting and storing education records of public schools.

339.  Renaissance is jointly engaged with state officials in the prohibited action and, as such, is acting under color of law.

340.  The conduct by Renaissance alleged herein is so entwined with governmental policies that it may fairly be treated as that of the state itself.

341.  Renaissance only gains access to student data by acting under color of

86

law, including government contracts and policies and federal privacy law.

342.   Renaissance's contracts with government entities are long-term contracts typically spanning years rather than short-term contracts.

343.   Renaissance states that it acts exclusively at the direction and discretion of the government, namely, schools and school districts.

344.   Renaissance describes the Stolen Information as the property of schools exclusively under schools' control.

345.   Renaissance sets out the division of responsibility for data security and compliance, which is highly complex, dynamic, and entwined with schools.

346.   Renaissance directs all parent requests to access student information to schools.

347.   Renaissance states that it need not comply with COPPA in obtaining parental consent because it provides services to schools and purports to shift its COPPA responsibilities to schools.

348.   Renaissance seeks to fully align itself with the government for the purposes of collecting, using, and disclosing student data and also avoiding the obligations attendant to its collection, use, and disclosure of student data.

349.   As a state actor with access to the personal and private information of public K-12 school students, Renaissance owes a duty of care to those students and their parents.

350.   Renaissance engages in the conduct described herein with the authority of state and local government or in excess of that authority.

351.   Renaissance's data policies and practices violate the constitutional rights of Plaintiffs and Subclass members, including their Fourth Amendment right to be free from unreasonable searches and seizures.

352.   Renaissance's data policies and practices far exceed any legitimate authority to act on the government's behalf.

353.  Renaissance's surreptitious and persistent surveillance of the Plaintiffs' and Subclass members' activity as they use and interact with its products as described herein is a violation of their Fourth Amendment rights.

354.  Renaissance's persistent, indiscriminate, and maximally intrusive surveillance data policies and practices are not justified by any legitimate governmental interest.

355.  Renaissance's nonconsensual taking of personal and private information of Plaintiffs and Subclass members for its own financial gain as described herein is a violation of their Fourth Amendment rights.

356.  Renaissance has admitted that the kinds of personal and private information it takes from children as described herein is "sensitive" and "would paint an incredibly intimate picture of an individual's life," and that the unlawful collection of such information poses "civil liberties and human rights concerns[.]"

357.  No compelling state interest outweighs these rampant violations of Plaintiffs' and Subclass members' constitutional rights.

358.  Renaissance is therefore liable to Plaintiffs and Subclass members for their costs, including attorney fees and expert fees under 42 United States Code section 1988.

### Count II: Violation of 42 U.S.C. § 1983 – Fourteenth Amendment
### *(On behalf of Plaintiffs and the Nationwide Subclass)*

359.  Plaintiffs incorporate by reference paragraphs 1 through 333 as though fully set forth herein.

360.  To state a claim under 42 United States Code section 1983, a plaintiff must allege that the defendant, acting under color of law, deprived the plaintiff of a federally protected right.

361.  The ultimate issue in determining whether a person is subject to suit under section 1983 is the same question posed in cases arising under the Fourteenth

Amendment, which is whether the alleged infringement of federal rights is fairly attributable to the government.

362.   Renaissance deems itself a "school official" under federal law for purposes of the conduct described here. It thereby admits that it performs a function for the school for which the school would otherwise use employees; it is under the direct control of the school for maintenance and use of education records; and the school determines whether it has a legitimate educational interest in education records.

363.   Renaissance has been authorized by governmental entities to perform a function that is traditionally and exclusively a public function performed by the government, namely, collecting and storing education records of public schools.

364.   Renaissance is jointly engaged with state officials in the prohibited action and, as such, is acting under color of law.

365.   The conduct by Renaissance alleged herein is so entwined with governmental policies that it may fairly be treated as that of the state itself.

366.   Renaissance only gains access to student data by acting under color of law, including government contracts and policies and federal privacy law.

367.   Renaissance's contracts with government entities are long-term contracts typically spanning years rather than short-term contracts.

368.   Renaissance states that it acts exclusively at the direction and discretion of schools, including public schools and school districts.

369.   Renaissance describes the Stolen Information as the property of schools exclusively under schools' control, including public schools.

