Melisa A. Rosadini-Knott
mrosadini@peifferwolf.com
(California Bar No. 316369)
**PEIFFER WOLF CARR**
**KANE CONWAY & WISE LLP**
3435 Wilshire Blvd., Ste. 1400
Los Angeles, CA 90010-1923
323-982-4109

*Counsel for Plaintiffs and the Proposed Class*

[*additional counsel listed on signature page*]

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

M.C. 1 and M.C. 2, by and through their legal guardian NICOLE REISBERG, and M.C. 3 and M.C. 4, by and through their legal guardian AMY WARREN, individually and on behalf of all others similarly situated,

        Plaintiffs,

  v.

RENAISSANCE LEARNING, INC.

        Defendant.

Civ. No. 8:25-cv-01379

**AMENDED CLASS ACTION COMPLAINT FOR:**

1. **Violation of 18 U.S.C. § 2510**
2. **Violation of Cal. Penal Code §§ 631, 632**
3. **Violation of Cal. Penal Code § 638.51(a)**
4. **Violation of Cal. Penal Code § 502 *et seq*.**
5. **Violation of Cal. Bus. & Prof. Code § 17200 *et seq*.**
6. **Invasion of Privacy – Intrusion Upon Seclusion**
7. **Unjust Enrichment – Quasi Contract**
8. **Negligence**
9. **Violation of Wis. Stat. § 968.31**
10. **Violation of Wis. Stat. § 100.18**

**JURY TRIAL DEMANDED**

# **TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................5

II.     JURISDICTION AND VENUE..................................................8

III.    THE PARTIES .........................................................................9

IV.     FACTUAL ALLEGATIONS.....................................................10

   A.   Education is "the world's most data-mineable industry by far."...................10

   B.   Renaissance is a multibillion-dollar EdTech company specializing in the collection and analysis of student data....................................................11

   C.   Renaissance collects Plaintiffs' personal information through their use of the Products and unlawfully denies them access to their own information. ..............13

      1.   M.C. 3 and M.C. 4 use Nearpod by Renaissance. .....................................14

      2.   M.C. 3 and M.C. 4 use Fastbridge.............................................................15

      3.   M.C. 3 and M.C. 4 use SAEBRS by Renaissance.....................................16

      4.   M.C. 1 and M.C. 2 used Renaissance DnA. ...............................................18

      5.   Renaissance admits that it creates and collects a sweeping array of data from students who use its Products.......................................................20

      6.   The personal information created and taken from Plaintiffs far exceeds "education records."......................................................................23

      7.   Renaissance unlawfully denied Plaintiffs access to their own data..........23

   D.   Renaissance uses and shares student data for a variety of commercial purposes without effective consent. ...................................................................25

      1.   Renaissance admits that it uses student data to develop, support, and market its own products. ...................................................................26

      2.   Renaissance shares K-12 student data it collects through its Products with numerous third parties for commercial purposes.............................................29

      3.   Forensic analysis confirms that Renaissance shares Plaintiffs' personal information.........................................................................36

   E.   Renaissance fails to obtain effective consent for its sweeping generation, extraction, use, and disclosure of students' personal information........................45

      1.   Any purported consent was not informed: Renaissance does not provide students or their parents its terms of use or privacy policies. ...........................45

2.    Any purported consent was not freely given: Students' use of Renaissance's Products is compulsory. ............................................47

3.    Any purported consent was not authorized: Renaissance relies on schools' consent alone to create, take, use, and share student data.................................48

F.    Renaissance makes false and misleading statements about its data practices and the law on which it intends schools and parents to rely. .............................50

1.    Renaissance falsely states that it complies with COPPA and that schools may consent to its student data practices in lieu of parents. .............................50

2.    Renaissance falsely states that its products may be used in compliance with FERPA. ........................................................................................51

G.    Renaissance's nonconsensual data practices harm students, including Plaintiffs. ..........................................................................................52

1.    Renaissance harms children, including Plaintiffs, by invading their privacy. ...................................................................................................52

2.    Renaissance harms children, including Plaintiffs, by compromising the security of their personal information. ............................................................53

3.    Renaissance harms children by affecting their access to information, opportunities, and other basic rights through algorithmic profiling. ...............54

4.    Renaissance's nonconsensual data practices have prevented the development of a legitimate market for student data. ..........................................55

5.    Renaissance harms children by forcing them to choose between their right to an education and other fundamental rights. ....................................................59

H.    Renaissance's nonconsensual data practices are unfair and unlawful. .........60

V.    CLASS ACTION ALLEGATIONS ................................................................60

VI.    TOLLING OF THE STATUTE OF LIMITATIONS ....................................63

VII.    CAUSES OF ACTION ....................................................................................64

COUNT I: Violation of the Federal Wiretap Act, U.S.C. § 2510 *et seq.*..................64

COUNT II: Violation of the California Invasion of Privacy Act ("CIPA") ............67

Cal. Penal Code §§ 631, 632 ........................................................................................67

COUNT III: Violation of the California Invasion of Privacy Act ("CIPA")...........70

Cal. Penal Code § 638.51(a)........................................................................................70

COUNT IV: Violation of the Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502 *et seq*. ........................................................... 72

COUNT V: Violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq*. .................................................................. 74

COUNT VI: Invasion of Privacy—Intrusion Upon Seclusion ............................... 76

COUNT VII: Unjust Enrichment ........................................................................ 79

COUNT VIII: Negligence ................................................................................ 81

COUNT IX: Violation of the Wisconsin Electronic Surveillance Control Law ("WESCL") ................................................................................................. 85

COUNT X: Violation of Wisconsin's Deceptive Trade Practices Act (DTPA), Wis. Stat. § 100.18 ............................................................................................. 88

VIII.    RELIEF REQUESTED ..................................................................... 90

IX.      JURY TRIAL DEMAND ................................................................... 91

## I.    INTRODUCTION

1.    M.C. 1[1] and M.C. 2, by and through their mother and legal guardian Nicole Reisberg, and M.C. 3 and M.C. 4, by and through their mother and legal guardian Amy Warren ("Plaintiffs"), individually and on behalf of all other similarly situated individuals, by and through their attorneys, bring this amended class action complaint ("Complaint") for injunctive and monetary relief under Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) against Defendant Renaissance, Inc. ("Renaissance") and make the following allegations based upon knowledge as to themselves and the acts of themselves, and upon information and belief as to all other matters.

2.    Renaissance makes digital products that students in kindergarten through twelfth grade ("K–12") use for school.

3.    Renaissance's core business is generating, collecting, and analyzing as much information about the student users of its products as is technologically possible and monetizing that information.

4.    The Renaissance products that are the subject of this Complaint are Nearpod, an interactive instructional platform; Fastbridge, an assessment tool for monitoring and screening student progress; Renaissance DnA (formerly Illuminate), a student-assessment and data-analytics platform; and SAEBRS, a screening tool used to purportedly identify students who may be at risk for social-emotional or behavioral problems (collectively, "Renaissance's Products" or "Products").

5.    Through these Products, Renaissance creates and extracts personal information from K–12 students. It then uses that information for commercial purposes, including developing, marketing, and delivering its own products.

6.    Renaissance also allows numerous third parties to access the information it extracts from K–12 students for the commercial benefit of Renaissance and that of the

---

[1] The minor children's names have been anonymized, and they will be referred to herein as Minor Child ("M.C.") 1, 2, 3, and 4.

third parties.

7.    Renaissance admits that it takes, uses, and shares all manner of personal information from students, including Plaintiffs, who use or used Renaissance's Products at their respective schools.

8.    Renaissance claims that it has consent to do so and that its activities are therefore authorized; Plaintiffs allege that Renaissance does not and that its activities are therefore unlawful violations of their privacy rights.

9.    Thus, there is one question at the heart of this case: does Renaissance obtain effective consent before taking and using *any* personal information from students in the compulsory setting of K–12 education, let alone vast troves of it, as Renaissance admits to doing?

10.    Plaintiffs allege that, in building a multibillion-dollar company atop the personal information of Plaintiffs and millions of students like them, Renaissance has long flouted the requirements of effective consent.

11.    In order for consent to be effective as a defense to tortious conduct, it must—at minimum—be informed, voluntary, and provided by a person with authority to do so. None of those essential elements are met here.

12.    First, any purported consent obtained by Renaissance is not informed: because schools create Renaissance accounts for students, Renaissance does not even provide its terms of service or privacy policies to students or their parents. Renaissance also fails to explain its data practices in a reasonably understandable manner.

13.    Second, any purported consent is not voluntary: because children are required to attend school, they are coerced into submitting to Renaissance's data practices rather than freely consenting to those practices. Students' use of Renaissance's Products in a compulsory environment does not unambiguously manifest their assent to Renaissance taking and using their personal information.

14.    Third, any purported consent was not provided by a person with authority to do

so: Although Renaissance's users are minors, Renaissance does not claim that it obtains consent from users' parents or even from users themselves. Instead, Renaissance relies on the consent of school personnel alone. But schools do not have authority to consent to data harvesting of minor students by a private company; only parents do. Indeed, the interests of school administrators may not be aligned with those of students, disqualifying them from serving as students' agents in this context. That is why the law highly restricts what kinds of information that even a *school* may collect from students and how school personnel may use such information, let alone what a private vendor may do.

15.    That Renaissance has been collecting and using student information for years without effective consent does not confer legality on its business practices. There is no adverse possession of the law: violations are violations, regardless of whether a practice has been generally accepted within an industry or has conferred some benefit upon those whose information has been unlawfully taken.

16.    Privacy is a fundamental right. Children have a right to privacy in the information that is taken from them at school. Parents have a right to determine who may access that information and for what purpose—and the right to determine whether certain information is created in the first place.

17.    Renaissance's data practices force children to entirely forgo that right in order to receive the education to which they are legally entitled. And parents, by sending their children to school as is their right and duty, are forced to surrender their authority to decide what personal information may be collected about their children and how it may be used. Renaissance must be held to account for operating as though the fundamental rights of children and their parents do not exist.

18.    Plaintiffs are among the millions of school children whose information was unlawfully taken and used by Renaissance. Through their use of Renaissance's Products at school, Renaissance has obtained vast amounts of their personal

information, such as their name, contact information, identifying demographic information, assignment submissions, assessment scores, IP addresses, browser and device data, and behavioral data, to cite just a few examples.

19.    Neither Plaintiffs nor their parents consented to Renaissance taking any of this personal information. They were not notified of Renaissance's data practices, nor were they given a choice about whether to consent to them.

20.    Instead, Plaintiffs were required to use Renaissance's Products at school, enabling Renaissance to gain virtually unfettered access to their personal information. Renaissance then took their personal information and used the information for its own benefit, including creating new records based on their data to derive behavioral analytics about those children.

21.    Through this lawsuit, Plaintiffs seek to hold Renaissance accountable for its surreptitious and unlawful data practices, obtain redress for the millions of school children whose personal information has been unfairly exploited, and restore to students and parents their basic right to be free from unwanted intrusion into their lives.

## II.    JURISDICTION AND VENUE

22.    This Court has original jurisdiction over the action under the Class Action Fairness Act ("CAFA") of 2005. Pursuant to 28 U.S.C. sections 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative Class members exceed $5 million, exclusive of interests and costs, and at least one member of the proposed Class is a citizen of a different state than Defendant Renaissance.

23.    Venue is proper in this District under 28 U.S.C. section 1391 because Renaissance is subject to personal jurisdiction here, regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

24.    Further, the unlawful conduct alleged in this Complaint occurred in, was directed to, and/or emanated in part from this District. Renaissance has sufficient minimum

contacts with this state and sufficiently avails itself of the markets of this state through its promotion, sales, licensing, activities, and marketing within this state. Renaissance purposely availed itself of the laws of California and engaged and is engaging in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, including persons Renaissance knew or had reason to know are located in California, including in this District.

## III.    THE PARTIES

25.    Plaintiff M.C. 1 is a minor. At all relevant times, she has been a citizen of the state of California. M.C. 1 attended school in an Orange County, California school district. As part of her schooling, she was required to access and use Renaissance's DnA, which she accessed and used from her school-issued device.

26.    Plaintiff M.C. 2 is a minor. At all relevant times, he has been a citizen of the state of California. M.C. 2 attended school in an Orange County, California school district. As part of his schooling, he was required to access and use Renaissance's DnA, which he has accessed and used from his school-issued device.

27.    Nicole Reisberg is the mother and legal guardian of Plaintiffs M.C. 1 and M.C. 2. At all relevant times, she has been a citizen of the state of California.

28.    Plaintiff M.C. 3 is a minor. At all relevant times, he has been a citizen of the state of Kansas. M.C. 3 attended school in a Kansas school district. As part of his schooling, he was required to access and use Renaissance's Nearpod and Fastbridge, which he accessed and used from his school-issued device.

29.    Plaintiff M.C. 4 is a minor. At all relevant times, he has been a citizen of the state of Kansas. M.C. 4 attended school in a Kansas school district. As part of his schooling, he was required to access and use Renaissance's Nearpod and Fastbridge, which he accessed and used from his school-issued device.

30.    Amy Warren is the mother and legal guardian of Plaintiffs M.C. 3 and M.C. 4.

At all relevant times, she has been a citizen of the state of Kansas.

31.    Defendant Renaissance is a Wisconsin Corporation. Its headquarters are located at 2911 Peach Street, Wisconsin Rapids, WI 54494.

## IV.    FACTUAL ALLEGATIONS

32.    Renaissance both generates and collects personal information belonging to millions of students, including Plaintiffs, without effective consent in violation of state and federal law. It then monetizes that information by using it to build, market, deliver, and improve its own products. It also shares that information with myriad third parties for the commercial benefit of both Renaissance and the third parties that receive the information. Its use and disclosure of students' personal information further violates state and federal law.

33.    Renaissance admits that it collects, uses, and shares personal information from millions of K-12 students across the country. However, Renaissance failed and fails to obtain effective consent before taking and using that data. Plaintiffs have been harmed by Renaissance's nonconsensual generation, collection, use, and disclosure of their personal information.

**A.    Education is "the world's most data-mineable industry by far."**

34.    Student data is extremely valuable in today's data economy.

35.    Like other consumer data, student data is valuable because it can be used to develop, deliver, and improve products and services; personalize and target marketing; identify and manage risk; and predict future behaviors and trends.[2]

36.    By generating, collecting, and monetizing student information, education

---

[2] Hamed Ghorban Tanhaei, "Predictive analytics in customer behavior: Anticipating trends and preferences" (December 2024), *available at* https://www.sciencedirect.com/science/article/pii/S2666720724000924.

technology, or "EdTech,"[3] has become a $250 billion global industry that is projected to nearly triple by 2027.[4] Investors have taken note. Investments in EdTech surged from $500 million in 2010 to $16.1 billion in 2021.[5]

37.    Education has been described by a leading executive as "the world's most data-mineable industry by far."[6] As one leading EdTech investor explained, these investments are not philanthropic: the purpose of these private EdTech ventures "isn't a social mission . . . . They're there to create return."[7]

38.    The result is that EdTech has overtaken K-12 education. School districts access an average of nearly 3,000 EdTech tools during a school year. A single student accesses nearly fifty EdTech tools per year.

**B.    Renaissance is a multibillion-dollar EdTech company specializing in the collection and analysis of student data.**

39.    Renaissance is an EdTech company that markets and sells products and services to K-12 schools and school districts. It provides a host of products and services

---

[3] Although the term "educational technology" can be defined broadly to include purely theoretical or pedagogical practices, this Complaint uses "EdTech" to refer generally to "all the privately owned companies currently involved in the financing, production and distribution of commercial hardware, software, cultural goods, services and platforms for the educational market with the goal of turning a profit." *EdTech Inc.: Selling, Automating and Globalizing Higher Education in the Digital Age*, Tanner Mirrlees and Shahid Alvi (2019).

[4] Louise Hooper, *et al.*, *Problems with Data Governance in UK Schools*, Digital Futures Commission, 5Rights Foundation (2022), https://digitalfuturescommission.org.uk/wp-content/uploads/2022/08/Problems-with-data-governance-in-UK-schools.pdf.

