Melisa A. Rosadini-Knott
mrosadini@peifferwolf.com
(California Bar No. 316369)
**PEIFFER WOLF CARR
KANE CONWAY & WISE LLP**
3435 Wilshire Blvd., Ste. 1400
Los Angeles, CA 90010-1923
323-982-4109

*Counsel for Plaintiffs and the Proposed Class*

[*additional counsel listed on signature page*]

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

M.C. 1 and M.C. 2, by and through their legal guardian NICOLE REISBERG, and M.C. 3 and M.C. 4, by and through their legal guardian AMY WARREN, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

RENAISSANCE LEARNING, INC.

Defendant.

Civ. No. 8:25-cv-01379

**SECOND AMENDED CLASS ACTION COMPLAINT FOR:**

1. **Violation of 18 U.S.C. § 2510**
2. **Violation of Cal. Bus. & Prof. Code § 17200 *et seq*.**
3. **Invasion of Privacy – Cal. Constitution**
4. **Invasion of Privacy – Intrusion Upon Seclusion – Cal. Law**
5. **Invasion of Privacy – Public Disclosure of Private Facts – Cal. Law**
6. **Invasion of Privacy – Public Disclosure of Private Facts – Wis. Law**
7. **Unjust Enrichment – Wis. Law**
8. **Negligence – Wis. Law**
9. **Violation of Wis. Stat. § 968.31**
10. **Violation of Wis. Stat. § 100.18**
11. **Unjust Enrichment – Kan. Law**
12. **Invasion of Privacy – Intrusion Upon Seclusion – Kan. Law**

13. Invasion of Privacy – Public Disclosure of Private Facts – Kan. Law

14. Violation of the Video Privacy Protection Act, 18 U.S.C. § 2710

**Jury Trial Demanded**

# TABLE OF CONTENTS

I.    INTRODUCTION ...........................................................................................1

II.   JURISDICTION AND VENUE...................................................................5

III.  THE PARTIES...............................................................................................5

IV.   FACTUAL ALLEGATIONS........................................................................6

   A.  EDUCATION IS "THE WORLD'S MOST DATA-MINEABLE INDUSTRY BY FAR"...........................................................................7

   B.  RENAISSANCE IS A MULTIBILLION-DOLLAR EDTECH COMPANY SPECIALIZING IN THE COLLECTION AND ANALYSIS OF STUDENT DATA. ...................................................8

   C.  RENAISSANCE GENERATES AND COLLECTS PLAINTIFFS' PERSONAL INFORMATION AS THEY USE THE PRODUCTS AND UNLAWFULLY DENIES THEM ACCESS TO THEIR OWN INFORMATION. .........................................................................10

   D.  RENAISSANCE ADMITS THAT IT CREATES AND COLLECTS A SWEEPING ARRAY OF DATA FROM STUDENTS WHO USE ITS PRODUCTS.................................................................................15

   E.  RENAISSANCE USES AND SHARES STUDENT DATA FOR A VARIETY OF COMMERCIAL PURPOSES WITHOUT EFFECTIVE CONSENT. ....................................................................20

   F.  RENAISSANCE FAILS TO OBTAIN EFFECTIVE CONSENT FOR ITS SWEEPING GENERATION, EXTRACTION, USE, AND DISCLOSURE OF STUDENTS' PERSONAL INFORMATION........53

   G.  RENAISSANCE MAKES FALSE AND MISLEADING STATEMENTS ABOUT ITS DATA PRACTICES AND THE LAW ON WHICH IT INTENDS SCHOOLS AND PARENTS TO RELY............................58

   H.  RENAISSANCE'S NONCONSENSUAL DATA PRACTICES HARM STUDENTS, INCLUDING PLAINTIFFS.............................................60

   I.  RENAISSANCE'S NONCONSENSUAL DATA PRACTICES ARE UNFAIR AND UNLAWFUL.............................................................69

V.    CLASS ACTION ALLEGATIONS ........................................................70

VI.   TOLLING OF THE STATUTE OF LIMITATIONS.....................73

VII.  CAUSES OF ACTION ..............................................................................74

   COUNT I: VIOLATION OF THE FEDERAL WIRETAP ACT, U.S.C. § 2510 ET SEQ.................................................................................74

   COUNT II: VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL"),.......................................................................77

CAL. BUS. & PROF. CODE § 17200, ET SEQ. ...................................77

COUNT III – INVASION OF PRIVACY: CALIFORNIA CONSTITUTION...........................................................................................80

COUNT IV – INVASION OF PRIVACY: INTRUSION UPON SECLUSION ...........................................................................................82

COUNT V: INVASION OF PRIVACY—PUBLIC DISCLOSURE OF PRIVATE FACTS .................................................................................86

COUNT VI: INVASION OF PRIVACY—PUBLIC DISCLOSURE OF PRIVATE FACTS .................................................................................90

COUNT VII: UNJUST ENRICHMENT ................................................94

COUNT VIII: NEGLIGENCE............................................................98

COUNT IX: VIOLATION OF THE WISCONSIN ELECTRONIC SURVEILLANCE CONTROL LAW ("WESCL") WIS. STAT. § 968.31 ....................................................................................................102

COUNT X: VIOLATION OF WISCONSIN'S DECEPTIVE TRADE PRACTICES ACT (DTPA), WIS. STAT. § 100.18.............................107

COUNT XI: UNJUST ENRICHMENT.................................................109

COUNT XII: INVASION OF PRIVACY—INTRUSION UPON SECLUSION .........................................................................................113

COUNT XIII: INVASION OF PRIVACY—PUBLIC DISCLOSURE OF PRIVATE FACTS .................................................................................117

COUNT XIV: VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT, 18 U.S.C. § 2710 ........................................................................121

VIII. RELIEF REQUESTED ........................................................................123

IX.    JURY TRIAL DEMAND.................................................................124

# I.   INTRODUCTION

1.     There is one question at the heart of this case: does Defendant Renaissance, Inc. ("Renaissance") obtain effective consent—as it is required to do under state and federal law—before taking, using, and disclosing any personal information from students in the compulsory setting of K–12 education, let alone vast troves of private information, as Renaissance admits to doing?

2.     M.C. 1[1] and M.C. 2, by and through their mother and legal guardian Nicole Reisberg, and M.C. 3 and M.C. 4, by and through their mother and legal guardian Amy Warren ("Plaintiffs"), individually and on behalf of all other similarly situated individuals, by and through their attorneys, bring this second amended class action complaint ("Complaint") for injunctive and monetary relief under Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) against Renaissance and make the following allegations based upon knowledge as to themselves and the acts of themselves, and upon information and belief as to all other matters.

3.     Renaissance makes digital products that students in kindergarten through twelfth grade ("K–12") use for school.

4.     Renaissance's core business is generating, collecting, and analyzing as much information about the student users of its products as is technologically possible and monetizing that information, including highly sensitive and private information related to children's academic progress, abilities and struggles, work ethic, attention span, social-emotional or behavioral problems, and even students' lunch balance and whether students are considered socioeconomically disadvantaged, among other categories of data.

5.     The Renaissance products that are the subject of this Complaint are Nearpod, an interactive instructional platform; FastBridge, an assessment tool for monitoring and screening student progress; Renaissance DnA (formerly Illuminate), a student-assessment and data-analytics platform; and SAEBRS, a screening tool used to

---

[1] The minor children's names have been anonymized, and they will be referred to herein as Minor Child ("M.C.") 1, 2, 3, and 4.

purportedly identify students who may be at risk for social-emotional or behavioral problems (collectively, "Renaissance's Products" or "Products").

6.      Through these Products, Renaissance creates and extracts personal information from Plaintiffs and other K–12 students, including, among many other things, the children's contact information, identifying demographic information, assignment submissions, assessment scores, browser and device data, and behavioral data such as whether they are at risk for social-emotional behavior problems.

7.      Renaissance then uses the information for other commercial purposes, including developing, marketing, and delivering its Products.

8.      Renaissance also allows numerous third parties, including advertising and identity-resolution companies, to access the information it extracts from K–12 students for the commercial benefit of Renaissance and that of the third parties.

9.      Renaissance fails to obtain effective consent before engaging in any generation, collection, use, or disclosure of Plaintiffs' and other students' personal information, and therefore its data practices violate students' state and federal rights.

10.     To the extent Renaissance purports to obtain consent, it relies on the consent of school personnel alone. But school personnel do not have authority to consent to data harvesting of minor students by a private company; only parents[2] do. Renaissance does not even notify parents of its data practices, let alone seek their consent.

11.     Any purported consent obtained by Renaissance is not effective because it is not informed, voluntary, or provided by a person with authority to do so.

12.     In order for consent to be effective as a defense to tortious conduct, it must—at minimum—be informed, voluntary, and provided by a person with authority to do so. None of those essential elements are met here.

---

[2] "Parent" as used herein refers broadly to a student's legal guardian.

13.    First, any purported consent obtained by Renaissance is not informed: because schools create Renaissance accounts for students, Renaissance does not even provide its terms of service or privacy policies to students or their parents. Renaissance also fails to explain its data practices in a reasonably understandable manner.

14.    Second, any purported consent is not voluntary: because children are required to attend school, they are coerced into submitting to Renaissance's data practices rather than freely consenting to them. Students' use of Renaissance's Products in a compulsory environment does not unambiguously manifest their assent to Renaissance taking and using their personal information.

15.    Third, any purported consent was not provided by a person with authority to do so: Although Renaissance's users are minors, Renaissance does not claim that it obtains consent from users' parents or even from users themselves. Instead, Renaissance relies on the consent of school personnel alone. But schools do not have authority to consent to data harvesting of minor students by a private company; only parents do. Indeed, the interests of school administrators may not be aligned with those of students, disqualifying them from serving as students' agents in this context. That is why the law highly restricts what kinds of information that even a school may collect from students and how school personnel may use such information, let alone what a private vendor may do.

16.    There is no adverse possession of the law: that Renaissance has been collecting and using student information for years without effective consent does not confer legality on its business practices.

17.    Privacy is a fundamental right. Children have a right to privacy in the information that is generated and taken from them at school. Parents have a right to determine who may access that information and for what purpose.

18.    Renaissance's data practices force children to entirely forgo their privacy rights in order to receive the education to which they are legally entitled. And parents, by sending their children to school as is their right and duty, are forced to

surrender their longstanding authority to make critical decisions about their children's personal information as a result of Renaissance's data practices. Renaissance must be held to account for operating as though the fundamental rights of children and their parents do not exist.

19. Plaintiffs are among the millions of school children whose sensitive information was unlawfully taken, used, and disclosed by Renaissance. Through their use of Renaissance's Products at school, Renaissance has obtained vast amounts of their personal information, including their contact information, identifying demographic information, assignment submissions, assessment scores, browser and device data, and behavioral data such as whether they are at risk for social-emotional behavior problems, to cite just a few examples. Many of these data points are private facts, and their disclosure to any third parties beyond the school was embarrassing to Plaintiffs.

20. Neither Plaintiffs nor their parents consented to Renaissance taking any of this personal information. They were not notified of Renaissance's data practices, nor were they given a choice about whether to consent to them.

21. Instead, Plaintiffs were required to use Renaissance's Products at school, enabling Renaissance to gain virtually unfettered access to their personal information. Renaissance then took their personal information and used the information for its own benefit, including creating new records based on their data to derive behavioral analytics about those children.

22. Through this lawsuit, Plaintiffs seek to hold Renaissance accountable for its surreptitious and unlawful data practices, obtain redress for the millions of school children whose personal information has been unfairly exploited, and restore to students and parents their basic right to be free from unwanted intrusion into their lives and from the wrongful use and disclosure of their private information for the commercial benefit of Renaissance and other private companies.

## II.  JURISDICTION AND VENUE

23.    This Court has original jurisdiction over the action under the Class Action Fairness Act ("CAFA") of 2005. Pursuant to 28 U.S.C. sections 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative Class members exceed $5 million, exclusive of interests and costs, and at least one member of the proposed Class is a citizen of a different state than Defendant Renaissance.

24.    Venue is proper in this District under 28 U.S.C. section 1391 because Renaissance is subject to personal jurisdiction here, regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

25.    Further, the unlawful conduct alleged in this Complaint occurred in, was directed to, and/or emanated in part from this District. Renaissance has sufficient minimum contacts with this state and sufficiently avails itself of the markets of this state through its promotion, sales, licensing, activities, and marketing within this state. Renaissance purposely availed itself of the laws of California and engaged and is engaging in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, including persons Renaissance knew or had reason to know are located in California, including in this District.

## III.  THE PARTIES

26.    Plaintiff M.C. 1 is a minor. At all relevant times, she has been a citizen of the state of California. M.C. 1 attended school in an Orange County, California school district. As part of her schooling, she was required to access and use Renaissance's DnA, which she accessed and used from her school-issued device.

27.    Plaintiff M.C. 2 is a minor. At all relevant times, he has been a citizen of the state of California. M.C. 2 attended school in an Orange County, California school district. As part of his schooling, he was required to access and use Renaissance's DnA, which he has accessed and used from his school-issued device.

28. Nicole Reisberg is the mother and legal guardian of Plaintiffs M.C. 1 and M.C. 2. At all relevant times, she has been a citizen of the state of California.

29. Plaintiff M.C. 3 is a minor. At all relevant times, he has been a citizen of the state of Kansas. M.C. 3 attended school in a Kansas school district. As part of his schooling, he was required to access and use Renaissance's Nearpod, FastBridge, and SAEBRS, which he accessed and used from his school-issued device.

30. Plaintiff M.C. 4 is a minor. At all relevant times, he has been a citizen of the state of Kansas. M.C. 4 attended school in a Kansas school district. As part of his schooling, he was required to access and use Renaissance's Nearpod, FastBridge, and SAEBRS, which he accessed and used from his school-issued device.

31. Amy Warren is the mother and legal guardian of Plaintiffs M.C. 3 and M.C. 4. At all relevant times, she has been a citizen of the state of Kansas.

32. Defendant Renaissance is a Wisconsin Corporation. Its headquarters are located at 2911 Peach Street, Wisconsin Rapids, WI 54494.

## IV. FACTUAL ALLEGATIONS

33. Renaissance both generates and collects personal information belonging to millions of students, including Plaintiffs, without effective consent in violation of state and federal law. It then shares that information with myriad third-party companies, some of which it identifies as "vendors" and "service providers" and others which it intentionally does not disclose, including advertising and identity-resolution companies. It also monetizes Plaintiffs' and other students' personal information by using it to build, market, deliver, and improve its Products, and by selling that information. Its use and disclosure of students' personal information further violates state and federal law.

34. Renaissance admits that it collects, uses, and shares personal information from millions of K-12 students across the country. However, Renaissance fails to obtain effective consent before taking, using, and sharing any of the personal information of students under the age of 13. Plaintiffs have been harmed by

Renaissance's nonconsensual generation, collection, use, and disclosure of their personal information.

**A.     Education is "the world's most data-mineable industry by far."**

35.     Student data is extremely valuable in today's data economy because it can be used to develop, deliver, and improve products and services; personalize and target marketing and advertising; identify and manage risk; and predict future behaviors and trends.[3]

36.     Targeted advertising directed at children is highly lucrative for private companies. A Harvard research study found that the 2022 annual advertising revenue from social-media users under the age of 17 across six major social-media platforms was nearly $11 billion.[4]

37.     By generating, collecting, and monetizing student information, education technology, or "EdTech,"[5] has become a $250 billion global industry that is projected to nearly triple by 2027.[6] Investors have taken note. Investments in EdTech surged from $500 million in 2010 to $16.1 billion in 2021.[7]

---

[3] Hamed Ghorban Tanhaei, "Predictive analytics in customer behavior: Anticipating trends and preferences" (December 2024), *available at* https://www.sciencedirect.com/science/article/pii/S2666720724000924.

[4] https://doi.org/10.1371/journal.pone.0295337

[5] Although the term "educational technology" can be defined broadly to include purely theoretical or pedagogical practices, this Complaint uses "EdTech" to refer generally to "all the privately owned companies currently involved in the financing, production and distribution of commercial hardware, software, cultural goods, services and platforms for the educational market with the goal of turning a profit." *EdTech Inc.: Selling, Automating and Globalizing Higher Education in the Digital Age*, Tanner Mirrlees and Shahid Alvi (2019).

[6] Louise Hooper, *et al.*, *Problems with Data Governance in UK Schools*, Digital Futures Commission, 5Rights Foundation (2022), https://digitalfuturescommission.org.uk/wp-content/uploads/2022/08/Problems-with-data-governance-in-UK-schools.pdf.

[7] Alex Yelenevych, *The Future of EdTech*, Forbes (December 26, 2022), https://www.forbes.com/sites/forbesbusinesscouncil/2022/12/26/the-future-of-edtech/?sh=7c2924676c2f.

38.    Education has been described by a leading executive as "the world's most data-mineable industry by far."[8] As one leading EdTech investor explained, these investments are not philanthropic: the purpose of these private EdTech ventures "isn't a social mission . . . . They're there to create return."[9]

39.    The result is that EdTech has overtaken K-12 education. School districts access an average of nearly 3,000 EdTech tools during a school year. A single student accesses nearly fifty EdTech tools per year.

**B. Renaissance is a multibillion-dollar EdTech company specializing in the collection and analysis of student data.**

40.    Renaissance is an EdTech company that markets and sells Products and services to K-12 schools and school districts. It provides a host of Products and services primarily focused on assessment, practice, instruction, and student-data analytics.

41.    One such Product is Nearpod, an interactive instructional platform that allows teachers to create lessons with built-in activities, polls, quizzes, and immersive content like virtual reality field trips. Renaissance acquired Nearpod in 2018 for $650 million. According to Renaissance, approximately 75 percent of K-12 public schools in the U.S. use Nearpod, and Nearpod captured 1.5 billion "student learning insights" in 2020 alone.[10]

42.    Another Renaissance product is FastBridge, a system of computer-adaptive and curriculum-based assessments for reading, math, and social-emotional behavior. According to Renaissance, FastBridge annually supports 34.7 million screening and 9.9 million progress monitoring administrations across 48 states.[11]

---

[8] Stephanie Simon, *The big biz of spying on little kids*, Politico (May 15, 2014), https://www.politico.com/story/2014/05/data-mining-your-children-106676.
[9] *Id.*
[10] https://nearpod.com/blog/covid-19-lasting-impact-k-12/#:~:text=Nearpod%20%E2%80%93%20which%20is%20now%20used,across%2019.5%20million%20lessons%20taught.
[11] https://www.prweb.com/releases/fastbridge-from-renaissance-now-reports-quantile-measures-providing-insight-into-students-math-abilities-

43.     Another Renaissance product is SAEBRS (Social, Academic, and Emotional Behavior Risk Screener). It is a tool that purports to identify students who are at risk for social-emotional behavior problems. It purports to assess both "the absence of problem behaviors and symptomatology (e.g., internalizing and externalizing behaviors) and the presence of well-being and competencies (e.g., social-emotional skills)."

44.     Another Renaissance product is Renaissance Data and Assessment ("Renaissance DnA," formerly Illuminate), a platform for creating and managing assessments and for visualizing student data from multiple sources to inform decisions. According to Renaissance, approximately 6.4 million students in the U.S. use Renaissance DnA.[12]

45.     Plaintiffs' school districts are among the thousands that use Nearpod, FastBridge, Renaissance DnA, and/or SAEBRS.

46.     By persuading schools to implement its Products, Renaissance gains virtually unrestricted access to the private and sensitive personal information of the children who attend those schools, including Plaintiffs.

47.     Renaissance's Products do not merely serve as a digital filing cabinet in which K-12 schools may store education records, or locally stored digital workbooks. Rather, Renaissance uses these Products among others to generate, collect, store, share, and analyze data about students. These functions are core to Renaissance's business model and its ability to attract substantial investment capital.

48.     Given the significant value of student data in today's data economy, numerous private investment firms have made significant investments in Renaissance. In early 2014, for example, Google Inc.'s investment fund acquired a

302016318.html#:~:text=FastBridge%20annually%20supports%2034.7%20million,Renaissance%20and%20Nearpod%20General%20Manager.
[12] https://renaissance.widen.net/s/6qd2rx6mp6/786807-dnadistrictleaderoverview-deck-ren

minority stake in Renaissance through a $40 million investment. Shortly thereafter, Renaissance was sold to the equity investment firm Hellman & Friedman for $1.1 billion. Since then, Renaissance has received millions of dollars from a host of investment firms, including Francisco Partners, which acquired the company in 2018, as well as TPG Capital and Blackstone.

49. Renaissance has thus created a significant return for investors by taking and exploiting school-aged children's personal and sensitive data at the expense of children's privacy, including Plaintiffs' personal information as described in this Complaint.

**C. Renaissance generates and collects Plaintiffs' personal information as they use the Products and unlawfully denies them access to their own information.**

50. Plaintiffs all use Renaissance's Products at their respective schools, including Nearpod, FastBridge, Renaissance DnA, and SAEBRS.

51. Neither Plaintiffs nor their parents were provided with any terms or policies pertaining to Nearpod, FastBridge, Renaissance DnA, or SAEBRS, nor were they given a choice about whether to use them.

52. Neither Plaintiffs nor their parents have consented to Renaissance's generation, collection, use, or disclosure of Plaintiffs' personal information through any of Renaissance's Products.

53. The data extracted from Plaintiffs by Renaissance through Renaissance's Products is highly personal: it facilitates insights and predictions regarding the children's skill and subject mastery, strengths and weaknesses, depth of understanding, comprehension challenges, and social-emotional and behavioral health.

54. Renaissance has thus generated and collected—and continues to generate and collect—vast troves of data belonging to Plaintiffs, including their personal information and private facts, through their use of its Products.

## 1. M.C. 3 and M.C. 4 use Nearpod.

55. Plaintiff M.C. 3 uses Nearpod, an interactive instructional platform that allows teachers to create lessons with built-in activities, polls, quizzes, and immersive content like virtual reality field trips, at his school. He began using Nearpod in or about August 2023 when he began sixth grade. He was 11 years old. M.C. 3 regularly used Nearpod during sixth, seventh, and eighth grade to participate in interactive lessons assigned by his teachers, including watching videos. He previously used it at least weekly and currently uses it occasionally at school.

56. Plaintiff M.C. 4 also uses Nearpod at his school. He began using it in or about August 2025 when he began sixth grade. He was 11 years old. M.C. 4 regularly used Nearpod to participate in interactive lessons assigned by his teachers, including watching videos. He previously used it at least weekly and currently uses it occasionally at school.

57. The school created the Nearpod accounts for M.C. 3 and M.C. 4.

58. Nearpod lessons span a variety of subjects and questions assume many forms. For example, they may ask the student to describe or assess their current understanding of certain material:

How much do you already know about different types of cells and how they are organized?

A. I know a lot.

B. I know a little.

C. I don't know anything.

59. Some are open-ended questions that require the student to submit their answer in a written format, fill-in-the-blank questions, polls for gauging the student's opinion about an item, or multiple-choice questions. Other formats are more interactive, requiring that the student draw, write or type on an interactive digital canvas, collaborate digitally with their peers, match like pairs, or categorize and sort items.

60. In completing their required schoolwork, Plaintiffs M.C. 3 and M.C. 4 have submitted information to Renaissance through Nearpod in all these formats.

61. Using this student-provided data, Renaissance purports to make powerful inferences and predictions about the student's knowledge, understanding, and engagement with the lesson content. Beyond a simple right-or-wrong analysis, this academic and behavioral data provides insight into the student's thought process and learning habits. Renaissance analyzes that data to generate reports that purport to reveal the student's mastery of a skill, her ability to communicate her thoughts and think critically, and the likelihood that she will pass upcoming assessments.