370.   Renaissance sets out the division of responsibility for data security and compliance, which is highly complex, dynamic, and entwined with schools.

371.   Renaissance directs all parent requests to access student information to schools.

372.   Renaissance states that it need not comply with COPPA in obtaining

parental consent because it provides services to schools and purports to shift its COPPA responsibilities to schools.

373. Renaissance seeks to fully align itself with schools, including public schools, for the purposes of collecting, using, and disclosing student data and also avoiding the obligations attendant to its collection, use, and disclosure of student data.

374. As a state actor with access to the personal and private information of public K-12 school students, Renaissance owes a duty of care to those students and their parents.

375. Renaissance engages in the conduct described herein with the authority of state and local government or in excess of that authority.

376. Renaissance's data policies and practices violate the constitutional rights of Plaintiffs and Subclass members, including their Fourth Amendment right to be free from unreasonable searches and seizures.

377. Renaissance's data policies and practices far exceed any legitimate authority to act on the government's behalf.

378. Renaissance's nonconsensual taking of personal and private information of Plaintiffs and Subclass members for its own financial gain as described herein is a violation of their Fourteenth Amendment rights.

379. The types of information that Renaissance generates and extracts from Plaintiffs and Subclass members is information that is constitutionally protected.

380. Renaissance has admitted that the personal and private information it takes from children as described herein is "sensitive" and "would paint an incredibly intimate picture of an individual's life," and that the unlawful collection of such information poses "civil liberties and human rights concerns[.]"

381. Plaintiffs and Subclass members have an interest in avoiding disclosure of personal matters.

382. The indiscriminate and automatic collection and dissemination of the

personal and private information of Plaintiffs and Subclass members to an unbounded number of unknown, undisclosed entities violate their constitutional rights.

383.    Renaissance's policies that govern and authorize its sweeping generation and extraction of the personal and private information of Plaintiffs and Subclass members are not narrowly tailored to achieve any legitimate governmental interest.

384.    The privacy interests at issue—and Renaissance's infringement of those interests—are of constitutional importance.

385.    Renaissance has far exceeded whatever authority it has to act under the color of law on behalf of schools and school districts in the collection of the personal and private information of Plaintiffs and Subclass members.

386.    Renaissance does not employ adequate safeguards to prevent further unauthorized disclosure of Plaintiffs' and Subclass members' private information.

387.    Renaissance's data policies and practices expose children to significant risks, including the risk of identity theft.

388.    Renaissance's denial of and policy of denying Plaintiffs' and Class members' access to their own personal and private information violations their constitutional rights.

389.    Renaissance's denial of, and policy of denying, Plaintiffs' and Subclass members' ability to control their own personal and private information violates their constitutional rights.

390.    These harms are exacerbated by the mandatory and surreptitious nature of Renaissance's Products, and their use by children in a compulsory environment.

391.    Any governmental interest that is served by Renaissance's invasive, exploitative data practices does not outweigh the rampant violations of Plaintiffs' and Subclass members' privacy rights inflicted by Renaissance's practices.

392.    Renaissance is therefore liable to Plaintiffs and Subclass members for their costs, including attorney fees and expert fees under 42 United States Code section

1988.

## Count III: Violation of the Federal Wiretap Act, 18 U.S.C. § 2510, *et seq.*
### *(On behalf of Plaintiffs and the Nationwide Class)*

393.   Plaintiffs incorporate by reference paragraphs 1 through 333 as though fully set forth herein.

394.   The Federal Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986, prohibits the intentional interception of the contents of any wire, oral, or electronic communication through the use of a device. 18 U.S.C. § 2511.

395.   The Wiretap Act protects both the sending and receipt of communications.

396.   18 United States Code section 2520(a) provides a private right of action to any person whose wire, oral, or electronic communication is intercepted.

397.   Renaissance's actions in intercepting and tracking user communications were intentional. Upon information and belief, Renaissance is aware that it is intercepting communications and has taken no Renaissance's actions.

398.   Renaissance's interception of internet communications that the Plaintiffs and Class members were sending and receiving was done contemporaneously with the Plaintiffs' and Class members' sending and receipt of those communications.