[5] Alex Yelenevych, *The Future of EdTech*, Forbes (December 26, 2022), https://www.forbes.com/sites/forbesbusinesscouncil/2022/12/26/the-future-of-edtech/?sh=7c2924676c2f.

[6] Stephanie Simon, *The big biz of spying on little kids*, Politico (May 15, 2014), https://www.politico.com/story/2014/05/data-mining-your-children-106676.

[7] *Id.*

primarily focused on assessment, practice, instruction, and student-data analytics.

40.    One such product is Nearpod, an interactive instructional platform that allows teachers to create lessons with built-in activities, polls, quizzes, and immersive content like virtual reality field trips. Renaissance acquired Nearpod in 2018 for $650 million. According to Renaissance, approximately 75 percent of K-12 public schools in the U.S. use Nearpod, and Nearpod captured 1.5 billion "student learning insights" in 2020 alone.[8]

41.    Another Renaissance product is Fastbridge, a system of computer-adaptive and curriculum-based assessments for reading, math, and social-emotional behavior. According to Renaissance, FastBridge annually supports 34.7 million screening and 9.9 million progress monitoring administrations across 48 states.[9]

42.    Another Renaissance product is SAEBRS (Social, Academic, and Emotional Behavior Risk Screener). It is a tool that purportedly identifies students who are at risk for social-emotional behavior problems. It purports to assess both "the absence of problem behaviors and symptomatology (e.g., internalizing and externalizing behaviors) and the presence of well-being and competencies (e.g., social-emotional skills)."

43.    Another Renaissance product is Renaissance Data and Assessment ("Renaissance DnA," formerly Illuminate), a platform for creating and managing assessments and for visualizing student data from multiple sources to inform decisions. According to Renaissance, approximately 6.4 million students in the U.S. use

---

[8] https://nearpod.com/blog/covid-19-lasting-impact-k-12/#:~:text=Nearpod%20%E2%80%93%20which%20is%20now%20used,across%2019.5%20million%20lessons%20taught.

[9] https://www.prweb.com/releases/fastbridge-from-renaissance-now-reports-quantile-measures-providing-insight-into-students-math-abilities-302016318.html#:~:text=FastBridge%20annually%20supports%2034.7%20million,Renaissance%20and%20Nearpod%20General%20Manager.

Renaissance DnA.[10]

44.     Plaintiffs' school districts are among the thousands that use Nearpod, Fastbridge, Renaissance DnA, and/or SAEBRS.

45.     By persuading schools to implement its Products, Renaissance gains virtually unrestricted access to the personal information of the children who attend those schools, including Plaintiffs.

46.     Renaissance's Products do not merely serve as a digital filing cabinet in which K-12 schools may store education records, or locally stored digital workbooks. Rather, Renaissance uses these Products among others to generate, collect, store, share, and analyze data about students. These functions are core to Renaissance's business model and its ability to attract substantial investment capital.

47.     Given the significant value of student data in today's data economy, numerous private investment firms have made significant investments in Renaissance. In early 2014, for example, Google Inc.'s investment fund acquired a minority stake in Renaissance through a $40 million investment. Shortly thereafter, Renaissance was sold to the equity investment firm Hellman & Friedman for $1.1 billion. Since then, Renaissance has received millions of dollars from a host of investment firms, including Francisco Partners, which acquired the company in 2018, as well as TPG Capital and Blackstone.

48.     Renaissance has thus created a significant return for investors by taking and exploiting school-aged children's data at the expense of children's privacy, including Plaintiffs' personal information as described in this Complaint.

**C.     Renaissance collects Plaintiffs' personal information through their use of the Products and unlawfully denies them access to their own information.**

49.     Plaintiffs all use Renaissance's Products at their respective schools, including

---

[10] https://renaissance.widen.net/s/6qd2rx6mp6/786807-dnadistrictleaderoverview-deck-ren

Nearpod, Fastbridge, Renaissance DnA, and SAEBRS.

**1.    M.C. 3 and M.C. 4 use Nearpod by Renaissance.**

50.    Plaintiff M.C. 3 uses Nearpod at his school. He began using Nearpod in or about August 2023 when he began sixth grade. He was 11 years old. M.C. 3 regularly used Nearpod during sixth, seventh, and eighth grade to participate in interactive lessons assigned by his teachers. He currently uses it at least weekly at school.

51.    Plaintiff M.C. 4 also uses Nearpod at his school. He began using it in or about August 2025 when he began sixth grade. He was 11 years old. M.C. 4 regularly uses Nearpod to participate in interactive lessons assigned by his teachers. He currently uses it at least weekly at school.

52.    The school created the Nearpod accounts for M.C. 3 and M.C. 4. Neither M.C. 3 or M.C. 4 nor their parents were provided with any terms or policies pertaining to Nearpod, nor were they given a choice about whether to use it.

53.    Nearpod lessons span a variety of subjects and questions assume many forms. For example, they may ask the student to describe or assess their current understanding of certain material:



54.    Some are open-ended questions that require the student to submit their answer in a written format, fill-in-the-blank questions, polls for gauging the student's opinion

about an item, or multiple-choice questions. Other formats are more interactive, requiring that the student draw, write or type on an interactive digital canvas, collaborate digitally with their peers, match like pairs, or categorize and sort items.

55.    In completing their required schoolwork, Plaintiffs M.C. 3 and M.C. 4 have submitted information to Renaissance through Nearpod in all these formats.

56.    Using this student-provided data, Renaissance purports to make powerful inferences and predictions about the student's knowledge, understanding, and engagement with the lesson content. Beyond a simple right-or-wrong analysis, this academic and behavioral data provides insight into the student's thought process and learning habits. Renaissance analyzes that data to create to generate reports that purport to reveal the student's mastery of a skill, her ability to communicate her thoughts and think critically, and the likelihood that she will pass upcoming assessments.

57.    The data submitted by Plaintiffs M.C. 3 and M.C. 4 to Nearpod is highly personal: it facilitates insights and predictions regarding the children's skill mastery, strengths and weaknesses, depth of understanding, and comprehension challenges.

58.    Renaissance has thus generated and collected—and continues to generate and collect—vast troves of data belonging to M.C. 3 and M.C. 4, including their personal information, through their use of its Products.

59.    Neither M.C. 3, M.C. 4, nor their parents have consented to Renaissance's generation or collection of Plaintiffs' personal information through Nearpod.

60.    Ms. Warren requested access to her children's data from Renaissance, but Renaissance did not respond to her request in violation of the Children's Online Privacy Protection Act ("COPPA"). 15 U.S.C. § 6502; 16 C.F.R. § 312.6.

### 2.    M.C. 3 and M.C. 4 use Fastbridge.

61.    Plaintiff M.C. 3 began using Fastbridge in or about August 2017 when he was in kindergarten and was five years old. He continues to use it several times a year to participate in school-required academic assessments.

62.    Plaintiff M.C. 4 also began using Fastbridge in or about August 2019 when he was in kindergarten and was five years old. He continues to use it several times a year to participate in school-required academic assessments.

63.    The school created Fastbridge accounts for M.C. 3 and M.C. 4. Neither M.C. 3 or M.C. 4 nor their parents were provided with any terms or policies pertaining to Fastbridge, nor were they given a choice about whether to use it.

64.    The data submitted by Plaintiffs M.C. 3 and M.C. 4 to Renaissance through Fastbridge is highly personal: it facilitates insights and predictions regarding the children's skill and subject mastery, strengths and weaknesses, depth of understanding, and comprehension challenges.

65.    Renaissance has thus generated and collected—and continues to generate and collect—vast troves of data belonging to M.C. 3 and M.C. 4, including their personal information, through their use of its Products at school.

66.    Neither M.C. 3, M.C. 4, nor their parents have consented to Renaissance's generation or collection of Plaintiffs' personal information through Fastbridge.

67.    Ms. Warren requested access to her children's data from Renaissance, but Renaissance did not respond to her request in violation of COPPA.

### 3.    M.C. 3 and M.C. 4 use SAEBRS by Renaissance.

68.    Plaintiff M.C. 3 began using SAEBRS in or about August 2017 when he was in kindergarten and was five years old.

69.    Plaintiff M.C. 4 also began using SAEBRS in or about August 2019 when he was in kindergarten and was five years old.

70.    In elementary school, the children's teacher completes SAEBR surveys on their behalf. In middle school, the children begin completing their own surveys. M.C. 3 has completed his own surveys for the past three years, while M.C. 4 will complete his first survey this year.

71.    M.C. 3 accesses these surveys through ClassLink, the school's single-sign-on

platform.

72.    Neither M.C. 3 or M.C. 4 nor their parents were provided with any terms or policies pertaining to SAEBRS, nor were they given a choice about whether to use it.

73.    The school requires that students participate in surveys through the SAEBR platform at least twice a year. The surveys solicit highly personal and sensitive information from and about students, which includes having them rank their own social and emotional behavior:

| Social Behavior | Never | Sometimes | Often | Almost Always |
|---|---|---|---|---|
| I argue with others. | 3 | 2 | 1 | 0 |
| I get along with my peers. | 0 | 1 | 2 | 3 |
| I lose my temper. | 3 | 2 | 1 | 0 |
| I disrupt class. | 3 | 2 | 1 | 0 |
| I am respectful. | 0 | 1 | 2 | 3 |
| Other people like me. | 0 | 1 | 2 | 3 |
| I have trouble waiting my turn. | 3 | 2 | 1 | 0 |

| Emotional Behavior | Never | Sometimes | Often | Almost Always |
|---|---|---|---|---|
| I feel sad. | 3 | 2 | 1 | 0 |
| I feel nervous. | 3 | 2 | 1 | 0 |
| I like to try new things. | 0 | 1 | 2 | 3 |
| I am happy. | 0 | 1 | 2 | 3 |
| I am worried. | 3 | 2 | 1 | 0 |
| When something bad happens... | 3 | 2 | 1 | 0 |

74.    The data collected through SAEBRS permits a number of inferences and decisions to be made about the student, such as whether the student is at risk for social or emotional problems, how accurately the student perceives himself, and whether to require him to submit to an emotional regulation program or other intervention.

75.    Neither Plaintiffs nor their parents consented to Renaissance collecting and using this information from their children for any purpose.

76.    Ms. Warren requested access to her children's data from Renaissance, but Renaissance did not respond in violation of COPPA.

### 4.    M.C. 1 and M.C. 2 used Renaissance DnA.

77.    Plaintiff M.C. 1 began using Renaissance DnA in or about September 2021 when she started kindergarten grade at age 5, and she continued using it until December 2024. She accessed the platform through her Safari web browser on her school-issued iPad.

78.     Plaintiff M.C. 2 began using Renaissance DnA in or about September 2022 when he began kindergarten at age 5, and he continued using it until December 2024. He accessed the platform through his Safari web browser on his school-issued iPad.

79.     M.C. 1 and M.C. 2 accessed Renaissance DnA through ClassLink, the school's single-sign-on platform.

80.     The school created Renaissance DnA accounts for M.C. 1 and M.C. 2. Neither M.C. 1 or M.C. 2 nor their parents were provided with any terms or policies pertaining to Renaissance DnA, nor were they given a choice about whether to use it. They were not even informed that their children would be using Renaissance DnA.

81.     The school provided Ms. Reisberg some information as to the data Renaissance obtained from her children through their use of Renaissance DnA, although they cited only generic data elements rather than providing her access to their specific data. Those data elements included their school ID, student ID, student number, name, Gmail, Gmail password, date of birth, gender, grade level, attendance, lunch balance, and guardian information, including name, address, email, phone, and language.

82.     According to Renaissance, Renaissance DnA data may be "aggregate[d] and disaggregate[d.]"[11] It provides "[r]eal-time live" monitoring of student work and "[i]nstant results" with "distractor rationales and rich metadata[.]"[12]

83.     The school did not provide Ms. Reisberg any of the metadata generated during her children's use of Renaissance DnA and collected by Renaissance because, on information and belief, the school does not have access to that data; only Renaissance does.

84.     Ms. Reisberg requested access to her children's data from Renaissance, but Renaissance did not respond to her request in violation of COPPA.

---

[11] https://renaissance.widen.net/s/6qd2rx6mp6/786807-dnadistrictleaderoverview-deck-ren
[12] https://www.renaissance.com/products/assessment/dna/

**5.      Renaissance admits that it creates and collects a sweeping array of data from students who use its Products.**

85.      Renaissance admits that it creates and collects a sweeping array of data from students who use its Products.

86.      Renaissance admits that it collects the following information *automatically* from every student who uses its Products, which includes Plaintiffs:[13]

    a. **Plaintiffs' usage information, including but not limited to:**

       i.   how often a student accesses certain features;

      ii.  the student's browser;

     iii. the student's operating system;

     iv.  all of the areas within Renaissance's products that the student visits;

      v.   the time of day the student used the product; and

     vi.  "other information."

    b. **Plaintiffs' device information, including but not limited to:**

       i.   IP addresses;

      ii.  Other unique device identifiers for any device used to access the products;

     iii. The student's physical location;

     iv.  The student's internet service provider;

      v.   The date and time of a student's visit;

     vi.  The student's browser language;

     vii. The student's browser type;

    viii. Referring and exit pages of URLs;

     ix.  The amount of time a student spends on particular pages;

      x.   Which parts of the products the student uses;

     xi.  Which links the student clicks;

---

[13] https://renaissance.widen.net/view/pdf/9hoolemzvy/Renaissance---Childrens-Privacy-Notice.pdf?t.download=true&u=zceria

xii.  The student's search terms;

xiii.  Traffic and related statistics;

xiv.  Keywords;

xv.  Other general browsing information; and

xvi.  Other general usage information.

c.  **Information collected about Plaintiffs via cookies and other tracking technologies.**

87.  Plaintiffs allege that Renaissance does what it says it does: Renaissance collects the foregoing information automatically from students when they use its Products, which includes Plaintiffs when they use Renaissance's Products as required by their schools.

88.  Neither Plaintiffs nor their parents consented to Renaissance taking this data from them.

89.  Metadata generated and collected from students is as valuable to Renaissance as is the express data collected from students. While data submitted directly by a student supports predictions and inferences about her knowledge and understanding of certain subject matter, the metadata—or the data about the student's interactions with the Products—provides insights into her behavior and learning habits.

90.  Renaissance generates and gathers a wealth of metadata about Plaintiffs while they use its Products. This data reveals intimate details about the process that students use to arrive at their responses, and includes information such as response time, error patterns, gaps in mastery, engagement and focus, work ethic, and test-taking strategies.

91.  In addition to metadata, Renaissance also states that certain information is "required" to be generated and collected in order for students to access its Products, which includes:[14]

---

[14] https://renaissance.widen.net/view/pdf/dyg5r6yjs8/Categories-of-Data-Collected-by-Product.pdf?u=zceria&t.download=true

a. **Required data generated and collected by Renaissance through Renaissance DnA, including:**

    i.   Student's first and/or last name;

    ii.   Student identifiers – local (school district) ID number;

    iii.   Student's date of birth;

    iv.   Student's gender;

    v.   Student school enrollment;

    vi.   Student grade level;

    vii.   Teacher names;

    viii.   IP address of users, use of cookies, "etc.";[15]

    ix.   "Other application technology metadata"; and

    x.   Metadata on user interaction with application;

b. **Required data generated and collected by Renaissance through Fastbridge, including:**

    i.   Student app username;

    ii.   Student identifier – student app passwords;

    iii.   Student identifier – first and/or last name;

    iv.   Student school enrollment;

    v.   Student grade level;

    vi.   Student in-app assessment performance;

    vii.   Student's IP address, use of cookies, "etc.";

    viii.   "Other application technology metadata"; and

    ix.   Metadata on user interaction with application;

---

[15] Renaissance does not disclose specific types of metadata it collects through use of tracking technologies such as cookies as students use its Products, but Plaintiffs undertook forensic testing that revealed some of those details and the third parties who receive that data, as discussed in section IV.D.3., *infra*.

c. **Required data generated and collected by Renaissance through Nearpod.**

    i.  Student's IP address, use of cookies, "etc.";

    ii.  Student's teachers' names; and

    iii.  Student's teachers' emails.