**2. M.C. 3 and M.C. 4 use FastBridge.**

62. Plaintiff M.C. 3 began using FastBridge, a system of computer-adaptive and curriculum-based assessments for reading, math, and social-emotional behavior, in or about August 2017 when he was in kindergarten and was five years old. He continues to use it at least twice a year to participate in school-required academic assessments.

63. Plaintiff M.C. 4 also began using FastBridge in or about August 2019 when he was in kindergarten and was five years old. He continues to use it at least twice a year to participate in school-required academic assessments.

64. The school created FastBridge accounts for M.C. 3 and M.C. 4.

**3. M.C. 3 and M.C. 4 use SAEBRS by Renaissance.**

65. Plaintiff M.C. 3 began using SAEBRS in or about August 2017 when he was in kindergarten and was five years old.

66.    Plaintiff M.C. 4 also began using SAEBRS in or about August 2019 when he was in kindergarten and was five years old.

67.    In elementary school, the children's teacher completes SAEBRS surveys on their behalf. In middle school, the children begin completing their own surveys. M.C. 3 has completed his own surveys for the past three years, while M.C. 4 completed at least one survey this year.

68.    M.C. 3 and M.C. 4 access these surveys through ClassLink, the school's single-sign-on platform.

69.    The school requires that students participate in surveys through the SAEBRS platform at least twice a year. The surveys solicit highly personal and sensitive information from and about students, which includes having them rank their own social and emotional behavior:

| Social Behavior | Never | Sometimes | Often | Almost Always |
|---|---|---|---|---|
| I argue with others. | 3 | 2 | 1 | 0 |
| I get along with my peers. | 0 | 1 | 2 | 3 |
| I lose my temper. | 3 | 2 | 1 | 0 |
| I disrupt class. | 3 | 2 | 1 | 0 |
| I am respectful. | 0 | 1 | 2 | 3 |
| Other people like me. | 0 | 1 | 2 | 3 |
| I have trouble waiting my turn. | 3 | 2 | 1 | 0 |

| Emotional Behavior | Never | Sometimes | Often | Almost Always |
|---|---|---|---|---|
| I feel sad. | 3 | 2 | 1 | 0 |
| I feel nervous. | 3 | 2 | 1 | 0 |
| I like to try new things. | 0 | 1 | 2 | 3 |
| I am happy. | 0 | 1 | 2 | 3 |
| I am worried. | 3 | 2 | 1 | 0 |
| When something bad happens... | 3 | 2 | 1 | 0 |

70.     The data collected through SAEBRS include extremely private facts, such as whether the student is at risk for social or emotional problems, how accurately the student perceives himself, and whether to require him to submit to an emotional regulation program or other intervention. A person of ordinary sensibilities would be highly offended to know that these private facts about young children engaged in compulsory educational activities were disclosed to third parties without parents' consent in violation of federal law.

### 4.  M.C. 1 and M.C. 2 used Renaissance DnA.

71.     Plaintiff M.C. 1 began using Renaissance DnA, a platform for creating and managing standards-based assessments and for visualizing student data from multiple sources to inform decisions, in or about September 2021 when she started kindergarten at age 5, and she continued using it until December 2024. She accessed the platform through her Safari web browser on her school-issued iPad.

72.     Plaintiff M.C. 2 began using Renaissance DnA in or about September 2022 when he began kindergarten at age 5, and he continued using it until December

2024. He accessed the platform through his Safari web browser on his school-issued iPad.

73.    M.C. 1 and M.C. 2 accessed Renaissance DnA through ClassLink, the school's single-sign-on platform.

74.    The school created Renaissance DnA accounts for M.C. 1 and M.C. 2. M.C. 1 and M.C. 2's parents were not even informed that their children would be using Renaissance DnA.

**D. Renaissance admits that it creates and collects a sweeping array of data from students who use its Products.**

75.    Renaissance admits that it creates and collects a sweeping array of data, including private information, from students who use its Products.

76.    Renaissance admits that it collects the following information automatically from every student who uses its Products, which includes Plaintiffs:[13]

**1.  Plaintiffs' usage information, including but not limited to:**

    i.      how often a student accesses certain features;

    ii.     all of the areas within Renaissance's Products that the student visits;

    iii.    the time of day the student used the Product; and

    iv.     other (unspecified) information.

**2.  Plaintiffs' device information, including but not limited to:**

    i.      IP addresses and other unique device identifiers for any device used to access the Products;

    ii.     The student's physical location;

    iii.    The date and time of a student's visit;

    iv.     The student's browser language;

    v.      Referring and exit pages of URLs;

    vi.     The amount of time a student spends on particular pages;

---

[13] https://renaissance.widen.net/view/pdf/9hoolemzvy/Renaissance---Childrens-Privacy-Notice.pdf?t.download=true&u=zceria

vii.    Which parts of the Products the student uses;

viii.    Which links the student clicks;

ix.    The student's search terms;

x.    Traffic and related statistics;

xi.    Keywords;

xii.    Other (unspecified) general browsing information; and

xiii.    Other (unspecified) general usage information.

**3. Information collected about Plaintiffs via cookies and other tracking technologies.**

77.    Plaintiffs allege that Renaissance does what it says it does: Renaissance collects and has collected the foregoing information automatically from students when they use its Products, which includes Plaintiffs when they have used and continue to use Renaissance's Products as required by their schools.

78.    Metadata generated and collected from students is as valuable to Renaissance as is the express data collected from students. While data submitted directly by a student supports predictions and inferences about her knowledge and understanding of certain subject matter or social-emotional well-being, the metadata—or the data about the student's interactions with the Products—provides insights into her behavior and learning habits.

79.    Renaissance generates and gathers a wealth of metadata about Plaintiffs while they use its Products. This data reveals intimate details about the process that students use to arrive at their responses, and includes information such as response time, error patterns, gaps in mastery, engagement and focus, work ethic, and test-taking strategies.

80.    According to Renaissance, Renaissance DnA data may be "aggregate[d] and disaggregate[d.]"[14] It provides "[r]eal-time live" monitoring of student work and "[i]nstant results" with "distractor rationales and rich metadata[.]"[15]

81.    In addition to metadata, Renaissance also states that certain information is "required" to be generated and collected in order for students to access its Products, which includes:[16]

**4. Required data generated and collected by Renaissance through Renaissance DnA, including:**

     i.    Student's first and/or last name;

     ii.    Student identifiers – local (school district) ID number;

     iii.    Student's date of birth;

     iv.    Student's gender;

     v.    Student school enrollment;

     vi.    Student grade level;

     vii.    Teacher names;

     viii.    IP address of users, use of cookies, "etc.";[17]

     ix.    "Other application technology metadata"; and

     x.    Metadata on user interaction with application;

**5. Required data generated and collected by Renaissance through FastBridge, including:**

     i.    Student app username;

     ii.    Student identifier – student app passwords;

---

[14] https://renaissance.widen.net/s/6qd2rx6mp6/786807-dnadistrictleaderoverview-deck-ren

[15] https://www.renaissance.com/products/assessment/dna/

[16] https://renaissance.widen.net/view/pdf/dyg5r6yjs8/Categories-of-Data-Collected-by-Product.pdf?u=zceria&t.download=true

[17] Renaissance does not disclose specific types of metadata it collects through use of tracking technologies such as cookies as students use its Products, but Plaintiffs undertook forensic testing that revealed some of those details and the third parties who receive that data, as discussed in section IV.D.3., *infra*.

iii.     Student identifier – first and/or last name;

iv.     Student school enrollment;

v.      Student grade level;

vi.     Student in-app assessment performance;

vii.    Student's IP address, use of cookies, "etc.";

viii.   "Other application technology metadata"; and

ix.     Metadata on user interaction with application;

**6. Required data generated and collected by Renaissance through Nearpod.**

i.      Student's IP address, use of cookies, "etc.";

ii.     Student's teachers' names; and

iii.    Student's teachers' emails.

82.     Plaintiffs allege that Renaissance does what it says it does: Renaissance collects the foregoing information from students when they use its Products, which includes Plaintiffs.

83.     While much of this data is sensitive and private as individual data elements, Renaissance also aggregates the data to create highly detailed profiles of students that Renaissance maintains and monetizes in a variety of ways, as discussed *infra*.

**7. The personal information created and taken from Plaintiffs far exceeds traditional education records.**

84.     The data Renaissance generates and extracts from students who use its Products, including Plaintiffs, far exceeds what could be traditionally characterized as education records.

85.     Plaintiffs—like all students—retain significant rights over the personal information contained in education records, which are protected by state and federal law.

86.     Further, the amount of data Renaissance collects about children, including children under 13, far exceeds that which is reasonably necessary for children to participate in any school activity that is facilitated by Renaissance Products and

services in violation of the Children's Online Privacy Protection Act ("COPPA"). 15 U.S.C. § 6502; 16 C.F.R. § 312.6.

87.    That Renaissance's Products are not designed to optimize for student privacy is an intentional, self-interested choice that comes at the expense of children's privacy, safety, and autonomy.

**8. Renaissance unlawfully denied Plaintiffs access to their own data.**

88.    Renaissance refuses to disclose to Plaintiffs or their parents the data it has collected from or about them or grant them access to such data.

89.    Under COPPA, Renaissance is required to grant parents access to all personal information belonging to their children under 13. However, Renaissance has a policy of refusing to accommodate those requests.[18]

90.    For example, Plaintiff M.C. 1 and M.C. 2 are under 13. When Ms. Reisberg requested access to their personal information collected by Renaissance, Renaissance confirmed receipt of her request but falsely informed her that she was required to direct her request to her school. Renaissance never provided Ms. Reisberg access to either of her children's data, in clear violation of COPPA.

91.    Ms. Reisberg was unable to obtain access to her children's data through any other means. When she requested access to that information from her school district, the district provided Ms. Reisberg some information as to the data Renaissance obtained from her children through their use of Renaissance DnA, although they cited only generic data element categories (including school ID, student ID, student number, name, Gmail, Gmail password, date of birth, gender, grade level, attendance, lunch balance, and guardian information, including name, address, email, phone, and language) rather than providing her access to their specific data. The district did not provide Ms. Reisberg any of the metadata generated during her children's use of Renaissance DnA and collected by

---

[18] https://renaissance.widen.net/view/pdf/9hoolemzvy/Renaissance---Childrens-Privacy-Notice.pdf?t.download=true&u=zceria

Renaissance because the district does not have access to that data; only Renaissance does.

92.     Likewise, Plaintiff M.C. 3 was under 13 when he began using Renaissance Products, and M.C. 4 is still under 13. When Ms. Warren requested access to their data collected by Renaissance, Renaissance failed to respond.

93.     Renaissance has not yet provided Ms. Warren access to either of her children's personal information, in clear violation of COPPA.

94.     Ms. Warren was also unable to access any of her children's data through their school.

95.     As a result of Renaissance's stated policy of denying COPPA requests for information referenced in paragraph 89, students and parents do not and cannot know the full extent of the personal information Renaissance generates and collects from and about students, whether that data is accurate, how that data is stored, how long that data is retained, who has access to that data, or how that data or data-derivative information or Products are used by Renaissance or third parties.

96.     Although Plaintiffs cannot know the full extent of the personal information taken from them by Renaissance, they base their allegations on Renaissance's own terms and policies that describe its data practices, their own personal experience using its Products, and expert forensic analysis of its Products.

**E.     Renaissance uses and shares student data for a variety of commercial purposes without effective consent.**

97.     In addition to generating and collecting vast troves of student data, including private information regarding Plaintiffs, Renaissance uses and shares that information for a host of commercial purposes.

98.     Renaissance refuses to disclose how it uses and shares the data of any individual student to the student or their parent in violation of COPPA. Thus, Plaintiffs' allegations are based on expert analysis of certain Renaissance Products when in use, as well as Renaissance's own statements in its terms and policies.

**1. Forensic analysis revealed that Renaissance shares Plaintiffs' personal information with several undisclosed third-party advertising and identity-resolution companies.**

99.     Plaintiffs conducted forensic analysis of some of Renaissance's Products—Nearpod and FastBridge—and discovered that Renaissance embedded a network of advertising, analytics, and identity-resolution tracking technologies into its educational platforms.

100.   These tracking technologies operate invisibly to students and parents and transmit information reflecting students' participation in classroom lessons, assignments, and assessments conducted through the platform.

101.   These technologies operate together to capture detailed information about how students interact with Renaissance's Products and to transmit that information to third-party data-analytics and advertising systems in real time.

102.   As described below, forensic analysis confirmed that Renaissance integrated tracking technologies associated with multiple third-party companies—including Google, Mixpanel, Microsoft, Xandr, Comscore, Taboola, and Leadfeeder—each of which receives and processes information about students' interactions with Renaissance's platforms.

103.   These companies collect behavioral data from websites and applications in order to identify individual users, build persistent profiles of those users across devices and services, and analyze or otherwise commercially exploit those profiles through advertising, audience measurement, marketing analytics, and related commercial services.

104.   Renaissance integrates these third-party tracking technologies because they provide Renaissance with analytics and behavioral-insight services regarding how users interact with its platforms. Through these integrations, Renaissance transmits students' interaction data—including identifiers and behavioral activity within the platform—to the third-party analytics providers, which process that data and provide Renaissance with reports, dashboards, experimentation tools, and other

analytics services designed to measure user engagement, evaluate product performance, and optimize the platform.

105.  In effect, Renaissance exchanges students' behavioral interaction data with these third-party companies in return for analytics services and related insights into how students use its Products.

106.  To obtain these services, Renaissance intentionally implemented and configured the tracking technologies associated with these companies—including Google Analytics and Mixpanel—within the source code of its platforms so that user interactions would automatically generate telemetry and network requests transmitted to the third-party analytics systems.

107.  At the same time, because Renaissance installed those third-party tracking technologies into several of its Products, the third-party analytics and marketing companies receive valuable behavioral data about students interacting with those Products, which these companies incorporate into their broader analytics, advertising, and identity-resolution systems. The student data that Renaissance shares with these third parties is therefore used by those third parties for purposes far beyond the services it provides to Renaissance.

108.  Tracking technologies such as analytics scripts, tags, and application programming interfaces ("APIs") operate by embedding executable code within a website or web application that runs automatically within a user's web browser when the page loads. Examples include tools such as Google Analytics and Google Tag Manager, which are deployed through JavaScript tags embedded in a website's source code, and analytics platforms such as Mixpanel, which are integrated through tracking libraries that generate event telemetry when users interact with the site or application. When these scripts execute in the browser, they observe and record user actions—such as page visits, content interactions, and video content viewed through the platform—and transmit that information through network requests to external servers operated by the analytics or marketing provider.

109.   These tracking technologies typically assign persistent identifiers to the user's browser or device—often through cookies, unique identifiers, or platform-specific user IDs—which allow the analytics provider to recognize the same user across multiple sessions and interactions. When the user performs actions within the website or application, the embedded tracking scripts attach those identifiers to the interaction data and transmit them to external servers along with information describing the user's activity, such as the page being viewed, the content being accessed, or the interaction being performed. Through this mechanism, companies operating analytics and marketing platforms—including Google Analytics and Mixpanel—receive detailed telemetry describing identifiable users' interactions with the website or application in real time.

110.   As a result of Renaissance's integration of these tracking technologies, Plaintiffs' and other students' interactions with their educational assignments and assessments were transmitted into the same advertising and behavioral-profiling infrastructure that is commonly used to track consumers across commercial websites.

111.   Plaintiffs conducted forensic analysis of Renaissance's Products using browser developer tools and network-monitoring techniques, including inspection of page source code, JavaScript execution, and hypertext transfer protocol ("HTTP") network requests generated when users interact with Renaissance's platforms. This analysis confirmed that Renaissance embeds tracking technologies—including analytics scripts, APIs, and other executable code—directly into the webpages and application interfaces through which students access Renaissance's Products. When a student loads a Renaissance webpage or application interface, the student's browser automatically downloads and executes this code as part of the communication between the student's device and Renaissance's servers.

112.   Once executed within the student's browser, these tracking technologies monitor and capture the student's interactions with Renaissance's platform—

including page visits, navigation activity, lesson pages accessed, video-based instructional content viewed through the platform, and other communications exchanged between the student's browser and Renaissance's servers. As those communications occur, the embedded tracking technologies generate additional network requests that transmit the navigation telemetry and related interaction data—such as the URLs of lesson pages visited, session identifiers, and device information—to external servers operated by the analytics or marketing provider. Monitoring the HTTP traffic generated by Renaissance's Products confirms that Plaintiffs' ordinary interactions and communications with Renaissance are acquired contemporaneously with their transmission.

113.   Through these tracking technologies embedded in the source code of its Products, Renaissance intercepts Plaintiffs' electronic communications by capturing them at the moment they occur within the student's browser during the transmission of those communications between the student's device and Renaissance's servers. In other words, when Plaintiffs use certain Renaissance Products, their communications with Renaissance are not transmitted solely between the student's browser and Renaissance's servers. Instead, Renaissance's tracking technologies acquire those communications in transit and transmit them through automated network requests to Renaissance and to external analytics and marketing systems integrated into the platform.

114.   The tracking technologies embedded in Renaissance's Products execute within the same browser environment that processes students' interactions with the platform. Because these scripts run within the student's browser at the moment the student interacts with the platform, they access the data structures and browser storage that contain information about the student's active lesson session, the specific lesson pages accessed, identifiers associated with the session, and other interaction data generated during the student's use of the platform. As a result, the tracking technologies embedded in the platform capture the contents of students'

communications with the platform—including navigation through lesson pages and engagement with instructional content—while those communications are in transit.

115.   Forensic inspection of the browser environment during student use of the Nearpod and FastBridge platforms further revealed that the platforms generated and stored data reflecting the substance of students' interactions with the educational products. For example, browser storage associated with the Nearpod platform contained parameters corresponding to specific assignment responses, including entries labeled "Answer:answer_[ID]" containing the value of a student's submitted response. These parameters were generated as the student interacted with lesson content and submitted responses through the platform and were present within the browser environment during the student's active session.

116. Renaissance intentionally designed and integrated these tracking technologies into its Products in order to capture and analyze user interactions with its platform. These technologies are used by Renaissance to collect detailed information regarding students' activities within the Products—including lesson pages accessed, session activity, behavioral interaction data, and other information reflecting how students navigate and engage with Renaissance's educational platforms.

117.   Neither Plaintiffs nor their parents consented to Renaissance intercepting or recording Plaintiffs' communications in this manner—or disclosing those communications to third parties.

118.   Forensic analysis of Renaissance Products used by M.C. 3 and M.C. 4, including monitoring the HTTP traffic generated by Nearpod and FastBridge, confirms that Plaintiffs M.C. 3's and M.C. 4's ordinary interactions and communications with Renaissance are intercepted and transmitted through tracking technologies embedded within those Products, including transmissions to third-party advertising, marketing, and identity-resolution companies in real time.

119.   Identity resolution is a process linking and combining disparate pieces of data about a person and the person's behavior from different devices, websites,

social-media platforms, other online interactions, and data stored offline locally on a computer or server, to provide a comprehensive profile of the person's interactions and behaviors.[19] Companies with identity-resolution capabilities store historical data about each person and continually collect new data and update each profile accordingly.[20]

120.  Renaissance does not disclose the third-party advertising, marketing, and identity-resolution recipients in its terms and policies.

121.  The categories of information being intercepted, recorded, and transmitted to the third-party companies, and the identity of the third parties with which that information is shared, are determined by each Renaissance Product and are typical of all student accounts.

122.  The categories of information being intercepted, recorded, and transmitted to third-party companies do not vary by user, their school, or their school district. In other words, every user of a given Renaissance Product is subject to the same data practices regardless of their school or location.

### a.  Renaissance's Nearpod product.

123.  Renaissance's Nearpod product intercepts and transmits personal information about students in real time through tracking technologies embedded in the Product's webpages and application interfaces.

124.  When a student interacts with a Nearpod webpage through a web browser, certain user actions—including loading a page, joining a session, or interacting with lesson content—trigger the execution of tracking technologies embedded in the Nearpod source code. These technologies capture and transmit information about the student's communications and interactions with the Nearpod platform while

---

[19] https://liveramp.com/blog/what-is-identity-resolution#:~:text=Identity%20resolution%20is%20the%20process,without%20using%20third%2Dparty%20cookies.

[20] https://www.transunion.com/blog/what-is-identity-resolution

those communications are in transit between the student's device and Renaissance's servers.

### i. Google

125.   For example, when a student loads a Nearpod page on a web browser, the page-load action triggers Google Analytics and Google Tag Manager. These tools capture information about the student's interactions with the Nearpod platform and cause that information to be transmitted through automated network requests to Google's servers contemporaneously with the student's communications with Renaissance.

126.   Google is the largest digital advertiser in the United States, accounting for 26.8-percent of the total digital advertising revenue generated nationwide.

127.   Renaissance does not disclose that Nearpod uses tracking technologies that transmit Plaintiffs' or other students' interactions with the platform to Google while children use the Product. Renaissance likewise does not disclose that Google uses information collected through its analytics infrastructure in connection with its broader analytics, advertising, and identity-resolution systems.

128.   Every time a student loads a Nearpod page, the page-load communication triggers Nearpod to transmit the full URL of the page being viewed and related navigation telemetry through Google Analytics tracking requests.

129.   Google generates two network transmissions to Google: a first packet containing several unique identifiers—including the "**cid**" parameter, "**_gid**" parameter, the "**jid**" parameter, and the "**a**" parameter—and a second packet containing the Google Tag Manager Tag ID.

130.   Forensic inspection of network traffic generated during student use of the Nearpod platform revealed that Google Analytics requests transmitted a persistent identifier known as the **Client ID** ("**cid**") to Google's servers. Specifically, monitoring HTTP requests sent to Google's analytics endpoint (google-analytics.com/g/collect) showed that the requests contained a parameter labeled **cid**, which uniquely identifies the browser or device generating the request. The **cid**

value is assigned by Google Analytics and functions as a persistent identifier that Google uses to recognize the same browser or device across multiple browsing sessions and across different websites that use Google Analytics. By attaching this identifier to telemetry describing the student's interaction with the Nearpod platform—including the specific lesson pages accessed and other interaction data—Google Analytics links those interactions to a persistent identifier associated with the student's device, which Google uses to track and aggregate the user's activity over time.

131.   Because the Google Analytics **Client ID** persists across browsing sessions and is transmitted with each analytics request, Google associates multiple interactions generated by the same browser or device with a single identifier over time. Google then compiles a longitudinal record of the user's activity across sessions and across different websites or applications that use Google's analytics or advertising technologies. In this way, interaction data generated when students use the Nearpod platform—including lesson pages accessed, session activity, and engagement with instructional content—is linked to other information associated with the same identifier within Google's broader analytics and advertising ecosystem. As a result, Google uses the identifier to incorporate data originating from students' use of Renaissance's educational platforms into persistent behavioral profiles associated with the same user.

132.   The **_gid** parameter functions as a unique user identifier that links information generated within the Nearpod product with other information associated with the same identifier collected across other websites or applications used by the same device. The **_gid** identifier is used by Google to recognize the same device or browser across multiple browsing sessions and across other websites that use Google tracking technologies, which feeds interaction data originating from the Nearpod platform into a persistent, longitudinal profile of the student user.

133.    While a student interacts with the Nearpod platform, Nearpod automatically generates and transmits interaction data through Google Analytics and Google Tag Manager. These tracking technologies capture the student's interactions as they occur and associate the captured information with the **_gid** identifier before transmitting it to Google's servers.

134.    Forensic inspection of the Nearpod browser environment further revealed that the platform generates and stores assignment-response data reflecting the substance of students' communications with the platform. For example, browser storage associated with Nearpod contained parameters corresponding to specific student answer submissions, including entries labeled "Answer:answer_[ID]" containing the value of a student's response to an assignment question. These parameters were generated as the student interacted with lesson content and submitted responses through the platform.