399.   The communications intercepted by Renaissance included "contents" of electronic communications made from the Plaintiffs and Class members to websites and other web properties other than Defendant's in the form of detailed URL requests, webpage browsing histories, search queries, and other information that Plaintiffs and the Class members sent to those websites and for which Plaintiffs received communications in return from those websites.

400.   These transmissions were tracked and intercepted without authorization and are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate commerce[,]" and were

therefore "electronic communications" within the meaning of 18 United States Code section 2510(12).

401. The following constitute "devices" within the meaning of 18 United States Code section 2510(5):

    a. The computer codes and programs that Renaissance used to track the Plaintiffs' and Class members' communications;

    b. The Plaintiffs' and Class members' browsers and mobile applications;

    c. The Plaintiffs' and Class members' computing and mobile devices;

    d. Renaissance's servers; and

    e. The plan that Renaissance carried out to effectuate its tracking and interception of the Plaintiffs' and Class members' communications.

402. Renaissance, in its conduct alleged here, was not providing an "electronic communication service" as that term is defined in 18 United States Code section 2510(12) and is used elsewhere in the Wiretap Act. Renaissance was not acting as an Internet Service Provider (ISP).

403. Renaissance was not an authorized party to the communications because the Plaintiffs and Class members were unaware of Renaissance's interceptions and did not knowingly send any communications to Renaissance when Renaissance intercepted the communications between the Plaintiffs and web properties other than Renaissance's. Renaissance could not manufacture its own status as a party to the Plaintiffs' and Class members' communications with others by surreptitiously redirecting or intercepting those communications.

404. Plaintiffs and Class members did not consent to Renaissance's continued gathering of their communications.

405. After intercepting the communications, Renaissance then used the contents of the communications knowing or having reason to know that such information was obtained through the interception of electronic communications in

violation of 18 United States Code section 2511(1)(a).

406.   As a result of this conduct, the Court may assess statutory damages to Plaintiffs and Class members; injunctive and declaratory relief; punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Renaissance in the future, and reasonable attorneys' fees and other litigations costs reasonably incurred.

### Count IV: Violation of the California Invasion of Privacy Act (CIPA)
### Cal. Penal Code §§ 631, 632
### *(On behalf of Plaintiffs and the California Subclass)*

407.   Plaintiffs incorporate by reference paragraphs 1 through 333 as though fully set forth herein.

408.   CIPA is codified at California Penal Code sections 630–638. The Act begins with its statement of purpose in California Penal Code section 630:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

409.   California Penal Code section 631(a) provides, in pertinent part:

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to lawfully

do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars[.]

410.  California Penal Code section 632(a) provides, in pertinent part:

A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished by a fine not exceeding two thousand five hundred dollars[.]

411.  Under either section of CIPA, a defendant must show it had the consent of all parties to a communication.

412.  Renaissance designed, contrived, and effectuated its scheme to track users in California.

413.  Renaissance's non-consensual tracking of the Plaintiffs' and Class members' internet communications was without authorization and consent from the Plaintiffs and Class members. The interception by Renaissance in the aforementioned circumstances was unlawful and tortious.

414.  The interceptions by Renaissance in the aforementioned circumstances occurred while the same was in transit or passing over a wire, line, or cable in California or was being sent from California, where Plaintiffs were located at the time of the interceptions.

415.  The following items constitute machines, instruments, or contrivances under CIPA, and even if they do not, Renaissance's deliberate and purposeful scheme that facilitated its interceptions falls under the broad statutory catch-all category of "any other manner":

a.  The computer code and programs Renaissance used to track Plaintiffs' and

Class members' communications;

b. The Plaintiffs' and Class members' browsers and mobile applications;

c. The Plaintiffs' and Class members' computing and mobile devices;

d. Renaissance's servers;

e. The computer codes and programs used by Renaissance to effectuate its tracking and interception of the Plaintiffs' and Class members' communications; and

f. The plan Renaissance carried out to effectuate its tracking and interception of the Plaintiffs' and Class members' communications.

416. The data collected by Renaissance constituted "confidential communications" as that term is used in section 632, because Plaintiffs and Class members had objectively reasonable expectations of privacy in their devices and activity.

417. Renaissance aided and abetted numerous third parties in unlawfully intercepting protected communications belonging to Plaintiffs and Class members.

418. Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, violation of their rights to privacy and loss of value in their personally identifiable information.