92.    Plaintiffs allege that Renaissance does what it says it does: Renaissance collects the foregoing information from students when they use its Products, which includes Plaintiffs.

93.    Neither Plaintiffs nor their parents consented to Renaissance taking this data or any other data from them.

**6.    The personal information created and taken from Plaintiffs far exceeds "education records."**

94.    The data Renaissance generates and extracts from students who use its Products, including Plaintiffs, far exceeds what could be legally or traditionally characterized as "education records."

95.    Even if certain data could be characterized as education records, Plaintiffs—like all students—retain significant rights over the personal information contained in such records, which are protected by state and federal law.

96.    Further, the amount of data Renaissance collects about children, including children under 13, far exceeds that which is reasonably necessary for children to participate in any school activity that is facilitated by Renaissance products and services in violation of COPPA.

97.    That Renaissance's Products are not designed to optimize for student privacy is an intentional, self-interested choice that comes at the expense of children's privacy, safety, and autonomy.

**7.    Renaissance unlawfully denied Plaintiffs access to their own data.**

98.    Renaissance refuses to disclose to Plaintiffs or their parents the data it has

collected from or about them or grant them access to such data.

99.    Under COPPA, Renaissance is required to grant parents access to all personal information belonging to their children under 13. However, Renaissance has a policy of refusing to accommodate those requests.[16]

100.    For example, Plaintiff M.C. 1 and M.C. 2 are under 13. When Ms. Reisberg requested access to their personal information collected by Renaissance, Renaissance confirmed receipt of her request but falsely informed her that she was required to direct her request to her school. Renaissance never provided Ms. Reisberg access to either of her children's data, in clear violation of COPPA.

101.    Ms. Reisberg was unable to obtain access to her children's data through any other means. When she requested access to that information from her school district, the district disclosed the generic data elements that Renaissance obtains, but no personal data belonging to M.C. 1 or M.C. 2.

102.    Likewise, Plaintiff M.C. 3 was under 13 when he began using Renaissance Products, and M.C. 4 is still under 13. When Ms. Warren requested access to their data collected by Renaissance, Renaissance failed to respond.

103.    Renaissance has not yet provided Ms. Warren access to either of her children's personal information, in clear violation of COPPA.

104.    On information and belief, Renaissance has a policy of denying parents access to information about their children to which they are entitled, in violation of federal law.

105.    Ms. Warren was also unable to access any of her children's data through their school.

106.    Consequently, students and parents do not and cannot know the full extent of the personal information Renaissance generates and collects from and about students,

---

[16] https://renaissance.widen.net/view/pdf/9hoolemzvy/Renaissance---Childrens-Privacy-Notice.pdf?t.download=true&u=zceria

whether that data is accurate, how that data is stored, how long that data is retained, who has access to that data, or how that data or data-derivative information or products are used by Renaissance or third parties.

107.    Although Plaintiffs cannot know the full extent of the personal information taken from them by Renaissance, they base their allegations on Renaissance's own terms and policies that describe its data practices, their own personal experience using its Products, and expert forensic analysis of its Products.

**D.    Renaissance uses and shares student data for a variety of commercial purposes without effective consent.**

108.    In addition to generating and collecting vast troves of student data, including Plaintiffs' personal information, Renaissance uses and shares that information for a host of commercial purposes.

109.    Renaissance refuses to disclose how it uses and shares the data of any individual student to the student or their parent in violation of COPPA. Thus, Plaintiffs' allegations are based on Renaissance's own statements, as well as expert analysis of certain Renaissance products when in use.

110.    According to its own terms, Renaissance uses and discloses student data in at least the following ways that directly benefit Renaissance:

    a.  To develop and deliver its products;

    b.  To maintain and improve its products;

    c.  For analytics and reporting;

    d.  For general research;

    e.  To develop new technologies;

    f.  To develop and improve educational sites, products, and services;

    g.   To enforce its terms and conditions;

    h.  To protect its own rights, privacy, safety, and property;

    i.  To comply as it believes necessary with applicable laws, lawful requests, and legal processes such as responding to subpoenas or requests from

governmental authorities;

j.  With consent from schools "for purposes not identified here"; and

k.  With consent from parents "for purposes not identified here."

111.  Plaintiffs allege that Renaissance does what it says: it uses student data in the foregoing ways, which includes Plaintiffs' personal information. Neither Plaintiffs nor their parents consented to Renaissance using their personal information in these ways.

112.  Such uses enable Renaissance to monetize student data, including Plaintiffs' personal information.

113.  The following allegations elaborate upon just a few of Renaissance's uses and disclosures of student data.

**1.  Renaissance admits that it uses student data to develop, support, and market its own products.**

114.  Renaissance admits that it uses student data to develop, support, improve, and market its own digital products for commercial purposes, which it does without obtaining effective consent.

115.  Renaissance's products are designed to work synergistically to collect data on every aspect of a student's persona and then manipulate that data to influence the student. The data is then marketed to Renaissance's current and prospective customers to increase profits for Renaissance.

116.  Renaissance states that it uses student data in the following ways:[17]

a.  To provide them access to its products;

b.  To communicate with authorized users;

c.  To market to schools;

d.  To enforce its own rights arising from its terms of service and license agreement;

---

[17] https://core-docs.s3.amazonaws.com/documents/asset/uploaded_file/1756509/Accelerated_Reader.pdf

e.  To estimate school size and student usage patterns;

f.  To customize its products;

g.  To maintain and improve its products;

h.  To "demonstrate the effectiveness of," or market, its products;

i.  For reporting and analytics;

j.  For general research and development of new technologies;

k.  To improve and develop sites, services, and products;

l.  To support any of the above uses; and

m.  For "any other legitimate business purpose."

117.  Data flows freely between various Renaissance products in support of what Renaissance calls its Renaissance "ecosystem."

118.  Fueled by its ever-growing trove of student data, Renaissance's suite of cloud-based online products now includes more than a dozen data-extracting and data-derived products, including the Products that Plaintiffs have used, such as follows:

a.  **Freckle** – a differentiation platform for math, social studies, science and English language arts.

b.  **Schoolzilla** – provides dashboards that integrate multiple sources of student data.

c.  **Star Assessments** – computer-adaptive tests designed to measure student proficiency and growth.

d.  **Renaissance Next** – provides teachers and administrators with a comprehensive view of student data and insights across Renaissance's products.

e.  **Renaissance Fundamentals** – a survey-based tool that helps educators identify and address non-academic barriers to student learning and success by collecting information on their feelings about their school and themselves.

f.  **Star Phonics** – a technology-based Phonics Screener and Diagnostic Assessment tool.

g.  **SchoolCity** – an assessment platform used by districts to create, administer, and analyze formative and summative assessments aligned to specific

learning standards.

h. **eSchoolData** – a comprehensive, web-based student information system used by school districts to manage student data, including attendance, grades, scheduling, and state reporting.

i. **eduCLIMBER** – a data-analysis platform that integrates information from various sources to provide a comprehensive, visual overview of student performance.

119.   On information and belief, student data collected through Renaissance's products is not segregated, and the collection and use of that data is not limited to only the platforms and products licensed by schools. Rather, Renaissance consolidates "siloed" student data to provide "whole child data." In other words, Renaissance's unification of data from multiple sources enables more targeted student surveillance, predictions of academic and behavioral outcomes.

120.   Renaissance also uses student data, including Plaintiffs' personal information, to develop its artificial intelligence technologies, which Renaissance has incorporated and continues to incorporate into its suite of products. For example, in July 2024, Renaissance announced the launch of Renaissance Next, an "AI-powered tool" that Renaissance's Chief Product Officer, Todd Brekhus, claimed draws on the "rich resource" of the "Renaissance database" that "incorporates over 38 years of real student and teacher data and insights."

121.   Renaissance also purports to reserve an unlimited license to use student data, which includes Plaintiffs' personal information, for its own benefit without compensation to students.

122.   Specifically, Renaissance's terms of service purports to grant itself "a non-exclusive, royalty-free, worldwide license to use the Customer Data throughout the Term to perform under the Agreement and as further described in the Data Protection

Addendum."[18]

123.    Plaintiffs allege that Renaissance does what it says: it uses "Customer Data," which includes Plaintiffs' personal information, to build, develop, improve, and market its products as described in its terms of service and data processing addendum. Neither Plaintiffs nor their parents consented to Renaissance using their personal information in this manner.

124.    Although Renaissance markets its products, including the Products used by Plaintiffs, as conferring administrative and pedagogical benefits to schools and school districts, these products are undeniably commercial, for-profit products that have enabled Renaissance to build a multibillion-dollar data-analytics company at the expense of student privacy.

## 2.    Renaissance shares K-12 student data it collects through its Products with numerous third parties for commercial purposes.

125.    Renaissance discloses personal information to a host of third parties.

126.    Renaissance discloses personal information to schools and educators.

127.    Renaissance discloses personal information to and under the following circumstances, without student, parent, or school consent:

    a.  governmental entities, including law enforcement;

    b.  personnel in legal proceedings;

    c.  "when required by law";

    d.  in response to bankruptcy proceedings;

    e.  when necessary to defend its rights;

    f.  to provide information to a claimed owner of intellectual property who claims that content a Child has provided to Renaissance infringes on their rights;

    g.  upon request of or as otherwise authorized by an academic institution connected to an investigation into academic integrity;

---

[18] https://renaissance.widen.net/view/pdf/lpbviw3kbm/US-Terms-of-Service-and-License-Short-Form.pdf?t.download=true&u=zceria

    h.  to protect and/or defend its Terms of Service agreement or other policies applicable to its products;

    i.  to protect the personal safety, rights, property or security of any organization or individual; and

    j.  to identify users, including in cooperation with copyright owners, Internet service providers, wireless service providers or law enforcement agencies in our discretion.

128.    Renaissance discloses personal information to a parent entity of Renaissance for business and operational purposes.

129.    Renaissance discloses personal information to affiliates of Renaissance for business and operational purposes.

130.    Renaissance discloses personal information to investors of Renaissance for business and operational purposes.

131.    Renaissance discloses personal information in the event of a business transition such as a merger, acquisition, or sale of all or a portion of Renaissance's assets, bankruptcy, "other corporate change (including, without limitation, during the course of any due diligence process)."

132.    Renaissance also discloses personal information with myriad entities that it variously describes as "service providers," "sub-processors," or "vendors" for a host of purposes, including:

    a.  hosting;

    b.  information technology;

    c.  customer support;

    d.  data security;

    e.  consumer research services;

    f.  educational research services; and

    g.  to obtain analytics and other information regarding traffic on its products.

133.    Renaissance does not describe what student data is shared with each vendor.

134.   Renaissance amends its list of purported subprocessors without notice to parents in violation of COPPA.

135.   Renaissance does not adequately describe who those entities are, what those entities do with student data, what types of student data they collect, how they collect student data, or why student data is shared with those entities.

136.   As of the date of this filing, Renaissance lists dozens of "vendors," along with a generic description of the purpose of sharing, as follows (the description of the vendor is not included in Renaissance's disclosures but is added for clarity):

| Vendor Name | Stated Purpose for Data Sharing | Vendor Description |
|---|---|---|
| 1.  Amazon Web Services (AWS) | Hosting, Engineering and Product Support and Development (all products) | The world's most comprehensive and broadly adopted cloud platform, offering over 200 fully featured services from data centers globally. It provides computing power, database storage, content delivery, and other functionalities. |
| 2.  Microsoft Azure | Hosting (all products) | Microsoft's cloud computing platform, offering a wide range of cloud services, including computing, analytics, storage, and networking, for building, deploying, and managing applications and services. |
| 3.  Amazon Web Services (Singapore) | Hosting (all products) | This is a specific geographical region for Amazon Web Services, indicating data centers and services located in Singapore to serve customers in the Asia-Pacific region with lower latency. Functionally, it's part of the broader AWS. |

| Vendor Name | Stated Purpose for Data Sharing | Vendor Description |
|---|---|---|
| 4. Hexacta | Engineering Support (all products) | An Argentina-based software development and IT consulting company that provides custom software development, UX/UI design, quality assurance, and digital transformation services. |
| 5. Pendio.io | Product Analytics and In-Product Notification (all products) | A data platform company that focuses on simplifying data integration and management for businesses, often enabling them to connect various data sources and prepare data for analytics. |
| 6. Snowflake | Cloud Data Platform (all products) | A cloud-based data warehousing company that provides a "Data Cloud" platform, allowing organizations to store, process, and analyze vast amounts of data using a single, integrated service. |
| 7. Datadog | Engineering Support (all products) | A monitoring and analytics platform for cloud-scale applications, providing end-to-end visibility across infrastructure, applications, and logs, helping organizations identify and resolve performance issues. |
| 8. Fivetran | Engineering Support (all products) | A data integration company that automates the extraction, loading, and transformation (ELT) of data from various sources into cloud data warehouses, simplifying the data pipeline for analytics. |

| Vendor Name | Stated Purpose for Data Sharing | Vendor Description |
|---|---|---|
| 9. EPAM Systems | Engineering Support and Product Development (all products) | A global provider of digital platform engineering and software development services, offering IT consulting, product development, and digital transformation solutions across various industries. |
| 10. BristleCone | Software Development (all products) | A global supply chain and analytics consulting firm that helps companies optimize their supply chain processes, implement technology solutions, and leverage data for better decision-making. |
| 11. R Systems | Product Development (all products) | An India-based global technology and analytics services company providing digital transformation, product engineering, and intelligent automation solutions. |
| 12. Cardinal Integrated Technologies | Product Development (all products) | A company that typically provides integrated technology solutions, often specializing in areas like automation, control systems, and IT infrastructure for industrial or commercial clients. |
| 13. Google Cloud Platform | Identity Management/Access Management (Nearpod) | Google's suite of cloud computing services that runs on the same infrastructure Google uses internally. It offers services for computing, data storage, analytics, machine learning, and networking. |

| Vendor Name | Stated Purpose for Data Sharing | Vendor Description |
|---|---|---|
| 14. Cloudflare | DNS, CDN, and Application Security (Nearpod) | A web infrastructure and website security company that provides content delivery network (CDN) services, DDoS mitigation, internet security, and distributed domain name server (DNS) services. |
| 15. Providigi | Engineering Support (Nearpod) | A digital solutions company often focusing on digital marketing, web development, and e-commerce solutions for businesses. |
| 16. Mandrill | Transactional and Triggered Emails (Nearpod) | (Now part of Mailchimp) A transactional email API for developers that provides a scalable and reliable way to send automated, data-driven emails (like password resets, order confirmations, etc.). |
| 17. Chameleon Intelligent Tech | In-App Communication (Nearpod) | A company specializing in adaptive or personalized technology solutions, potentially leveraging AI to tailor user experiences or system behaviors. |

137. Plaintiffs allege that Renaissance does what it says: it discloses the foregoing information to third parties, which includes Plaintiffs' personal information, in order to develop, operate, and market its products. Indeed, Renaissance states that it must disclose personal information to these third parties in order to operate its products.[19]

138. Neither Plaintiffs nor their parents consented to Renaissance disclosing their personal information to any third party.

139. The information Renaissance provides terms and policies has little meaning to

---

[19] https://www.Renaissance.com/policies/product-privacy-policy

the average person and does not adequately describe Renaissance's data practices.

140.  Renaissance includes no links to any of its vendors' terms of use or privacy policies.

141.  In addition to sharing personal information with these purported vendors, Renaissance discloses personal information through expansive data-sharing agreements with numerous third-party companies.

142.  This sharing of student data commercially benefits both Renaissance and the third parties.

143.  Its primary value to third-party partners depends on maximizing access to student data.

144.  Data exchanged through these partnerships—including children's personal information—enables Renaissance and participating partners to develop, improve, expand, deliver, support, market, and sell their products and services.

145.  Renaissance markets to its partners "open interoperability" that allows data integration "via our open architecture design and customization capabilities."