135.    Because the Google Analytics and Google Tag Manager tracking technologies embedded in Nearpod execute within the student's browser, those technologies generate automated network requests that transmit information reflecting the student's navigation through the platform—including the URLs of lesson pages visited and related session telemetry—to Google's servers during the student's use of the platform. In forensic analysis, this was observed as the tracking requests included parameters such as the **dl** ("**document location**") field containing the full URL of the Nearpod lesson page being viewed.

136.    These communications reflected Plaintiffs' and other students' participation in classroom assignments and educational activities conducted through the platform, including the specific lesson pages and instructional content accessed during the student's session.

137.    The information transmitted to Google through these tracking technologies also includes which pages within Nearpod a student visits and for how long; the origin of the visitor (such as whether the visitor arrived through another website,

search engine, or direct navigation); the number of sessions and engagement time; and device and browser characteristics.

138.   The **_gid** identifier associates this information with a persistent user profile that can link a student's activity across multiple websites and services.

139.   The **jid** parameter, or **JoinID**, functions as another unique identifier that links information generated within the Nearpod product with identifiers associated with Google's DoubleClick advertising cookie.

140.   By associating Nearpod interaction data with the DoubleClick cookie through the **jid** identifier, Google links a student's activity within the Nearpod platform to the same identifiers used throughout Google's advertising ecosystem. This means that a student's interactions with Nearpod—including the specific pages visited, lesson content accessed, and engagement behavior—are connected to a persistent advertising identifier tied to that student's device and browser.

141.   The "**a**" parameter similarly associates information generated within the Nearpod platform with Google's AdSense advertising infrastructure. Through this identifier linkage, Google connects Nearpod interaction data to advertising identifiers used across Google's network of websites and applications, enabling Google to attribute the student's activity within Nearpod to a persistent user profile.

142.   These identifiers are used by Google to recognize the same student or device across multiple browsing sessions and across other websites and applications that use Google's tracking technologies. As a result, information originating from a student's use of Nearpod is combined with other data Google has collected about the same user, including information obtained from Google Search, YouTube, Gmail, Chrome, Android devices, and other Google-owned services.

143.   The **Google Tag Manager Tag ID** transmitted with these requests likewise functions as a persistent identifier associated with a specific browser or device. When combined with other identifiers and telemetry transmitted through Google's analytics infrastructure, this identifier allows Google to attribute Nearpod interaction data to a particular user or device with a high degree of specificity.

144. Google integrates the identifiers and interaction data transmitted from Nearpod with information collected from other Google-owned properties and third-party websites using Google tracking technologies. Through this integration, Google creates persistent, longitudinal profiles of individual student users and their behavior across digital platforms.

145. Nearpod also provides instructional video content as part of its lesson materials and classroom activities. Teachers using Nearpod incorporate videos into lessons, and students access and view those videos through the Nearpod platform during classroom sessions and assignments. Through this functionality, Renaissance delivers audio-visual instructional materials to students and maintains systems that enable students to request and obtain video content through the Nearpod service.

146. Students access Nearpod through accounts or classroom sessions created for them by their schools or teachers and use those accounts to obtain and view instructional video content through the platform.

147. Through their interaction with Nearpod lessons, students directly request and obtain instructional video materials presented within those lessons.

### ii. Mixpanel

148. Nearpod also integrates tracking technologies provided by Mixpanel, Inc. that capture and transmit students' interactions with the platform in real time.

149. Mixpanel is a marketing, analytics, and identity-resolution company that observes how users interact with digital products.

150. Renaissance does not disclose to students or parents that Nearpod uses tracking technologies that transmit Plaintiffs' and other students' interactions with the platform to Mixpanel while children use the Product.

151. Renaissance likewise does not disclose that Mixpanel uses information collected through its analytics infrastructure in connection with its broader analytics, advertising, and identity-resolution systems.

152.   When a student performs certain actions within the Nearpod platform—such as joining a session, submitting an activity response, playing an interactive video, or connecting to the Drawit Socket—Nearpod generates event transmissions that send these communications to Mixpanel along with a student's unique identifier. (In forensic analysis, student actions, or interaction events, that trigger the transmittal of information originating in Nearpod to Mixpanel were observed in network traffic as "**Join Session**," "**Student Activity Submission**," "**Interactive Video Play**," which corresponds to the student playing a specific instructional video within a Nearpod lesson, and "**Drawit Socket Connection**.")

153.   These events are triggered when a student works on assignments or interacts with lesson content within the Nearpod platform.

154.   Because these events are triggered when a student performs specific actions within assignments and instructional content, the information transmitted to Mixpanel reflects the substance of the student's communications with the platform, including participation in lesson activities, engagement with educational videos, and submission of assignment responses. When a student plays an instructional video within a Nearpod lesson, the resulting "**Interactive Video Play**" event therefore reveals that the identifiable student requested or obtained that video material through the platform.

155.   These event transmissions associate a student's activity with a Mixpanel "**Distinct ID**," a persistent identifier assigned within Mixpanel's analytics system that corresponds to the student's account or device and allows Mixpanel to link multiple interaction events generated by the same student.

156.   Once associated with a student's identifying information, the Mixpanel **Distinct ID** links all subsequent interaction events generated by that student within the Nearpod platform to the same identifiable user profile.

157.   Through these tracking technologies, Mixpanel receives records of identifiable students' interactions with the Nearpod platform, including when those students participate in lessons, submit responses to assignments, and play

instructional videos presented through the platform. These event transmissions therefore disclose personally identifiable information identifying students together with information revealing their viewing of instructional video content through the Nearpod service.

158.   Through its integration with Nearpod, Mixpanel also captures detailed information about how students interact with the Nearpod product, including which pages they visit and for how long; the origin of the student, such as whether the student came from another website, a search engine, or a direct visit; information about the student's total number of sessions and engagement time; and device, browser, and operating system characteristics associated with the student's device.

159.   Mixpanel's tracking technologies also record granular behavioral interaction data in real-time, observing the specific videos the student watches; how long the student watches specific videos; other specific content, such as lessons, the student interacts with; and how long the student interacts with that content. These video-viewing events are transmitted to Mixpanel together with identifiers associated with the student, revealing identifiable students' viewing of instructional video content through the Nearpod platform. These interactions occur as students communicate with and respond to the Nearpod platform during lessons and assignments.

160.   The telemetry transmitted to Mixpanel also includes the current lesson URL and session-specific identifiers associated with the student's active Nearpod lesson session. These fields confirm that the telemetry is generated within the student's active browser session and reflects the student's communications with the platform at the moment those interactions occur.

161.   Forensic inspection of network traffic generated during student use of the Nearpod platform revealed that the platform transmits event telemetry to Mixpanel through requests to Mixpanel's tracking endpoint (**api-js.mixpanel.com/track**). These transmissions include persistent identifiers such as **distinct_id**, **$user_id**, and **$device_id**, which uniquely identify the student's device or account within Mixpanel's analytics system and allow Mixpanel to recognize the same user across

multiple events and sessions. The transmitted event properties also include detailed lesson metadata, including the lesson name, lesson subject, slide types, session identifiers, and other information reflecting the student's participation in instructional content. For example, requests to Mixpanel included fields identifying the lesson name and a "**Slide Types List**" parameter identifying the types of instructional content contained in the lesson, including "**Interactive Video**." As a result, the event telemetry transmitted to Mixpanel links a persistent identifier associated with the student to specific instructional content being accessed within the platform—including lessons containing interactive video content. The event telemetry therefore discloses to Mixpanel both a persistent identifier associated with the student and information identifying the specific instructional video content requested or viewed by that student within the Nearpod platform. Each Mixpanel event transmission also contains a unique event identifier and timestamp associated with the student's interaction, allowing Mixpanel to record and sequence individual user actions as they occur and to reconstruct a chronological record of the student's interactions with the platform in real time.

162.   The telemetry transmitted to Mixpanel also includes session-specific identifiers such as a lesson identifier and session identifier associated with the student's participation in a particular Nearpod lesson. These identifiers allow Mixpanel to associate each recorded interaction event—including engagement with lesson slides containing interactive video—with a specific lesson session and user profile within Mixpanel's analytics system.

163.   Because the Mixpanel tracking code is embedded directly in the Nearpod platform, these communications are captured and transmitted as they occur when a student performs each action within the Product, providing Mixpanel with detailed information about the student's interactions with the platform while those communications are in transit. These transmissions therefore disclose personally identifiable information identifying students as individuals who requested or obtained specific instructional video materials through the Nearpod platform.

164. If Mixpanel has collected additional information about the student from other sources, the Mixpanel **Distinct ID** is also associated with additional attributes, including the student's name, location, gender, the unique devices they use, the student's lifetime value in U.S. dollars, and other behavioral interaction data, according to Mixpanel.

165. The Mixpanel **Distinct ID** allows interaction data generated through Nearpod to be linked with data collected from other sources, enabling persistent longitudinal profiling of individual students' behavior, engagement patterns, and interactions across multiple sessions and devices.

166. Mixpanel uses the interaction data collected through its integrations— including the above-identified behavioral engagement metrics, interaction events, and timestamps—not solely to provide analytics services to Renaissance, but also to improve Mixpanel's own analytics products, refine predictive models, develop commercial tools and features, and benchmark user engagement patterns across its broader client base.

### iii. Microsoft

167. When a student loads a Nearpod webpage through a web browser, Nearpod's embedded tracking technologies generate network transmissions that send a unique Microsoft user identifier associated with the student's device to Microsoft's advertising systems, including Microsoft Advertising, MSN (Microsoft's web portal of Internet services and applications), and LinkedIn (Microsoft's business social network), while the student's communications with the Nearpod platform are in transit.

168. This Microsoft identifier is used by Microsoft to recognize the same device or user across multiple browsing sessions and across other websites that use Microsoft advertising technologies, allowing Microsoft to associate Nearpod interaction data with a persistent, longitudinal profile of the student user.

169. These identifiers are used by Microsoft to track user activity across websites and services and to link information generated within the Nearpod platform with

other data associated with the same device or user within Microsoft's broader advertising and identity-resolution ecosystem.

### iv.   Xandr

170.   When a student loads a Nearpod page on a web browser, Nearpod's embedded tracking technologies cause a universally unique user ID associated with that student to be sent to Xandr, Inc., the advertising and analytics subsidiary of Microsoft.

171.   Xandr is a global marketplace for premium digital advertising.

172.   The Xandr universally unique user ID is used to develop a persistent, longitudinal profile of individual students to deliver personalized advertisements to them.

173.   Renaissance does not disclose that it shares Plaintiffs' and other students' personal information with Xandr.

### v. Comscore

174.   When a student loads a Nearpod page on a web browser, Nearpod's embedded tracking technologies cause a universally unique user ID associated with that student to be sent to Comscore, Inc. in real time.

175.   Comscore is an advertising measurement, marketing data, and analytics platform that sells audience data to third parties.

176.   Renaissance does not disclose that it shares Plaintiffs' and other students' personal information with Comscore.

177.   Comscore can identify a single student's media consumption across multiple devices and can uniquely identify that student.

178.   The Comscore universally unique user ID tracks all student activity within a web browser and all tabs, including the student's media consumption and the student's location.

### vi. Taboola

179. When a student loads a Nearpod page on a web browser, Nearpod's embedded tracking technologies cause a universally unique user ID associated with that student to be sent to Taboola, Inc. in real time.

180. Taboola is an online advertising platform that sells audience data.

181. Renaissance does not disclose that it shares Plaintiffs' and other students' personal information with Taboola.

182. The Taboola universally unique user ID combines data about a student from different sources.

183. The Taboola universally unique user ID is used to develop a persistent, longitudinal profile of individual students.

184. The Taboola universally unique user ID is used to recommend other internet content to students based on what Taboola knows about that student.

### b.   Renaissance's FastBridge product.

185. Renaissance's FastBridge product intercepts and transmits personal information about students through tracking technologies embedded within FastBridge webpages and application interfaces.

186. When a student interacts with a FastBridge webpage through a web browser, certain user actions—including loading a page, navigating between pages, or interacting with content—trigger the execution of tracking technologies embedded in the FastBridge source code. These technologies capture information about the student's interactions with the platform and transmit that information while the communications between the student's browser and Renaissance's servers are in transit.

### i. Google

187. When a student loads a FastBridge page on a web browser, the page-load action triggers Google Analytics and Google Tag Manager. These tracking technologies capture information about the student's communications and interactions with the FastBridge platform and transmit that information through automated network requests to Google's servers in real time.

188.   Each time a student loads a FastBridge webpage, FastBridge's embedded Google tracking technologies cause information about that page request and related interaction data to be transmitted to Google.

189.   Renaissance does not disclose to students or their parents that FastBridge uses tracking technologies that transmit Plaintiffs' and other students' interactions with the platform to Google while children use the Product.

190.   Renaissance likewise does not disclose that Google uses information collected through these tracking technologies within its broader analytics, advertising, and identity-resolution infrastructure.

191.   Google Analytics generates two network transmissions to Google, a first packet containing several unique user identifiers—including the "**_gid**" parameter, the "**jid**" parameter, and the "**a**" parameter, and a second packet with the Google Tag Manager Tag ID.

192.   The **_gid** parameter functions as a unique user identifier that associates information generated within the FastBridge product with the same identifier observed across other websites or applications that use Google tracking technologies.

193.   Through the **_gid** identifier, Google links students' interactions within the FastBridge platform to the same identifiers used across Google's broader tracking ecosystem, which Google uses to build persistent, longitudinal profiles of individual student users over time.

194.   While a student interacts with the FastBridge platform, FastBridge automatically generates interaction data that is captured by Google Analytics and Google Tag Manager while those communications are in transit between the student's device and Renaissance's servers. These tracking technologies associate the captured interaction data with the **_gid** identifier and transmit the information to Google.

195.   Forensic inspection of the FastBridge browser environment further revealed that student identifiers were transmitted between FastBridge webpages during

assessment sessions through URL query parameters. These query parameters included the student's first and last name and were used by the platform to identify the student during the student's interaction with FastBridge assessment pages.

196.    When these FastBridge pages triggered embedded tracking scripts, including Google Analytics and Google Tag Manager, the associated network requests transmitted the page URL and query parameters—including the student's name—along with other interaction data to Google's servers. As a result, the tracking requests generated during FastBridge sessions transmitted information identifying the student together with information revealing the specific assessment pages and interactions associated with that student.

197.    These communications reflected Plaintiffs' and other students' participation in classroom assignments and educational activities conducted through the platform.

198.    The information transmitted to Google through these tracking technologies also includes which pages within Renaissance's Products a student visits and for how long; the origin of the visitor (including whether the visitor arrived through another website, search engine, or direct navigation); the total number of sessions and engagement time; and device and browser characteristics associated with the student's device.

199.    The **_gid** identifier is used by Google to link these interaction events with a persistent identifier associated with a particular device or browser.

200.    The **jid** parameter, or **JoinID**, functions as a unique identifier that associates FastBridge interaction data collected through Google Analytics with identifiers used within Google's DoubleClick advertising infrastructure.

201.    By linking FastBridge interaction data with the DoubleClick cookie, Google associates a student's activity within the FastBridge platform with the same advertising identifiers used across Google's broader advertising ecosystem and allows the uniquely identified student to be targeted for advertising.

202.   The "**a**" parameter is a unique user identifier that similarly links students' FastBridge interaction data with Google's AdSense advertising infrastructure.

203.   Joining the Google Analytics information with the AdSense cookie in this way makes students' information available to AdSense and is used by Google to monetize advertisements directed to the uniquely identified student.

204.   The **Google Tag Manager Tag ID** transmitted with these requests likewise functions as a persistent identifier associated with a specific browser or device and is used to associate FastBridge interaction data with a particular user or device.

205.   Further, student first names and student last names are transmitted between FastBridge webpages via query parameters. When those pages trigger Google tracking scripts, Renaissance causes student first names and student last names to be sent to Google via Google Analytics.

206.   Google combines identifiers and interaction data originating from students' use of FastBridge with information obtained from other Google-owned properties and third-party websites using Google tracking technologies in order to create persistent, longitudinal profiles of individual student users, which it then uses for its own purposes independent of the services it provides Renaissance.

### ii. Leadfeeder

207.   FastBridge also integrates tracking technologies provided by Leadfeeder, the business name of Dealfront Finland Oy and its affiliated entities.

208.   Leadfeeder is a marketing intelligence company that "turns anonymous traffic into real [ ] names" and reveals "the exact behavior" of website visitors.

209.   When a student loads a FastBridge page through a web browser, FastBridge's embedded tracking technologies generate network requests that transmit user information to Leadfeeder in real time while the student's interactions with the FastBridge platform are being transmitted between the student's device and Renaissance's servers.

210.   Renaissance does not disclose to students or their parents that FastBridge transmits Plaintiffs' and other students' personal information to Leadfeeder via tracking technologies.

211.   Leadfeeder assigns a persistent identifier known as the "**lfclientId**," which functions as a universal unique identifier associated with a particular website visitor. This identifier is used by Leadfeeder to recognize the same device or user across multiple browsing sessions and to associate interaction data collected over time with a persistent, longitudinal profile of that user.

212.   The **lfclientId** identifier is combined with Google tracking identifiers—including Google Analytics identifiers and Google Tag Manager identifiers—to associate a student's FastBridge interactions with a uniquely identifiable user profile and to aggregate those interactions into a persistent, longitudinal behavioral profile of that student over time.

213.   The Leadfeeder identifier includes a parameter labeled anonymize=false, which indicates that the visitor's IP address is not anonymized.

214.   The Leadfeeder identifier also includes a parameter labeled **autoTrackingEnabled:true**, which automatically tracks individual users' activity as they interact with the FastBridge platform.

215.   Leadfeeder uniquely identifies website visitors, including their first name, last name, email address, and phone number, even when those visitors have not directly provided that information on the website, which Leadfeeder uses to associate a student's FastBridge activity with a persistent, longitudinal profile of that individual.

### iii. Microsoft

216.   FastBridge also integrates tracking technologies associated with Microsoft's advertising and analytics infrastructure.

217.   When a student loads a FastBridge webpage through a web browser, FastBridge's embedded tracking technologies generate network transmissions that send a unique Microsoft user identifier associated with the student's device to

Microsoft's advertising systems, including Microsoft Advertising, MSN, and LinkedIn, while the student's communications with the FastBridge platform are in transit.

218. This Microsoft identifier functions as a persistent identifier that enables Microsoft to recognize the same device or user across multiple browsing sessions and across other websites and applications that integrate Microsoft advertising technologies. Through this identifier, Microsoft associates interaction data generated within the FastBridge platform with a persistent, longitudinal profile of the student user.

219. These identifiers are used by Microsoft to link data generated within the FastBridge platform with other information associated with the same device or user within Microsoft's broader advertising and identity-resolution ecosystem, through which Microsoft tracks user activity across websites, services, and devices and incorporates FastBridge interaction data into broader behavioral profiles.

220. The forensic analysis described above further demonstrates that Renaissance's platforms transmit student interaction data through multiple integrated tracking systems operating simultaneously within the student's browser session. As the student interacts with Nearpod lessons and FastBridge assessments, the browser executes embedded scripts associated with multiple analytics and tracking vendors, including Google Analytics, Google Tag Manager, and Mixpanel. These scripts generate automated network requests that transmit persistent identifiers, session identifiers, lesson metadata, and other information reflecting the student's communications with the platform to external analytics systems in real time. As a result, multiple third-party analytics systems receive parallel telemetry reflecting the same student interaction events—including participation in lesson content and engagement with instructional videos—while those interactions are occurring within the platform.

221. Based on forensic testing of the Nearpod and FastBridge products, Renaissance employs the same or similar tracking tools and data sharing practices on the other Products at issue in this case.

222. The data shared with the third-party recipients includes highly sensitive and personal information of Plaintiffs' and other children under the age of 13 taken while the children are engaged in required school curriculum, all without parental consent in violation of federal law.

223. Renaissance's disclosure of Plaintiffs' and other students' highly sensitive and personal information under these circumstances is highly offensive to a reasonable person of ordinary sensibilities given (1) the sensitivity of the personal information shared, (2) that it is taken from children during their compulsory educational activities, (3) that Renaissance does not obtain parental consent for the collection, use, or disclosure of the data as required by federal law, (4) that Renaissance does not disclose that it shares students' personal information with the third-party recipients, (5) that the third-party recipients include advertising giants with an extensive reach throughout the world, (6) that Renaissance obtains and discloses students' personal information to such third parties through surreptitious tracking technologies, (7) that Renaissance does not provide parents with copies of the data it collects from their children or information regarding the ways in which the recipients use their children's information in violation of federal law, and (8) that Renaissance takes no responsibility for the security or use of the data once shared.

224. The extensive disclosure of the data also exposes the private and personal information of Plaintiffs' and other students to companies with massive advertising operations and access to an enormous number of other companies who have business interests in the data. These companies' knowledge of the personal and sensitive data of Plaintiffs' and other students is and would be highly embarrassing to Plaintiffs' and other students.

225.   Renaissance's sharing of Plaintiffs' and other students' personal information to these third-party companies enables Renaissance to monetize the information, and Renaissance has not compensated Plaintiffs for the monetization of their data.

226.   Because Plaintiffs and putative class members are children, they lacked a common-sense expectation of how their data would be used when they interacted with Renaissance's Products. Additionally, because Plaintiffs and putative class members interacted with Renaissance's Products in the context of compulsory education, they did not voluntarily share any of their personal information with Renaissance.

**2.   Renaissance admits that it also shares K-12 student data it collects through its Products with numerous third parties for commercial purposes.**

227.   Renaissance discloses personal information to a host of third parties.

228.   Renaissance discloses personal information to and under the following circumstances, without student, parent, or school consent:

      a.  governmental entities, including law enforcement;

      b.  personnel in legal proceedings;

      c.  "when required by law";

      d.  in response to bankruptcy proceedings;

      e.  when necessary to defend its rights;

      f.  to provide information to a claimed owner of intellectual property who claims that content a Child has provided to Renaissance infringes on their rights;

      g.  upon request of or as otherwise authorized by an academic institution connected to an investigation into academic integrity;

      h.  to protect and/or defend its Terms of Service agreement or other policies applicable to its products;

      i.  to protect the personal safety, rights, property or security of any organization or individual; and

j. to identify users, including in cooperation with copyright owners, Internet service providers, wireless service providers or law enforcement agencies in our discretion.

229. Renaissance discloses personal information to (a) a parent entity of Renaissance, (b) affiliates of Renaissance, and (c) investors for business and operational purposes.

230. Renaissance discloses personal information in the event of a business transition such as a merger, acquisition, or sale of all or a portion of Renaissance's assets, bankruptcy, "other corporate change (including, without limitation, during the course of any due diligence process)."

231. Renaissance also discloses personal information with myriad entities that it variously describes as "service providers," "sub-processors," or "vendors" for a host of purposes, including:

a. hosting;

b. information technology;

c. customer support;

d. data security;

e. consumer research services;

f. educational research services; and

g. to obtain analytics and other information regarding traffic on its products.

232. Renaissance does not describe what student data is shared with each vendor.

233. Renaissance amends its list of purported subprocessors without notice to parents in violation of COPPA.

234. Renaissance does not adequately describe who those entities are, what those entities do with student data, what types of student data they collect, how they collect student data, or why student data is shared with those entities.

235. According to its own terms, Renaissance also uses and discloses student data in commercial ways that directly benefit Renaissance, including:

a. To develop its products;

b. To maintain and improve its products;

c. For analytics and reporting;

d. For general research;

e. To develop new technologies;

f. To develop and improve educational sites, products, and services; and

g. To enforce its terms and conditions.