419. Pursuant to California Penal Code section 637.2, Plaintiffs and Class members have been injured by the violations of California Penal Code sections 631 and 632, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

**Count V: Violation of the Comprehensive Computer Data Access and Fraud Act (CDAFA), Cal. Penal Code §§ 502,** *et seq.*
*(On behalf of Plaintiffs and the California Subclass)*

420. Plaintiffs incorporate by reference paragraphs 1 through 333 as though fully set forth herein.

421.   California Penal Code section 502 provides: "For purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction."

422.   Renaissance violated California Penal Code section 502(c)(2) by knowingly accessing and without permission taking, copying, analyzing, and using Plaintiffs' and Class members' data.

423.   Renaissance effectively charged Plaintiffs and Class members and was enriched by acquiring their sensitive and valuable personal information without permission and using it for Renaissance's own financial benefit to advance its business interests. Plaintiffs and Class members retain a stake in the profits that Renaissance earned from the misuses of their activity and personally identifiable information because, under the circumstances, it is unjust for Renaissance to retain those profits.

424.   Renaissance accessed, copied, took, analyzed, and used from Plaintiffs' and Class members' computers in and from the State of California, where Renaissance: (1) has its principal place of business; (2) upon information and belief used servers that provided communication links between Plaintiffs' and Class members' computers and Renaissance, which allowed Renaissance to access and obtain their data; and (3) Renaissance's Terms of Service mandate that the provision of Renaissance's service is "deemed solely based in California" thus foreclosing any suggestion that the service is based anywhere else. Accordingly, Renaissance caused the access of their computers from California and is therefore deemed to have accessed their computers in California.

425.   As a direct and proximate result of Renaissance's unlawful conduct within the meaning of California Penal Code section 502, Renaissance has caused loss to Plaintiffs and Class members and has been unjustly enriched in an amount to be proven at trial.

426.   Plaintiffs, on behalf of themselves and Class members, seek compensatory damages and/or disgorgement in an amount to be proven at trial, and declarative, injunctive, or other equitable relief.

427.   Plaintiffs and Class members are entitled to punitive or exemplary damages pursuant to California Penal Code section 502(e)(4) because Renaissance's violations were willful and, upon information and belief, Renaissance is guilty of oppression or malice as defined by California Civil Code section 3294.

428.   Plaintiffs and Class members are also entitled to recover their reasonable attorneys' fees pursuant to California Penal Code section 502(e).

### Count VI: Violation of California's Unfair Competition Law (UCL)
### Cal. Bus. & Prof. Code § 17200, *et seq*.
### *(On behalf of Plaintiffs and the California Subclass)*

429.   Plaintiffs incorporate by reference paragraphs 1 through 333 as though fully set forth herein.

430.   The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200 (UCL). By engaging in the practices aforementioned, Renaissance has violated the UCL.

431.   A plaintiff may pursue a claim under the UCL through any or all of three prongs: the unlawful prong, the unfair prong, or the fraudulent prong.

432.   Renaissance's conduct violated the spirit and letter of these laws, which protect property, economic and privacy interests and prohibit unauthorized disclosure and collection of private communications and personal information.

433.   Renaissance's unfair acts and practices include its violation of property, economic, and privacy interests protected by federal and state laws.

434.   To establish liability under the "unfair" prong, Plaintiffs and Class members need not establish that these statutes were actually violated, although the

allegations herein establish that they were. The foregoing allegations are tethered to underlying constitutional, statutory or regulatory provisions; describe practices that are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers; and show that negative impact of Renaissance's practices on school-aged children and their parents far outweighs the reasons, justifications, and motives of Renaissance.

435.   The foregoing allegations establish liability under the "unlawful" prong, as they show that Renaissance violated an array of state and federal laws protecting privacy and property.

436.   The foregoing allegations also establish liability under the "fraudulent" prong, as Renaissance's false and misleading representations and omissions were material, and they were likely to and did mislead some members of the public and/or caused harm to the public interest. They also misled parents, whether directly or indirectly through school personnel.

437.   Plaintiffs and Class members have suffered injury-in-fact, including the loss of money and/or property as a result of Renaissance's unfair and/or unlawful practices, to wit, the unauthorized disclosure and taking of their personal information which has value as demonstrated by its use and sale by Renaissance. Plaintiffs and Class members have suffered harm in the form of diminution of the value of their private and personally identifiable data and content.