146.  Renaissance shares data directly with its partners through its "robust API [Application Programming Interfaces] technology." It "support[s] a vast range of integrations—including SSO [single sign-on] and data exchanges[.]"

147.  Fastbridge and Renaissance DnA integrate with the single-sign-on platforms Clever and ClassLink, both of which Plaintiffs' schools have used. With these platforms, Renaissance shares student data obtained through Fastbridge and Renaissance DnA, including their student ID, gender, date of birth, and "race demographics."[20] This data is transmitted through Renaissance's OneRoster API, which facilitates real-time transmission of data between platforms.

148.  Renaissance DnA integrates with numerous products offered by various

---

[20] https://support.renaissance.com/s/article/ClassLink-OneRoster-Integration-Requirements-1752694443694?language=en_US

companies, including Blackboard by Finalsite and Schoology by PowerSchool[21]—other products used by M.C. 1's and M.C. 2's school.

149.    M.C. 3 and M.C. 4. also use Nearpod, which integrates with Canvas by Instructure[22] and Microsoft Teams,[23] two other platforms that M.C. 3 and M.C. 4's schools require them to use.

150.    This data sharing is beneficial to both Renaissance and the third parties with whom Renaissance shares or exchanges data. The companies all monetize the data in numerous ways, such as by using it to develop and enhance their own products, facilitate greater data analytics and "user insights," improve internal operations, or more effectively target their marketing efforts and attract new customers. These types of indirect data monetization can be at least as valuable to a company as directly monetizing it through the sale of raw or aggregated data.

151.    Neither Plaintiffs nor their parents consented to Renaissance disclosing their personal information to any third party. Renaissance was not permitted to rely on the consent of schools alone before making Plaintiffs' personal information available to wide-ranging third parties. Plaintiffs and their parents were denied the choice as to whether to permit Renaissance or any other company to use their personal information to fuel this highly profitable, industry-wide, data-sharing ecosystem.

### 3. Forensic analysis confirms that Renaissance shares Plaintiffs' personal information.

152.    Forensic analysis of Renaissance products used by M.C. 3 and M.C. 4, and monitoring the hypertext transfer protocol ("HTTP") traffic generated by certain Renaissance products, reveals that Renaissance generates, records, and transmits

---

[21] https://support.renaissance.com/s/article/Integrations-Overview-1752675501441?language=en_US

[22] https://support.renaissance.com/s/article/LTI-1-3-Canvas-1752689735798?language=en_US

[23] https://support.renaissance.com/s/article/How-to-use-Nearpod-with-Microsoft-Teams-1752690016781?language=en_US

information about Plaintiffs to third parties in real time.

153.   The third-party recipients of information belonging to Plaintiffs include advertising companies, marketing companies, and identity-resolution companies.

154.   The categories of information being generated, recorded, and transmitted to third party companies, and the identity of the third parties with which that information is shared, are determined by each Renaissance product and are typical of all student accounts.

155.   Because they vary by product, the categories of information being generated, recorded, and transmitted to third party companies do not vary by user, their school, or their school district. In other words, every user of a given Renaissance product is subject to the same data practices regardless of their school or location.

a. **Renaissance's Nearpod product.**

156.   Renaissance's Nearpod product generates, records, and transmits personal information about students in real time to third parties, without the knowledge or consent of the students or their parents.

157.   When a student interacts with a Nearpod web page, certain interactions cause information to be generated, recorded, and instantaneously transmitted to third parties.

158.   **Google.** For example, when a student loads a Nearpod page on a web browser, the page load user action triggers Google Analytics and Google Tag Manager, which are marketing tools that create information about the student and transmit it to Google in real time.

159.   Nearpod causes student information to be sent to Google every time a student loads the page.

160.   Google Analytics transmits two packets of information to Google, a first packet with several unique user identifiers, including the "**_gid**" parameter, the "**jid**" parameter, and the "**a**" parameter, and a second packet with the Google Tag Manager Tag ID.

161.    As for the first type of packet, the **_gid** parameter is a unique user identifier that allows information associated with the **_gid** parameter originating in the Nearpod product to be combined with information associated with the same **_gid** parameter that originated in other applications used by a student, into a unique, longitudinal profile about that student.

162.    The Nearpod product automatically generates, collects, and transmits information about how a student interacts with the Nearpod product in real time when the student is interacting with the product and, using Google Analytics and Google Tag managers while that information is in transit, associates that information with the **_gid** parameter and simultaneously transmits it to Google.

163.    On information and belief, the student information associated with the **_gid** parameter and transmitted to Google in real time includes which pages within any Renaissance product that a student visits and for how long; the origin of the visitor, such as whether the visitor came from another website, a search engine, or a direct visit; information about the total number of sessions and engagement time; and device and browser information, including data about the type of device; and the operating system.

164.    The **_gid** parameter is vital for obtaining real-time insights and acquiring user-specific data.

165.    The **jid** parameter, or JoinID, is a unique user identifier that joins user information originating in the Nearpod product and collected through Google Analytics with the Doubleclick cookie, a proprietary Google advertising cookie.

166.    Joining the Google Analytics information with the Doubleclick cookie in this way makes user information available to Doubleclick and, on information and belief, allows the uniquely identified student to be targeted for advertising.

167.    The "**a**" parameter is a unique user identifier that joins user information originating in the Nearpod product and collected through Google Analytics with the

AdSense cookie, another proprietary Google advertising cookie.

168.   Joining the Google Analytics information with the AdSense cookie in this way makes user information available to AdSense and, on information and belief, allows Google to monetize advertisements directed to the uniquely identified student.

169.   As for the second type of packet, the Google Tag Manager Tag ID can be converted into a unique user identifier that can be used to identify a specific student.

170.   On information and belief, Google combines user information originating in the Nearpod product with other information it has received from other Google-owned properties into a unique, longitudinal profile about student users, which it then uses or is capable of using for its own purposes, independent of the services it provides Renaissance.

171.   **Mixpanel.** As a second example, when a student interacts with a Nearpod page on a web browser, the interactions cause user information to be sent to Mixpanel, Inc. in real time.

172.   Mixpanel is a marketing and analytics company that observes how users interact with web pages.

173.   Student actions, or interaction events, that trigger the transmittal of information originating in Nearpod to Mixpanel are "Join Session," "Student Activity Submission," "Interactive Video Play," and "Drawit Socket Connection."

174.   In other words, these events are triggered when a student works on an assignment on a Nearpod page.

175.   These triggering events cause a student's actual identity, including their first name, last name, city, and state, to be associated with a Mixpanel "Distinct ID."

176.   In addition to being associated with a student's first name, last name, city, and state, the Mixpanel Distinct ID is also associated with the student's gender, the unique devices they use, and the student's lifetime value in U.S. dollars, according to Mixpanel.

177.   Mixpanel automatically collects information about how a student interacts with the Nearpod product, including which pages they visit and for how long; the origin of the visitor, such as whether the visitor came from another website, a search engine, or a direct visit; information about the total number of sessions and engagement time; and device, browser, and operating system information.

178.   Mixpanel comprehensively tracks a student's interactions in real-time, observing where the student moves their mouse; how the student scrolls; where and how quickly the student types; the specific videos the student watches; how long the student watches specific videos; other specific content the student interacts with; and how long the student interacts with the content. These interactions are students' communications with Renaissance, and through Mixpanel's integration with Nearpod through source code, these communications are intercepted by Nearpod and Mixpanel simultaneously and in real-time when the student takes each of those actions on the product.

179.   Mixpanel allows Nearpod to generate hypotheses and launch experiments designed to test how students interact with the Nearpod product.

180.   The Mixpanel Distinct ID associated with a student allows data about that student to be combined with data from other sources, enabling longitudinal behavioral profiling of the student.

181.   Upon information and belief, Mixpanel uses data it collects from students' interactions with Nearpod—such as real-time mouse movements, scrolling behavior, typing speed and patterns, video engagement metrics, and content interaction timestamps—not solely to provide analytics services to Renaissance, but also to refine its own predictive models, develop new commercial tools and features, benchmark behavioral engagement across clients, and create or train proprietary datasets and algorithms for use in other unrelated products or services.

182.   **Microsoft.** As a third example, when a student loads the Nearpod page on a web browser, the page load user action causes a unique Microsoft user ID to be sent to

Microsoft advertising, MSN, and LinkedIn in real time.

183.   The unique Microsoft user ID is used to develop a persistent, longitudinal profile of individual students.

184.   **Xandr.** As a fourth example, when a student loads a Nearpod page on a web browser, the page load user action causes a universally unique user ID associated with that student to be sent to Xandr, Inc., the advertising and analytics subsidiary of Microsoft.

185.   Xandr is a global marketplace for premium digital advertising.

186.   The Xandr universally unique user ID is used to develop a persistent, longitudinal profile of individual students to deliver personalized advertisements to them.

187.   **Comscore.** As a fifth example, when a student loads a Nearpod page on a web browser, the page load user action causes a universally unique user ID associated with that student to be sent to Comscore, Inc. in real time.

188.   Comscore is an advertising measurement, marketing data, and analytics platform that sells audience data to third parties.

189.   Comscore can identify a single anonymous student's media consumption across multiple devices and can uniquely identify that student.

190.   The Comscore universally unique user ID, on information and belief, can track all student activity within a web browser and all tabs, as well as the student's location.

191.   **Taboola.** As a sixth example, when a student loads a Nearpod page on a web browser, the page load user action causes a universally unique user ID associated with that student to be sent to Taboola, Inc. in real time.

192.   Taboola is an online advertising platform that sells audience data.

193.   The Taboola universally unique user ID enables data about a student from different sources to be combined.

194.   The Taboola universally unique user ID is used to develop a persistent,

longitudinal profile of individual students.

195.   The Taboola universally unique user ID is used to recommend other internet content to students based on what Taboola knows about that student.

### b.  Renaissance's Fastbridge product.

196.   Renaissance's Fastbridge product generates, records, and transmits personal information about students in real time to third parties, without the knowledge or consent of the students or their parents.

197.   When a student interacts with a Fastbridge web page, certain interactions cause information to be generated, recorded, and instantaneously transmitted to third parties.

198.   **Google.** For example, when a student loads a Fastbridge page on a web browser, the page load user action triggers Google Analytics and Google Tag Manager, which are marketing tools that create information about the student and transmit it to Google in real time.

199.   Fastbridge causes student information to be sent to Google every time a student loads the page.

200.   Google Analytics transmits two packets of information to Google, a first packet with several unique user identifiers, including the "**_gid**" parameter, the "**jid**" parameter, and the "**a**" parameter, and a second packet with the Google Tag Manager Tag ID.

201.   As for the first type of packet, the **_gid** parameter is a unique user identifier that allows information associated with the **_gid** parameter originating in the Fastbridge product to be combined with information associated with the same **_gid** parameter that originated in other applications used by a student, into a unique, longitudinal profile about that student.

202.   The Fastbridge product automatically generates, collects, and transmits information about how a student interacts with the Fastbridge product in real time when the student is interacting with the product and, using Google Analytics and Google Tag

managers while that information is in transit, associates that information with the **_gid** parameter and simultaneously transmits it to Google.

203.    On information and belief, the student information associated with the **_gid** parameter and transmitted to Google in real-time includes which pages within any Renaissance product that a student visits and for how long; the origin of the visitor, such as whether the visitor came from another website, a search engine, or a direct visit; information about the total number of sessions and engagement time; and device and browser information, including data about the type of device; and the operating system.

204.    The **_gid** parameter is vital for obtaining real-time insights and acquiring user-specific data.

205.    The **jid** parameter, or JoinID, is a unique user identifier that joins user information originating in the Fastbridge product and collected through Google Analytics with the Doubleclick cookie, a proprietary Google advertising cookie.

206.    Joining the Google Analytics information with the Doubleclick cookie in this way makes user information available to Doubleclick and, on information and belief, allows the uniquely identified student to be targeted for advertising.

207.    The "**a**" parameter is a unique user identifier that joins user information originating in the Fastbridge product and collected through Google Analytics with the AdSense cookie, another proprietary Google advertising cookie.

208.    Joining the Google Analytics information with the AdSense cookie in this way makes user information available to AdSense and, on information and belief, allows Google to monetize advertisements directed to the uniquely identified student.

209.    As for the second type of packet, the Google Tag Manager Tag ID can be converted into a unique user identifier that can be used to identify a specific student.

210.    Further, student first names and student last names are passed between various Fastbridge webpages via query parameters. When these pages trigger Google scripts,

Google Analytics causes student first names and student last names to be sent Google.

211. On information and belief, Google combines user information originating in the Fastbridge product with other information it has received from other Google-owned properties into a unique, longitudinal profile about student users, which it then uses or is capable of using for its own purposes independent of the services it provides Renaissance.

212. **LeadFeeder.** As a second example, when a student loads a Fastbridge page on a web browser, the page load user action causes user information to be sent to LeadFeeder in real time.

213. LeadFeeder is the business name of Dealfront Finland Oy and its affiliates, including but not limited to Echobot Media Technologies GmbH and Echobot Group GmbH.

214. LeadFeeder is a marketing insights company that "turns anonymous traffic into real [ ] names" and reveals "the exact behavior" of website visitors.

215. The LeadFeeder universal unique identifier, "**lfclientId**," is used to create a persistent, longitudinal profile of individual students.

216. The LeadFeeder **lfclientId** identifier is combined with Google's tracking identifiers, including a Google Analytics tracking identifier and a Google Tag Manager Tag ID, to uniquely identify a student.

217. The LeadFeeder **lfclientId** identifier includes a parameter, "anonymize=false," that does not anonymize the student's IP address.

218. The LeadFeeder **lfclientId** identifier includes a parameter, "autoTrackingEnabled:true," that enables automatic tracking of individual users.

219. Leadfeeder uniquely identifies website visitors, including their first name, last name, email address, and phone number, even when visitors use a site anonymously and do not voluntarily provide their contact information.

220. **Microsoft.** As a third example, when a student loads the Fastbridge page on a

web browser, the page load user action causes a unique Microsoft user ID associated with that student to be sent to Microsoft advertising, MSN, and LinkedIn in real time.

221.   The unique Microsoft user ID, on information and belief, is used to develop a persistent, longitudinal profile of individual students and is used to track user activity across websites.

**E.   Renaissance fails to obtain effective consent for its sweeping generation, extraction, use, and disclosure of students' personal information.**

222.   Renaissance has failed and continues to fail to obtain effective consent for its sweeping collection and use of student data, including Plaintiffs' personal information.

223.   Specifically, any purported consent obtained by Renaissance is ineffective because (1) Renaissance fails to provide sufficient information to support informed consent; (2) student use of Renaissance's Products is not voluntary; and (3) such consent is not obtained from a person with authority to provide consent to Renaissance's collection and use of student information.

**1.   <u>Any purported consent was not informed</u>: Renaissance does not provide students or their parents its terms of use or privacy policies.**

224.   A party seeking to raise consent as a defense to alleged tortious conduct has the burden of proving that it obtained effective consent.

225.   Effective consent may be express or implied, but it must be actual.

226.   Effective consent must be informed, meaning the aggrieved person must have sufficient knowledge of the nature of the act or transaction to make an educated decision.

227.   Further, before collecting personal information from children under 13, Renaissance is required to provide parents notice of its data practices that is "clearly and understandably written, complete," and that contains "no unrelated, confusing, or contradictory materials." 15 U.S.C. § 6502; 16 C.F.R. § 312.4.

228.   Renaissance does not provide students or their parents any notice of its data

practices before collecting student data.

229.    Neither Plaintiffs nor their parents created their own Renaissance accounts; their schools did.

230.    Renaissance also did not provide notice of its data practices to Plaintiffs or their parents before Plaintiffs began using their Renaissance accounts.

231.    Thus, neither Plaintiffs nor their parents received *any* information necessary to support informed consent.

232.    Even if Renaissance had provided Plaintiffs' parents its terms and policies, Plaintiffs' parents would not have been able to understand them or Renaissance's data practices. In fact, it is difficult to determine the totality of Renaissance's terms and policies, as they are scattered across its own sprawling website.