236. Plaintiffs allege that Renaissance does what it says: it uses student data, including Plaintiffs' personal information, in the foregoing ways, which includes Plaintiffs' personal information. Neither Plaintiffs nor their parents consented to Renaissance using their personal information in these ways.

237. Such uses enable Renaissance to monetize student data, including Plaintiffs' personal information, and Renaissance has not compensated Plaintiffs for the monetization of their data.

238. As of March 12, 2026, Renaissance lists 17 "vendors" with which it shares Plaintiffs' and other students' data, along with a generic description of the purpose of sharing, as follows: Amazon Web Services for hosting, engineering, and product support and development; Microsoft Azure for hosting; Hexacta for engineering support; Pendio.io for product analytics and in-product notification; Snowflake for cloud data platform; Datadog for engineering support; Fivetran for engineering support; EPAM Systems for engineering support and product development; BristleCone for software development; R Systems for product development; Cardinal Integrated Technologies for product development; Google Cloud Platform for identity and access management (for DnA); Cloudflare for DNS, CDN, and application security (for Nearpod); Providigi for engineering support (for Nearpod); Mandrill for transactional and triggered emails (for Nearpod); and Chameleon Intelligent Tech for in-app communication (for Nearpod).

239. All of these companies are valued in the millions, billions, or trillions of dollars.

240. Seven of them operate global advertising and marketing platforms along with their other operations, including Amazon Web Services, Microsoft Azure, Google Cloud Platform, Snowflake, Datadog, Cloudflare, and Fivetran.

241. Plaintiffs allege that—in addition to what forensic testing has revealed—Renaissance does what it says: it discloses the foregoing information to third parties, which includes Plaintiffs' personal information, in order to develop, operate, and market its Products, and it takes no responsibility for what the third-party recipients do with the data. Indeed, Renaissance previously stated in its privacy policy that it must disclose personal information to these third parties in order to operate its Products.

242. As explained in greater detail, *infra*, Renaissance fails to obtain effective consent for its expansive sharing of student data.

243. The information Renaissance provides on its website regarding its terms and policies has little meaning to the average person and does not adequately describe Renaissance's data practices.

244. On its website, Renaissance includes no links to any of its vendors' terms of use or privacy policies.

245. In addition to sharing personal information with these purported vendors, Renaissance discloses personal information through expansive data-sharing agreements with numerous third-party companies, which commercially benefits both Renaissance and the third parties.

246. Its primary value to third-party partners depends on maximizing access to student data. Data exchanged through these partnerships—including children's personal information—enables Renaissance and participating partners to develop, improve, expand, deliver, support, market, and sell their Products and services.

247. Renaissance markets to its partners "open interoperability" that allows data integration "via our open architecture design and customization capabilities."[21]

---

[21] https://gestest.renaissance.com/products/actionable-insights/eschooldata/

248.  Renaissance shares data directly with its partners through its "robust API [Application Programming Interfaces] technology." It "support[s] a vast range of integrations—including SSO [single sign-on] and data exchanges[.]"[22]

249.  FastBridge and Renaissance DnA integrate with the single-sign-on platforms Clever and ClassLink, both of which Plaintiffs' schools have used. With these platforms, Renaissance shares student data obtained through FastBridge and Renaissance DnA, including their student ID, gender, date of birth, and "race demographics."[23] This data is transmitted through Renaissance's OneRoster API, which facilitates real-time transmission of data between platforms.

250.  Renaissance DnA integrates with numerous products offered by various companies, including Blackboard by Finalsite and Schoology by PowerSchool[24]—other products used by M.C. 1's and M.C. 2's school.

251.  M.C. 3 and M.C. 4 also use Nearpod, which integrates with Canvas by Instructure[25] and Microsoft Teams,[26] two other platforms that M.C. 3 and M.C. 4's schools require them to use.

252.  This data sharing is beneficial to both Renaissance and the third parties with whom Renaissance shares or exchanges data. The companies all monetize the data in numerous ways, such as by using it to develop and enhance their own products, facilitate greater data analytics and "user insights," improve internal operations, or more effectively target their marketing efforts and attract new customers. These types of indirect data monetization can be at least as valuable to a company as directly monetizing it through the sale of raw or aggregated data.

---

[22] *Id.*

[23] https://support.renaissance.com/s/article/ClassLink-OneRoster-Integration-Requirements-1752694443694?language=en_US

[24] https://support.renaissance.com/s/article/Integrations-Overview-1752675501441?language=en_US

[25] https://support.renaissance.com/s/article/LTI-1-3-Canvas-1752689735798?language=en_US

[26] https://support.renaissance.com/s/article/How-to-use-Nearpod-with-Microsoft-Teams-1752690016781?language=en_US

253. Using and sharing student data to develop its Products and support so-called "interoperability" requires parental consent, which Renaissance has never obtained. Neither Plaintiffs nor their parents consented to Renaissance disclosing their personal information to any third party. Renaissance was not permitted to rely on the consent of schools alone before making Plaintiffs' personal information available to wide-ranging third parties. Plaintiffs and their parents were denied the choice as to whether to permit Renaissance or any other company to use their personal information to fuel this highly profitable, industry-wide, data-sharing ecosystem.

254. Renaissance admits that it takes no responsibility for how third-party recipients of student data use the data, explicitly stating that it "makes no warranty . . . that the use of [student or other users' personally identifiable information] by the [third-party] [r]ecipient is valid and in compliance with all application Data Protection Legislation and [the students' and other users'] organization's policies or that [students' and other users'] personally identifiable information will remain secure upon transfer to the [third-party] [r]ecipient and disclaims any responsibility for the transfer."[27]

255. The data shared with the third-party recipients includes highly sensitive and personal information of Plaintiffs' and other children taken while the children are engaged in required school activities, all without parental consent in violation of state and federal law.

256. Renaissance's disclosure of Plaintiffs' and other students' highly sensitive and personal information is highly offensive to a reasonable person of ordinary sensibilities given (1) the sensitivity of the personal information shared, (2) that it is taken from children during their compulsory educational activities, (3) that Renaissance does not obtain parental consent for the collection, use, or disclosure of the data as required by federal law, (4) that the third-party recipients include

_____

[27] https://renaissance.widen.net/view/pdf/rtvix11tcw/US-Terms-of-Service-and-License---Exhibit-D---Personal-Data-Annex.pdf?u=zceria

global companies, (5) that Renaissance does not provide parents with copies of the data it collects from their children or information regarding the ways in which the recipients use their children's information in violation of federal law, and (6) that Renaissance takes no responsibility for the security or use of the data once shared.

257. The extensive disclosure of the data to global companies, and the companies' knowledge of the personal and sensitive data of Plaintiffs' and other students is and would be highly embarrassing to Plaintiffs' and other students.

258. Renaissance's sharing of Plaintiffs' and other students' personal information to these third-party companies enables Renaissance to monetize the information, and Renaissance has not compensated Plaintiffs for the monetization of their data.

259. Because Plaintiffs and putative class members are children, they lacked a common-sense expectation of how their data would be used when they interacted with Renaissance's Products. Additionally, because Plaintiffs and putative class members interacted with Renaissance's Products in the context of compulsory education, they did not voluntarily share any of their personal information with Renaissance.

### 3. Renaissance further admits that it uses student data to develop, support, and market its own products.

260. Renaissance admits that it uses student data to develop, support, improve, and market its own digital products for commercial purposes, which it does without obtaining effective consent.

261. Renaissance's products are designed to work synergistically to collect data on every aspect of a student's persona and then manipulate that data to influence the student. The data is then marketed to Renaissance's current and prospective customers to increase profits for Renaissance.

262. Renaissance states that it uses student data in various ways that provide it commercial benefit, including:

    a.    To develop its products;

    b.    To market to schools;

c.    To enforce its own rights arising from its terms of service and license agreement;

d.    To improve its products;

e.    To "demonstrate the effectiveness of," or market, its products;

f.    For reporting and analytics;

g.    For general research;

h.    For the development of new technologies;

i.    To improve and develop sites, services, and products; and

j.    For "any other legitimate business purpose."[28]

263.    Data flows freely between various Renaissance products in support of what Renaissance calls its Renaissance "ecosystem."

264.    Fueled by its ever-growing trove of student data, Renaissance's suite of cloud-based online products now includes more than a dozen data-extracting and data-derived products, including the Products that Plaintiffs have used, such as follows:

a.    **Freckle** – a differentiation platform for math, social studies, science and English language arts.

b.    **Schoolzilla** – provides dashboards that integrate multiple sources of student data.

c.    **Star Assessments** – computer-adaptive tests designed to measure student proficiency and growth.

d.    **Renaissance Next** – provides teachers and administrators with a comprehensive view of student data and insights across Renaissance's products.

e.    **Renaissance Fundamentals** – a survey-based tool that helps educators identify and address non-academic barriers to student learning and success by collecting information on their feelings about their school and themselves.

---

[28] https://core-docs.s3.amazonaws.com/documents/asset/uploaded_file/1756509/Accelerated_Reader.pdf

f. **Star Phonics** – a technology-based Phonics Screener and Diagnostic Assessment tool.

g. **SchoolCity** – an assessment platform used by districts to create, administer, and analyze formative and summative assessments aligned to specific learning standards.

h. **eSchoolData** – a comprehensive, web-based student information system used by school districts to manage student data, including attendance, grades, scheduling, and state reporting.

i. **eduCLIMBER** – a data-analysis platform that integrates information from various sources to provide a comprehensive, visual overview of student performance.

265. Student data collected through Renaissance's Products, including Plaintiffs' data, is not segregated, and the collection and use of that data is not limited to only the platforms and products licensed by schools. Rather, Renaissance consolidates "siloed" student data to provide "whole child data." In other words, Renaissance's unification of data from multiple sources enables more targeted student surveillance and predictions of academic and behavioral outcomes.

266. Renaissance also uses student data, including Plaintiffs' personal information, to develop its artificial intelligence technologies, which Renaissance has incorporated and continues to incorporate into its suite of products. For example, in July 2024, Renaissance announced the launch of Renaissance Next, an "AI-powered tool" that Renaissance's Chief Product Officer, Todd Brekhus, claimed draws on the "rich resource" of the "Renaissance database" that "incorporates over 38 years of real student and teacher data and insights."

267. Renaissance also purports to reserve an unlimited license to use student data, which includes Plaintiffs' personal information, for its own benefit without compensation to students.

268. Specifically, Renaissance's terms of service purports to grant itself "a non-exclusive, royalty-free, worldwide license to use the Customer Data throughout the

Term to perform under the Agreement and as further described in the Data Protection Addendum."[29]

269.   Plaintiffs allege that Renaissance does what it says: it uses "Customer Data," including Plaintiffs' personal information, to build, develop, improve, and market its products as described in its terms of service and data processing addendum. Neither Plaintiffs nor their parents consented to Renaissance using their personal information in this manner.

270.   Plaintiffs are unable to say with certainty all of the ways in which their personal information was used and shared by Renaissance because Renaissance refused to disclose the information in violation of COPPA, but Renaissance's statements support Plaintiffs' allegations.

271.   Although Renaissance markets its products, including the Products used by Plaintiffs, as conferring administrative and pedagogical benefits to schools and school districts, these products are undeniably commercial, for-profit products that have enabled Renaissance to build a multibillion-dollar data-analytics company at the expense of student privacy.

**F. Renaissance fails to obtain effective consent for its sweeping generation, extraction, use, and disclosure of students' personal information.**

272.   Renaissance has failed and continues to fail to obtain effective consent for its sweeping collection and use of student data, including Plaintiffs' personal information.

273.   Specifically, any purported consent obtained by Renaissance is ineffective because (1) Renaissance fails to provide sufficient information to support informed consent; (2) student use of Renaissance's Products is not voluntary; and (3) such consent is not obtained from a person with authority to provide consent to Renaissance's collection and use of student information.

---

[29]

**1. Any purported consent was not informed: Renaissance does not provide students or their parents its terms of use or privacy policies.**

274. Effective consent may be express or implied, but it must be actual.

275. Effective consent must be informed, meaning the aggrieved person must have sufficient knowledge of the nature of the act or transaction to make an educated decision.

276. Further, before collecting personal information from children under 13, Renaissance is required to provide parents notice of its data practices that is "clearly and understandably written, complete," and that contains "no unrelated, confusing, or contradictory materials." 15 U.S.C. § 6502; 16 C.F.R. § 312.4.

277. Renaissance does not provide students or their parents any notice of its data practices before collecting student data.

278. Neither Plaintiffs nor their parents created their own Renaissance accounts; their schools did.

279. Renaissance also did not provide notice of its data practices to Plaintiffs or their parents before Plaintiffs began using their Renaissance accounts.

280. Thus, neither Plaintiffs nor their parents received any information necessary to support informed consent.

281. Even if Renaissance had provided Plaintiffs' parents with its terms and policies, Plaintiffs' parents would not have been able to understand them or Renaissance's data practices. In fact, it is difficult to determine the totality of Renaissance's terms and policies, as they are scattered across its own sprawling website.

282. The terms and policies also reference and incorporate other materials that are not readily available to parents. For example, the Notice of Renaissance's Practices Relating to Children's Online Privacy states that its use and processing of the personal information it collects is governed by agreements with the schools and that those schools may have their own privacy policies that govern the personal information collected in connection with their use of Renaissance Products. The

policy also states that "the policies of the applicable [s]chool govern how they process and share [p]ersonal [i]nformation relating to the products, including with respect to any rights users may have to such [p]ersonal [i]nformation."

283.   Renaissance also fails to provide public access to other relevant documents that are referred to in its terms and policies, including:

   a.   Information Security Overview;

   b.   Acceptable Use Policy;

   c.   Business Continuity Management Policy;

   d.   Customer Data Confidentiality Policy;

   e.   Incident Response Plan;

   f.   Information Security Policy; and

   g.   Vendor Management Policy.

284.   Therefore, even if a parent was notified that their child would be using Renaissance Products at school, it would be impossible for that parent to understand Renaissance's data practices to provide informed consent to those practices on behalf of their child.

285.   Because neither Plaintiffs nor their parents were notified of Renaissance's data practices, any purported consent provided by them was ineffective because it was not informed.

**2.   Any purported consent was not freely given: Students' use of Renaissance's Products is compulsory.**

286.   For consent to be effective, it must be freely given.

287.   Every state has compulsory education laws.

288.   Schools use Renaissance's Products to support a host of pedagogical and administrative functions.

289.   Students, including Plaintiffs, whose schools use Renaissance's Products are required to use them. Students are not given a choice to forgo using those Products.

290.   Even if students theoretically could opt out of using Renaissance's Products and avoid having Renaissance take their personal information, Renaissance may

not place students and their parents in the position of having to choose between their right to privacy and their right to an education. Nor may Renaissance place students and their parents at risk of compromising their relationship with their teachers and school administrators. Such inherently coercive circumstances do not support freely given consent.

291. Use of Renaissance's Products under these circumstances would not lead a reasonable person to believe that a student or their parent had freely consented to Renaissance's data practices.

292. Because Plaintiffs were unable to decline or avoid using Renaissance's Products, any purported consent they provided by which they agreed to submit to Renaissance's data practices is ineffective.

### 3. Any purported consent was not authorized: Renaissance relies on schools' consent alone to create, take, use, and share student data.

293. For consent to be effective, it must be obtained from the aggrieved person or a person authorized to consent on their behalf.

294. In addition to general standards governing consent, COPPA contains a heightened parental-consent requirement that Renaissance must meet before it may collect personal information from children under 13. *See* 16 C.F.R. § 312.5. Specifically, COPPA requires that Renaissance "obtain verifiable parental consent before any collection, use, or disclosure of personal information from children, including consent to any material change in the collection, use, or disclosure practices to which the parent has previously consented." Id. § 312.5(a)(1).

295. Renaissance has never obtained, and does not purport to obtain, consent from students or their parents before it generates, collects, uses, or discloses the personal information of students, including Plaintiffs.

296. Instead, for children under 13, Renaissance purports to shift the responsibility of obtaining parental consent for Renaissance's creation, collection, and use of student data to schools and fails to obtain any evidence of assent by students or parents themselves.

297. Renaissance also or alternatively relies on the school's consent alone. Renaissance's privacy policy falsely states that "[t]he school may consent to the collection, use or disclosure of personal information from Children by agreeing to use or purchase the products."

298. Plaintiffs' respective schools do not own Plaintiffs' personal information and did not have authority to consent to Renaissance's taking of Plaintiffs' personal information.

299. School personnel are not Plaintiffs' legal guardians.

300. Plaintiffs' have significant privacy and property rights in their own personal information.

301. Plaintiffs' school could not and cannot legally consent—in lieu of Plaintiffs or over their objections—to the collection or use of their personal information by Renaissance, even if such collection and use may confer a benefit upon schools that is administrative, pedagogical, or otherwise, or even upon students themselves.

302. Plaintiffs' schools do not control the generation, collection, storage, use, or disclosure of Plaintiffs' personal information by Renaissance or any third party to which Renaissance grants access to Plaintiffs' personal information.

303. Plaintiffs retain significant, legally protected privacy interests in their personal information contained within education records, as that term is defined under the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g.

304. Renaissance generates and obtains student data, including Plaintiffs' personal information, in excess of education records, as that term is defined under FERPA and interpreting case law.

305. Renaissance generates, obtains, and uses student data, including Plaintiffs' personal information, in excess of legitimate educational interests.

306. Renaissance rediscloses students' data, including Plaintiffs' personal information, to a host of third parties without obtaining consent from students or their parents.

307. Renaissance does not require or obtain proof that students or parents have authorized their respective schools to act as their agent or intermediary to provide consent on their behalf.

308. Renaissance did not require or obtain proof that Plaintiffs authorized their respective schools to consent on their behalf as their agent or intermediary.

309. Renaissance has thus generated, collected, retained, used, and disclosed Plaintiffs' personal information without effective consent, and it continues to do so.

**G. Renaissance makes false and misleading statements about its data practices and the law on which it intends schools and parents to rely.**

310. Renaissance makes false and misleading statements about its data practices and the law on which it intends school personnel and parents to rely.

**1. Renaissance falsely states that it complies with COPPA and that schools may consent to its student data practices in lieu of parents.**

311. In its privacy policies posted on its website, Renaissance repeatedly and falsely states that it complies with COPPA.

312. In fact, Renaissance violates numerous provisions of COPPA.

313. Renaissance fails to provide parents with complete, understandable notice of its data practices, including when its terms and policies materially change.

314. Renaissance fails to obtain verifiable parental consent before taking, using, and disclosing children's personal information.

315. Renaissance fails to provide parents with the ability to access and review the data of students under 13 it has generated and collected.

316. Renaissance falsely states that schools may consent to the taking of children's information on behalf of parents. In fact, COPPA expressly requires parental consent, and specifies that it must be obtained by the company, not schools. Lawmakers and regulators have expressly and repeatedly considered and declined to adopt a school exception to COPPA's parental-consent requirements.

317. Renaissance falsely states that it "only collects information from a Child that is reasonably necessary for the Child to use the Products for purposes authorized

by a School." Renaissance obtains far more information than is reasonably necessary to provide children and schools education services, including data obtained to develop and market the products of Renaissance and myriad third parties.

318. Renaissance falsely states that parents must direct their requests to access their children's data to their child's school. But COPPA does not permit Renaissance to shift its duty to provide parents access to their child's data to a school.

319. Further, schools are not able to facilitate such requests.

320. Students and parents thus cannot know the full extent of the data Renaissance obtains about them, whether that data is accurate, how that data is stored, how long that data is retained, who has access to that data, or how that data or data-derivative information or products are used.

## 2. Renaissance falsely states that its Products may be used in compliance with FERPA.

321. In its privacy policies posted on its website, Renaissance falsely states that it complies with FERPA.

322. Renaissance falsely states that it "has met the criteria for being a 'School Official' with Legitimate Educational Interests" (as those terms are used in FERPA)[.]"

323. Renaissance falsely states that "it will not redisclose such Education Records or Personally Identifiable Information except with Authorization from Customer[.]"

324. Renaissance does not meet the definition of "school official" under FERPA.

325. Schools do not control the maintenance and use of the personal information that Renaissance collects from children, including education records.

326. Renaissance does not only receive students' personal information from schools: it generates and takes such information directly from students.

327. Renaissance generates and takes personal and private information of students in excess of "education records" as defined by FERPA.

328. Renaissance generates, takes, uses, and discloses student data more than legitimate educational interests as contemplated by FERPA.

329. Renaissance rediscloses student data to a host of third parties without prior parental consent, which is expressly prohibited even under the school-official exception. Renaissance may not stand in as the school, and the school may not stand in as the parent.

330. All the foregoing false and misleading statements are implemented by Renaissance on a company-wide basis: they are included in its publicly available terms of use and privacy policies, as well as its agreements with schools and school districts, which are developed in and emanate from its principal place of business in Wisconsin.

**H. Renaissance's nonconsensual data practices harm students, including Plaintiffs.**

331. Renaissance's surreptitious data practices are not benign. Rather, they harm children, including Plaintiffs, in myriad ways that are immediate, long-lasting, and substantial.

**1. Renaissance harms children, including Plaintiffs, by invading their privacy.**

332. The right to privacy encompasses the person's right to control information concerning his or her person. Loss of such control harms a person's ability to, for example, manage and minimize risk.

333. Renaissance's data practices violate children's fundamental right to privacy. By disclosing sensitive personal information to myriad third-party companies, including undisclosed global advertising and identity-resolution companies without effective consent, Renaissance forever wrests from children and their parents control over children's private information.

334.   Renaissance collects, uses and discloses private information about school-aged children—for the commercial benefit of itself and numerous third parties—from data it takes from students while they use Renaissance's Products as part of their legally required education. This private information includes, among many other things, Plaintiffs' and other students' demographic information; devices used; universally unique identifiers that track each child across web sites, applications and devices; academic assessments; social-emotional or behavioral problems; and behavioral data, including pages each child visits and video they watch, all of which is not public information.

335.   That Renaissance does so in a compulsory environment and without parental notice or consent is conduct that is highly offensive to a reasonable person and constitutes an egregious breach of social norms.

336.   There is no legitimate public interest in the private information that Renaissance discloses to third parties, including students' online activities, academic assessments, and social-emotional or behavioral problems.

337.   Renaissance either knew that there was no legitimate public interest in students' private information or acted unreasonably or recklessly as to whether there was a legitimate public interest in students' private information.

**2. Renaissance harms children, including Plaintiffs, by compromising the security of their personal information.**

338.   By collecting and storing children's personal information, including Plaintiffs' personal information—and by creating information about them that did not previously exist, such as digital profiles that purport to predict their future performance and behavior—Renaissance forever jeopardizes that information by making it vulnerable to a host of data security risks.

339.   Rates of cybercrime are steadily rising, including numerous data breaches that affect a host of consumers and their personal information.

340.   Schools and school districts have been particularly and increasingly targeted by cybercriminals in recent years, which has resulted in leaks of highly personal

information about children, which in some cases have been made publicly available by the perpetrators.

341.   In fact, another widely used education-technology company was hacked in December 2024, compromising the personal information of tens of millions of students dating back four decades.[30]

342.   Such exposure can have immediate and long-term consequences for children. As explained by one cybersecurity professional, whose son's school was hacked, "It's your future. It's getting into college, getting a job. It's everything."[31]

343.   Renaissance's sweeping, indiscriminate data practices unduly compromise the security of children's information.

344.   Children's private data is further compromised by Renaissance's practice of providing access to and otherwise sharing that information with a multitude of third parties and without taking responsibility for what the third parties do with the data. And the resulting harms and risks of harms are exacerbated by the sheer volume of data collected and the number of entities that receive access to it. Once such data is unlawfully obtained, the harms are irreversible.