438.   Renaissance's actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

439.   Renaissance reaped unjust profits and revenues in violation of the UCL. This includes Renaissance's profits and revenues from their targeted-advertising and improvements of Renaissance's other products. Plaintiffs and the Class seek restitution and disgorgement of these unjust profits and revenues.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Count VII: Invasion of Privacy—Public Disclosure of Private Facts
### *(On behalf of Plaintiffs and the Nationwide Class)*

440.    Plaintiffs incorporate by reference paragraphs 1 through 333 as though fully set forth herein.

441.    Under California law, the tort of invasion of privacy by public disclosure of private facts occurs under the following elements: (1) the disclosure of the private facts must be a public disclosure and not a private one; (2) the facts disclosed to the public must be private facts, and not public ones; and (3) the matter made public must be one that would be highly offensive and objectionable to a reasonable person of ordinary sensibilities.

442.    Renaissance, as a matter of course, disclosed Plaintiffs' and Class members' personal information to its vast network of partners, as described herein. The recipients of Plaintiffs' and Class members' personal information because of Renaissance's disclosures are so numerous that they amount to public disclosures.

443.    Moreover, Renaissance's creation and disclosure of intimate digital dossiers containing Plaintiffs' and Class members' personal information further constitutes public disclosures of that information.

444.    The contents of the personal information that Renaissance publicly disclosed is highly personal and not otherwise public knowledge, including education records to include grades, disciplinary records, health records, mental health records, behavioral information, and other highly sensitive information described in this complaint. Renaissance's disclosure of this information would be highly offensive and objectionable to a reasonable person of ordinary sensibilities.

445.    As described herein, Renaissance has knowingly intruded upon the legally protected privacy interests in violation of:

a.  ECPA;

b.  COPPA;

100

    c. CIPA;

    d. CDAFA;

    e. The Fourth Amendment right to privacy contained on school-issued and/or personal computing devices, including all of their activity on their devices;

    f. The Fourteenth Amendment right to informational privacy; and

    g. The California Constitution, which guarantees a right to privacy.

446. Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances in that Plaintiffs and Class members could not reasonably expect that Renaissance would commit acts in violation of federal and state civil and criminal laws.

447. Renaissance's actions constituted a serious invasion of privacy in that it:

    a. Invaded a zone of privacy protected by the Fourth Amendment, namely the right to privacy in data contained on personal computing devices, including web search, browsing histories, and other activities to which Renaissance had no legitimate basis for accessing;

    b. Invaded a zone of privacy protected by the Fourteenth Amendment, namely the right to privacy in information contained on personal computing devices, including web search, browsing histories, personal and private communications and content, and other activities to which Renaissance had no legitimate basis for accessing;

    c. Violated laws, including the ECPA, COPPA, CIPA, and CDAFA;

    d. Invaded the privacy rights of Plaintiffs and Class members without their knowledge or consent, including the rights of school-aged children;

    e. Constituted an unauthorized taking of valuable information from Plaintiffs and Class members through deceit; and

    f. Further violated Plaintiffs' and Class members' reasonable expectation of

privacy via Renaissance's review, analysis, and subsequent uses of Plaintiffs' and Class members' activity that was considered sensitive and confidential.

448.    Committing these acts against Plaintiffs and Class members alike constitutes an egregious breach of social norms that is highly offensive, particularly given Renaissance's specific targeting of school-aged children for data extraction and exploitation in a compulsory setting.

449.    Renaissance's surreptitious and unauthorized tracking of Plaintiffs' and Class members' activity constitutes an egregious breach of social norms that is highly offensive, particularly given that Renaissance's K-12-marketed Products were represented as tools to assist with the education of children.

450.    Taking this information through deceit is highly offensive behavior, and Renaissance lacked any legitimate business interest in tracking Plaintiffs and Class members without their consent.

451.    Plaintiffs and Class members have been damaged by Renaissance's invasion of their privacy and are entitled to just compensation and injunctive relief.