233.    The terms and policies also reference and incorporate other materials that are not readily available to parents. For example, the Notice of Renaissance's Practices Relating to Children's Online Privacy states that its use and processing of the personal information it collects is governed by agreements with the schools and that those schools may have their own privacy policies that govern the personal information collected in connection with their use of Renaissance products. The policy also states that "the policies of the applicable school govern how they process and share personal information relating to the products, including with respect to any rights users may have to such personal information."

234.    Renaissance also fails to provide public access to other relevant documents that are referred to in its terms and policies, including:

    a.  Information Security Overview 2025;

    b.  Acceptable Use Policy;

    c.  Business Continuity Management Policy;

    d.  Customer Data Confidentiality Policy;

    e.  Incident Response Plan;

f.  Information Security Policy; and

g.  Vendor Management Policy.

235.  Therefore, even if a parent was notified that their child would be using Renaissance products at school, it would be impossible for that parent to understand Renaissance's data practices as necessary to support their informed consent to those practices on behalf of their child.

236.  Because neither Plaintiffs nor their parents were notified of Renaissance's data practices, any purported consent provided by them was ineffective because it was not informed.

## 2.  <u>Any purported consent was not freely given</u>: Students' use of Renaissance's Products is compulsory.

237.  A party seeking to raise consent as a defense to alleged tortious conduct has the burden of proving that it obtained effective consent.

238.  For consent to be effective, it must be freely given.

239.  Every state has compulsory education laws.

240.  Schools use Renaissance's Products to support a host of pedagogical and administrative functions.

241.  Students, including Plaintiffs, whose schools use Renaissance's Products are required to use them. Students are not given a choice to forgo using those Products.

242.  Even if students theoretically could opt out of using Renaissance's Products and avoid having Renaissance take their personal information, Renaissance may not place students and their parents in the position of having to choose between their right to privacy and their right to an education. Nor may Renaissance place students and their parents at risk of compromising their relationship with their teachers and school administrators. Such inherently coercive circumstances do not support freely given consent.

243.  Use of Renaissance's Products under these circumstances would not lead a

reasonable person to believe that a student or their parent had freely consented to Renaissance's data practices.

244.   Because Plaintiffs were unable to decline or avoid using Renaissance's Products, any purported consent they provided by which they agreed to submit to Renaissance's data practices is ineffective.

### 3.   <u>Any purported consent was not authorized</u>: Renaissance relies on schools' consent alone to create, take, use, and share student data.

245.   A party seeking to raise consent as a defense to alleged tortious conduct has the burden of proving that it obtained effective consent.

246.   For consent to be effective, it must be obtained from the aggrieved person or a person authorized to consent on their behalf.

247.   In addition to general standards governing consent, COPPA contains a heightened parental-consent requirement that Renaissance must meet before it may collect personal information from children under 13. *See* 16 C.F.R. § 312.5. Specifically, COPPA requires that Renaissance "obtain verifiable parental consent before any collection, use, or disclosure of personal information from children, including consent to any material change in the collection, use, or disclosure practices to which the parent has previously consented." *Id.* § 312.5(a)(1).

248.   Renaissance has never obtained, and does not purport to obtain, consent from students or their parents before it generates, collects, uses, or discloses the personal information of students, including Plaintiffs.

249.   Instead, for children under 13, Renaissance purports to shift the responsibility of obtaining parental consent for Renaissance's creation, collection, and use of student data to schools and fails to obtain any evidence of assent by students or parents themselves.

250.   Renaissance also or alternatively relies on the school's consent alone. Renaissance's privacy policy falsely states that "[t]he school may consent to the

collection, use or disclosure of personal information from Children by agreeing to use or purchase the products."

251.   Plaintiffs' respective schools did not have authority to consent to Renaissance's taking of their personal information.

252.   School personnel are not Plaintiffs' legal guardians.

253.   Plaintiffs' schools do not own Plaintiffs' personal information.

254.   Plaintiffs' have significant privacy and property rights in their own personal information.

255.   Plaintiffs' school could not and cannot legally consent—in lieu of Plaintiffs or over their objections—to the collection or use of their personal information by Renaissance, even if such collection and use may confer a benefit upon schools that is administrative, pedagogical, or otherwise, or even upon students themselves.

256.   Plaintiffs' schools do not control the generation, collection, storage, use, or disclosure of Plaintiffs' personal information by Renaissance or any third party to which Renaissance grants access to Plaintiffs' personal information.

257.   Plaintiffs retain significant, legally protected privacy interests in their personal information contained within education records, as that term is defined under the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g.

258.   Renaissance generates and obtains student data, including Plaintiffs' personal information, in excess of education records, as that term is defined under FERPA and interpreting case law.

259.   Renaissance generates, obtains, and uses student data, including Plaintiffs' personal information, in excess of legitimate educational interests.

260.   Renaissance rediscloses students' data, including Plaintiffs' personal information, to a host of third parties without obtaining consent from students or their parents.

261.   Renaissance does not require or obtain proof that students or parents have

authorized their respective schools to act as their agent or intermediary to provide consent on their behalf.

262.   Renaissance did not require or obtain proof that Plaintiffs authorized their respective schools to consent on their behalf as their agent or intermediary.

263.   Renaissance has thus generated, collected, retained, used, and disclosed Plaintiffs' personal information without effective consent, and it continues to do so.

**F.     Renaissance makes false and misleading statements about its data practices and the law on which it intends schools and parents to rely.**

264.   Renaissance makes false and misleading statements about its data practices and the law on which it intends school personnel and parents to rely.

**1.    Renaissance falsely states that it complies with COPPA and that schools may consent to its student data practices in lieu of parents.**

265.   In its privacy policies posted on its website, Renaissance repeatedly and falsely states that it complies with COPPA.

266.   In fact, Renaissance violates numerous provisions of COPPA.

267.   Renaissance fails to provide parents with complete, understandable notice of its data practices, including when its terms and policies materially change.

268.   Renaissance fails to obtain verifiable parental consent before taking, using, and disclosing children's personal information.

269.   Renaissance fails to provide parents with the ability to access and review the data of students under 13 it has generated and collected.

270.   Renaissance falsely states that schools may consent to the taking of children's information on behalf of parents. In fact, COPPA expressly requires parental consent, and specifies that it must be obtained by the company, not schools. Lawmakers and regulators have expressly and repeatedly considered and declined to adopt a school exception to COPPA's parental-consent requirements.

271.   Renaissance falsely states that it "only collects information from a Child that is

reasonably necessary for the Child to use the Products for purposes authorized by a School." Renaissance obtains far more information than is reasonably necessary to provide children and schools education services, including data obtained to develop and market the products of Renaissance and myriad third parties.

272.   Renaissance falsely states that parents must direct their requests to access their children's data to their child's school. But COPPA does not permit Renaissance to shift its duty to provide parents access to their child's data to a school.

273.   Further, schools are not able to facilitate such requests.

274.   Students and parents thus cannot know the full extent of the data Renaissance obtains about them, whether that data is accurate, how that data is stored, how long that data is retained, who has access to that data, or how that data or data-derivative information or products are used.

### 2.   Renaissance falsely states that its products may be used in compliance with FERPA.

275.   In its privacy policies posted on its website, Renaissance falsely states that it complies with FERPA.

276.   Renaissance falsely states that it "has met the criteria for being a 'School Official' with Legitimate Educational Interests" (as those terms are used in FERPA)[.]"

277.   Renaissance falsely states that "it will not redisclose such Education Records or Personally Identifiable Information except with Authorization from Customer[.]"

278.   Renaissance does not meet the definition of "school official" under FERPA.

279.   Schools do not control the maintenance and use of the personal information that Renaissance collects from children, including education records.

280.   Renaissance does not only receive students' personal information from schools: it generates and takes such information directly from students.

281.   Renaissance generates and takes personal and private information of students in excess of "education records" as defined by FERPA.

282.   Renaissance generates, takes, uses, and discloses student data more than legitimate educational interests as contemplated by FERPA.

283.   Renaissance rediscloses student data to a host of third parties without prior parental consent, which is expressly prohibited even under the school-official exception. Renaissance may not stand in as the school, and the school may not stand in as the parent.

284.   All the foregoing false and misleading statements are implemented by Renaissance on a company-wide basis: they are included in its publicly available terms of use and privacy policies, as well as its agreements with schools and school districts, which are developed in and emanate from its principal place of business in Wisconsin.

## G.   Renaissance's nonconsensual data practices harm students, including Plaintiffs.

285.   Renaissance's surreptitious data practices are not benign. Rather, they harm children, including Plaintiffs, in myriad ways that are immediate, long-lasting, and substantial.

### 1.   Renaissance harms children, including Plaintiffs, by invading their privacy.

286.   A person's right to privacy begins with protection from having information created about them in the first instance.

287.   The right to privacy encompasses the person's right to control information concerning his or her person. Loss of such control harms a person's ability to, for example, manage and minimize risk.

288.   Renaissance's data practices violate children's fundamental right to privacy. They forever wrest from children and their parents control over children's personal information, including the right to determine whether such information is created in the first place.

289.   Renaissance collects, uses and discloses personal information about school-aged

children—for the commercial benefit of itself and numerous third parties—from data it takes from students while they use Renaissance's Products as part of their legally required education.

290.   That Renaissance does so in a compulsory environment and without parental notice or consent is conduct that is highly offensive to a reasonable person and constitutes an egregious breach of social norms.

### 2.   Renaissance harms children, including Plaintiffs, by compromising the security of their personal information.

291.   By collecting and storing children's personal information, including Plaintiffs' personal information—and by creating information about them that did not previously exist, such as digital profiles that purport to predict their future performance and behavior—Renaissance forever jeopardizes that information by making it vulnerable to a host of data security risks.

292.   Rates of cybercrime are steadily rising, including numerous data breaches that affect a host of consumers and their personal information.

293.   Schools and school districts have been particularly and increasingly targeted by cybercriminals in recent years, which has resulted in leaks of highly personal information about children, which in some cases have been made publicly available by the perpetrators.

294.   In fact, another widely used education-technology company was hacked in December 2024, compromising the personal information of tens of millions of students dating back four decades.[24]

295.   Such exposure can have immediate and long-term consequences for children. As explained by one cybersecurity professional, whose son's school was hacked, "It's your

---

[24] TechCrunch, Malware stole internal PowerSchool passwords from engineer's hacked computer, https://techcrunch.com/2025/01/17/malware-stole-internal-powerschool-passwords-from-engineers-hacked-computer/

future. It's getting into college, getting a job. It's everything."[25]

296.    Renaissance's sweeping, indiscriminate data practices unduly compromise the security of children's information.

297.    Children's data is further compromised by Renaissance's practice of providing access to and otherwise sharing that information with a multitude of third parties. And the resulting harms and risks of harms are exacerbated by the sheer volume of data collected and the number of entities that receive access to it. Once such data is unlawfully obtained, the harms are irreversible.

298.    In sum, Renaissance's data practices harm children from the moment their personal information is generated or otherwise obtained by Renaissance.

299.    That harm is exacerbated by Renaissance's persistent storage, use, and disclosure of that information to its vast network of partners.

### 3.    Renaissance harms children by affecting their access to information, opportunities, and other basic rights through algorithmic profiling.

300.    As described herein, Renaissance uses student data to create products that purport to analyze and predict student performance and behavior.

301.    Renaissance markets these analytics to its customers for use in wide-ranging decision-making about children, a practice known as algorithmic profiling. Such analytics purport to help teachers and administrators "personalize" a child's curriculum and learning plan, understand a child's strengths and weaknesses, identify a student's individual education goals, formulate plans for reaching those goals, and a host of other predictions and recommendations for purportedly better management of the child.

302.    Renaissance's algorithms attempt to gather children's knowledge, understanding, development, and potential to reduce them to quantifiable analytics. In

---

[25] Natasha Singer, *A Cyberattack Illuminates the Shaky State of Student Privacy*, The New York Times (July 31, 2022), https://www.nytimes.com/2022/07/31/business/student-privacy-illuminate-hack.html.

doing so, attributes that benefit children, such as accuracy, nuance, and privacy, are sacrificed in favor of those that benefit Renaissance, such as efficiency, measurability, and scalability.

303.    Renaissance's algorithmic models define their own metrics, which Renaissance uses to justify their results, creating and perpetuating a pernicious and untested feedback loop.

304.    By generating these predictions on which myriad third parties rely in making consequential decisions affecting children, Renaissance produces and sells the equivalent of credit reports on children in every domain over which Renaissance claims algorithmic expertise.

305.    This harm is compounded by Renaissance's policy of denying students and parents access to, control of, or the ability to delete their own data, and as well as an understanding of how their data is used to generate predictions about them.

### 4.    Renaissance's nonconsensual data practices have prevented the development of a legitimate market for student data.

306.    Personal data is now viewed as a form of currency. There has long been a growing consensus that consumers' valuable personal information would become the new frontier of financial exploitation.

307.    A robust market exists for user data, especially children's personal information. That market has been analogized to the "oil" of the digital economy[26]

308.    The EdTech data market is valued at nearly half a trillion dollars.

309.    Thus, the information Renaissance generates and collects from students as they use Renaissance's Products has significant economic value.

310.    Renaissance takes and uses vast troves of personal information belonging to students without effective consent or compensation, including Plaintiffs' personal

---

[26] The Economist, "The world's most valuable resource is no longer oil, but data" (2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data.

information, as described herein.

311.   Renaissance further purports to reserve for itself sweeping, perpetual rights to retain and use students' personal information for its own commercial gain without providing consideration or compensation to them.

312.   Renaissance's unfair and unlawful business practices are common across the education-technology sector.

313.   By taking student information without consent or compensation, Renaissance and other education technology companies have prevented a market for student data from developing in which Plaintiffs could fairly choose to participate.

314.   Plaintiffs and their parents would consider participating in a market for their information if: their participation was voluntary; the terms of the transaction were transparent; they controlled what information was taken and how it could be used; and they were fairly compensated by those benefiting from their information.

315.   By way of example, an online market research company called Luth Research LLC ("Luth") offers consumers ongoing cash rewards in return for the consumers installing an application called SavvyConnect on their devices that tracks and collects the consumers' online search activity and other data.[27]

316.   Consumers enter into the agreement knowingly and voluntarily, and give their consent under terms clearly disclosed to them.[28]

317.   Consumers are given detailed information about how Luth collects and uses their data before they decide to participate.

318.   Consumers receive compensation for their participation in the SavvyConnect program that non-participants do not receive and are not entitled to.

319.   Plaintiffs would consider participating in a market for their information that resembled the one created by Luth to compensate Plaintiffs for the taking and use of

---

[27] https://surveysavvy.com/savvyconnect/
[28] https://surveysavvy.com/savvyconnect/

their personal data.

320.   As another example, for decades Nielsen Company (US), LLC has provided media ratings by monitoring or surveying panels of individuals or households that are statistically representative of a larger audience.[29]

321.   Panelists may be invited to participate or may sign up voluntarily, but in either case their participation in a panel is knowing and consensual under terms that are clearly disclosed by Nielsen to the panelist.

322.   Prospective panelists are given detailed information about how Nielsen collects and uses their data before they decide to participate.

323.   Panelists receive compensation for their participation that non-participants do not receive and are not entitled to.

324.   Plaintiffs would consider participating in a market for their information that resembled the one created by Nielsen to measure media ratings.

325.   As another example, certain scientific research involving human subjects is federally regulated.[30] *See, e.g.*, 45 C.F.R. § 46 *et seq*.