345.   In sum, Renaissance's data practices harm children from the moment their personal information is generated or otherwise obtained by Renaissance.

346.   That harm is exacerbated by Renaissance's persistent storage, use, and disclosure of that information to its vast network of partners.

> **3. Renaissance harms children by affecting their access to information, opportunities, and other basic rights through algorithmic profiling.**

[30] TechCrunch, Malware stole internal PowerSchool passwords from engineer's hacked computer, https://techcrunch.com/2025/01/17/malware-stole-internal-powerschool-passwords-from-engineers-hacked-computer/

[31] Natasha Singer, *A Cyberattack Illuminates the Shaky State of Student Privacy*, The New York Times (July 31, 2022), https://www.nytimes.com/2022/07/31/business/student-privacy-illuminate-hack.html.

347.   As described herein, Renaissance uses student data to create products that purport to analyze and predict student performance and behavior.

348.   Renaissance markets these analytics to its customers for use in wide-ranging decision-making about children, a practice known as algorithmic profiling. Such analytics purport to help teachers and administrators "personalize" a child's curriculum and learning plan, understand a child's strengths and weaknesses, identify a student's individual education goals, formulate plans for reaching those goals, and a host of other predictions and recommendations for purportedly better management of the child.

349.   Renaissance's algorithms attempt to gather children's knowledge, understanding, development, and potential to reduce them to quantifiable analytics. In doing so, attributes that benefit children, such as accuracy, nuance, and privacy, are sacrificed in favor of those that benefit Renaissance, such as efficiency, measurability, and scalability.

350.   Renaissance's algorithmic models define their own metrics, which Renaissance uses to justify their results, creating and perpetuating a pernicious and untested feedback loop.

351.   By generating these predictions on which myriad third parties rely in making consequential decisions affecting children, Renaissance produces and sells the equivalent of credit reports on children in every domain over which Renaissance claims algorithmic expertise.

352.   This harm is compounded by Renaissance's policy of denying students and parents access to, control of, or the ability to delete their own data, and as well as an understanding of how their data is used to generate predictions about them.

### 4. Student data is valuable, and Renaissance's nonconsensual data practices have prevented the development of a legitimate market for student data.

353.   Personal data is now viewed as a form of currency. There has long been a growing consensus that consumers' valuable personal information would become the new frontier of financial exploitation.

354.   A robust market exists for user data, especially children's personal information. That market has been analogized to the "oil" of the digital economy.[32]

355.   The EdTech data market is valued at nearly half a trillion dollars.

356.   Thus, the information Renaissance generates and collects from students as they use Renaissance's Products has significant economic value.

357.   Renaissance takes and uses vast troves of personal information belonging to students without effective consent or compensation, including Plaintiffs' personal information, as described herein.

358.   Renaissance further purports to reserve for itself sweeping, perpetual rights to retain and use students' personal information for its own commercial gain without providing consideration or compensation to them.

359.   Renaissance's unfair and unlawful business practices are common across the education-technology sector.

360.   By taking student information without consent or compensation, Renaissance and other education technology companies have prevented a market for student data from developing in which Plaintiffs could fairly choose to participate.

361.   Plaintiffs and their parents would consider participating in a market for their information if: their participation was voluntary; the terms of the transaction were

---

[32] The Economist, "The world's most valuable resource is no longer oil, but data" (2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data.

transparent; they controlled what information was taken and how it could be used; and they were fairly compensated by those benefiting from their information.

362.   By way of example, an online market research company called Luth Research LLC ("Luth") offers consumers ongoing cash rewards in return for the consumers installing an application called SavvyConnect on their devices that tracks and collects the consumers' online search activity and other data.[33]

363.   Consumers enter into the agreement knowingly and voluntarily, and give their consent under terms clearly disclosed to them.[34]

364.   Consumers are given detailed information about how Luth collects and uses their data before they decide to participate.

365.   Consumers receive compensation for their participation in the SavvyConnect program that non-participants do not receive and are not entitled to.

366.   As another example, for decades Nielsen Company (US), LLC has provided media ratings by monitoring or surveying panels of individuals or households that are statistically representative of a larger audience.[35]

367.   Panelists may be invited to participate or may sign up voluntarily, but in either case their participation in a panel is knowing and consensual under terms that are clearly disclosed by Nielsen to the panelist.

368.   Prospective panelists are given detailed information about how Nielsen collects and uses their data before they decide to participate.

369.   Panelists receive compensation for their participation that non-participants do not receive and are not entitled to.

370.   As another example, certain scientific research involving human subjects is federally regulated.[36] *See, e.g.,* 45 C.F.R. § 46 *et seq.*

---

[33] https://surveysavvy.com/savvyconnect/
[34] https://surveysavvy.com/savvyconnect/
[35] https://panels.nielsen.com/panels-and-surveys/
[36] https://www.nih.gov/health-information/nih-clinical-research-trials-you/guiding-principles-ethical-research

371. The guiding principles for research involving human subjects under federal jurisdiction require that the research study:

    a. has social and clinical value, namely that it is designed to answer a specific question that justifies the risk or inconvenience to the subject;

    b. has scientific validity, namely that it is designed in a way to get an understandable answer to the important research question;

    c. selects subjects fairly, namely that subjects are chosen based on the scientific goals of the study and not vulnerability, privilege, or other unrelated factors;

    d. has a favorable risk-benefit ratio that minimizes all potential risks and maximizes all potential benefits;

    e. is independently reviewed and deemed ethically acceptable before it starts; obtains the informed consent of participants, which requires that individuals (1) are accurately informed of the purpose, methods, risks, benefits, and alternatives to the research, (2) understand this information and how it relates to their own clinical situation or interests, and (3) make a voluntary decision about whether to participate; and

    f. treats individuals with respect, whether or not they choose to participate, which requires (1) respecting their privacy and keeping their private information confidential; (2) respecting their right to change their mind, to decide that the research does not match their interests, and to withdraw without a penalty; (3) informing them of new information that might emerge in the course of research, which might change their assessment of the risks and benefits of participating; (4) monitoring their welfare and, if they experience adverse reactions, unexpected effects, or changes in clinical status, ensuring appropriate treatment and, when necessary, removal from the study; and (5) informing them about what was learned from the research.

372. Best practices for scientific research suggest that participants should be reimbursed for their costs and appropriately compensated for the time and inconvenience of participation, as determined by consideration of the research activities, subject population, and the context in which the research will take place.

373. Participating subjects receive compensation for their participation that non-participants do not receive and are not entitled to.

374.   Plaintiffs would consider participating in a market for their information that resembled the ones associated with Luth, Nielsen, or federally regulated research to compensate Plaintiffs for the taking and use of their personal data.

375.   Because of its unlawful practices, Renaissance has diminished the value of Plaintiffs' personal information, without compensation or other legally sufficient consideration.

376.   Renaissance has also deprived students of their choice of whether to participate in the data market at all.

377.   Renaissance purports to reserve for itself sweeping rights to retain and use students' personal information for its own commercial gain without providing students consideration or compensation.

378.   Renaissance's conduct has thus caused students, including Plaintiffs, economic injury, damage, and loss.

### 5. Renaissance harms Plaintiffs by obtaining their personal information by wrongful means and then sharing and profiting from it.

379.   Renaissance obtained access to and collected, generated, used, and shared Plaintiffs' and other students' valuable personal information for the benefit of itself and third-party businesses, including advertising companies, by: (a) disregarding its legal obligations to provide notice to parents and obtain parental consent before collecting, using, and sharing the personal information of children under 13; (b) making false representations about its data practices; (c) using and sharing the data for its own financial gain separate from its provision of educational services; and (d) intentionally failing to disclose that it shares the information with third-party advertising companies that use the data for targeted advertising.

380.   Personal data is a recognized asset with commercial value in the digital economy, as made clear by Renaissance's admissions that it uses and discloses Plaintiffs' and other students' personal data to develop, improve, and market its products. The value of Plaintiffs' and other students' personal data is further

evidenced by Renaissance's disclosure of the data to third-party advertising and identity-resolution companies that engage in targeted advertising.

381. As a multibillion-dollar company that has attracted substantial investment capital, Renaissance would not use and share students' personal data in these ways if it did not receive an economic benefit in return.

382. Renaissance has thus harmed Plaintiffs and other students by obtaining, collecting, generating, using, and sharing their valuable data by and with wrongful means and then denying them the economic benefit gained as a result.

### 6. Renaissance harms children by forcing them to choose between their right to an education and other fundamental rights.

383. Renaissance forces families into the untenable position of having to choose between their right to an education and other fundamental rights, such as their rights to privacy and property.

384. Research shows that nearly 80 percent of adults reported being very or somewhat concerned about how companies use data collected about adults,[37] and the number of those concerned about their online privacy is growing quickly.

385. Protective behaviors are on the rise, with 87 percent of U.S. adults using at least one privacy- or security-protecting tool online.[38]

---

[37] Brooke Auxier, et al., Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their personal information, Pew Research Center (November 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

[38] Olivia Sideot and Emily Vogels, What Americans Know About AI, Cybersecurity and Big Tech, Pew Research Center (August 17, 2023), https://www.pewresearch.org/internet/2023/08/17/what-americans-know-about-ai-cybersecurity-and-big-tech/.

386.   An even greater percentage of parents value protecting their children's personal data, including their identity (90%), location (88%), health data (87%), age (85%), school records (85%), and browsing history (84%).[39]

387.   Renaissance has driven a wedge between school officials and parents, including Plaintiffs' parents, leaving them reluctant to press their schools for information regarding Renaissance's data practices or request that their children be alternatively accommodated.

388.   Parents fear becoming adversarial with their children's schools and the possible repercussions they or their children might suffer if they are perceived as difficult or meddlesome, including stigmatization or retaliation. Renaissance has thus chilled parental efforts to inquire about and object to its practices.

389.   This chilling effect has left children particularly vulnerable and disempowered to protect themselves against Renaissance's exploitative conduct.

**I.   Renaissance's nonconsensual data practices are unfair and unlawful.**

390.   Renaissance has generated massive profits through collection and analysis of children's personal information—without their parents' knowledge or consent, and without compensating them for actively and passively providing that valuable information.

391.   This one-sided arrangement—whereby Renaissance earns vast revenues each year from the personal information of children gathered through children's compelled use of Renaissance Products, and all that children receive in return are education services to which they are already legally entitled—is particularly unjust given the core philanthropic purpose and compulsory nature of a public education.

392.   Through its surreptitious, exploitative data practices, Renaissance has unjustly enriched itself at the cost of children's privacy, security, and autonomy, when children would otherwise have the ability to choose how they would monetize

---

[39] Polling Memo: Parents' Views on Children's Digital Privacy and Safety, Trusted Future (2022), https://trustedfuture.org/childrens-digital-privacy-and-safety/.

their data—or decide not to. School-aged children should not be made to bear these risks and harms for the commercial benefit of private, for-profit corporations like Renaissance and its partners.

## V.    CLASS ACTION ALLEGATIONS

393.   Plaintiffs bring this class action pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure on behalf of themselves and all other similarly situated.

394.   Plaintiffs seek to represent a nationwide class of students ("Nationwide Class") defined as:

> ***All persons in the United States who attend or attended a K-12 school who used one or more Renaissance Products.***

395.   Plaintiffs M.C. 1 and M.C. 2 seek to represent a state-only subclass of students ("California Subclass") under the law of the State of California defined as:

> ***All persons in California who attend or attended a K-12 school who used one or more Renaissance Products.***

396.   Plaintiffs M.C. 3 and M.C. 4 seek to represent a state-only subclass of students ("Kansas Subclass") under the law of the State of Kansas defined as:

> ***All persons in Kansas who attend or attended a K-12 school who used one or more Renaissance Products.***

397.   In addition, and in the alternative to the Nationwide Class, Plaintiffs reserve the right to seek leave to amend the complaint to represent state subclasses under the laws of 50 states.

398.   Plaintiffs reserve the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

399.   The Nationwide Class and California Subclass are collectively referred to herein as the "Classes." Members of both Classes are collectively referred to herein as "Class members."

400.   Excluded from the Classes are: (1) the Court (including any Judge or Magistrate presiding over this action and any members of their chambers and

families); (2) Renaissance, its subsidiaries, parents, predecessors, successors and assigns, including any entity in which any of them have a controlling interest and its officers, directors, employees, affiliates, or legal representatives; (3) persons who properly and timely request exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel, Classes' counsel, and Renaissance's counsel; and (6) the legal representatives, successors, and assigns of any such excluded person.

401.   Ascertainability: Membership of the Classes is defined based on objective criteria and individual members will be identifiable from Renaissance's records, including from Renaissance's massive data storage. Based on information readily accessible to it, Renaissance can identify members of the Classes who have used Renaissance's Products.

402.   Numerosity: Members of the Classes are so numerous that joinder of all members is impracticable. The exact size of the Classes and the identities of the members of the Classes are readily ascertainable in or through Renaissance's records.

403.   Typicality: Plaintiffs' claims are typical of the claims of other members of the Classes, as all members of the Classes were uniformly affected by Renaissance's wrongful conduct in violation of federal and state law as described herein.

404.   Adequacy: Plaintiffs will fairly and adequately protect the interests of the members of the Classes and have retained counsel that is competent and experienced in class action litigation, including nationwide class actions and privacy violations. Plaintiffs and their counsel have no interest that is in conflict with or otherwise antagonistic to the interests of the other members of the Classes. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and they have the resources to do so.

405.   **Commonality**: Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting solely individual

members of the Classes. Common questions for the Classes include, but are not limited to, the following:

a. Whether Renaissance obtained effective consent to generate, obtain, use, and disclose the personal and private information of the members of the Classes;

b. Whether Renaissance led the members of the Classes to believe, either directly or through school personnel, that their data and their privacy would be protected;

c. Whether Renaissance represented that members of the Classes could control what data were intercepted, received, or collected by Renaissance;

d. Whether Renaissance actually protected the data and privacy of members of the Classes;

e. Whether Renaissance's practice of intercepting, receiving, or collecting users' data violated state or federal privacy laws;

f. Whether Renaissance's practice of intercepting, receiving, or collecting users' data violated anti-wiretapping laws;

g. Whether Renaissance's practice of intercepting, receiving, or collecting users' data violated any other state or federal tort laws;

h. Whether Plaintiffs and members of the Classes are entitled to declaratory or injunctive relief to enjoin the unlawful conduct alleged herein; and

i. Whether Plaintiffs and members of the Classes have sustained damages as a result of Renaissance's conduct and, if so, what is the appropriate measure of damages or restitution.

406. **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. This proposed class action presents fewer management difficulties than individual litigation and provides the benefits of a single adjudication, economies of scale and comprehensive supervision by a single, able court. Furthermore, as the damages individual members of the Classes have suffered may be relatively small, the expense and burden of individual litigation make it impossible for members of the Classes to individually redress the wrongs done to them. There will be no difficulty in management of this action as a class action.

407.  Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## VI.  TOLLING OF THE STATUTE OF LIMITATIONS

408.  Any applicable statute(s) of limitations have been tolled by Renaissance's and its affiliates' knowing and active concealment and denial of the facts alleged herein. Plaintiffs and members of the Classes could not have reasonably discovered the true nature of Renaissance's data-harvesting scheme because Renaissance purposely concealed it. Plaintiffs' claims were thus tolled under the discovery rule.

409.  The causes of action alleged herein did not accrue until Plaintiffs and members of the Classes discovered or could have discovered Renaissance's data-harvesting scheme.

410.  As alleged above, Plaintiffs and members of the Classes had no way of knowing about Renaissance's data-harvesting scheme. Renaissance concealed the scheme while simultaneously claiming that it protects student data and privacy.

411.  To this day, Renaissance fails to disclose the full extent of, and risks associated with, its data-harvesting scheme.

412.  Within any applicable statutes of limitation, Plaintiffs and members of the Classes could not have discovered, through the exercise of reasonable diligence, that Renaissance was concealing the conduct complained of herein and misrepresenting the nature of its business.

413.  Plaintiffs and members of the Classes did not know facts that would have caused a reasonable person to suspect that there was a data-harvesting scheme that would result in a private corporation collecting, manipulating, and monetizing every aspect of their children's lives and their own interactions with their children's schools and school districts. Renaissance also withheld any and all information that would give a reasonable person knowledge of the data-harvesting scheme and disclaimed that it unlawfully monetized data about and belonging to Plaintiffs and members of the Classes.

414. For ordinary consumers, the existence of the data-harvesting scheme is still unknown. For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to the claims in this litigation.

## VII. CAUSES OF ACTION

### COUNT I: Violation of the Federal Wiretap Act, U.S.C. § 2510 et seq.

### *(On behalf of Plaintiffs and the Nationwide Class)*

415. Plaintiffs incorporate by reference paragraphs 1 through 414 as though fully set forth herein.

416. The Federal Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986, prohibits the intentional interception of the contents of any wire, oral, or electronic communication through the use of any electronic, mechanical, or other device. 18 U.S.C. § 2511.

417. The Wiretap Act protects both the sending and receipt of electronic communications.

418. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of the Act.

419. Plaintiffs and members of the Nationwide Class communicated electronically with Renaissance through Renaissance's online educational platforms, including but not limited to the Nearpod and FastBridge Products.

420. These communications included, among other things, page requests and navigation commands, the specific instructional lesson pages and assessment interfaces students accessed, student identifiers transmitted during platform sessions, interactions with instructional content and videos, and other engagement with lesson materials exchanged between Plaintiffs' devices and Renaissance's servers.

421. These transmissions constitute "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

422. Renaissance embedded tracking technologies—including analytics scripts, application programming interfaces ("APIs"), and other executable code—directly into the webpages and application interfaces through which students access its Products.

423. When Plaintiffs and members of the Nationwide Class accessed or interacted with Renaissance's Products, their web browsers automatically executed this tracking code, which captured and recorded their interactions with the platform.

424. Through these tracking technologies, Renaissance acquired the contents of Plaintiffs' and Nationwide Class members' electronic communications—including their navigation through lesson pages, interactions with instructional materials, engagement with videos and other lesson content, and other communications with the platform—contemporaneously with the transmission of those communications between Plaintiffs' devices and Renaissance's servers.

425. Because these tracking technologies execute within the student's browser at the time the student interacts with the platform, Renaissance disclosed the contents of these communications at the moment Plaintiffs and Nationwide Class members initiated those communications and transmitted them between the Plaintiffs' and Nationwide Class members' devices and Renaissance's servers.

426. The tracking technologies embedded in Renaissance's Products generated automated network transmissions that transmitted the intercepted communications and related interaction data to external analytics, advertising, and identity-resolution systems.

427. As described above, Renaissance's tracking technologies transmitted these communications and related data to third-party systems including Google (Google Analytics, Google Tag Manager, DoubleClick, and AdSense), Mixpanel, Microsoft (Microsoft Advertising, MSN, and LinkedIn), Xandr, Comscore, Taboola, and Leadfeeder (Dealfront Finland Oy).

428. Renaissance intentionally designed, integrated, and deployed these tracking technologies within its Products in order to capture detailed information about how students interact with its platforms.

429. The interception of Plaintiffs' and Nationwide Class members' communications through these technologies was intentional and occurred contemporaneously with Plaintiffs' and Nationwide Class members' use of Renaissance's Products.

430. Plaintiffs and Nationwide Class members did not consent to Renaissance intercepting, recording, or transmitting their communications through these tracking technologies.

431. After intercepting Plaintiffs' and Nationwide Class members' communications, Renaissance disclosed the contents of those communications to third-party analytics, advertising, and identity-resolution companies through the tracking technologies embedded in its Products, knowing or having reason to know that such information was obtained through the interception of electronic communications.

432. After intercepting Plaintiffs' and Nationwide Class members' communications, Renaissance also intentionally used the contents of those communications for its own purposes, including analyzing user behavior and developing insights regarding how students interact with its Products.

433. Renaissance violated COPPA by collecting, intercepting, recording, using, transmitting, and sharing Plaintiffs' and Nationwide Class member's personal information without providing notice to the children's parents and without obtaining parental consent.

434. Renaissance's use of student data does not comport with FERPA and causes schools to violate FERPA because Renaissance fails to obtain parental consent before transmitting or otherwise sharing Plaintiffs' and Nationwide Class members' personal information.

435. Although Renaissance was a party to Plaintiffs' communications with its platforms, the Wiretap Act's party exception does not apply because Renaissance intercepted those communications for the purpose of committing tortious acts.

436. Specifically, Renaissance intercepted Plaintiffs' communications in order to collect, analyze, and disclose private student information to analytics, advertising, and identity-resolution companies, conduct that constitutes invasion of privacy—including intrusion upon seclusion and public disclosure of private facts—under applicable state law.

437. As a result of Renaissance's unlawful interception, disclosure, and use of Plaintiffs' and Nationwide Class members' electronic communications, Plaintiffs and the Nationwide Class suffered injuries including invasion of privacy and the unauthorized collection and disclosure of their private educational, social-emotional and behavioral information.

438. Pursuant to 18 U.S.C. § 2520, Plaintiffs and the Nationwide Class are entitled to statutory damages, actual damages, punitive damages, injunctive relief, attorneys' fees and costs, and such other relief as the Court deems just and proper.

## COUNT II: Violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq.

### *(On behalf of California Plaintiffs and the California Subclass)*

439. Plaintiffs incorporate by reference paragraphs 1 through 414 as though fully set forth herein.

440. Plaintiffs lack an adequate remedy at law.

441. In addition or as an alternative to legal remedies sought herein, Plaintiffs seek equitable relief to the extent that legal remedies are inadequate.

442. The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. By engaging in the aforementioned practices, Renaissance has violated the UCL.

443.  A plaintiff may pursue a claim under the UCL through any or all of three prongs: the unlawful prong, the unfair prong, or the fraudulent prong.

444.  Renaissance's conduct violated the spirit and letter of the laws as alleged herein, which protect property, economic, and privacy interests and prohibit unauthorized disclosure and collection of private communications and personal information.

445.  Renaissance took California Plaintiffs' and California Subclass members' student data without compensating them for it. As alleged in paragraphs 35-38, 48 and 353-374, that student data has value to both Renaissance and California Plaintiffs and California Subclass members.

446.  Renaissance's unfair acts and practices include its violation of property, economic, and privacy interests of children protected by federal and state laws.

447.  To establish liability under the "unfair" prong, California Plaintiffs and California Subclass members need not establish that these statutes were actually violated, although the allegations herein establish that they were. The foregoing allegations are tethered to underlying constitutional, statutory, or regulatory provisions; describe practices that are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers; and show that the negative impact of Renaissance's practices on school-aged children and their parents far outweighs the reasons, justifications, and motives of Renaissance.

448.  The foregoing allegations also establish liability under the "unlawful" prong, as they show that Renaissance violated an array of state and federal laws protecting individual privacy and property.

449.  California Plaintiffs and California Subclass members have suffered injury-in-fact, including the loss of money or property, as a result of Renaissance's unfair and unlawful practices, which include the unauthorized disclosure and taking of their personal information that has value as demonstrated by its use and sale by Renaissance. California Plaintiffs and California Subclass members have suffered

harm in the form of diminution of the value of their private and personally identifiable data and content.

450.   Renaissance's actions caused damage to and loss of California Plaintiffs' and California Subclass members' property right to control the dissemination and use of their personal information and communications, including their right to exclude Renaissance and third parties from accessing their valuable student data.

451.   Renaissance's actions also prevented the development of a legitimate market for student data in which Plaintiffs could fairly choose to participate. And Plaintiffs would consider participating in a market for their information if their participation was voluntary; the terms of the transaction were transparent; they controlled what information was taken and how it could be used; and they were fairly compensated by those benefiting from their information.