### Count VIII: Intrusion Upon Seclusion
#### *(On behalf of Plaintiffs and the Nationwide Class)*

452.    Plaintiffs incorporate by reference paragraphs 1 through 333 as though fully set forth herein.

453.    Plaintiffs asserting claims for intrusion upon seclusion under California law must plead (1)  intrusion into a private place, conversation, or matter; (2) in a manner highly offensive to a reasonable person.

454.    In carrying out its scheme to conscript parents and their children into the Renaissance product ecosystem to enable Renaissance to track and intercept Plaintiffs' and Class members' communications in violation of its own privacy promises, Renaissance intentionally intruded upon the Plaintiffs' and Class members' solitude or

seclusion in that it effectively placed itself in the middle of conversations to which it was not an authorized party.

455. Renaissance's tracking and interception were not authorized by the Plaintiffs and Class members.

456. Renaissance's intentional intrusion into their internet communications and their computing devices and web-browsers was highly offensive to a reasonable person in that they violated federal and state criminal and civil laws designed to protect individual privacy and against theft.

457. The taking of personally identifiable information from children through deceit is highly offensive behavior.

458. Renaissance's continued collection of data after Plaintiffs and Class members navigated away from Renaissance's websites and to wholly different and unrelated websites is highly offensive behavior as that collection has no bearing on the application of Renaissance's products to children's education.

459. Wiretapping and surreptitious recording of communications is highly offensive behavior.

460. Public polling on internet tracking has consistently revealed that the overwhelming majority of Americans believe it is important or very important to be "in control of who can get information" about them; to not be tracked without their consent; and to be in "control[] of what information is collected about [them]." The desire to control one's information is further heightened when children are using the internet.

461. Renaissance understands and admits the sensitivity of the information it generates and collects and acknowledges that such information implicates fundamental human rights.

462. Plaintiffs and the Class members have been damaged by Renaissance's invasion of their privacy and are entitled to reasonable compensation including but not

limited to disgorgement of profits related to the unlawful internet tracking.

**Count IX: Violation of the Wisconsin Electronic Surveillance Control Law, Wis. Stat. § 968.31**
*(On behalf of Plaintiffs and the Nationwide Class)*

463.    Plaintiffs incorporate by reference paragraphs 1 through 333 as though fully set forth herein.

464.    All conditions precedent to this action have been performed or have occurred.

465.    Wis. Stat. section 968.31 prohibits the interception and disclosure of wire, electronic or oral communications. Specifically, under Wis. Stat. section 968.31(1), the following acts are prohibited: when a person

a. "Intentionally intercepts, attempts to intercept or procures any other person to intercept or attempt to intercept, any wire, electronic or oral communication.";

b. "Intentionally uses, attempts to use or procures any other person to use or attempt to use any electronic, mechanical or other device to intercept any oral communication.";

c. "Discloses, or attempts to disclose, to any other person the contents of any wire, electronic or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication in violation of this section or under circumstances constituting violation of this section."; or

d. "Uses, or attempts to use, the contents of any wire, electronic or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication in violation of this section or under circumstances constituting violation of this section."

466. Defendant intercepted Plaintiffs' and Class Members' electronic communications for the purpose of committing multiple tortious acts, including, but not limited to, the criminal and tortious acts specified below.

467. For example, Defendant intercepted Plaintiffs' and Class Members' electronic communications for the purpose of disclosing those communications to third parties without the knowledge or consent of Plaintiffs or Class Members.

468. Defendant's misconduct falls within the ambit of Wisconsin's wiretapping statute because the disclosure of Plaintiffs and Class Members' communications to third parties—without consent or proper authorization—is an illegal or tortious act that violates multiple laws, including (but not limited to) invasion of privacy by intrusion upon seclusion and by public disclosure of private facts (codified in Wisconsin as Wis. Stat. § 995.50). Further, as set forth *supra*, Defendant's interception and disclosure of Plaintiffs' and Class Members' electronic communication commits, under Wisconsin law, the torts of invasion of privacy and violation of the Fourth and Fourteenth Amendments to the U.S. Constitution.

469. Wis. Stat. section 968.31(2m) provides that "[a]ny person whose wire, electronic or oral communication is intercepted, disclosed or used in violation of §§ 968.28 to 968.37 shall have a civil cause of action against any person who intercepts, discloses or uses, or procures any other person to intercept, disclose, or use, the communication."