326.   The guiding principles for research involving human subjects under federal jurisdiction require that the research study:

    a.   has social and clinical value, namely that it is designed to answer a specific question that justifies the risk or inconvenience to the subject;

    b.   has scientific validity, namely that it is designed in a way to get an understandable answer to the important research question;

    c.   selects subjects fairly, namely that subjects are chosen based on the scientific goals of the study and not vulnerability, privilege, or other unrelated factors;

    d.   has a favorable risk-benefit ratio that minimizes all potential risks and maximizes all potential benefits;

    e.   is independently reviewed and deemed ethically acceptable before it starts;

---

[29] https://panels.nielsen.com/panels-and-surveys/

[30] https://www.nih.gov/health-information/nih-clinical-research-trials-you/guiding-principles-ethical-research

obtains the informed consent of participants, which requires that individuals (1) are accurately informed of the purpose, methods, risks, benefits, and alternatives to the research, (2) understand this information and how it relates to their own clinical situation or interests, and (3) make a voluntary decision about whether to participate; and

f.  treats individuals with respect, whether or not they choose to participate, which requires (1) respecting their privacy and keeping their private information confidential; (2) respecting their right to change their mind, to decide that the research does not match their interests, and to withdraw without a penalty; (3) informing them of new information that might emerge in the course of research, which might change their assessment of the risks and benefits of participating; (4) monitoring their welfare and, if they experience adverse reactions, unexpected effects, or changes in clinical status, ensuring appropriate treatment and, when necessary, removal from the study; and (5) informing them about what was learned from the research.

327.  Best practices for scientific research suggest that participants should be reimbursed for their costs and appropriately compensated for the time and inconvenience of participation, as determined by consideration of the research activities, subject population, and the context in which the research will take place.

328.  Participating subjects receive compensation for their participation that non-participants do not receive and are not entitled to.

329.  Plaintiffs would consider participating in a market for their information that resembled the one associated with federally regulated research involving human subjects.

330.  Because of its unlawful practices, Renaissance has diminished the value of Plaintiffs' personal information, without compensation or other legally sufficient consideration.

331.  Renaissance has also deprived students of their choice of whether to participate in the data market at all.

332.  Renaissance purports to reserve for itself sweeping rights to retain and use students' personal information for its own commercial gain without providing students

consideration or compensation.

333.   Renaissance's conduct has thus caused students, including Plaintiffs, economic injury, damage, and loss.

### 5.    Renaissance harms children by forcing them to choose between their right to an education and other fundamental rights.

334.   Renaissance forces families into the untenable position of having to choose between their right to an education and other fundamental rights, such as their rights to privacy and property.

335.   Research shows that nearly 80 percent of adults reported being very or somewhat concerned about how companies use data collected about adults,[31] and the number of those concerned about their online privacy is growing quickly.

336.   Protective behaviors are on the rise, with 87 percent of U.S. adults using at least one privacy- or security-protecting tool online.[32]

337.   An even greater percentage of parents value protecting their children's personal data, including their identity (90%), location (88%), health data (87%), age (85%), school records (85%), and browsing history (84%).[33]

338.   Renaissance has driven a wedge between school officials and parents, including Plaintiffs' parents, leaving them reluctant to press their schools for information regarding Renaissance's data practices or request that their children be alternatively

---

[31] Brooke Auxier, et al., Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their personal information, Pew Research Center (November 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

[32] Olivia Sideot and Emily Vogels, What Americans Know About AI, Cybersecurity and Big Tech, Pew Research Center (August 17, 2023), https://www.pewresearch.org/internet/2023/08/17/what-americans-know-about-ai-cybersecurity-and-big-tech/.

[33] Polling Memo: Parents' Views on Children's Digital Privacy and Safety, Trusted Future (2022), https://trustedfuture.org/childrens-digital-privacy-and-safety/.

accommodated.

339.    Parents fear becoming adversarial with their children's schools and the possible repercussions they or their children might suffer if they are perceived as difficult or meddlesome, including stigmatization or retaliation. Renaissance has thus chilled parental efforts to inquire about and object to its practices.

340.    This chilling effect has left children particularly vulnerable and disempowered to protect themselves against Renaissance's exploitative conduct.

**H.    Renaissance's nonconsensual data practices are unfair and unlawful.**

341.    Renaissance has generated massive profits through collection and analysis of children's personal information—without their parents' knowledge or consent, and without compensating them for actively and passively providing that valuable information.

342.    This one-sided arrangement—whereby Renaissance earns vast revenues each year from the personal information of children gathered through children's compelled use of Renaissance Products, and all that children receive in return are education services to which they are already legally entitled—is particularly unjust given the core philanthropic purpose and compulsory nature of a public education.

343.    Through its surreptitious, exploitative data practices, Renaissance has unjustly enriched itself at the cost of children's privacy, security, and autonomy, when children would otherwise have the ability to choose how they would monetize their data—or decide not to. School-aged children should not be made to bear these risks and harms for the commercial benefit of private, for-profit corporations like Renaissance and its partners.

## V.    CLASS ACTION ALLEGATIONS

344.    Plaintiffs bring this class action pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure on behalf of themselves and all other similarly situated.

345.    Plaintiffs seek to represent a nationwide class of students ("Nationwide Class") defined as:

> ***All persons in the United States who attend or attended a K-12 school who used one or more Renaissance products.***

346.    Plaintiffs M.C. 1 and M.C. 2 seek to represent a state-only subclass of students ("California Subclass") under the law of the State of California defined as:

> ***All persons in California who attend or attended a K-12 school who used one or more Renaissance products.***

347.    In addition, and in the alternative to the Nationwide Class, Plaintiffs reserve the right to seek leave to amend the complaint to represent state subclasses under the laws of 50 states.

348.    Plaintiffs reserve the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

349.    The Nationwide Class and California Subclass are collectively referred to herein as the "Classes." Members of both Classes are collectively referred to herein as "Class members."

350.    Excluded from the Classes are: (1) the Court (including any Judge or Magistrate presiding over this action and any members of their chambers and families); (2) Renaissance, its subsidiaries, parents, predecessors, successors and assigns, including any entity in which any of them have a controlling interest and its officers, directors, employees, affiliates, or legal representatives; (3) persons who properly and timely request exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel, Classes' counsel, and Renaissance's counsel; and (6) the legal representatives, successors, and assigns of any such excluded person.

351.    **Ascertainability:** Membership of the Classes is defined based on objective criteria and individual members will be identifiable from Renaissance's records,

including from Renaissance's massive data storage. Based on information readily accessible to it, Renaissance can identify members of the Classes who have used Renaissance's products.

352. **Numerosity:** Members of the Classes are so numerous that joinder of all members is impracticable. The exact size of the Classes and the identities of the members of the Classes are readily ascertainable in or through Renaissance's records.

353. **Typicality:** Plaintiffs' claims are typical of the claims of other members of the Classes, as all members of the Classes were uniformly affected by Renaissance's wrongful conduct in violation of federal and state law as described herein.

354. **Adequacy:** Plaintiffs will fairly and adequately protect the interests of the members of the Classes and have retained counsel that is competent and experienced in class action litigation, including nationwide class actions and privacy violations. Plaintiffs and their counsel have no interest that is in conflict with or otherwise antagonistic to the interests of the other members of the Classes. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and they have the resources to do so.

355. **Commonality:** Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting solely individual members of the Classes. Common questions for the Classes include, but are not limited to, the following:

    a.  Whether Renaissance obtained effective consent to generate, obtain, use, and disclose the personal and private information of the members of the Classes;

    b.  Whether Renaissance led the members of the Classes to believe, either directly or through school personnel, that their data and their privacy would be protected;

    c.  Whether Renaissance represented that members of the Classes could control what data were intercepted, received, or collected by Renaissance;

    d.  Whether Renaissance actually protected the data and privacy of members of the Classes;

e. Whether Renaissance's practice of intercepting, receiving, or collecting users' data violated state or federal privacy laws;

f. Whether Renaissance's practice of intercepting, receiving, or collecting users' data violated anti-wiretapping laws;

g. Whether Renaissance's practice of intercepting, receiving, or collecting users' data violated any other state or federal tort laws;

h. Whether Plaintiffs and members of the Classes are entitled to declaratory or injunctive relief to enjoin the unlawful conduct alleged herein; and

i. Whether Plaintiffs and members of the Classes have sustained damages as a result of Renaissance's conduct and, if so, what is the appropriate measure of damages or restitution.

356. **Superiority:** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. This proposed class action presents fewer management difficulties than individual litigation and provides the benefits of a single adjudication, economies of scale and comprehensive supervision by a single, able court. Furthermore, as the damages individual members of the Classes have suffered may be relatively small, the expense and burden of individual litigation make it impossible for members of the Classes to individually redress the wrongs done to them. There will be no difficulty in management of this action as a class action.

357. Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS

358. Any applicable statute(s) of limitations have been tolled by Renaissance's and its affiliates' knowing and active concealment and denial of the facts alleged herein. Plaintiffs and members of the Classes could not have reasonably discovered the true nature of Renaissance's data-harvesting scheme because Renaissance purposely concealed it. Plaintiffs' claims were thus tolled under the discovery rule.

359.   The causes of action alleged herein did not accrue until Plaintiffs and members of the Classes discovered or could have discovered Renaissance's data-harvesting scheme.

360.   As alleged above, Plaintiffs and members of the Classes had no way of knowing about Renaissance's data-harvesting scheme. Renaissance concealed the scheme while simultaneously claiming that it protects student data and privacy.

361.   To this day, Renaissance fails to disclose the full extent of, and risks associated with, its data-harvesting scheme.

362.   Within any applicable statutes of limitation, Plaintiffs and members of the Classes could not have discovered, through the exercise of reasonable diligence, that Renaissance was concealing the conduct complained of herein and misrepresenting the nature of its business.

363.   Plaintiffs and members of the Classes did not know facts that would have caused a reasonable person to suspect that there was a data-harvesting scheme that would result in a private corporation collecting, manipulating, and monetizing every aspect of their children's lives and their own interactions with their children's schools and school districts. Renaissance also withheld any and all information that would give a reasonable person knowledge of the data-harvesting scheme and disclaimed that it unlawfully monetized data about and belonging to Plaintiffs and members of the Classes.

364.   For ordinary consumers, the existence of the data-harvesting scheme is still unknown. For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to the claims in this litigation.

## VII.    CAUSES OF ACTION

### COUNT I: Violation of the Federal Wiretap Act, U.S.C. § 2510 *et seq.*

### (*On behalf of Plaintiffs and the Nationwide Class*)

365.   Plaintiffs incorporate by reference paragraphs 1 through 364 as though fully set

forth herein.

366.   The Federal Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986, prohibits the intentional interception of the contents of any wire, oral, or electronic communication through the use of a device. 18 U.S.C. § 2511.

367.   The Wiretap Act protects both the sending and receipt of communications.

368.   18 United States Code section 2520(a) provides a private right of action to any person whose wire, oral, or electronic communication is intercepted.

369.   Renaissance's actions in intercepting and tracking user communications were intentional. Upon information and belief, Renaissance is aware that it is intercepting communications and has taken no remedial actions.

370.   Renaissance's interception of internet communications that Plaintiffs and Nationwide Class members were sending and receiving was done contemporaneously with Plaintiffs' and Nationwide Class members' sending and receipt of those communications.

371.   The communications intercepted by Renaissance included "contents" of electronic communications made from Plaintiffs and Nationwide Class members to websites and other web properties other than Renaissance's in the form of detailed URL requests, webpage browsing histories, search queries, and other information that Plaintiffs and Nationwide Class members sent to those websites and for which Plaintiffs received communications in return from those websites.

372.   These transmissions were tracked and intercepted without authorization and are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate commerce[,]" and were therefore "electronic communications" within the meaning of 18 United States Code section 2510(12).

373.   The following constitute "devices" within the meaning of 18 United States Code section 2510(5):

a. The computer codes and programs that Renaissance used to track Plaintiffs' and Nationwide Class members' communications;

b. Plaintiffs' and Nationwide Class members' browsers and mobile applications;

c. Plaintiffs' and Nationwide Class members' computing and mobile devices;

d. Renaissance's servers; and

e. The plan that Renaissance carried out to effectuate its tracking and interception of Plaintiffs' and Nationwide Class members' communications.

374.   Renaissance, in its conduct alleged here, was not providing an "electronic communication service" as that term is defined in 18 United States Code section 2510(12) and used elsewhere in the Wiretap Act. Renaissance was not acting as an Internet Service Provider.

375.   Renaissance was not an authorized party to the communications because Plaintiffs and Nationwide Class members were unaware of Renaissance's interceptions and did not knowingly send any communications to Renaissance when Renaissance intercepted the communications between Plaintiffs and web properties other than Renaissance's. Renaissance could not manufacture its own status as a party to Plaintiffs' and Nationwide Class members' communications with others by surreptitiously redirecting or intercepting those communications.

376.   Plaintiffs and Nationwide Class members did not consent to Renaissance's continued gathering of their communications.

377.   After intercepting the communications, Renaissance, through tracking code that it installed in its source code, simultaneously disclosed the contents of the communications to unauthorized third parties, including but not limited to Mixpanel, knowing or having reason to know that such information was obtained through the interception of electronic communications in violation of 18 United States Code section 2511(1)(a).

378.   Renaissance disclosed the contents of those communications with third parties

for the purpose of committing a crime or tort, including but not limited to, the tort of intrusion upon seclusion.

379.    After intercepting the communications, Renaissance then used the contents of the communications knowing or having reason to know that such information was obtained through the interception of electronic communications in violation of 18 United States Code section 2511(1)(a).

380.    As a result of this conduct, the Court may assess statutory damages to Plaintiffs and Nationwide Class members; injunctive and declaratory relief; punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Renaissance in the future, and reasonable attorneys' fees and other litigations costs reasonably incurred.

**COUNT II: Violation of the California Invasion of Privacy Act ("CIPA")**
**Cal. Penal Code §§ 631, 632**
***(On behalf of Plaintiffs and the California Subclass)***

381.    Plaintiffs incorporate by reference paragraphs 1 through 364 as though fully set forth herein.

382.    CIPA is codified at California Penal Code sections 630–638. The Act begins with its statement of purpose in California Penal Code section 630:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

383.    California Penal Code section 631(a) provides, in pertinent part:

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any

unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to lawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars[.]

384.  California Penal Code section 632(a) provides, in pertinent part:

A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished by a fine not exceeding two thousand five hundred dollars[.]

385.  Under either section of CIPA, a defendant must show it had the consent of all parties to a communication.

386.  Renaissance designed, contrived, and effectuated its scheme to track California users.

387.  Renaissance's non-consensual tracking of the California Plaintiffs' and California Subclass members' internet communications was without authorization and consent from the California Plaintiffs and California Subclass members. The interception by Renaissance in the aforementioned circumstances was unlawful and tortious.

388.  The interceptions by Renaissance in the aforementioned circumstances occurred while the same was in transit or passing over a wire, line, or cable in California or was being sent from California, where California Plaintiffs were located at the time of the

interceptions.

389.   The following items constitute machines, instruments, or contrivances under CIPA, and even if they do not, Renaissance's deliberate and purposeful scheme that facilitated its interceptions falls under the broad statutory catch-all category of "any other manner":

    a.  The computer code and programs Renaissance used to track California Plaintiffs' and California Subclass members' communications;

    b.  The California Plaintiffs' and California Subclass members' browsers and mobile applications;

    c.  The California Plaintiffs' and California Subclass members' computing and mobile devices;

    d.  Renaissance's servers;

    e.  The computer codes and programs used by Renaissance to effectuate its tracking and interception of the California Plaintiffs' and California Subclass members' communications; and

    f.  The plan Renaissance carried out to effectuate its tracking and interception of the California Plaintiffs' and California Subclass members' communications.

390.   The data collected by Renaissance constituted "confidential communications" as that term is used in section 632, because California Plaintiffs and California Subclass members, who are children, had objectively reasonable expectations of privacy in their devices and activity.

391.   Renaissance aided and assisted numerous third parties, including but not limited to, Mixpanel, to unlawfully intercept protected communications belonging to California Plaintiffs and California Subclass members and use the contents of those communications for their own commercial benefit, including the development and improvement of proprietary technologies, independent of the services those third parties provide Renaissance.

392.   California Plaintiffs and California Subclass members have suffered loss by reason of these violations, including, but not limited to, violation of their rights to privacy and loss of value in their personally identifiable information.