452.   Renaissance violated COPPA by collecting, using, and sharing California and California Subclass member's personal information without providing notice to the children's parents and without obtaining parental consent.

453.   Renaissance failed to comply with FERPA by failing to obtain parental consent before sharing California and California Subclass member's personal information.

454.   Because Renaissance and other education-technology companies simply take valuable student data without effective consent and monetize it as they see fit, (1) no lawful market for that data exists and (2) even if it did, Renaissance's unlawful taking and use of that data has diminished the value of that data.

455.   Renaissance reaped unjust profits and revenues in violation of the UCL. This includes Renaissance's profits and revenues from its sale and licensing of its products, which Renaissance develops, delivers, maintains, and improves using the personal information of California Plaintiffs and California Subclass members, as well as through data-sharing agreements with innumerable third parties. California Plaintiffs and the California Subclass members seek restitution and disgorgement of these unjust profits and revenues.

## COUNT III – Invasion of Privacy: California Constitution

### *(On behalf of California Plaintiffs and the California Subclass)*

456.   Plaintiffs incorporate by reference paragraphs 1 through 414 as though fully set forth herein.

457.   California's constitution creates a right of action against a private entity such as Renaissance that has sufficient minimum contacts with California and purposely avails itself of the markets of the state through its promotion, sales, licensing, activities, and marketing within the state.

458.   Renaissance purposely availed itself of the laws of California and engaged and is engaging in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons that Renaissance knew or had reason to know are located in California.

459.   California Plaintiffs' and California Subclass members' expectation of privacy is deeply enshrined in California's Constitution. Article I, § 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possession, and protecting property and pursuing and obtaining safety, happiness, and privacy."

460.   The phrase "and privacy" was added by the "Privacy Initiative" adopted by California voters in 1972 after voters approved a proposed legislative constitutional amendment designated as Proposition 11. Critically, the argument in favor of Proposition 11 reveals that the legislative intent was to curb businesses' control over the unauthorized collection and use of consumers' personal information, stating:

> The right of privacy is the right to be left alone. . . . It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom.

461. The principal purpose of this constitutional right was to protect against unnecessary information gathering, use, and dissemination by public and private entities such as Renaissance.

462. A California constitutional privacy claim requires an invasion of (1) a legally protected privacy interest; (2) where the plaintiff had a reasonable expectation of privacy in the circumstances; and (3) conduct by the defendant constituting a serious invasion of privacy.

463. As described herein, Renaissance has intruded upon the following legally protected interests:

   a. a Fourth Amendment right to privacy contained on personal computing devices, including all of California Plaintiffs' and California Subclass members' activity on their devices, as explained by the United States Supreme Court in the unanimous decision of Riley v. California; and

   b. the California Constitution, which guarantees a right to privacy.

464. California Plaintiffs and California Subclass members had a reasonable expectation of privacy under the circumstances in that California Plaintiffs and California Subclass members could not reasonably expect that Renaissance would commit acts in violation of federal and state laws.

465. Renaissance violated COPPA by collecting, intercepting, recording, using, transmitting, and sharing Plaintiffs' and Nationwide Class member's personal information without providing notice to the children's parents and without obtaining parental consent.

466. Renaissance violated FERPA by failing to obtain parental consent before transmitting or otherwise sharing Plaintiffs' and Nationwide Class member's personal information.

467. FERPA demonstrates that students have an expectation of privacy in their education records, and Renaissance's taking and using of those records in violation of FERPA renders the taking and use a serious invasion of privacy.

468. Renaissance's actions constituted a serious invasion of privacy in that they:

a. invaded a zone of privacy protected by the Fourth Amendment, namely the right to privacy in data contained on personal computing devices, including web search, browsing histories, and other activities to which Renaissance had no consensual basis for accessing;

b. violated laws, including COPPA, and disregarded and caused schools to violate laws, including FERPA;

c. invaded the privacy rights of California Plaintiffs and California Subclass members without their consent;

d. constituted an unauthorized taking of valuable information from California Plaintiffs and California Subclass members through deceit; and

e. further violated California Plaintiffs' and California Subclass members' reasonable expectation of privacy via Renaissance's review, analysis, use, disclosure and monetization of California Plaintiffs and California Subclass members' activity that was considered sensitive and confidential.

469. Committing these acts against California Plaintiffs and California Subclass members constitutes an egregious breach of social norms that is highly offensive.

470. Renaissance's surreptitious and unauthorized tracking of California Plaintiffs' and California Subclass members' activity constitutes an egregious breach of social norms that is highly offensive, particularly given that Renaissance's Products and services were represented as tools to assist with the education of children.

471. Taking this information through deceit is highly offensive behavior, and Renaissance lacked any legal authority to track and surveil California Plaintiffs and California Subclass members without their consent.

472. California Plaintiffs and California Subclass members have been damaged by Renaissance's invasion of their privacy and are entitled to just compensation and equitable relief.

**COUNT IV – Invasion of Privacy: Intrusion Upon Seclusion**

*(On behalf of California Plaintiffs and the California Subclass)*

473. Plaintiffs incorporate by reference paragraphs 1 through 414 as though fully set forth herein.

474. California common law protects consumers from invasions of their privacy and intrusion upon seclusion.

475. An action for invasion of privacy by intrusion upon seclusion arises when an intentional intrusion, physically or otherwise, upon the solitude, seclusion, private affairs or concerns occurs and is in a substantial manner that would be highly offensive to a reasonable person.

476. Renaissance intentionally intruded into California Plaintiffs' and California Subclass members' private affairs in a highly offensive manner through its systematic and pervasive collection, accessing, downloading, transferring, selling, storing and use of California Plaintiffs' and California Subclass members' private information and data.

477. Renaissance's scheme to collect, manipulate, disclose, and monetize student data was implemented in California.

478. California Plaintiffs and California Subclass members maintained a reasonable expectation of privacy interest in their personal information absent consent to tracking and collection practices. California Plaintiffs and California Subclass members never consented—and in the case of Renaissance school-licensed Products, never even had the opportunity to consent—to Renaissance's data practices. The reasonableness of this expectation is reflected in longstanding custom and practice; security measures intended to prevent unauthorized access to personal information, especially concerning young children; state, federal, and international laws protecting a right to financial privacy; and the privacy policies and other assurances of protection by applications that use Renaissance discussed herein, among other indicia.

479. California Plaintiffs and California Subclass members could not reasonably expect that Renaissance would collect, store, manipulate, and monetize such voluminous, far-reaching, and sensitive categories of personal information, prevent California Plaintiffs and California Subclass members from reviewing or

controlling that information, and use that information in ways that were harmful to California Plaintiffs and California Subclass members.

480.   Individuals also maintain a reasonable expectation of privacy when they are using products in a compulsory environment such as public schools. Renaissance's collection of California Plaintiffs' and California Subclass members' information while logged into Renaissance Products was also unreasonable.

481.   Renaissance violated COPPA by collecting, using, and sharing California and California Subclass member's personal information without providing notice to the children's parents and without obtaining parental consent.

482.   Renaissance's use of student data fails to comport with FERPA and causes schools to violate FERPA because Renaissance fails to obtain parental consent before sharing California and California Subclass member's personal information with third parties.

483.   FERPA demonstrates that students have an expectation of privacy in their education records, and Renaissance's taking and using of those records in violation of FERPA renders the taking and use highly offensive to a reasonable person. Renaissance's collection, use and disclosure of children's data and personal information without the knowledge or consent of those children or their parents is highly offensive to a reasonable person.

484.   Renaissance's intrusions upon California Plaintiffs' and California Subclass members' private affairs and concerns are highly offensive to a reasonable person, especially considering (a) the highly sensitive and personal nature of California Plaintiffs' and California Subclass members' personal information and data; (b) the extensive scope of data obtained by Renaissance, including years of historical data; (c) Renaissance's intent to profit from California Plaintiffs' and California Subclass members' data by selling it outright (e.g., back to schools, its "customer," and other third parties) and using it to develop and market its products and services; (d) Renaissance's use of subterfuge to intrude into California Plaintiffs' and California Subclass members' electronic devices for the purpose of collecting their data; (e)

the surreptitious and unseen nature of Renaissance's data collection with respect to consumers, and (f) Renaissance's failure to obtain valid consent in violation of COPPA and with no regard to FERPA.

485.   Renaissance's conduct would be highly offensive to a reasonable person, particularly given Renaissance's extensive and false public statements regarding its commitment to user privacy and given that Renaissance designs products to be used by children, including young children. The manner of the invasion—collection through students' use of education tools in a compulsory setting—was also highly offensive.

486.   Renaissance's intrusion caused California Plaintiffs and California Subclass members the following damages:

   a.   Nominal damages;

   b.   The diminution in value of California Plaintiffs' and California Subclass members' private information;

   c.   The loss of privacy due to Renaissance rendering no longer private the sensitive and confidential information that California Plaintiffs and California Subclass members intended to remain private; and

   d.   Renaissance took something of value from California Plaintiffs and California Subclass members—their personal information and data—and derived benefits therefrom without California Plaintiffs' and California Subclass members' knowledge or consent and without Renaissance sharing the fair benefit of such value with California Plaintiffs or California Subclass members.

487.   Renaissance's intrusion into California Plaintiffs' and California Subclass members' seclusion was with oppression, fraud, or malice.

488.   As a result of Renaissance's intrusion into their seclusion, California Plaintiffs and California Subclass members seek actual damages, compensatory damages, restitution, disgorgement, general damages, nominal damages, unjust enrichment, punitive damages, and any other relief the Court deems just.

**COUNT V: Invasion of Privacy—Public Disclosure of Private Facts**

*(On behalf of California Plaintiffs and the California Subclass)*

489.   Plaintiffs incorporate by reference paragraphs 1 through 414 as though fully set forth herein.

490.   Under California law, plaintiffs asserting claims for public disclosure of private facts must plead (1) the defendant gave unreasonable publicity to the plaintiffs' private life; (2) the facts disclosed are private facts; and (3) the private matter made public is one that would be highly offensive to a reasonable person.

491.   Renaissance intentionally disclosed private facts about California Plaintiffs and California Subclass members through its systematic and pervasive collection, accessing, downloading, transferring, selling, storing and use of California Plaintiffs' and California Subclass members' personal information. Renaissance disclosed private facts to companies it discloses on its website, as identified in paragraph 238, as well as to other companies it fails to disclose, as identified in paragraphs 99-112, 120, 123-127, 135, 148-151, 163, 170-176, 179-181, 185-190, 207-210. The third-party companies include numerous global companies with commercial interests in using and further sharing the data, and advertising and identity-resolution companies that use the data to build profiles of each student for the purpose of targeted advertising.

492.   Renaissance failed to provide notice of how the third-party recipients use the student data and what the recipients' disclosure practices are with respect to the information. Indeed, Renaissance explicitly disclaims responsibility for the security or use of personal information once it discloses the information to third parties.

493.   The private facts at issue are detailed throughout this complaint, including but not limited to the allegations contained in paragraphs 4 (academic progress, abilities and struggles, work ethic, attention span, social-emotional or behavioral problems, and lunch balance); 19 (contact information, identifying demographic information, assignment submissions, assessment scores, browser and device data, and behavioral data including whether students are at risk for social-emotional

behavior problems); 53 (skill and subject mastery, strengths and weaknesses, depth of understanding, comprehension challenges, and social-emotional and behavioral health); 61 (knowledge, understanding and engagement with lesson content, thought processes and learning habits, mastery of a skill, ability to communicate thoughts and think critically, and the likelihood students will pass upcoming assessments); 69 (rankings of their own social and emotional behavior); 70 (whether students are at risk for social or emotional problems, how accurately students perceive themselves, and whether to require students to submit to an emotional regulation program or other intervention); 76 (physical location, browser language, time spent on particular pages, parts of products used, links clicked, search terms, and keywords); 78 (metadata demonstrating behavior and learning habits); 79 (response time, error patterns, gaps in mastery, engagement and focus, work ethic, and test-taking strategies); 81 (in-app assessment performance); 154 (participation in lesson activities, engagement with educational videos, and submission of assignment responses); 158 (which pages visited and for how long, and number of sessions and engagement time); 159 (specific videos the student watches and for how long, specific content and lessons the student interacts with and for how long); 161 (detailed lesson metadata); 163 (personally identifiable information identifying students as individuals who requested or obtained specific instructional video materials); 177 (media consumption across multiple devices); 198 (pages visited and for how long, number of sessions and engagement time); 205 (activity across websites); 208 ("exact behavior" of website visitors); 265 (whole child data); and 351 (the equivalent of credit reports on children).

494.   Renaissance violated COPPA by collecting, using, and sharing California and California Subclass member's personal information without providing notice to the children's parents and without obtaining parental consent.

495.   Renaissance's use of student data failed to comport with FERPA and caused schools to violate FERPA because Renaissance failed to obtain parental consent

before sharing California and California Subclass member's personal information with third parties.

496. FERPA demonstrates that students have an expectation of privacy in their education records, and Renaissance's taking and using of those records in violation of FERPA renders the taking and use highly offensive to a reasonable person.

497. A reasonable person of ordinary sensibilities would be highly offended that children's private data is being shared with third-party companies given that (1) Renaissance violates COPPA and willfully disregards FERPA in obtaining, and using, and sharing schoolchildren's personal information, including failing to obtain parental consent and concealing its true data practices; (2) the information is highly sensitive and personal; (3) the data is obtained while children are engaged in compulsory educational activities at school; and (4) Renaissance intentionally makes the information public to more than 20 companies, many of which are advertising companies with global reach, and several of which Renaissance intentionally conceals.

498. There is no legitimate public interest in millions of schoolchildren's personal, sensitive, and private data, and Renaissance knew that or acted unreasonably or recklessly as to whether there was a legitimate public interest.

499. California Plaintiffs and California Subclass members maintained a reasonable expectation of privacy interest in their personal information absent consent to tracking and collection practices. California Plaintiffs and California Subclass members never consented—and in the case of Renaissance school-licensed products, never even had the opportunity to consent—to Renaissance's data practices. The reasonableness of this expectation of privacy is reflected in longstanding custom and practice; security measures intended to prevent unauthorized access to personal information, especially concerning young children; state, federal, and international laws protecting a right to financial privacy; and the privacy policies and other assurances of protection by applications that use Renaissance discussed herein, among other indicia.

500.    California Plaintiffs and California Subclass members could not reasonably expect that, by simply participating in their education and completing required school activities, Renaissance would collect, store, manipulate, disclose, and monetize such voluminous and far-reaching categories of personal information; prevent California Plaintiffs and California Subclass members from reviewing, correcting, or controlling that information; and use that information in ways that were harmful to California Plaintiffs and California Subclass members.

501.    Individuals also maintain a reasonable expectation of privacy when they are using products in a compulsory environment such as public schools. Renaissance's collection of California Plaintiffs' and California Subclass members' information while logged into Renaissance products was unreasonable.

502.    Renaissance's disclosure of children's private facts without the knowledge or consent of those children or their parents is highly offensive to a reasonable person of ordinary sensibilities, especially considering (a) the highly sensitive and personal nature of California Plaintiffs' and California Subclass members' personal information and data; (b) the extensive scope of data obtained by Renaissance, including years of historical data; (c) Renaissance's intent to profit from California Plaintiffs' and California Subclass members' private information by selling it outright to third parties and using it to develop and market its products and services; (d) Renaissance's use of subterfuge to intrude into California Plaintiffs' and California Subclass members' electronic devices for the purpose of collecting their private facts; (e) the surreptitious and unseen nature of Renaissance's data collection with respect to children, and (f) Renaissance's failure to obtain valid consent from parents.

503.    Renaissance's conduct would be highly offensive to a reasonable person of ordinary sensibilities, particularly given Renaissance's extensive and false public statements regarding its commitment to user privacy and given that Renaissance designs products to be used by children, including young children. The manner of

collection of the private facts through students' use of education tools in a compulsory setting is also highly offensive.

504. Renaissance's invasions of privacy caused California Plaintiffs and California Subclass members the following damages:

    a. Nominal damages;

    b. The diminution in value of California Plaintiffs' and California Subclass members' private information;

    c. The loss of privacy due to Renaissance disclosing the confidential and personal information that California Plaintiffs and California Subclass members intended to remain private; and

    d. The fair value of California Plaintiffs' and California Subclass members' personal information and data. Renaissance took something of value from California Plaintiffs and California Subclass members—their personal information and data—and derived benefits therefrom without California Plaintiffs' and California Subclass members' knowledge or consent and without Renaissance sharing the fair benefit of such value with them.

505. Renaissance invaded California Plaintiffs' and California Subclass members' privacy with oppression, fraud, or malice.

506. As a result of Renaissance's invasions of privacy, California Plaintiffs and California Subclass members seek actual damages, compensatory damages, restitution, disgorgement, general damages, nominal damages, unjust enrichment, punitive damages, and any other relief the Court deems just.

**COUNT VI: Invasion of Privacy—Public Disclosure of Private Facts**

*(On behalf of Plaintiffs and the Nationwide Class Pursuant to Wisconsin Law)*

507. Plaintiffs incorporate by reference paragraphs 1 through 414 as though fully set forth herein.

508. Under Wisconsin law, plaintiffs asserting claims for public disclosure of private facts must plead (1) an intentional public disclosure of facts regarding the plaintiff; (2) the facts disclosed are private facts; (3) the private matter made public is one that would be highly offensive to a reasonable person of ordinary sensibilities; and (4) the defendant acted either unreasonably or recklessly as to

whether there was a legitimate public interest in the matter, or with actual knowledge that none existed.

509. Renaissance intentionally disclosed private facts about Plaintiffs and Nationwide Class members through its systematic and pervasive collection, accessing, downloading, transferring, selling, storing and use of Plaintiffs' and Nationwide Class members' personal information. Renaissance disclosed private facts to companies it discloses on its website, as identified in paragraph 238, as well as to other companies it fails to disclose, as identified in paragraphs 99-112, 120, 123-127, 135, 148-151, 163, 170-176, 179-181, 185-190, 207-210. The third-party companies include numerous global companies with commercial interests in using and further sharing the data, and advertising and identity-resolution companies that use the data to build profiles of each student for the purpose of targeted advertising.

510. Renaissance violated COPPA by collecting, using, and sharing Plaintiffs' and Nationwide Class members' personal information without providing notice to the children's parents and obtaining parental consent, and it failed to comply with FERPA by sharing Plaintiffs' and Nationwide Class members' personal information without obtaining parental consent. Renaissance further failed to provide notice of how the third-party recipients use the student data and what the recipients' disclosure practices are with respect to the information. Indeed, Renaissance explicitly disclaims responsibility for the security or use of Plaintiffs' and Nationwide Class Members' personal information once it discloses the information to third parties.

511. The private facts at issue are detailed throughout this complaint, including but not limited to the allegations contained in paragraphs 4 (academic progress, abilities and struggles, work ethic, attention span, social-emotional or behavioral problems, and lunch balance); 19 (contact information, identifying demographic information, assignment submissions, assessment scores, browser and device data, and behavioral data including whether students are at risk for social-emotional behavior problems); 53 (skill and subject mastery, strengths and weaknesses, depth

of understanding, comprehension challenges, and social-emotional and behavioral health); 61 (knowledge, understanding and engagement with lesson content, thought processes and learning habits, mastery of a skill, ability to communicate thoughts and think critically, and the likelihood students will pass upcoming assessments); 69 (rankings of their own social and emotional behavior); 70 (whether students are at risk for social or emotional problems, how accurately students perceive themselves, and whether to require students to submit to an emotional regulation program or other intervention); 76 (physical location, browser language, time spent on particular pages, parts of products used, links clicked, search terms, and keywords); 78 (metadata demonstrating behavior and learning habits); 79 (response time, error patterns, gaps in mastery, engagement and focus, work ethic, and test-taking strategies); 81 (in-app assessment performance); 154 (participation in lesson activities, engagement with educational videos, and submission of assignment responses); 158 (which pages visited and for how long, and number of sessions and engagement time); 159 (specific videos the student watches and for how long, specific content and lessons the student interacts with and for how long); 161 (detailed lesson metadata); 163 (personally identifiable information identifying students as individuals who requested or obtained specific instructional video materials); 177 (media consumption across multiple devices); 198 (pages visited and for how long, number of sessions and engagement time); 205 (activity across websites); 208 ("exact behavior" of website visitors); 265 (whole child data); and 351 (the equivalent of credit reports on children).

512.   A reasonable person of ordinary sensibilities would be highly offended to know that their private data was being shared by Renaissance to third parties outside of their school, especially given that: (a) Renaissance violates COPPA and FERPA in obtaining, using, and sharing schoolchildren's personal information, including by failing to obtain parental consent and concealing its true data practices; (b) the information is highly sensitive and personal; (c) the extensive scope of data obtained by Renaissance includes years of historical data; (d) Renaissance

intentionally makes the information public to more than 20 companies, many of which are advertising companies with global reach; (e) Renaissance's intent to profit from Plaintiffs' and Nationwide Class members' private information by selling it outright to third parties and using it to develop and market its products and services; (f) Renaissance's use of subterfuge to intrude into Plaintiffs' and Nationwide Class members' electronic devices for the purpose of collecting their private facts; (g) the surreptitious and unseen nature of Renaissance's data collection with respect to children; and (h) Renaissance's extensive and false public statements regarding its commitment to user privacy.

513. There is no legitimate public interest in millions of schoolchildren's personal, sensitive, and private data related to their identifying information, online activities and behavior, academic assessments, or social-emotional or behavioral health, and Renaissance knew that or acted unreasonably or recklessly as to whether there was a legitimate public interest.

514. Plaintiffs and Nationwide Class members maintained a reasonable expectation of privacy interest in their personal information absent consent to tracking and collection practices. Plaintiffs and Nationwide Class members never consented—and in the case of Renaissance school-licensed products, never even had the opportunity to consent—to Renaissance's data practices. The reasonableness of this expectation of privacy is reflected in longstanding custom and practice; security measures intended to prevent unauthorized access to personal information, especially concerning young children; state, federal, and international laws protecting a right to financial privacy; and the privacy policies and other assurances of protection by applications that use Renaissance discussed herein, among other indicia.

515. Plaintiffs and Nationwide Class members could not reasonably expect that, by simply participating in their education and completing required activities, Renaissance would collect, store, manipulate, and monetize such voluminous and far-reaching categories of personal information; prevent Plaintiffs and Nationwide

Class members from reviewing, correcting, or controlling that information; and use that information in ways that were harmful to Plaintiffs and Nationwide Class members.

516.   Individuals also maintain a reasonable expectation of privacy when they are using products in a compulsory environment such as public schools. Renaissance's collection of Plaintiffs' and Nationwide Class members' information while logged into Renaissance Products was unreasonable.

517.   Renaissance's invasions of privacy caused Plaintiffs and Nationwide Class members the following damages:

   a.  Nominal damages;
   b.  The diminution in value of Plaintiffs' and Nationwide Class members' private information;
   c.  The loss of privacy due to Renaissance disclosing the confidential and personal information that Plaintiffs and Nationwide Class members intended to remain private; and
   d.  The fair value of Plaintiffs' and Nationwide Class members' personal information and data. Renaissance took something of value from Plaintiffs and Nationwide Class members—their personal information and data—and derived benefits therefrom without Plaintiffs' and Nationwide Class members' knowledge or consent and without Renaissance sharing the fair benefit of such value with them.

518.   Renaissance invaded Plaintiffs' and Nationwide Class members' privacy with oppression, fraud, or malice.

519.   As a result of Renaissance's invasions of privacy, Plaintiffs and Nationwide Class members seek actual damages, compensatory damages, restitution, disgorgement, general damages, nominal damages, unjust enrichment, punitive damages, and any other relief the Court deems just.