470. Defendant qualifies as a person under the statute.

471. Under Wis. Stat. section 968.27, Wisconsin defines "electronic communications" to mean "any transfer of signs, signals, writing, images, sounds, data or intelligence of any nature wholly or partially transmitted by a wire, radio, electromagnetic, photoelectronic or photooptical system." Plaintiffs' and Class Members' communications with Defendant constitute "electronic communications" under Wisconsin law.

472. Plaintiffs and Class Members' communications with Defendant constitute "electronic communications" because each communication was the transfer of data or intelligence, including, but not limited to, communications made from the Plaintiffs and Class members to websites and other web properties other than Defendant's in the form of detailed URL requests, webpage browsing histories, search queries, and other information that Plaintiffs and the Class members sent to those websites and for which Plaintiffs received communications in return from those websites.

473. Plaintiffs and Class Members' communications with Defendant constitute "electronic communications" because they were wholly or partially transmitted by wire, electromagnetic, and/or photoelectronic systems including Defendant.

474. No legitimate purpose was served by Defendant's willful and intentional disclosure of Plaintiffs and Class Members' communications to third parties. Neither Plaintiffs nor Class Members consented to the disclosure of their communications by Defendant to third parties. Nor could they have consented, given that Defendant never sought Plaintiffs' or Class Members' consent.

475. Plaintiffs' and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their communications.

476. Plaintiffs' and Class Members' electronic communications were intercepted during transmission in the state of Wisconsin, where Defendant is headquartered.

477. Under Wis. Stat. section 968.31(2m), aggrieved persons are entitled to: "(a) Actual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher; (b) Punitive damages; and (c) A reasonable attorney's fee and other litigation costs reasonably incurred."

478. In addition to statutory damages, Defendant's breach caused Plaintiffs and Class Members the following damages, *inter alia*:

106

a. sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendant abused and eroded the trust of Plaintiffs and Class Members attending school – children whose confidential, nonpublic, personal information protected by COPPA and FERPA was collected by Defendant merely by Plaintiffs and Class Members attending school; and

c. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value.

479. Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**Count X: Violation of Wisconsin's Deceptive Trade Practices Act (DTPA), Wis. Stat. § 100.18**
***(On behalf of Plaintiffs and the Nationwide Class)***

480. Plaintiffs incorporate by reference paragraphs 1 through 333 as though fully set forth herein.

481. The DTPA prohibits businesses from making any "assertion, representation or statement of fact which is untrue, deceptive or misleading" when the business makes such a statement to the public with the intent to induce a sale.

482. By engaging in the practices aforementioned, Renaissance has violated the DTPA.

483. The foregoing allegations establish liability under the DTPA as Renaissance's false and misleading representations and omissions were made on their public website and were material, and they were likely to and did mislead some members of the public, including Plaintiffs' school district, and caused harm to Plaintiffs and the public interest.

484.    The foregoing untrue, fraudulent, and misleading representations to the public originated in Wisconsin, where Renaissance is headquartered and where Renaissance caused those representations to be placed onto Renaissance's public website with the intent to induce Plaintiffs' and Class members' school districts to purchase products and services from Renaissance and to enter contracts with Renaissance for those products and services.

485.    Plaintiffs' and Class members' school districts relied on Renaissance's subject statements and were induced to purchase products and services from and contract with Defendant because of those statements. Plaintiffs and Class members were foreseeable beneficiaries of the contract that Defendant induced those school district to enter based on these untrue, fraudulent, and deceptive statements.

486.    These untrue, fraudulent, and deceptive statements also misled the parents of Plaintiffs and Class members, whether directly or indirectly through school personnel.

487.    Plaintiffs and Class members have suffered injury-in-fact and a pecuniary loss, including the loss of money and/or property as a result of Renaissance's untrue, deceptive, and misleading statements, to wit, the unauthorized disclosure and taking of their personal information which has value as demonstrated by its use and sale by Renaissance. Plaintiffs and Class members have suffered harm in the form of diminution of the value of their private and personally identifiable data and content.

488.    Renaissance's actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

489.    Pursuant to Wisc. Stat. section 110.18(11)(b), Plaintiffs and the Class are entitled to recover their pecuniary loss, including the value of the data that Defendant collected, used, disclosed, and monetized without consent, as well as reasonable attorneys' fees and costs for prosecuting this action.