393.   Pursuant to California Penal Code section 637.2, California Plaintiffs and California Subclass members have been injured by the violations of California Penal Code sections 631 and 632, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

### COUNT III: Violation of the California Invasion of Privacy Act ("CIPA") Cal. Penal Code § 638.51(a) *(On behalf of Plaintiffs and the California Subclass)*

394.   Plaintiffs incorporate by reference paragraphs 1 through 364 as though fully set forth herein.

395.   Plaintiff brings this claim *in the alternative to, or in addition to*, violations of Cal. Penal Code sections 631(a) and 632, which prohibit the interception of the *contents* of communications in transit. The section 638.51(a) claim is based solely on Renaissance's capture of non-content signaling data, such as IP addresses and routing metadata, regardless of whether content was also intercepted.

396.   CIPA is codified at California Penal Code sections 630–638. The Act begins with its statement of purpose in California Penal Code section 630:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

397.   CIPA section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

398.   A "pen register" is "a device or process that records or decodes dialing, routing,

addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

399.    The Products are "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—the IP address and other device identifier information such as device type, browser type, unique cookie identifiers, session identifiers, referrer URLs, user-agent strings, clickstream paths, and timestamped navigation or submission data ("Device Metadata")—from the electronic communications transmitted by California Plaintiffs' and the California Subclass members' computers, tablets or smartphones. Cal. Penal Code § 638.50(b).

400.    Likewise, the Products are "pen registers" because they are "device[s] or process[es]" that "capture[d]" the unique user identifiers associated with each Product from the electronic communications transmitted by California Plaintiffs' and the California Subclass members' computers, tablets or smartphones. Cal. Penal Code § 638.50(b). The unique IDs are "addressing" information because they are used to tie a Product's user to third parties' databases and repositories of information about the user and ascertain the user's identity.

401.    At all relevant times, Renaissance installed the Products—which include pen registers—on California Plaintiffs' and California Subclass members' browsers, and used the Products to collect California Plaintiffs' and California Subclass members' IP addresses and Device Metadata.

402.    The Products collect California Plaintiffs' and California Subclass members' IP addresses and Device Metadata independent of the contents it also collects of Plaintiffs' and the California Subclass members' electronic communications with Renaissance. *See In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108 (9th Cir. 2014) ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

403.   California Plaintiffs and California Subclass members did not provide their prior consent to Renaissance's use of the Products to collect their IP addresses and Device Metadata.

404.   Renaissance did not obtain a court order to install or use the Products.

405.   Renaissance, in its conduct alleged here, was not providing an "electronic communication service" as that term is defined in 18 United States Code section 2510(12) and used in the Wiretap Act. Renaissance was not acting as an Internet Service Provider.

406.   Even if Renaissance did qualify as an "electronic communication service" provider, (i) it did not install or use pen registers solely for the purpose of operating or protecting its own service, but instead used them for analytics, marketing, behavioral profiling, or unauthorized surveillance; and (ii) its deployment of pen registers in this context exceeds the narrow technical exception set forth in § 638.51(b), as it permitted third parties (e.g., data analytics or tracking vendors) to receive, process, or store these intercepted signals without user consent or judicial oversight.

407.   Pursuant to Cal. Penal Code section 637.2, California Plaintiffs and California Subclass members have been injured by Renaissance's violations of CIPA section 638.51(a), and each seeks statutory damages of $5,000 for each of Renaissance's violations of CIPA section 638.51(a).

### COUNT IV: Violation of the Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502 *et seq.*

### (*On behalf of California Plaintiffs and the California Subclass*)

408.   Plaintiffs incorporate by reference paragraphs 1 through 364 as though fully set forth herein.

409.   Cal. Penal Code section 502 provides: "For purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another

jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction."

410.    Plaintiffs and California Subclass members' devices on which they accessed Renaissance's services, including computers, smart phones, and tablets, constitute computers or "computer systems" within the meaning of CDAFA. *Id.* § 502(b)(5).

411.    Renaissance violated Cal. Penal Code section 502(c)(2) by knowingly accessing and without permission taking, copying, analyzing, and using California Plaintiffs' and California Subclass members' data as described herein.

412.    Renaissance was unjustly enriched by acquiring the valuable personal information of California Plaintiffs and California Subclass members without permission and using it for Renaissance's own financial benefit to advance its business interests.

413.    California Plaintiffs and California Subclass members retain a stake in the profits that Renaissance earned from the misuse of their activity and personally identifiable information because, under the circumstances, it is unjust for Renaissance to retain those profits.

414.    Renaissance accessed, copied, took, analyzed, and used data from California Plaintiffs' and California Subclass members' computers in and from the State of California, where Renaissance marketed and sold its products. Accordingly, Renaissance caused the access of their computers in California and is therefore deemed to have accessed their computers in California.

415.    As a direct and proximate result of Renaissance's unlawful conduct within the meaning of Cal. Penal Code section 502, Renaissance has caused loss to California Plaintiffs and California Subclass members and has been unjustly enriched in an amount to be proven at trial.

416.    California Plaintiffs and California Subclass members seek compensatory damages and/or disgorgement in an amount to be proven at trial, and declarative,

injunctive, or other equitable relief.

417.   California Plaintiffs and California Subclass members are entitled to punitive or exemplary damages pursuant to Cal. Penal Code section 502(e)(4) because Renaissance's violations were willful and, upon information and belief, Renaissance is guilty of oppression or malice as defined by Cal. Civil Code section 3294.

418.   California Plaintiffs and California Subclass members are also entitled to recover their reasonable attorneys' fees pursuant to Cal. Penal Code section 502(e).

### COUNT V: Violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq*.

### (*On behalf of California Plaintiffs and the California Subclass*)

419.   Plaintiffs incorporate by reference paragraphs 1 through 364 as though fully set forth herein.

420.   Plaintiffs lack an adequate remedy at law.

421.   In addition or as an alternative to legal remedies sought herein, Plaintiffs seek equitable relief to the extent that legal remedies are inadequate.

422.   The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. By engaging in the aforementioned practices, Renaissance has violated the UCL.

423.   A plaintiff may pursue a claim under the UCL through any or all of three prongs: the unlawful prong, the unfair prong, or the fraudulent prong.

424.   Renaissance's conduct violated the spirit and letter of the laws as alleged herein, which protect property, economic, and privacy interests and prohibit unauthorized disclosure and collection of private communications and personal information.

425.   Renaissance's unfair acts and practices include its violation of property, economic, and privacy interests of children protected by federal and state laws.

426.   To establish liability under the "unfair" prong, California Plaintiffs and

California Subclass members need not establish that these statutes were actually violated, although the allegations herein establish that they were. The foregoing allegations are tethered to underlying constitutional, statutory, or regulatory provisions; describe practices that are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers; and show that the negative impact of Renaissance's practices on school-aged children and their parents far outweighs the reasons, justifications, and motives of Renaissance.

427. The foregoing allegations also establish liability under the "unlawful" prong, as they show that Renaissance violated an array of state and federal laws protecting individual privacy and property.

428. California Plaintiffs and California Subclass members have suffered injury-in-fact, including the loss of money or property, as a result of Renaissance's unfair and unlawful practices, which include the unauthorized disclosure and taking of their personal information that has value as demonstrated by its use and sale by Renaissance. California Plaintiffs and California Subclass members have suffered harm in the form of diminution of the value of their private and personally identifiable data and content.

429. Renaissance's actions caused damage to and loss of California Plaintiffs' and California Subclass members' property right to control the dissemination and use of their personal information and communications.

430. Renaissance's actions also prevented the development of a legitimate market for student data in which Plaintiffs could fairly choose to participate. And Plaintiffs would consider participating in a market for their information if their participation was voluntary; the terms of the transaction were transparent; they controlled what information was taken and how it could be used; and they were fairly compensated by those benefiting from their information.

431. Because Renaissance and other education-technology companies simply take valuable student data without effective consent and monetize it as they see fit, (1) no

lawful market for that data exists and (2) even if it did, Renaissance's unlawful taking and use of that data has diminished the value of that data.

432.   Renaissance reaped unjust profits and revenues in violation of the UCL. This includes Renaissance's profits and revenues from its sale and licensing of its products, which Renaissance develops, delivers, maintains, and improves using the personal information of California Plaintiffs and California Subclass members, as well as through data-sharing agreements with innumerable third parties. California Plaintiffs and the California Subclass members seek restitution and disgorgement of these unjust profits and revenues.

### COUNT VI: Invasion of Privacy—Intrusion Upon Seclusion
#### (*On behalf of Plaintiffs and the Nationwide Class*)

433.   Plaintiffs incorporate by reference paragraphs 1 through 364 as though fully set forth herein.

434.   Under Wisconsin law, Plaintiffs asserting claims for intrusion upon seclusion must plead (1) intrusion into a private place, conversation, or matter; (2) in a manner highly offensive to a reasonable person.

435.   Renaissance intentionally intruded into Plaintiffs' and Nationwide Class members' private affairs in a highly offensive manner through its systematic and pervasive collection, accessing, downloading, transferring, selling, storing and use of Plaintiffs' and Nationwide Class members' personal information.

436.   Plaintiffs and Nationwide Class members maintained a reasonable expectation of privacy interest in their personal information absent consent to tracking and collection practices. Plaintiffs and Nationwide Class members never consented—and in the case of Renaissance school-licensed products, never even had the opportunity to consent—to Renaissance's data practices. The reasonableness of this expectation of privacy is reflected in longstanding custom and practice; security measures intended to prevent unauthorized access to personal information, especially concerning young

children; state, federal, and international laws protecting a right to financial privacy; and the privacy policies and other assurances of protection by applications that use Renaissance discussed herein, among other indicia.

437.   Plaintiffs and Nationwide Class members could not reasonably expect that, by simply participating in their education and completing required activities, Renaissance would collect, store, manipulate, and monetize such voluminous and far-reaching categories of personal information; prevent Plaintiffs and Nationwide Class members from reviewing, correcting, or controlling that information; and use that information in ways that were harmful to Plaintiffs and Nationwide Class members.

438.   Individuals also maintain a reasonable expectation of privacy when they are using products in a compulsory environment such as public schools. Renaissance's collection of Plaintiffs' and Nationwide Class members' information while logged into Renaissance products was unreasonable.

439.   Renaissance's collection and use of children's personal information without the knowledge or consent of those children or their parents is highly offensive to an ordinary reasonable person.

440.   Renaissance's collection and use of parent data and personal information without the knowledge or consent of parents is highly offensive to an ordinary reasonable person.

441.   Renaissance's intrusions upon Plaintiffs' and Nationwide Class members' private affairs and concerns are highly offensive to an ordinary reasonable person, especially considering (a) the highly sensitive and personal nature of Plaintiffs' and Nationwide Class members' personal information and data; (b) the extensive scope of data obtained by Renaissance, including years of historical data; (c) Renaissance's intent to profit from Plaintiffs' and Nationwide Class members' data by selling it outright (e.g., back to schools, its "customers," and myriad other third parties) and using it to develop and market its products and services; (d) Renaissance's use of

subterfuge to intrude into Plaintiffs' and Nationwide Class members' electronic devices for the purpose of collecting their data; (e) the surreptitious and unseen nature of Renaissance's data collection with respect to consumers, and (f) Renaissance's failure to obtain valid consent.

442. Renaissance's conduct would be highly offensive to a reasonable person, particularly given Renaissance's extensive and false public statements regarding its commitment to user privacy and given that Renaissance designs products to be used by children, including young children. The manner of the invasion—collection through students' use of education tools in a compulsory setting—is also highly offensive.

443. Renaissance's invasions of privacy caused Plaintiffs and Nationwide Class members the following damages:

    a. Nominal damages;

    b. The diminution in value of Plaintiffs' and Nationwide Class members' private information;

    c. The loss of privacy due to Renaissance rendering no longer private the confidential and personal information that Plaintiffs and Nationwide Class members intended to remain private; and

    d. The fair value of Plaintiffs' and Nationwide Class members' personal information and data. Renaissance took something of value from Plaintiffs and Nationwide Class members—their personal information and data—and derived benefits therefrom without Plaintiffs' and Nationwide Class members' knowledge or consent and without Renaissance sharing the fair benefit of such value with them.

444. Renaissance invaded Plaintiffs' and Nationwide Class members' privacy with oppression, fraud, or malice.

445. As a result of Renaissance's invasions of privacy, Plaintiffs and Nationwide Class members seek actual damages, compensatory damages, restitution, disgorgement, general damages, nominal damages, unjust enrichment, punitive damages, and any other relief the Court deems just.

## COUNT VII: Unjust Enrichment

### (*On Behalf of Plaintiffs and the Nationwide Class Pursuant to Wisconsin Law*)

446.   Plaintiffs incorporate by reference paragraphs 1 through 364 as though fully set forth herein.

447.   Plaintiffs lack an adequate remedy at law.

448.   In addition or as an alternative to legal remedies sought herein, Plaintiffs seek equitable relief to the extent that legal remedies are inadequate.

449.   Plaintiffs conferred a benefit upon Renaissance, namely, provision of their personal information to Renaissance through their compelled use of Renaissance's Products at school.

450.   Renaissance appreciated the fact that it obtained this benefit from Plaintiff, namely, it understands that student data is the raw material that fuels its business, without which Renaissance would have no product and no business.

451.   It would be inequitable for Renaissance to retain that benefit without payment to Plaintiffs of the value that benefit has conferred to Renaissance.

452.   More specifically, Renaissance acquired and compromised troves of personal information that rightfully belong to Plaintiffs and Nationwide Class members without effective consent through intentionally deceptive practices conducted in connection with students' compulsory use of Renaissance's products.

453.   Renaissance obtained access to this information only by marketing and selling its products for use by children in the compulsory environment of K-12 education.

454.   Renaissance has built, developed, improved, marketed, and delivered an ever-growing suite of products using the personal information of Plaintiffs and Nationwide class members. It has further derived profits and other tangible and intangible benefits from its improper collection, use, and disclosure of Plaintiffs' and Nationwide Class members' data.

455.   But for collecting children's personal information without effective consent,

Renaissance could not have grown its business, acquired numerous other tangible and intangible assets, developed other applications, and received millions of dollars in investment capital to exceed a billion-dollar valuation.

456. Renaissance has also directly and substantially profited from its use, storage, aggregation, and sale of Plaintiffs' and Nationwide Class members' data. Indeed, Plaintiffs' and Nationwide Class members' data powers Renaissance's ever-growing ecosystem of products and services. Without Plaintiffs' and Nationwide Class members' personal information unlawfully taken by Renaissance, Renaissance would cease to operate in its current form.

457. In exchange for these benefits to Renaissance, Plaintiffs and Nationwide Class members received nothing but educational services to which they were already legally entitled and required to receive.

458. To benefit its bottom line, Renaissance deprived Plaintiffs and Nationwide Class members of their property, security, privacy, and autonomy.

459. Renaissance harmed Plaintiffs and Nationwide Class members by, among other harms, subjecting them to commercial manipulation and continuous surveillance; invading their privacy; denying their due process rights by subjecting them to opaque, unreviewable data practices; forcing them to choose between their right to an education and other fundamental rights; and failing to compensate them for their property and labor.

460. Plaintiffs and Nationwide Class members did not consent to Renaissance's taking of their personal information and using it for Renaissance's or other third parties' commercial gain.

461. There is no justification for Renaissance's enrichment. It would be inequitable, unconscionable, and unjust for Renaissance to be permitted to retain these benefits when they were procured because of and by means of Renaissance's wrongful conduct and at the expense of children's property and wellbeing.

462.    Plaintiffs and Nationwide Class members seek an order compelling Renaissance to disgorge the profits and other benefits it has unjustly obtained.

463.    Plaintiffs and Nationwide Class Members may not have an adequate remedy at law against Renaissance, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## COUNT VIII: Negligence

### (*On Behalf of Plaintiffs and the Nationwide Class*)

464.    Plaintiffs incorporate by reference paragraphs 1 through 364 as though fully set forth herein.

465.    Under Wisconsin law, Renaissance owed a duty to children who use its products, including Plaintiffs and Nationwide Class members, including a duty to exercise reasonable care in the collection, handling, retention, and use of their personal and behavioral data.