## COUNT VII: Unjust Enrichment

### *(On Behalf of Plaintiffs and the Nationwide Class Pursuant to Wisconsin Law)*

520.   Plaintiffs and Nationwide Class members incorporate by reference paragraphs 1 through 414 as though fully set forth herein.

521.  Plaintiffs and Nationwide Class members lack an adequate remedy at law.

522.  In addition or as an alternative to legal remedies sought herein, Plaintiffs and Nationwide Class members seek equitable relief to the extent that legal remedies are inadequate.

523.  Under Wisconsin law, plaintiffs asserting claims for unjust enrichment must plead that (1) the plaintiffs conferred a benefit on the defendant; (2) the defendant knew of the benefit; and (3) it is inequitable for the defendant to accept or retain the benefit without paying its value.

524. Plaintiffs and Nationwide Class members conferred a benefit upon Renaissance, namely, provision of their personal information to Renaissance through their compelled use of Renaissance's Products at school.

525.  Renaissance violated several laws in obtaining the benefit of Plaintiffs' valuable data, including violating COPPA by collecting, using, and sharing Plaintiffs' and Nationwide Class members' personal information without providing notice to the children's parents and obtaining parental consent, and violating FERPA by sharing Plaintiffs' and Nationwide Class members' personal information without obtaining parental consent. Renaissance further failed to disclose all the third parties with which it shares the data. Renaissance also violated its own policies stating that it does not share any student data unless necessary for educational services while also sharing the data with intentionally undisclosed advertising companies with no legitimate interest in the data other than their own commercial benefit.

526.  All of these violations constitute wrongful acts through which Renaissance took, used, and shared Plaintiffs' and Nationwide Class members' personal information for its own benefit and the benefit of third parties.

527.  Personal data is a recognized asset with commercial value in the digital economy, the benefit of which is evidenced by Renaissance's extensive use and sharing of the student data for its own commercial purposes, including developing,

improving, and marketing its Products, and in its extensive sharing of the student data with undisclosed third-party advertising and identity-resolution companies.

528.   Renaissance appreciated the fact that it obtained this benefit from Plaintiffs and Nationwide Class members, namely, it understands that student data is the raw material that fuels its business, without which Renaissance would have no product and no business.

529.   Renaissance's appreciation of the benefit of Plaintiffs' and Nationwide Class members' personal information is evidenced by its admissions that it uses the data for its own commercial purposes, including developing, improving, and marketing its Products, and by forensic analysis revealing that Renaissance shares the data with undisclosed third-party advertising and identity-resolution companies that engage in targeted advertising.

530.   If Plaintiffs' and Nationwide Class members' personal information had no value to Renaissance, Renaissance would have no reason to use the data in these ways.

531.   Given Renaissance's wrongful acts in taking, using, and sharing Plaintiffs' and Nationwide Class members' personal information for its own benefit, it would be inequitable for Renaissance to retain that benefit without payment to Plaintiffs of the value that benefit has conferred to Renaissance.

532.   More specifically, Renaissance acquired and compromised troves of personal information that rightfully belong to Plaintiffs and Nationwide Class members without effective consent through intentionally deceptive practices conducted in connection with students' compulsory use of Renaissance's Products.

533.   Renaissance obtained access to this information by marketing and selling its Products for use by children in the compulsory environment of K-12 education.

534.   Renaissance has built, developed, improved, marketed, and delivered an ever-growing suite of products using the personal information of Plaintiffs and Nationwide Class members. It has further derived profits and other tangible and

intangible benefits from its improper collection, use, and disclosure of Plaintiffs' and Nationwide Class members' data.

535.   But for collecting children's personal information without effective consent, Renaissance could not have grown its business, acquired numerous other tangible and intangible assets, developed other applications, and received millions of dollars in investment capital to exceed a billion-dollar valuation.

536.   Renaissance has also directly and substantially profited from its use, storage, aggregation, disclosure, and sale of Plaintiffs' and Nationwide Class members' data. Indeed, Plaintiffs' and Nationwide Class members' data powers Renaissance's ever-growing ecosystem of products and services. Without Plaintiffs' and Nationwide Class members' personal information, Renaissance would cease to operate in its current form.

537.   In exchange for these benefits to Renaissance, Plaintiffs and Nationwide Class members received nothing but educational services to which they were already legally entitled and required to receive.

538.   To benefit its bottom line, Renaissance deprived Plaintiffs and Nationwide Class members of their property, security, privacy, and autonomy.

539.   Renaissance harmed Plaintiffs and Nationwide Class members by, among other harms, subjecting them to commercial manipulation and continuous surveillance; invading their privacy; denying their due process rights by subjecting them to opaque, unreviewable data practices; forcing them to choose between their right to an education and other fundamental rights; and failing to compensate them for their property.

540.   Plaintiffs and Nationwide Class members did not consent to Renaissance's taking of their personal information and using it for Renaissance's or other third parties' commercial gain.

541.   There is no justification for Renaissance's enrichment. It would be inequitable, unconscionable, and unjust for Renaissance to be permitted to retain

these benefits when they were procured because of and by means of Renaissance's wrongful conduct and at the expense of children's property and wellbeing.

542. Plaintiffs and Nationwide Class members seek an order compelling Renaissance to disgorge the profits and other benefits it has unjustly obtained.

543. Plaintiffs and Nationwide Class Members may not have an adequate remedy at law against Renaissance, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## COUNT VIII: Negligence

### (On Behalf of Plaintiffs and the Nationwide Class)

545. Plaintiffs incorporate by reference paragraphs 1 through 414 as though fully set forth herein.

546. Under Wisconsin law, plaintiffs asserting claims for negligence must plead (1) a duty owed to the plaintiffs by the defendant; (2) a breach of that duty; (3) that the breach caused the plaintiffs damages; and (4) that the plaintiffs suffered damages.

547. Under Wisconsin law, Renaissance owed a duty to children who use its Products, including Plaintiffs and Nationwide Class members, including a duty to exercise reasonable care in the collection, handling, retention, and use of their personal and behavioral data.

548. Under Wisconsin law, every person owes a duty to exercise ordinary care to prevent harm to others. This general duty applies when a defendant's conduct creates a foreseeable risk of harm—including privacy harms arising from the unauthorized or exploitative use of children's data.

549. Renaissance further owed a heightened duty of care because it contracts with schools and school districts for the express purpose of providing educational services to children, including Plaintiffs and Nationwide Class members. It solicits and collects student data under the guise of an educational context, thereby establishing a relationship of trust and dependency. Having assumed this role, Renaissance had a duty not to exploit that relationship by using student data,

including that of Plaintiffs and Nationwide Class members, for its own independent commercial advantage, or for the benefit of third parties with whom those students and parents have no direct relationship.

550. Renaissance breached these duties by, among other things, (a) sharing Plaintiffs' and Nationwide Class members' personal and behavioral information—including real-time telemetry such as video viewing patterns and clickstream activity—with third-parties, some it identifies as "subprocessors," "service providers," and "vendors"; and (b) allowing or enabling those third parties to use such information to enhance their own commercial products, models, and services, independent of Renaissance's provision of educational services.

551. Renaissance also breached its duties by using Plaintiffs' and Nationwide Class members' personal data—collected without informed consent—to improve or train its own proprietary systems, including artificial intelligence, adaptive learning, behavioral analytics, engagement scoring, and product development features unrelated to the specific students or educational services at issue. This misuse of student data for Renaissance's own product development purposes was not reasonably foreseeable or disclosed to parents, and it constituted an unreasonable invasion of children's data privacy interests.

552. It was reasonably foreseeable to Renaissance that collecting and sharing such granular behavioral and interactional data—particularly from minors—without express informed consent, and using that data to power commercial product improvements, posed a substantial risk of privacy harm. This risk is especially acute in the context of educational software, where users are children. Renaissance's failure to implement adequate controls to prevent such misuse, and its active facilitation of third-party data access, was a breach of its duty of ordinary care under Wisconsin law.

553. Renaissance's duty of care owed to children who use its Products includes complying with applicable federal laws that protect children, privacy, and property.

554. COPPA imposes legal requirements on operators of websites and online services directed to children under 13 years of age. Among other provisions, COPPA prohibits the collection, use, or disclosure of a child's personal information — including persistent identifiers and behavioral data — without verifiable parental consent. *See* 15 U.S.C. § 6502(b); 16 C.F.R. § 312.5.

555. Although COPPA does not contain an express private right of action, it can be used to support the existence of a standard of care in a negligence case.

556. COPPA's statutory protections were enacted specifically to prevent the kind of unauthorized and exploitative data collection alleged here—namely, the use of children's behavioral, interactional, and identifying data for commercial benefit without adequate notice or consent. Renaissance's failure to obtain verifiable parental consent before collecting such data—and its subsequent disclosure of that data to third parties for analytics, product development, and cross-platform tracking—constitutes a violation of COPPA that may properly serve as support for the existence of a standard of care owed to Plaintiffs and Nationwide Class members by Renaissance.

557. Plaintiffs and Nationwide Class members are among the class of persons COPPA was designed to protect, and the harm they suffered—loss of privacy, unauthorized profiling, exploitation of behavioral data, and exposure to cross-platform tracking and commercial targeting—is of the type the statute was designed to prevent.

558. Renaissance was required to comply with COPPA and did not: it failed to notify parents of its data practices and obtain verifiable parental consent before collecting and using children's data; it failed to limit its collection of data to only that necessary for children to participate in the activity; and it failed to permit parents to access, review, and delete all personal information that was collected from their children when they were under 13.

559. Renaissance owed a higher duty of care to children than to an ordinary consumer because of minor's lack of capacity to appreciate and avoid risks.

560. Renaissance, which markets its Products for use by K-12 students, knew or should have known that minors under 13 would be the primary users of its Products, that parental consent would therefore be required for the collection and use of students' personal data, and that the failure to obtain parental consent would result in the unlawful collection of students' personal information, including persistent identifiers such as cookies and IP addresses.

561. Renaissance negligently failed to obtain parental consent before collecting, using, and sharing children's information.

562. Renaissance failed to implement or maintain policies, procedures, or oversight mechanisms necessary to comply with COPPA.

563. Renaissance's use of student data also does not comport with FERPA and causes schools to violate FERPA because Renaissance does not obtain parental consent before sharing Plaintiffs' and Nationwide Class members' personal information. FERPA demonstrates that students have an expectation of privacy in their education records, and Renaissance's taking, using, and sharing of Plaintiffs' and Nationwide Class members' education records in violation of FERPA is highly offensive to a reasonable person and renders unjust any taking, using, or sharing of those records.

564. Renaissance's failure to obtain parental consent or act with reasonable care directly enabled the unlawful collection of children's personal information, exposing millions of children to commercial exploitation and violating their right to privacy.

565. Renaissance also had independent duties under state and federal laws that required it to ensure that personal information of children was not collected without parental consent.

566. As a direct and proximate result of Renaissance's negligent actions and Renaissance's violations of COPPA and FERPA, Plaintiffs and Nationwide Class members suffered injury, including the improper collection, exposure, exploitation, and diminution in value of their intimate personal information.

SECOND AMENDED CLASS ACTION COMPLAINT SECOND AMENDED CLASS ACTION COMPLAINT   101   Case No. 8:25-cv-01379

567.    Renaissance's conduct in collecting, sharing, and monetizing student data without meaningful notice or consent was undertaken knowingly, willfully, and with reckless disregard for the privacy and well-being of minor students, including Plaintiffs and Nationwide Class members. Renaissance prioritized commercial analytics, product development, monetary gain, and its own competitive advantage over its duty to safeguard children's data, including that of Plaintiffs and Nationwide Class members. This conduct supports a finding of moral fault warranting the imposition of punitive damages under Wisconsin law.

568.    Because legal remedies are inadequate to fully redress the harm, Plaintiffs seek equitable relief, including restitution and disgorgement of all profits, benefits, and other compensation obtained by Renaissance as a result of its unlawful conduct.

**COUNT IX: Violation of the Wisconsin Electronic Surveillance Control Law ("WESCL") Wis. Stat. § 968.31**

***(On behalf of Plaintiffs and the Nationwide Class)***

569.    Plaintiffs incorporate by reference paragraphs 1 through 414 as though fully set forth herein.

570.    All conditions precedent to this action have been performed or have occurred.

571.    The Wisconsin Electronic Surveillance Control Law prohibits the interception, disclosure and use of wire, electronic or oral communications. Wis. Stat. § 968.31.

572.    Specifically, under Wis. Stat. section 968.31(1), the following acts are prohibited, including when a person:

  a. "Intentionally intercepts, attempts to intercept or procures any other person to intercept or attempt to intercept, any wire, electronic or oral communication";

  b. "Intentionally uses, attempts to use or procures any other person to use or attempt to use any electronic, mechanical or other device to intercept any oral communication";

  c. "Discloses, or attempts to disclose, to any other person the contents of any wire, electronic or oral communication, knowing or having reason to

SECOND AMENDED CLASS ACTION COMPLAINT          102          Case No. 8:25-cv-01379

know that the information was obtained through the interception of a wire, electronic or oral communication in violation of this section or under circumstances constituting violation of this section"; or

d. "Uses, or attempts to use, the contents of any wire, electronic or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication in violation of this section or under circumstances constituting violation of this section."

573.   Wisconsin courts interpret Wis. Stat. § 968.31 consistently with federal decisions interpreting the federal Wiretap Act.

574.   Renaissance intercepted Plaintiffs' and Nationwide Class members' electronic communications through tracking technologies embedded in its online educational platforms.

575.   Plaintiffs and Nationwide Class members communicated electronically with Renaissance through Renaissance's Products, including the Nearpod and FastBridge platforms.

576.   These communications included, among other things, students' interactions with lesson materials, access to assignments and assessments, engagement with instructional content and videos, session participation events, and other communications exchanged between students' devices and Renaissance's servers while using the platforms.

577.   Under Wis. Stat. § 968.27, Wisconsin defines "electronic communications" to mean "any transfer of signs, signals, writing, images, sounds, data or intelligence of any nature wholly or partially transmitted by a wire, radio, electromagnetic, photoelectronic or photooptical system."

578.   Plaintiffs' and Nationwide Class members' communications with Renaissance constitute "electronic communications" under Wisconsin law because they involve the transfer of data and information between users' devices and Renaissance's servers over the internet.

579. Plaintiffs' and Nationwide Class members' communications with Renaissance were transmitted wholly or partially by wire, electromagnetic, and/or photoelectronic systems.

580. Renaissance embedded tracking technologies—including analytics scripts, tracking tags, application programming interfaces, and other executable code—directly into the webpages and application interfaces through which students access Renaissance's platforms.

581. When students interact with Renaissance's platforms, their browsers automatically execute these tracking technologies, which capture and record students' interactions with the platform while those communications are being transmitted between the student's device and Renaissance's servers.

582. Through these technologies, Renaissance acquires the contents of Plaintiffs' and Nationwide Class members' communications contemporaneously with their transmission.

583. The tracking technologies embedded in Renaissance's platforms—including analytics scripts, tracking tags, and related executable code integrated into the platforms' webpages—constitute electronic, mechanical, or other devices within the meaning of Wis. Stat. §§ 968.27 and 968.31 because they are used to capture and transmit the contents of electronic communications occurring between users' devices and Renaissance's servers.

584. The intercepted communications include, among other things, students' access to lessons and assignments, engagement with lesson materials and instructional videos, session participation events, and other interaction data reflecting how students communicate with and use Renaissance's platforms.

585. Renaissance's tracking technologies generate automated network transmissions that transmit these communications and related data to external analytics, advertising, and identity-resolution systems.

586. As described *supra*, these transmissions include disclosures to third-party companies including Google, Mixpanel, Microsoft, Xandr, Comscore, Taboola, and Leadfeeder.

587. Renaissance intentionally configured these tracking technologies within its platforms in order to capture and analyze user interactions and to transmit those interactions to third-party analytics and marketing systems.

588. Plaintiffs and Nationwide Class members had a reasonable expectation of privacy in their communications with Renaissance. These communications occurred while Plaintiffs and Nationwide Class members were participating in classroom instruction and completing educational assignments through Renaissance's platforms.

589. Plaintiffs and Nationwide Class members did not consent to Renaissance intercepting, recording, or disclosing their communications, and Renaissance never sought or obtained informed consent for the interception or disclosure of those communications.

590. Renaissance disclosed the contents of Plaintiffs' and Nationwide Class members' communications to third-party analytics, advertising, and identity-resolution companies—including Google, Mixpanel, Microsoft, Xandr, Comscore, Taboola, and Leadfeeder—knowing or having reason to know that such information was obtained through the interception of electronic communications.

591. Renaissance also used the contents of these intercepted communications for its own purposes, including analyzing user behavior, improving its products, and obtaining analytics insights regarding how students interact with its platforms. Renaissance violated COPPA by collecting, intercepting, using, and disclosing Plaintiffs' and Nationwide Class member's personal information without providing notice to the children's parents and without obtaining parental consent. Renaissance's use of student data does not comport with FERPA and causes schools to violate FERPA because Renaissance fails to obtain parental consent before disclosing Plaintiffs' and Nationwide Class members' personal information.

592. Renaissance intercepted Plaintiffs' and Nationwide Class members' electronic communications for the purpose of committing multiple tortious acts, including, but not limited to, the tortious acts described *supra*.

593. Renaissance's misconduct falls within the ambit of Wisconsin's wiretapping statute because the interception and disclosure of Plaintiffs' and Nationwide Class members' communications—without consent or proper authorization—constitutes unlawful and tortious conduct, including invasion of privacy by public disclosure of private facts under Wis. Stat. § 995.50, as well as negligence as alleged *supra*.

594. Plaintiffs' and Nationwide Class members' electronic communications were intercepted during transmission in the state of Wisconsin, where Renaissance is headquartered, and those intercepted communications were also used by Renaissance in Wisconsin and disclosed to third parties.

595. Renaissance designed, implemented, and controlled the tracking technologies described herein from its headquarters in Wisconsin. The interception, acquisition, processing, and disclosure of Plaintiffs' and Nationwide Class members' electronic communications therefore occurred, at least in substantial part, within the State of Wisconsin through systems and decisions controlled by Renaissance from that state.

596. Under Wis. Stat. § 968.31(2m), "[a]ny person whose wire, electronic or oral communication is intercepted, disclosed or used in violation of sections 968.28 to 968.37 shall have a civil cause of action against any person who intercepts, discloses or uses, or procures any other person to intercept, disclose, or use, the communication."

597. Renaissance qualifies as a "person" under the statute.

598. As a result of Renaissance's violations of the Wisconsin Electronic Surveillance Control Law, Plaintiffs and Nationwide Class members are entitled to the relief provided by Wis. Stat. § 968.31(2m), including: actual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of

violation or $1,000, whichever is higher; punitive damages; and reasonable attorneys' fees and other litigation costs reasonably incurred.

599. In addition to statutory damages, Renaissance's misconduct caused Plaintiffs and Nationwide Class members damages including, inter alia:

    a. personal information that Plaintiffs and Nationwide Class members intended to remain private is no longer private;

    b. Renaissance abused and eroded the trust of Plaintiffs and Nationwide Class members attending school—children whose confidential, nonpublic personal information protected by COPPA and FERPA was collected by Renaissance merely by Plaintiffs and Nationwide Class members attending school; and

    c. Renaissance took something of value from Plaintiffs and Nationwide Class members and derived benefit therefrom without Plaintiffs' and Nationwide Class members' knowledge or informed consent and without sharing the benefit of such value.

600. Plaintiffs and Nationwide Class members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT X: Violation of Wisconsin's Deceptive Trade Practices Act**

**(DTPA), Wis. Stat. § 100.18**

*(On behalf of Plaintiffs and the Nationwide Class)*

601. Plaintiffs incorporate by reference paragraphs 1 through 414 as though fully set forth herein.

602. The DTPA prohibits businesses from making any "assertion, representation or statement of fact which is untrue, deceptive or misleading" when the business makes such a statement to the public with the intent to induce a sale.

603. Renaissance made false and misleading statements on which it intended schools and parents to rely, namely, that it complies with COPPA, that it may be used in compliance with FERPA, that schools may consent to its student-data practices in lieu of parents, and that it shares Plaintiffs' and Nationwide Class Members' personal information with third parties only for the purposes of providing educational services. In fact, Renaissance violated COPPA by collecting,

using, and sharing Plaintiffs' and Nationwide Class member's personal information without providing notice to the children's parents and without obtaining parental consent, and Renaissance does not comport with FERPA and causes schools to violate FERPA because Renaissance fails to obtain parental consent before sharing Plaintiffs' and Nationwide Class members' personal information.

604. But for Renaissance's misrepresentations, Renaissance would not have obtained vast troves of student data without parental consent, including Plaintiffs' and Nationwide Class members' personal information.

605. By engaging in the aforementioned practices, Renaissance has violated the DTPA.

606. The foregoing allegations establish liability under the DTPA as Renaissance's false and misleading representations and omissions were made on their public website and were material, and they were likely to and did mislead some members of the public, including Plaintiffs' and Nationwide Class members' school districts, and caused harm to Plaintiffs, Nationwide Class members, and the public interest.

607. The foregoing untrue and misleading representations to the public originated in Wisconsin, where Renaissance is headquartered and where Renaissance caused those representations to be placed onto Renaissance's public website with the intent to induce Plaintiffs' and Nationwide Class members' school districts to purchase products and services from Renaissance and to enter into contracts with Renaissance for those products and services.

608. Renaissance's untrue and misleading representations were made to Plaintiffs and Nationwide Class members and/or their schools, who are members of the public.

609. Plaintiffs' and Nationwide Class members' school districts relied on Renaissance's subject statements and were induced to purchase products and services from and contract with Renaissance because of those statements. Plaintiffs and Nationwide Class members were foreseeable beneficiaries of the contract that

Renaissance induced those school districts to enter based on these untrue and deceptive statements.

610. These untrue and deceptive statements also misled the parents of Plaintiffs and Nationwide Class members, whether directly or indirectly through school personnel.

611. Plaintiffs and Nationwide Class members have suffered injury-in-fact and a pecuniary loss, including the loss of money and/or property as a result of Renaissance's untrue, deceptive, and misleading statements, to wit, the unauthorized disclosure and taking of their personal information which has value as demonstrated by its use and sale by Renaissance. Plaintiffs and Nationwide Class members have suffered harm in the form of diminution of the value of their private and personally identifiable data and content.

612. Renaissance's actions caused damage to and loss of Plaintiffs' and Nationwide Class members' property right to control the dissemination and use of their personal information and communications.

613. Pursuant to Wisc. 110.18(11)(b), Plaintiffs and Nationwide Class members are entitled to recover their pecuniary loss, including the value of the data that Renaissance collected, used, disclosed, and monetized without consent, as well as reasonable attorneys' fees and costs for prosecuting this action.

## COUNT XI: Unjust Enrichment

### *(On Behalf of Kansas Plaintiffs and the Kansas Subclass)*

614. Plaintiffs incorporate by reference paragraphs 1 through 414 as though fully set forth herein.

615. Kansas Plaintiffs and Kansas Subclass members lack an adequate remedy at law.

616. In addition or as an alternative to legal remedies sought herein, Kansas Plaintiffs and Kansas Subclass members seek equitable relief to the extent that legal remedies are inadequate.

617. Under Kansas law, plaintiffs asserting claims for unjust enrichment must plead that (1) the plaintiffs conferred a benefit on the defendant; (2) the defendant had appreciation or knowledge of the benefit received; and (3) the defendant accepted or retained the benefit under circumstances that make it inequitable for the defendant to retain the benefit without paying for its value.

618. Kansas Plaintiffs and Kansas Subclass members conferred a benefit upon Renaissance, namely, provision of their personal information to Renaissance through their compelled use of Renaissance's Products at school.