## Count XI: Unjust Enrichment
### *(On behalf of Plaintiffs and the Nationwide Class)*

490.   Plaintiffs incorporate by reference paragraphs 1 through 333 as though fully set forth herein.

491.   Renaissance has unjustly received benefits at the expense of Plaintiffs and Class members under California law.

492.   Renaissance acquired and compromised the security of troves of personal data that rightfully belong to Plaintiffs and Class members without valid consent through intentionally deceptive practices conducted in connection with consumers' use of Renaissance sites and products.

493.   Renaissance has derived profits and other tangible benefits from its collection of Stolen Information, without which Renaissance could not as effectively have grown its business, acquired numerous other tangible and intangible assets, developed other products, supported myriad data-sharing agreements, and, as of the date of this filing, stand at a more than $1.8 trillion valuation. Renaissance has also directly and substantially profited from its use, storage, aggregation, and sale of Plaintiffs' and Class members' data. Indeed, Plaintiffs' and Class members' data is the fuel that powers Renaissance's ever-growing suite of "personalized" products and services marketed for use by children in K-12 education.

494.   These benefits were the expected result of Renaissance acting in its pecuniary interests at the expense of children and their parents.

495.   In exchange for these benefits to Renaissance, Plaintiffs and Class members received nothing more than education services to which they were already entitled.

496.   Renaissance did not and made no efforts to determine whether Plaintiffs' and Class members' use of its Products in compulsory K-12 environments was voluntary.

497. In order to enrich itself, Renaissance deprived Plaintiffs and Class members of their property, security, privacy, and autonomy.

498. Renaissance harmed Plaintiffs and Class members by, among other harms, subjecting them to commercial manipulation and continuous surveillance; abridging parents' right to parent as they choose; invading their privacy; denying their due process rights by subjecting them to opaque, unreviewable data practices; forcing them to choose between their right to an education and other fundamental rights; and failing to compensate them for their property and labor.

499. Plaintiffs and Class members did not provide their consent to Renaissance taking their information and using it for Renaissance's commercial gain.

500. There is no justification for Renaissance's enrichment. It would be inequitable, unconscionable, and unjust for Renaissance to be permitted to retain these benefits because the benefits were procured because of and by means of their wrongful conduct.

501. Plaintiffs and Class members seek an order compelling Renaissance to disgorge the profits and other benefits it has unjustly obtained.

502. Plaintiffs and Class members are entitled to restitution of the benefits Renaissance unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position they occupied prior to dealing with Renaissance.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request the Court enter judgment in their favor and against Renaissance as follows:

a. An award of damages, including actual, compensatory, general, special, incidental, consequential, and punitive damages, in an amount to be determined at trial;

b. Injunctive, declaratory, and other equitable relief as is appropriate;

c. Pre- and post-judgment interest to the extent provided by law;

d.  Attorneys' fees to the extent provided by law;

e.  Costs to the extent provided by law; and

f.  Such other relief the Court deems just and proper.

## **JURY TRIAL DEMAND**

Plaintiffs demand a jury trial for all claims so triable.

Dated: June 25, 2025                Respectfully submitted,

By:  */s/  Melisa A. Rosadini-Knott*
Melisa A. Rosadini-Knott
(California Bar No. 316369)
**PEIFFER WOLF CARR
KANE CONWAY & WISE LLP**
3435 Wilshire Blvd., Ste. 1400
Los Angeles, CA 90010-1923
323-982-4109
mrosadini@peifferwolf.com

Andrew R. Tate*
**PEIFFER WOLF CARR
KANE CONWAY & WISE LLP**
235 Peachtree St. NE, Suite 400
Atlanta, GA 30303
(314) 669-3600
atate@peifferwolf.com

Julie U. Liddell*
**EDTECH LAW CENTER PLLC**
P.O. Box 300488
Austin, Texas 78705
(737) 351-5855
julie.liddell@edtech.law

Karen Dahlberg O'Connell*
**ALMEIDA LAW GROUP LLC**
157 Columbus Ave, 4th Floor
New York NY 10023
(347) 395-5666

karen@almeidalawgroup.com

*pro hac vice* forthcoming

*Counsel for Plaintiffs and the Proposed Classes*