466.    Under Wisconsin law, every person owes a duty to exercise ordinary care to prevent harm to others. This general duty applies when a defendant's conduct creates a foreseeable risk of harm—including privacy harms arising from the unauthorized or exploitative use of children's data.

467.    Renaissance further owed a heightened duty of care because it contracts with schools and school districts for the express purpose of providing educational services to children, including Plaintiffs and Nationwide Class members. It solicits and collects student data under the guise of an educational context, thereby establishing a relationship of trust and dependency. Having assumed this role, Renaissance had a duty not to exploit that relationship by using student data, including that of Plaintiffs and Nationwide Class members, for its own independent commercial advantage, or for the benefit of third parties with whom those students and parents have no direct relationship.

468.    Renaissance breached these duties by, among other things, (a) sharing Plaintiffs'

and Nationwide Class members' personal and behavioral information—including real-time telemetry such as scrolling behavior, typing speed, video viewing patterns, and clickstream activity—with third-party "subprocessors," "service providers," and "vendors"; and (b) allowing or enabling those third parties to use such information to enhance their own commercial products, models, and services, independent of Renaissance's provision of educational services.

469.   Renaissance also breached its duties by using Plaintiffs' and Nationwide Class members' personal data—collected without informed consent—to improve or train its own proprietary systems, including artificial intelligence, adaptive learning, behavioral analytics, engagement scoring, and product development features unrelated to the specific students or educational services at issue. This misuse of student data for Renaissance's own product development purposes was not reasonably foreseeable or disclosed to parents, and it constituted an unreasonable intrusion upon children's data privacy interests.

470.   It was reasonably foreseeable to Renaissance that collecting and sharing such granular behavioral and interactional data—particularly from minors—without express informed consent, and using that data to power commercial product improvements, posed a substantial risk of privacy harm. This risk is especially acute in the context of educational software, where users are children. Renaissance's failure to implement adequate controls to prevent such misuse, and its active facilitation of third-party data access, was a breach of its duty of ordinary care under Wisconsin law.

471.   Renaissance's duty of care owed to children who use its products includes complying with applicable federal laws that protect children, privacy, and property.

472.   COPPA imposes legal requirements on operators of websites and online services directed to children under 13 years of age. Among other provisions, COPPA prohibits the collection, use, or disclosure of a child's personal information — including persistent identifiers and behavioral data — without verifiable parental consent. *See* 15

U.S.C. § 6502(b); 16 C.F.R. § 312.5.

473.    Although COPPA does not contain an express private right of action, courts in Wisconsin and elsewhere have recognized that violations of a federal statute may supply the standard of care for a negligence per se claim, even if the statute itself does not authorize private enforcement.

474.    COPPA's statutory protections were enacted specifically to prevent the kind of unauthorized and exploitative data collection alleged here—namely, the use of children's behavioral, interactional, and identifying data for commercial benefit without adequate notice or consent. Renaissance's failure to obtain verifiable parental consent before collecting such data—and its subsequent disclosure of that data to third parties for analytics, product development, and cross-platform tracking—constitutes a violation of COPPA that may properly serve as the predicate for negligence per se under Wisconsin law.

475.    Plaintiffs and Nationwide Class members are among the class of persons COPPA was designed to protect, and the harm they suffered—loss of privacy, unauthorized profiling, exploitation of behavioral data, and exposure to cross-platform tracking and commercial targeting—is of the type the statute was designed to prevent.

476.    Renaissance was required to comply with COPPA and did not: it failed to notify parents of its data practices and obtain verifiable parental consent before collecting and using children's data; it failed to limit its collection of data to only that necessary for children to participate in the activity; and it failed to permit parents to access, review, and delete all personal information that was collected from their children when they were under 13.

477.    Renaissance's routine violations of COPPA constitute negligence *per se*.

478.    Renaissance owed a higher duty of care to children than to an ordinary consumer because of minor's lack of capacity to appreciate and avoid risks.

479.    Renaissance, which markets its products for use by K-12 students, knew or

should have known that minors would be the primary users of its products, that parental consent would therefore be required for the collection and use of students' personal data, and that the failure to obtain parental consent would result in the unlawful collection of students' personal information, including persistent identifiers such as cookies and IP addresses.

480.    Renaissance negligently failed to obtain parental consent before collecting, using, and sharing children's information.

481.    Renaissance failed to implement or maintain policies, procedures, or oversight mechanisms necessary to comply with COPPA.

482.    Renaissance's failure to obtain parental consent or act with reasonable care directly enabled the unlawful collection of children's personal information, exposing millions of children to commercial exploitation and violating their right to privacy.

483.    Renaissance also had independent duties under state and federal laws that required it to ensure that personal information of children was not collected without parental consent.

484.    As a direct and proximate result of Renaissance's negligent actions and Renaissance's violations of COPPA, Plaintiffs and Nationwide Class members suffered injury, including the improper collection, exposure, exploitation, and diminution in value of their intimate personal information.

485.    Renaissance's conduct in collecting, sharing, and monetizing student data without meaningful notice or consent was undertaken knowingly, willfully, and with reckless disregard for the privacy and well-being of minor students, including Plaintiffs and Nationwide Class members. Renaissance prioritized commercial analytics, product development, and its own competitive advantage over its duty to safeguard children's data, including that of Plaintiffs and Nationwide Class members. This conduct supports a finding of moral fault warranting the imposition of punitive damages under Wisconsin law.

486.   Because legal remedies are inadequate to fully redress the harm, Plaintiffs seek equitable relief, including restitution and disgorgement of all profits, benefits, and other compensation obtained by Renaissance as a result of its unlawful conduct.

**COUNT IX: Violation of the Wisconsin Electronic Surveillance Control Law ("WESCL")**
**Wis. Stat. § 968.31**
***(On behalf of Plaintiffs and the Nationwide Class)***

487.   Plaintiffs incorporate by reference paragraphs 1 through 364 as though fully set forth herein.

488.   All conditions precedent to this action have been performed or have occurred.

489.   Wis. Stat. section 968.31 prohibits the interception and disclosure of wire, electronic or oral communications. Specifically, under Wis. Stat. section 968.31(1), the following acts are prohibited, including when a person:

> a. "Intentionally intercepts, attempts to intercept or procures any other person to intercept or attempt to intercept, any wire, electronic or oral communication";

> b. "Intentionally uses, attempts to use or procures any other person to use or attempt to use any electronic, mechanical or other device to intercept any oral communication";

> c. "Discloses, or attempts to disclose, to any other person the contents of any wire, electronic or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication in violation of this section or under circumstances constituting violation of this section"; or

> d. "Uses, or attempts to use, the contents of any wire, electronic or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication in violation of this section or under circumstances constituting violation of this section."

490.   Renaissance intercepted Plaintiffs' and Nationwide Class members' electronic communications for the purpose of committing multiple tortious acts, including, but

not limited to, the criminal and tortious acts specified below.

491. For example, Renaissance intercepted Plaintiffs' and Nationwide Class members' electronic communications for the purpose of disclosing those communications to third parties without the knowledge or consent of Plaintiffs or Nationwide Class members.

492. Renaissance's misconduct falls within the ambit of Wisconsin's wiretapping statute because the disclosure of Plaintiffs and Nationwide Class members' communications to third parties—without consent or proper authorization—is an illegal or tortious act that violates multiple laws, including, but not limited to, invasion of privacy by intrusion upon seclusion and by public disclosure of private facts (codified at Wis. Stat. section 995.50). Further, as set forth *supra*, Renaissance's interception and disclosure of Plaintiffs' and Nationwide Class members' electronic communication commits, under Wisconsin law, the torts of invasion of privacy, negligence, and negligence *per se*.

493. Wis. Stat. section 968.31(2m) provides that "[a]ny person whose wire, electronic or oral communication is intercepted, disclosed or used in violation of sections 968.28 to 968.37 shall have a civil cause of action against any person who intercepts, discloses or uses, or procures any other person to intercept, disclose, or use, the communication."

494. Renaissance qualifies as a person under the statute.

495. Under Wis. Stat. section 968.27, Wisconsin defines "electronic communications" to mean "any transfer of signs, signals, writing, images, sounds, data or intelligence of any nature wholly or partially transmitted by a wire, radio, electromagnetic, photoelectronic or photooptical system." Plaintiffs' and Nationwide Class members' communications with Renaissance constitute "electronic communications" under Wisconsin law.

496. Plaintiffs and Nationwide Class members' communications with Renaissance constitute "electronic communications" because each communication was the transfer

of data or intelligence, including, but not limited to, communications made from the Plaintiffs and Nationwide Class members to websites and web properties other than Renaissance's in the form of detailed URL requests, webpage browsing activity, search queries, and other information that Plaintiffs and Nationwide Class members sent to those websites and for which Plaintiffs received communications in return from those websites.

497. Plaintiffs' and Nationwide Class members' communications with Renaissance constitute "electronic communications" because they were wholly or partially transmitted by wire, electromagnetic, and/or photoelectronic systems.

498. Plaintiffs and Nationwide Class members had a reasonable expectation of privacy in their communications with Renaissance. The communications were made and intercepted when Plaintiffs and Nationwide Class members were exercising their rights to an education. Plaintiffs and Nationwide Class members were unaware and did not consent to the use and disclosure of their communications by Renaissance.

499. No legitimate purpose was served by Renaissance's willful and intentional disclosure of Plaintiffs' and Nationwide Class members' communications to third parties. Neither Plaintiffs nor Nationwide Class members consented to the disclosure of their communications by Renaissance to third parties. Nor could they have consented, given that Renaissance never sought Plaintiffs' or Nationwide Class members' consent.

500. Plaintiffs' and Nationwide Class members' electronic communications were intercepted during transmission and used—all without their consent—for the unlawful and/or wrongful purpose of monetizing their communications including through the disclosure of those communications with third parties who also did not have Plaintiffs' and Nationwide Class members' consent.

501. Plaintiffs' and Nationwide Class members' electronic communications were intercepted during transmission in the state of Wisconsin, where Renaissance is

headquartered, and those intercepted communications were also used by Renaissance in Wisconsin and disclosed to third parties.

502.    Under Wis. Stat. section 968.31(2m), aggrieved persons are entitled to: "(a) Actual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher; (b) Punitive damages; and (c) A reasonable attorney's fee and other litigation costs reasonably incurred."

503.    In addition to statutory damages, Renaissance's breach caused Plaintiffs and Nationwide Class members the following damages, *inter alia*:

> a. personal information that Plaintiffs and Nationwide Class members intended to remain private is no longer private;

> b. Renaissance abused and eroded the trust of Plaintiffs and Nationwide Class members attending school – children whose confidential, nonpublic, personal information protected by COPPA and FERPA was collected by Renaissance merely by Plaintiffs and Nationwide Class members attending school; and

> c. Renaissance took something of value from Plaintiffs and Nationwide Class members and derived benefit therefrom without Plaintiffs' and Nationwide Class members' knowledge or informed consent and without sharing the benefit of such value.

504.    Plaintiffs and Nationwide Class members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT X: Violation of Wisconsin's Deceptive Trade Practices Act (DTPA), Wis. Stat. § 100.18**
***(On behalf of Plaintiffs and the Nationwide Class)***

505.    Plaintiffs incorporate by reference paragraphs 1 through 364 as though fully set forth herein.

506.    The DTPA prohibits businesses from making any "assertion, representation or statement of fact which is untrue, deceptive or misleading" when the business makes such a statement to the public with the intent to induce a sale.

507.    Renaissance made false and misleading statements on which it intended schools

and parents to rely, namely, that it complies with COPPA, that it may be used in compliance with FERPA, and that schools may consent to its student-data practices in lieu of parents.

508. But for those misrepresentations, Renaissance would not have obtained vast troves of student data without parental consent, including Plaintiffs' and Nationwide Class members' personal information.

509. By engaging in the practices aforementioned, Renaissance has violated the DTPA.

510. The foregoing allegations establish liability under the DTPA as Renaissance's false and misleading representations and omissions were made on their public website and were material, and they were likely to and did mislead some members of the public, including Plaintiffs' and Nationwide Class members' school districts, and caused harm to Plaintiffs, Nationwide Class members, and the public interest.

511. The foregoing untrue and misleading representations to the public originated in Wisconsin, where Renaissance is headquartered and where Renaissance caused those representations to be placed onto Renaissance's public website with the intent to induce Plaintiffs' and Nationwide Class members' school districts to purchase products and services from Renaissance and to enter into contracts with Renaissance for those products and services.

512. Renaissance's untrue and misleading representations were made to Plaintiffs and Nationwide Class members and/or their schools, who are members of the public.

513. Plaintiffs' and Nationwide Class members' school districts relied on Renaissance's subject statements and were induced to purchase products and services from and contract with Renaissance because of those statements. Plaintiffs and Nationwide Class members were foreseeable beneficiaries of the contract that Renaissance induced those school districts to enter based on these untrue and deceptive statements.

514.    These untrue and deceptive statements also misled the parents of Plaintiffs and Nationwide Class members, whether directly or indirectly through school personnel.

515.    Plaintiffs and Nationwide Class members have suffered injury-in-fact and a pecuniary loss, including the loss of money and/or property as a result of Renaissance's untrue, deceptive, and misleading statements, to wit, the unauthorized disclosure and taking of their personal information which has value as demonstrated by its use and sale by Renaissance. Plaintiffs and Nationwide Class members have suffered harm in the form of diminution of the value of their private and personally identifiable data and content.

516.    Renaissance's actions caused damage to and loss of Plaintiffs' and Nationwide Class members' property right to control the dissemination and use of their personal information and communications.

517.    Pursuant to Wisc. 110.18(11)(b), Plaintiffs and Nationwide Class members are entitled to recover their pecuniary loss, including the value of the data that Renaissance collected, used, disclosed, and monetized without consent, as well as reasonable attorneys' fees and costs for prosecuting this action.

## VIII.    RELIEF REQUESTED

Wherefore, Plaintiffs respectfully request the Court enter judgment in their favor and against Renaissance as follows:

An award of damages, including actual, compensatory, general, special, incidental, consequential, and punitive damages, in an amount to be determined at trial;

    a.  Injunctive, declaratory, and other equitable relief as appropriate;

    b.  Pre- and post-judgment interest to the extent provided by law;

    c.  Attorneys' fees to the extent provided by law;

    d.  Costs to the extent provided by law; and

    e.  Such other relief the Court deems just and proper.

## IX.   JURY TRIAL DEMAND

Plaintiffs demand a jury trial for all claims so triable.

Dated: September 25, 2025

Respectfully submitted,

By: */s/ Melisa A. Rosadini-Knott*
Melisa A. Rosadini-Knott
(California Bar No. 316369)
**PEIFFER WOLF CARR
KANE CONWAY & WISE LLP**
3435 Wilshire Blvd., Ste. 1400
Los Angeles, CA 90010-1923
(323) 982-4109
mrosadini@peifferwolf.com

Andrew R. Tate*
**PEIFFER WOLF CARR
KANE CONWAY & WISE LLP**
235 Peachtree St. NE, Suite 400
Atlanta, GA 30303
(314) 669-3600
atate@peifferwolf.com

Julie U. Liddell*
**EDTECH LAW CENTER PLLC**
P.O. Box 300488
Austin, Texas 78705
(737) 351-5855
julie.liddell@edtech.law

Karen Dahlberg O'Connell*
**ALMEIDA LAW GROUP LLC**
157 Columbus Ave, 4th Floor
New York NY 10023
(347) 395-5666
karen@almeidalawgroup.com

Lori G. Feldman**
**GEORGE FELDMAN MCDONALD, PLLC**
102 Half Moon Bay Drive
Croton-on-Hudson, NY 10520
(917) 983-9321
lfeldman@4-justice.com
eservice@4-justice.com

* *pro hac vice* granted
** *pro hac vice* forthcoming

*Counsel for Plaintiffs and the Proposed Classes*