619. The personal and private information of Kansas Plaintiffs and Kansas Subclass members conferred upon Renaissance includes, among many other things, the children's demographic information, physical location, academic strengths and weaknesses, comprehension challenges, assessment scores, online links they click, online search terms they use, their internet browsing information, the videos they watch, and whether they are at risk for social-emotional behavior problems.

620. Personal data is a recognized asset with commercial value in the digital economy, the benefit of which is evidenced by Renaissance's extensive use and sharing of the student data for its own commercial purposes, including developing, improving, and marketing its Products, and in its extensive sharing of the student data with undisclosed third-party advertising and identity-resolution companies.

621. Renaissance appreciated the fact that it obtained this benefit from Kansas Plaintiffs and Kansas Subclass members, namely, it understands that student data is the raw material that fuels its business, without which Renaissance would have no product and no business.

622. Renaissance's appreciation of the benefit of Plaintiffs' personal information is evidenced by its admissions that it uses the data for its own commercial purposes, including developing, improving, and marketing its Products, and by forensic analysis revealing that Renaissance shares the data with undisclosed third-party advertising and identity-resolution companies that engage in targeted advertising.

623.   If Kansas Plaintiffs and Kansas Subclass members' personal information had no value to Renaissance, Renaissance would have no reason to use the data in these ways. Renaissance violated COPPA by collecting, using, and sharing Plaintiffs' and Nationwide Class member's personal information without providing notice to the children's parents and without obtaining parental consent. Renaissance's use of student data does not comport with FERPA and causes schools to violate FERPA because Renaissance fails to obtain parental consent before sharing Plaintiffs' and Nationwide Class members' personal information. FERPA demonstrates that students have an expectation of privacy in their education records. The taking and using of their records in violation of FERPA violates that expectation of privacy, is highly offensive, and renders the taking and using of the records unjust.

624.   Renaissance thus obtained the benefit of Kansas Plaintiffs and Kansas Subclass members' valuable data (1) in violation of COPPA and without regard to FERPA, (2) in further violation of COPPA by failing to disclose all the third parties with which it shares the data; and (3) in violation of its own policies stating that it does not share any student data unless necessary for educational services while also sharing the data with intentionally undisclosed advertising companies with no legitimate interest in the data other than their own commercial benefit.

625.   All of these violations constitute wrongful acts through which Renaissance took, used, and shared Kansas Plaintiffs and Kansas Subclass members' personal information for its own benefit and the benefit of third parties.

626.   Given Renaissance's wrongful acts in taking, using, and sharing Kansas Plaintiffs and Kansas Subclass members' personal information for its own benefit, it would be inequitable for Renaissance to retain that benefit without payment to Kansas Plaintiffs and Kansas Subclass members of the value that benefit has conferred to Renaissance.

627.   More specifically, Renaissance acquired and compromised troves of personal information that rightfully belong to Kansas Plaintiffs and Kansas Subclass members without effective consent through intentionally deceptive

practices conducted in connection with students' compulsory use of Renaissance's Products.

628.   Renaissance obtained access to this information only by marketing and selling its Products for use by children in the compulsory environment of K-12 education.

629.   Renaissance has built, developed, improved, marketed, and delivered an ever-growing suite of products using the personal information of Kansas Plaintiffs and Kansas Subclass members. It has further derived profits and other tangible and intangible benefits from its improper collection, use, and disclosure of Kansas Plaintiffs and Kansas Subclass members' data.

630.   But for collecting children's personal information without effective consent, Renaissance could not have grown its business, acquired numerous other tangible and intangible assets, developed other applications, and received millions of dollars in investment capital to exceed a billion-dollar valuation.

631.   Renaissance has also benefited from sharing children's personal information with numerous undisclosed advertising companies who provide data analytics and marketing services to Renaissance in return for the information.

632.   Renaissance has also directly and substantially profited from its use, storage, aggregation, disclosure, and sale of Kansas Plaintiffs and Kansas Subclass members' data. Indeed, Kansas Plaintiffs and Kansas Subclass members' data powers Renaissance's ever-growing ecosystem of products and services. Without Kansas Plaintiffs and Kansas Subclass members' personal information unlawfully taken by Renaissance, Renaissance would cease to operate in its current form.

633.   In exchange for these benefits to Renaissance, Kansas Plaintiffs and Kansas Subclass members received nothing but educational services to which they were already legally entitled and required to receive.

634.   To benefit its bottom line, Renaissance deprived Kansas Plaintiffs and Kansas Subclass members of their property, security, privacy, and autonomy.

635. Renaissance harmed Kansas Plaintiffs and Kansas Subclass members by, among other harms, subjecting them to commercial manipulation and continuous surveillance; invading their privacy; denying their due process rights by subjecting them to opaque, unreviewable data practices; forcing them to choose between their right to an education and other fundamental rights; and failing to compensate them for their property and labor.

636. Kansas Plaintiffs and Kansas Subclass members did not consent to Renaissance's taking of their personal information and using it for Renaissance's or other third parties' commercial gain.

637. There is no justification for Renaissance's enrichment. It would be inequitable, unconscionable, and unjust for Renaissance to be permitted to retain these benefits when they were procured because of and by means of Renaissance's wrongful conduct and at the expense of children's property and wellbeing.

638. Kansas Plaintiffs and Kansas Subclass members seek an order compelling Renaissance to disgorge the profits and other benefits it has unjustly obtained.

639. Kansas Plaintiffs and Kansas Subclass members may not have an adequate remedy at law against Renaissance, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

### COUNT XII: Invasion of Privacy—Intrusion Upon Seclusion
#### (On behalf of Kansas Plaintiffs and the Kansas Subclass)

640. Plaintiffs incorporate by reference paragraphs 1 through 414 as though fully set forth herein.

641. Under Kansas law, plaintiffs asserting claims for intrusion upon seclusion must plead (1) the defendant intentionally interfered in the solitude or seclusion of the plaintiffs' physical being or pried into their private affairs or concerns; and (2) a reasonable person would be highly offended by the intrusion.

642. Renaissance intentionally pried into Kansas Plaintiffs and Kansas Subclass members' private affairs and concerns by systematically and pervasively accessing, downloading, collecting, transferring, selling, storing and using Kansas Plaintiffs

SECOND AMENDED CLASS ACTION COMPLAINT          113          Case No. 8:25-cv-01379

and Kansas Subclass members' personal and private information, including, among many other things, demographic information, physical location, academic strengths and weaknesses, comprehension challenges, assessment scores, online links they click, online search terms they use, their internet browsing information, the videos they watch, and whether they are at risk for social-emotional behavior problems.

643. Renaissance's accessing, downloading, collecting, transferring, selling, storing and using Kansas Plaintiffs and Kansas Subclass members' personal and private information was done without authorization because Renaissance did not first obtain parental consent as required by COPPA. Renaissance violated COPPA by collecting, using, and sharing Kansas Plaintiffs' and Kansas Subclass member's personal information without providing notice to the children's parents and without obtaining parental consent. Renaissance's use of student data does not comport with FERPA and causes schools to violate FERPA because Renaissance fails to obtain parental consent before sharing Kansas Plaintiffs' and Kansas Subclass members' personal information. FERPA demonstrates that students have an expectation of privacy in their education records, and Renaissance's taking and using those records in violation of FERPA renders the taking and use highly offensive to a reasonable person.

644. A reasonable person would be highly offended to know that a private business gains access to and collects the personal and private information of young children without authorization while the children are engaged in required educational activities and then uses and shares the information for commercial purposes, all while disregarding the legal requirement that it obtain prior parental consent.

645. Kansas Plaintiffs and Kansas Subclass members maintained a reasonable expectation of privacy in their personal information absent consent to tracking and collection practices. Kansas Plaintiffs and Kansas Subclass members never consented—and in the case of Renaissance school-licensed products, never even had the opportunity to consent—to Renaissance's data practices. The

reasonableness of this expectation of privacy is reflected in longstanding custom and practice; security measures intended to prevent unauthorized access to personal information, especially concerning young children; state, federal, and international laws protecting a right to financial privacy; and the privacy policies and other assurances of protection by applications that use Renaissance discussed herein, among other indicia.

646.   Kansas Plaintiffs and Kansas Subclass members could not reasonably expect that, by simply participating in their education and completing required school activities, Renaissance would collect, store, manipulate, and monetize such voluminous and far-reaching categories of personal information; prevent Kansas Plaintiffs and Kansas Subclass members from reviewing, correcting, or controlling that information; and use that information in ways that were harmful to Kansas Plaintiffs and Kansas Subclass members.

647.   Individuals also maintain a reasonable expectation of privacy when they are using products in a compulsory environment such as public schools. Renaissance's collection of Kansas Plaintiffs and Kansas Subclass members' information while logged into Renaissance Products was unreasonable.       FERPA       also demonstrates that students have a reasonable expectation of privacy in their education records.

648.   Renaissance's collection and use of children's personal information without the knowledge or consent of those children or their parents is highly offensive to an ordinary reasonable person.

649.  Renaissance's intrusions upon Kansas Plaintiffs and Kansas Subclass members' private affairs and concerns are highly offensive to an ordinary reasonable person, especially considering (a) the highly sensitive and personal nature of Kansas Plaintiffs and Kansas Subclass members' personal information and data; (b) the extensive scope of data obtained by Renaissance, including years of historical data; (c) Renaissance's intent to profit from Kansas Plaintiffs and Kansas Subclass members' data by selling it outright (e.g., back to schools, its

"customers," and myriad other third parties) and using it to develop and market its products and services; (d) Renaissance's intentional concealment of advertising and identity-resolution companies with which it share the data; (e) Renaissance's use of subterfuge to intrude into Kansas Plaintiffs and Kansas Subclass members' electronic devices for the purpose of collecting their data; (f) the surreptitious and unseen nature of Renaissance's data collection with respect to consumers, and (g) Renaissance's failure to obtain valid consent in violation of COPPA and with no regard to FERPA.

650.   Renaissance's conduct would be highly offensive to a reasonable person, particularly given that Renaissance designs products to be used by children, including young children. The manner of the invasion—collection through students' use of education tools in a compulsory setting—is also highly offensive.

651.   Renaissance's invasions of privacy caused Kansas Plaintiffs and Kansas Subclass members the following damages:

    a.   Nominal damages;

    b.   The diminution in value of Kansas Plaintiffs and Kansas Subclass members' private information;

    c.   The loss of privacy due to Renaissance rendering no longer private the confidential and personal information that Kansas Plaintiffs and Kansas Subclass members intended to remain private; and

    d.   The fair value of Kansas Plaintiffs and Kansas Subclass members' personal information and data. Renaissance took something of value from Kansas Plaintiffs and Kansas Subclass members —their personal information and data—and derived benefits therefrom without Kansas Plaintiffs and Kansas Subclass members' knowledge or consent and without Renaissance sharing the fair benefit of such value with them.

652.   Renaissance invaded Kansas Plaintiffs and Kansas Subclass members' privacy with oppression, fraud, or malice.

653.   As a result of Renaissance's invasions of privacy, Kansas Plaintiffs and Kansas Subclass members seek actual damages, compensatory damages,

restitution, disgorgement, general damages, nominal damages, unjust enrichment, punitive damages, and any other relief the Court deems just.

### COUNT XIII: Invasion of Privacy—Public Disclosure of Private Facts

*(On behalf of Kansas Plaintiffs and the Kansas Subclass)*

654.   Plaintiffs incorporate by reference paragraphs 1 through 414 as though fully set forth herein.

655.   Under Kansas law, plaintiffs asserting claims for public disclosure of private facts must plead (1) the defendant gave unreasonable publicity to the plaintiffs' private life; (2) the facts disclosed are private facts; and (3) the private matter made public is one that would be highly offensive to a reasonable person.

656.   Renaissance intentionally disclosed private facts about Kansas Plaintiffs and Kansas Subclass members through its systematic and pervasive collection, accessing, downloading, transferring, selling, storing and use of Kansas Plaintiffs and Kansas Subclass members' personal information. Renaissance disclosed private facts to companies it discloses on its website, as identified in paragraph 238, as well as to other companies it fails to disclose, as identified in paragraphs 99-112, 120, 123-127, 135, 148-151, 163, 170-176, 179-181, 185-190, 207-210. The third-party companies include numerous global companies with commercial interests in using and further sharing the data, and advertising and identity-resolution companies that use the data to build profiles of each student for the purpose of targeted advertising.

657.   Renaissance failed to provide notice of how the third-party recipients use the student data and what the recipients' disclosure practices are with respect to the information, in violation of COPPA. Indeed, Renaissance explicitly disclaims responsibility for the security or use of Kansas Plaintiffs and Kansas Subclass members' personal information once it discloses the information to third parties.

658.   The private facts at issue are detailed throughout this complaint, including but not limited to the allegations contained in paragraphs 4 (academic progress, abilities and struggles, work ethic, attention span, social-emotional or behavioral

problems, and lunch balance); 19 (contact information, identifying demographic information, assignment submissions, assessment scores, browser and device data, and behavioral data including whether students are at risk for social-emotional behavior problems); 53 (skill and subject mastery, strengths and weaknesses, depth of understanding, comprehension challenges, and social-emotional and behavioral health); 61 (knowledge, understanding and engagement with lesson content, thought processes and learning habits, mastery of a skill, ability to communicate thoughts and think critically, and the likelihood students will pass upcoming assessments); 69 (rankings of their own social and emotional behavior); 70 (whether students are at risk for social or emotional problems, how accurately students perceive themselves, and whether to require students to submit to an emotional regulation program or other intervention); 76 (physical location, browser language, time spent on particular pages, parts of products used, links clicked, search terms, and keywords); 78 (metadata demonstrating behavior and learning habits); 79 (response time, error patterns, gaps in mastery, engagement and focus, work ethic, and test-taking strategies); 81 (in-app assessment performance); 154 (participation in lesson activities, engagement with educational videos, and submission of assignment responses); 158 (which pages visited and for how long, and number of sessions and engagement time); 159 (specific videos the student watches and for how long, specific content and lessons the student interacts with and for how long); 161 (detailed lesson metadata); 163 (personally identifiable information identifying students as individuals who requested or obtained specific instructional video materials); 177 (media consumption across multiple devices); 198 (pages visited and for how long, number of sessions and engagement time); 205 (activity across websites); 208 ("exact behavior" of website visitors); 265 (whole child data); and 351 (the equivalent of credit reports on children).

659.   A reasonable person of ordinary sensibilities would be highly offended to know that schoolchildren's personal data is being shared with third parties given that (1) Renaissance makes several violations of federal law in obtaining and using

schoolchildren's personal information, including failing to obtain parental consent and concealing its true data practices; (2) the information is highly sensitive and personal; and (3) Renaissance intentionally makes the information public to more than 20 companies, many of which are advertising companies with global reach, and several of which Renaissance intentionally conceals.

660. Renaissance violated COPPA by collecting, using, and sharing Kansas Plaintiffs and Kansas Subclass member's personal information without providing notice to the children's parents and without obtaining parental consent.

661. Renaissance's use of student data does not comport with FERPA and causes schools to violate FERPA because Renaissance fails to obtain parental consent before sharing Kansas Plaintiffs and Kansas Subclass members' personal information.

662. FERPA demonstrates that students have an expectation of privacy in their education records, and Renaissance's taking and using those records in violation of FERPA renders the taking and use highly offensive to a reasonable person.

663. There is no legitimate public interest in millions of schoolchildren's personal, sensitive, and private data related to their identifying information, online activities, academic assessments, and social-emotional or behavioral health, among many other things, and Renaissance knew that or acted unreasonably or recklessly as to whether there was a legitimate public interest.

664. Kansas Plaintiffs and Kansas Subclass members maintained a reasonable expectation of privacy interest in their personal information absent consent to tracking and collection practices. Kansas Plaintiffs and Kansas Subclass members never consented—and in the case of Renaissance school-licensed products, never even had the opportunity to consent—to Renaissance's data practices. The reasonableness of this expectation of privacy is reflected in longstanding custom and practice; security measures intended to prevent unauthorized access to personal information, especially concerning young children; state, federal, and international laws protecting a right to financial privacy; and the privacy policies and other

assurances of protection by applications that use Renaissance discussed herein, among other indicia.

665.   Kansas Plaintiffs and Kansas Subclass members could not reasonably expect that, by simply participating in their education and completing required activities, Renaissance would collect, store, manipulate, and monetize such voluminous and far-reaching categories of personal information; prevent Kansas Plaintiffs and Kansas Subclass members from reviewing, correcting, or controlling that information; and use that information in ways that were harmful to Kansas Plaintiffs and Kansas Subclass members.

666.   Individuals also maintain a reasonable expectation of privacy when they are using products in a compulsory environment such as public schools. Renaissance's collection of Kansas Plaintiffs and Kansas Subclass members' information while logged into Renaissance Products was unreasonable. FERPA also demonstrates that students have an expectation of privacy in their education records.

667.   Renaissance's disclosure of children's private facts without the knowledge or consent of those children or their parents is highly offensive to a reasonable person of ordinary sensibilities, especially considering (a) the highly sensitive and personal nature of Kansas Plaintiffs and Kansas Subclass members' personal information and data; (b) the extensive scope of data obtained by Renaissance, including years of historical data; (c) Renaissance's intent to profit from Kansas Plaintiffs and Kansas Subclass members' private information by selling it outright to third parties and using it to develop and market its products and services; (d) Renaissance's use of subterfuge to intrude into Kansas Plaintiffs and Kansas Subclass members' electronic devices for the purpose of collecting their private facts; (e) the surreptitious and unseen nature of Renaissance's data collection with respect to children, and (f) Renaissance's failure to obtain valid consent from parents in violation of COPPA and without regard to FERPA.

668.   Renaissance's conduct would be highly offensive to a reasonable person of ordinary sensibilities, particularly given that Renaissance designs products to be

used by children, including young children. The manner of collection of the private facts through students' use of education tools in a compulsory setting is also highly offensive.

669.  Renaissance's invasions of privacy caused Kansas Plaintiffs and Kansas Subclass members the following damages:

    a.  Nominal damages;

    b.  The diminution in value of Kansas Plaintiffs and Kansas Subclass members' private information;

    c.  The loss of privacy due to Renaissance disclosing the confidential and personal information that Kansas Plaintiffs and Kansas Subclass members intended to remain private; and

    d.  The fair value of Kansas Plaintiffs and Kansas Subclass members' personal information and data. Renaissance took something of value from Kansas Plaintiffs and Kansas Subclass members —their personal information and data—and derived benefits therefrom without Kansas Plaintiffs and Kansas Subclass members' knowledge or consent and without Renaissance sharing the fair benefit of such value with them.

670.  Renaissance invaded Kansas Plaintiffs and Kansas Subclass members' privacy with oppression, fraud, or malice.

671.  As a result of Renaissance's invasions of privacy, Kansas Plaintiffs and Kansas Subclass members seek actual damages, compensatory damages, restitution, disgorgement, general damages, nominal damages, unjust enrichment, punitive damages, and any other relief the Court deems just.

**COUNT XIV: Violation of the Video Privacy Protection Act,**

**18 U.S.C. § 2710**

***(On behalf of Plaintiffs and the Nationwide Class)***

672.  Plaintiffs and Nationwide Class members incorporate by reference paragraphs 1 through 414 as though fully set forth herein.

673.  The Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710, prohibits a "video tape service provider" from knowingly disclosing personally identifiable information concerning any consumer of such provider.

674.   Renaissance is a "video tape service provider" within the meaning of 18 U.S.C. § 2710(a)(4) because it is engaged in the business of delivering audio-visual materials, including instructional videos, through its Products, including but not limited to its Nearpod educational platform.

675.   Nearpod provides instructional videos as part of classroom lessons and assignments. Teachers incorporate videos into Nearpod lessons, and students access and view those videos through the Nearpod platform during classroom sessions and assignments.

676.   Plaintiffs and members of the Nationwide Class are "consumers" within the meaning of 18 U.S.C. § 2710(a)(1) because they requested and obtained audio-visual materials from Renaissance through their use of Renaissance's Products, including the Nearpod platform.

677.   When students interact with the Nearpod platform, including when they play instructional videos within lessons, Nearpod generates telemetry events reflecting those interactions.

678.   These events include events labeled "Interactive Video Play," which correspond to a student playing an instructional video within a Nearpod lesson.

679.   Through the tracking technologies embedded within the Nearpod platform, these video interaction events are transmitted to third parties, including Mixpanel, Inc.

680.   The event transmissions sent to Mixpanel are associated with a persistent identifier known as a "Distinct ID," which Renaissance's integration associates with identifying student information including the student's first and last name and other profile attributes.

681.   As a result, Mixpanel receives records identifying individual students together with information revealing those students' viewing of instructional videos through the Nearpod platform.

682. These disclosures therefore reveal personally identifiable information identifying Plaintiffs and Nationwide Class members as individuals who requested or obtained specific video materials through the Nearpod platform.

683. Renaissance knowingly disclosed this information to Mixpanel through tracking technologies embedded in the Nearpod platform.

684. Plaintiffs and members of the Nationwide Class did not provide informed, written consent authorizing Renaissance to disclose their video-viewing information and personally identifiable information to Mixpanel.

685. Renaissance's disclosures were not otherwise authorized under any exception to the VPPA.

686. By knowingly disclosing personally identifiable information identifying Plaintiffs and Nationwide Class members as individuals who requested or obtained video materials through the Nearpod platform, Renaissance violated 18 U.S.C. § 2710(b).

687. As a result of Renaissance's violations of the VPPA, Plaintiffs and the Nationwide Class are entitled to relief under 18 U.S.C. § 2710(c), including: statutory damages of $2,500 per violation; punitive damages; reasonable attorneys' fees and litigation costs; and such other relief as the Court deems appropriate.

## VIII. RELIEF REQUESTED

Wherefore, Plaintiffs respectfully request the Court enter judgment in their favor and against Renaissance as follows:

    a.    An award of damages, including actual, compensatory, general, special, incidental, consequential, and punitive damages, in an amount to be determined at trial;

    b.    Injunctive, declaratory, and other equitable relief as appropriate;

    c.    Pre- and post-judgment interest to the extent provided by law;

    d.    Attorneys' fees to the extent provided by law;

    e.    Costs to the extent provided by law; and

    f.    Such other relief the Court deems just and proper.

## IX.  JURY TRIAL DEMAND

Plaintiffs demand a jury trial for all claims so triable.

Dated: March 17, 2026

Respectfully submitted,

By:  */s/ Andrew R. Tate*
Andrew R. Tate*
PEIFFER WOLF CARR
KANE CONWAY & WISE LLP
235 Peachtree St. NE, Suite 400
Atlanta, GA 30303
(314) 669-3600
atate@peifferwolf.com

Melisa A. Rosadini-Knott
(California Bar No. 316369)
PEIFFER WOLF CARR
KANE CONWAY & WISE LLP
3435 Wilshire Blvd., Ste. 1400
Los Angeles, CA 90010-1923
(323) 982-4109
mrosadini@peifferwolf.com

Julie U. Liddell*
EDTECH LAW CENTER PLLC
P.O. Box 300488
Austin, Texas 78705
(737) 351-5855
julie.liddell@edtech.law

Karen Dahlberg O'Connell*
ALMEIDA LAW GROUP LLC
157 Columbus Ave, 4th Floor
New York NY 10023
(347) 395-5666
karen@almeidalawgroup.com

Lori G. Feldman*
HECHT PARTNERS LLP
125 Park Avenue, 25th Floor
New York, NY 10017

SECOND AMENDED CLASS ACTION COMPLAINT        124        Case No. 8:25-cv-01379

Main Phone: (212) 851-6821
LFeldman@hechtpartners.com
e-servicecapg@hechtpartners.com

\* *pro hac vice* granted

Counsel for Plaintiffs and the Proposed Class