UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

JS-6

**CIVIL MINUTES – GENERAL**

Case No. 8:25-cv-01379-FWS-JDE Date: September 11, 2026
Title: Nicole Reisberg *et al.* v. Renaissance Learning, Inc.

Present: **HONORABLE FRED W. SLAUGHTER, UNITED STATES DISTRICT JUDGE**

| | |
|---|---|
| Rolls Royce Paschal | N/A |
| Deputy Clerk | Court Reporter |

| | |
|---|---|
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**PROCEEDINGS: (IN CHAMBERS) ORDER GRANTING DEFENDANT'S MOTION TO DISMISS [63]**

Plaintiffs Minor Child 1 and Minor Child 2, by and through their legal guardian Nicole Reisberg, and Minor Child 3 and Minor Child 4, by and through their legal guardian Amy Warren, bring this putative class action against Defendant Renaissance Learning Inc. ("Renaissance") related to Renaissance's collection of student information on Renaissance's software platforms used in schools and subsequent disclosure of that information to Renaissance's business partners. (*See generally* Dkt. 60 (Second Amended Complaint, "SAC").) The court previously granted Renaissance's Motion to Dismiss Plaintiffs' First Amended Complaint. (Dkt. 59 ("Prior Order").) Now before the court is Renaissance's Motion to Dismiss Plaintiffs' Second Amended Complaint. (Dkt. 63 ("Motion" or "Mot.").) Plaintiffs oppose the Motion. (Dkt. 65 ("Opp.").) Renaissance filed a reply in support of the Motion. (Dkt. 66 ("Reply").) The court held a hearing on the Motion on August 27, 2026. (Dkt. 69.) Based on the record, as applied to the relevant law, the Motion is **GRANTED**.

## I. Background

Plaintiffs' 129-page SAC alleges facts including the following. Renaissance "makes digital products that students in kindergarten through twelfth grade ('K–12') use for school" that "Plaintiffs were required to use . . . at school." (SAC ¶¶ 3, 21; *see id.* ¶¶ 26-27, 29-30, 40, 50, 55-56, 62-63, 65-66, 71-72.) "The Renaissance products that are the subject of this Complaint are Nearpod, an interactive instructional platform; FastBridge, an assessment tool for monitoring and screening student progress; Renaissance DnA (formerly Illuminate), a student-

assessment and data-analytics platform; and SAEBRS, a screening tool used to purportedly identify students who may be at risk for social-emotional or behavioral problems (collectively, 'Renaissance's Products' or 'Products')." (*Id.* ¶ 5.) "Through these Products, Renaissance creates and extracts personal information from Plaintiffs and other K–12 students," which it uses "for other commercial purposes, including developing, marketing, and delivering its Products," including "artificial intelligence technologies," and "allows numerous third parties, including advertising and identity-resolution companies, to access the information it extracts from K–12 students for the commercial benefit of Renaissance and that of the third parties." (*Id.* ¶¶ 6-8, 266, 551.) "Renaissance also purports to reserve an unlimited license to use student data, which includes Plaintiffs' personal information, for its own benefit without compensation to students." (*Id.* ¶ 267.)

"Renaissance has failed and continues to fail to obtain effective consent for its sweeping collection and use of student data, including Plaintiffs' personal information," and "any purported consent obtained by Renaissance is ineffective because (1) Renaissance fails to provide sufficient information to support informed consent; (2) student use of Renaissance's Products is not voluntary; and (3) such consent is not obtained from a person with authority to provide consent to Renaissance's collection and use of student information." (*Id.* ¶¶ 272-73.) "Through this lawsuit, Plaintiffs," who allege they "are among the millions of school children" from "thousands" of school districts "whose sensitive information was unlawfully taken, used, and disclosed by Renaissance," "seek to hold Renaissance accountable for its surreptitious and unlawful data practices, obtain redress for the millions of school children whose personal information has been unfairly exploited, and restore to students and parents their basic right to be free from unwanted intrusion into their lives and from the wrongful use and disclosure of their private information for the commercial benefit of Renaissance and other private companies." (*Id.* ¶¶ 19, 22, 45.)

The information Plaintiffs argue Renaissance unlawfully obtains includes automatically-collected metadata such as:

1. **Plaintiffs' usage information, including but not limited to:**
    i. how often a student accesses certain features;
    ii. all of the areas within Renaissance's Products that the student visits;

iii. the time of day the student used the Product; and
iv. other (unspecified) information.

2. **Plaintiffs' device information, including but not limited to:**
    i. IP addresses and other unique device identifiers for any device used to access the Products;
    ii. The student's physical location;
    iii. The date and time of a student's visit;
    iv. The student's browser language;
    v. Referring and exit pages of URLs;
    vi. The amount of time a student spends on particular pages;
    vii. Which parts of the products the student uses;
    viii. Which links the student clicks;
    ix. The student's search terms;
    x. Traffic and related statistics;
    xi. Keywords;
    xii. Other (unspecified) general browsing information; and
    xiii. Other (unspecified) general usage information.
3. **Information collected about Plaintiffs via cookies and other tracking technologies.**

(*Id.* ¶ 76.) "This data reveals intimate details about the process that students use to arrive at their responses, and includes information such as response time, error patterns, gaps in mastery, engagement and focus, work ethic, and test-taking strategies." (*Id.* ¶ 79.)

"In addition to metadata, Renaissance also states that certain information is 'required' to be generated and collected in order for students to access its Products, which includes:"

4. **Required data generated and collected by Renaissance through Renaissance DnA, including:**
    i. Student's first and/or last name;
    ii. Student identifiers – local (school district) ID number;
    iii. Student's date of birth;
    iv. Student's gender;

v. Student school enrollment;
vi. Student grade level;
vii. Teacher names;
viii. IP address of users, use of cookies, "etc.";
ix. "Other application technology metadata"; and
x. Metadata on user interaction with application;

5. **Required data generated and collected by Renaissance through FastBridge, including:**
   i. Student app username;
   ii. Student identifier – student app passwords;
   iii. Student identifier – first and/or last name;
   iv. Student school enrollment;
   v. Student grade level;
   vi. Student in-app assessment performance;
   vii. Student's IP address, use of cookies, "etc.";
   viii. "Other application technology metadata"; and
   ix. Metadata on user interaction with application;
6. **Required data generated and collected by Renaissance through Nearpod.**
   i. Student's IP address, use of cookies, "etc.";
   ii. Student's teachers' names; and
   iii. Student's teachers' emails.

(*Id.* ¶ 81 (footnotes omitted).) "While much of this data is sensitive and private as individual data elements, Renaissance also aggregates the data to create highly detailed profiles of students that Renaissance maintains and monetizes in a variety of ways." (*Id.* ¶ 83.)

"In addition to generating and collecting vast troves of student data, including private information regarding Plaintiffs, Renaissance uses and shares that information for a host of commercial purposes." (*Id.* ¶ 97.) More specifically, "Renaissance embedded a network of advertising, analytics, and identity-resolution tracking technologies into its educational platforms," which "operate together to capture detailed information about how students interact with Renaissance's Products and to transmit that information to third-party data-analytics and

advertising systems in real time," including "Google, Mixpanel, Microsoft, Xandr, Comscore, Taboola, and Leadfeeder." (*Id.* ¶¶ 99, 101-02.)

Renaissance "also shares K-12 student data it collects through its Products with numerous third parties for commercial purposes," including "service providers," "sub-processors," or "vendors," including "Amazon Web Services for hosting, engineering, and product support and development; Microsoft Azure for hosting; Hexacta for engineering support; Pendio.io for product analytics and in-product notification; Snowflake for cloud data platform; Datadog for engineering support; Fivetran for engineering support; EPAM Systems for engineering support and product development; BristleCone for software development; R Systems for product development; Cardinal Integrated Technologies for product development; Google Cloud Platform for identity and access management (for DnA); Cloudflare for DNS, CDN, and application security (for Nearpod); Providigi for engineering support (for Nearpod); Mandrill for transactional and triggered emails (for Nearpod); and Chameleon Intelligent Tech for in-app communication (for Nearpod)." (*Id.* at 44 (heading), ¶¶ 231, 238.)

Renaissance's practices cause harm to students, including "by invading their privacy," "compromising the security of their personal information," "affecting their access to information, opportunities, and other basic rights through algorithmic profiling," "prevent[ing] the development of a legitimate market for student data," "obtaining their personal information by wrongful means and then sharing and profiting from it," and "forcing them to choose between their right to an education and other fundamental rights." (*Id.* ¶¶ 332-89 (headings).)

Based on these and other allegations, Plaintiffs assert claims for (1) violation of the federal Wiretap Act, (2) invasion of privacy under the California Constitution, (3) invasion of privacy—intrusion upon seclusion under California law, (4) invasion of privacy—public disclosure of private facts under California law, (5) invasion of privacy—public disclosure of private facts under Wisconsin law, (6) unjust enrichment under Wisconsin law, (7) violation of the Wisconsin Electronic Surveillance Control Law ("WESCL"), (8) unjust enrichment under Kansas Law, (9) invasion of privacy—intrusion upon seclusion under Kansas law, and (10) invasion of privacy—public disclosure of private facts under Kansas law. (*Id.* ¶¶ 415-671.)

## II. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) permits a defendant to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). To withstand a motion to dismiss brought under Rule 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). While "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," a plaintiff must provide "more than labels and conclusions" and "a formulaic recitation of the elements of a cause of action" such that the factual allegations "raise a right to relief above the speculative level." *Id.* at 555 (citations and internal quotation marks omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (reiterating that "recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice"). "A Rule 12(b)(6) dismissal 'can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'" *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)).

"Establishing the plausibility of a complaint's allegations is a two-step process that is 'context-specific' and 'requires the reviewing court to draw on its judicial experience and common sense.'" *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 995-96 (9th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 679). "First, to be entitled to the presumption of truth, allegations in a complaint . . . must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Id.* at 996 (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)). "Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Id.* (quoting *Starr*, 652 F.3d at 1216); *see also Iqbal*, 556 U.S. at 681.

Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). On one hand, "[g]enerally, when a plaintiff alleges facts consistent with both the plaintiff's and the defendant's explanation, and both explanations are plausible, the plaintiff survives a motion to dismiss under Rule 12(b)(6)." *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 47 (9th Cir. 2022) (citing *Starr*, 652 F.3d at 1216). But, on the other, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Eclectic Props. E.*, 751 F.3d at 996 (quoting *Iqbal*, 556 at U.S. 678). Ultimately, a claim is facially plausible where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 at 556); *accord Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012).

## III. Discussion

The court addresses Plaintiffs' claims for (A) invasion of privacy, (B) violation of federal and state wiretapping statutes, (C) unjust enrichment, and then turns to (D) the remaining claims and (E) leave to amend.

### A. Invasion of Privacy

Plaintiffs bring invasion of privacy claims under theories of (1) intrusion upon seclusion, and (2) public disclosure of private facts.

#### 1. Intrusion Upon Seclusion (Claims 4 and 12) and Parallel California Constitution Claim (Claim 3)

Plaintiffs assert two claims for "invasion of privacy—intrusion upon seclusion": claim 4 under California law, and claim 12 under Kansas law.[1] (SAC ¶¶ 473-88, 640-653.) "To state a

[1] The court previously dismissed Plaintiffs' similar claim under Wisconsin law, and Plaintiffs did not replead it.

claim for intrusion upon seclusion under California common law, a plaintiff must plead that (1) a defendant intentionally intruded into a place, conversation, or matter as to which the plaintiff has a reasonable expectation of privacy, and (2) the intrusion occurred in a manner highly offensive to a reasonable person." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020) (cleaned up).

Plaintiffs also assert a claim for invasion of privacy under the California Constitution. (SAC ¶¶ 456-472.) "A claim for invasion of privacy under the California Constitution involves similar elements [as an intrusion upon seclusion claim]. Plaintiffs must show that (1) they possess a legally protected privacy interest, (2) they maintain a reasonable expectation of privacy, and (3) the intrusion is so serious as to constitute an egregious breach of the social norms such that the breach is highly offensive." *In re Facebook*, 956 F.3d at 601. "Given the similarity of the two tests, courts consider them together and ask (1) whether there is a reasonable expectation of privacy, and (2) whether the intrusion was highly offensive." *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1088 (N.D. Cal. 2022). Kansas law appears to be similar, and the parties have pointed the court to no differences. (*See* Mot. at 14 n.10; Opp. at 18-27.)

"Generally, the tort of intrusion upon seclusion is based upon the manner in which an individual obtains information. Several cases are illustrative: installation of an electronic listening device in a tenant's bedroom; taking pictures and peeking through windows with binoculars; unauthorized prying into the plaintiff's bank account. In addition, the intrusion must be highly offensive to a reasonable person." *Werner v. Kliewer*, 238 Kan. 289, 294-95 (1985). "While liability for the intrusion does not require publication of a plaintiff's private affairs, it does require that the defendant place himself physically, or by means of his senses, within plaintiff's zone of privacy." *Smith-Utter v. Kroger Co.*, 2009 WL 790183, at *5 (D. Kan. Mar. 24, 2009). Stated slightly differently, a claim for intrusion upon seclusion redresses situations in which "a defendant intentionally intrude[s] into a place, conversation, or matter as to which the plaintiff has a reasonable expectation of privacy." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 601 (cleaned up). Other factors relevant to whether there was an intrusion upon seclusion include "the amount and sensitivity of the data, and the defendant's representations to users," *D'Angelo v. FCA US, LLC*, 726 F. Supp. 3d 1179, 1205 (S.D. Cal. 2024), as well as "the degree and setting of the intrusion" and "the intruder's motives

and objectives," *Riganian v. LiveRamp Holdings, Inc.*, 791 F. Supp. 3d 1075, 1088 (N.D. Cal. 2025).

For example, in *In re Facebook, Inc. Internet Tracking Litigation*, the Ninth Circuit addressed a situation where Facebook was allegedly gathering user data on non-Facebook websites after the user had logged out of Facebook. 956 F.3d at 596. Simply stated, users alleged Facebook was in a place Facebook was not allowed to be—on websites that were not Facebook. (They also alleged Facebook "sold" the collected browsing histories "to advertisers to generate revenue." *Id.*) "In light of the privacy interests and Facebook's allegedly surreptitious and unseen data collection," the Ninth Circuit reasoned that "Plaintiffs have adequately alleged a reasonable expectation of privacy." *Id.*; *see also Cherkin v. PowerSchool Holdings, Inc.*, 2025 WL 844378, at *2 (N.D. Cal. Mar. 17, 2025) (finding reasonable expectation of privacy where, among other allegations, "the complaint also alleges plausibly that, when students access PowerSchool apps and websites on personal devices, PowerSchool harvests user-device information and embeds tracking technologies on the device that allow it to track the student across the internet for purpose of collecting data about them, even after they have navigated away from PowerSchool's application or website") (cleaned up).

In sum, an intrusion upon seclusion claim "has two elements: (1) intrusion into a private place, conversation or matter, (2) in a manner highly offensive to a reasonable person." *Savala v. Freedom Commc'ns, Inc.*, 2006 WL 1738169, at *4 (Cal. Ct. App. June 27, 2006) (unpublished). On the first element, intrusion into a private place, conversation, or matter, the court has already found in this case that Plaintiffs fail to sufficiently allege that Renaissance intruded into a private place, conversation, or matter in order to obtain the relevant data. *See id.*; (Prior Order at 7); *see also In re Facebook*, 956 F.3d at 596. And the court has not received sufficient new information or allegations to disturb that prior finding.

To the extent Plaintiffs argue they adequately allege a cognizable intrusion based on the subsequent *disclosure* of the data, (*see* Opp. at 18-27), against the backdrop just described, the court finds Plaintiffs fail to state a claim for intrusion upon seclusion—a claim that focuses on *how* the data was obtained. *See, e.g.*, *Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1086 (C.D. Cal. 2021) ("The Ninth Circuit recently held that Facebook users had a cognizable privacy interest in browsing data surreptitiously collected by Facebook across the internet after

the user had logged out of his Facebook account. But courts have been less willing to find that users have a cognizable privacy interest in browsing data collected only while users interact with the website of the defendant company.") (citation omitted); (*see also* Opp. at 24 ("Plaintiffs allege that Renaissance's collection and use of their personal information constitutes the intrusion."); Reply at 12 n.7 ("Plaintiffs expressly concede Renaissance's argument that its alleged ***disclosure*** (as opposed to collection) of data to third parties does not constitute a separate 'intrusion' under the law.")).

Plaintiffs also argue that "all of Renaissance's data collection and sharing is conducted without notice to or consent from Plaintiffs' parents," and that Renaissance obtained the "information without consent while Plaintiffs—minor schoolchildren—were engaged in compulsory schoolwork as part of their required education," distinguishing cases where "adult[s] voluntarily cho[se] to use websites." (Opp. at 20; *see also id.* ("The heart of this lawsuit is that Plaintiffs' use of Renaissance's products was involuntary and without their parents' consent.").) It is true that the voluntariness of data disclosure can be a factor in an intrusion upon seclusion claim. *See, e.g.*, *Smith-Utter v. Kroger Co.*, 2009 WL 790183, at *5 (D. Kan. Mar. 24, 2009) ("Here, Plaintiff brought her check into Dillons to be cashed. She voluntarily gave the check and her driver's license to the Dillons' employees. As such, the manner in which Defendant obtained information was not intrusive. Defendant is entitled to summary judgment on Plaintiff's intrusion upon seclusion invasion of privacy claim."). But again, "[w]ith regard to an intrusion upon seclusion claim, the pertinent question is whether the defendant intentionally interfered or placed itself into plaintiff's private affairs." *Id.* "Another way of viewing this is through the lens of objectively reasonable expectation of seclusion: To prove actionable intrusion, the plaintiff must show the defendant penetrated some zone of physical or sensory privacy surrounding, or obtained unwanted access to data about, the plaintiff. The tort is proven only if the plaintiff had an objectively reasonable expectation of seclusion or solitude in the place, conversation or data source." *Savala*, 2006 WL 1738169, at *4. As the court has already held, Plaintiffs have not sufficiently alleged for purposes of an intrusion upon seclusion claim that Renaissance intruded into a private place to obtain the data it obtained. (Prior Order at 7.) Renaissance's alleged lack of parental consent does not persuade the court to alter that conclusion. (*See* Opp. at 20.)

As a separate and alternative basis, the court finds—as it found previously, (Prior Order at 9)—that Plaintiffs fail to adequately allege that Renaissance's practice of collecting data on its own platforms meets the "particularly high" standard of being "highly offensive to a reasonable person" by being "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Rowell v. King*, 2005 WL 2099718, at *2 (D. Kan. Aug. 30, 2005), *aff'd,* 234 F. App'x 821 (10th Cir. 2007) (quoting Restatement (Second) of Torts, § 46 (comment d)); (*see* Reply at 17-18 (collecting cases to this effect)); *see, e.g. Hubbard v. Google LLC*, 2024 WL 3302066, at *8 (N.D. Cal. July 1, 2024) ("Plaintiffs extend this argument with an implicit suggestion that Defendants' collection of children's data necessarily constitutes highly offensive behavior as an alleged violation of the COPPA. The Court does not agree because violations of law do not necessarily represent highly offensive behavior.") (record citation omitted) (collecting cases); *id.* ("Further, routine behavior, including the collection of internet-browsing data and persistent identifiers, does not obtain a more-offensive status merely because the behavior happened to involve a child in a particular instance.") (collecting cases); *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1088 (N.D. Cal. 2022) ("The Court concludes that these two privacy claims fail because, although Plaintiffs have pleaded a reasonable expectation of privacy, they have not pleaded that the intrusion was highly offensive," noting that the Northern "District sets a high bar when assessing the 'highly offensive' requirement."); *see also In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1041 (N.D. Cal. 2014) ("Rather, the case law suggests that in determining whether a plaintiff has satisfied the elements of the claim, a plaintiff's lack of consent does not matter so much as the nature of the information in which he or she alleges a privacy interest. *See, e.g., In re iPhone Application Litig.,* 844 F.Supp.2d at 1063 ('Even assuming this information was transmitted *without Plaintiffs' knowledge and consent,* a fact disputed by Defendants, such disclosure [of information including device identifier number, personal data, and geolocation information] does not constitute an egregious breach of social norms.' (emphasis added))."); (*see* Prior Order at 9 ("Here, the court agrees with Renaissance that Plaintiffs have not alleged in the FAC adequate facts to support the notion that 'the ubiquitous practice of sharing user data with third-party service providers' under the facts of this case 'can be understood to defy "social convention and expectation[]" so as to be "highly offensive to a reasonable person[.]" ' (Reply at 16-17 (quoting *Bogie*, 705 F.3d at 612 (affirming dismissal without leave to amend of invasion of privacy claim for failure to adequately allege 'highly offensive' element))); *cf. Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1089 (N.D. Cal. 2022) ('[T]here is no

reasonable expectation of privacy when the data collection is within users' common-sense expectation.').").

In summary, the court finds that Plaintiffs fail to plausibly allege that Renaissance's collection of their data constituted an intrusion into a private place, conversation or matter in a manner highly offensive to a reasonable person in today's society. *See, e.g.*, *D'Angelo v. FCA US, LLC*, 726 F. Supp. 3d 1179, 1205–06 (S.D. Cal. 2024) ("In the present case, Plaintiffs do not allege that Defendant set out an expectation that it would not collect chat conversations or allow a third party to do so, nor do Plaintiffs allege facts to suggest that Defendant or a third party continued to collect their data after they exited the Website, as was the case in *In re Facebook.* Further, while the Complaint alleges that Defendant collects a 'vast' amount of data from the chat conversations, Plaintiffs fail to plead any facts to suggest that this data was sensitive. The allegations that Defendant allowed a third party to collect, among other things, the user's account name, IP address, geographic location, and site the user previously visited does not give rise to an invasion of privacy.") (cleaned up).

For similar reasons, the court finds Plaintiffs do not sufficiently allege a parallel claim under the California Constitution. *See, e.g.*, *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1063 (N.D. Cal. 2012) ("Here, the information allegedly disclosed to third parties included the unique device identifier number, personal data, and geolocation information from Plaintiffs' iDevices. Even assuming this information was transmitted without Plaintiffs' knowledge and consent, a fact disputed by Defendants, such disclosure does not constitute an egregious breach of social norms. Accordingly, Plaintiffs have failed to establish that Defendants' conduct amounts to a serious invasion of the protected privacy interest.") (internal quotations and citations omitted); *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1025 (N.D. Cal. 2012) ("The information disclosed to third parties by LinkedIn, including a numeric code associated with a user and the URL of the profile page viewed, does not meet the standard set by California courts. Plaintiffs have failed to establish that Defendant's conduct amounts to a serious invasion of the protected privacy interest.") (internal quotations and citations omitted).

The Motion is therefore **GRANTED** on Plaintiffs' intrusion upon seclusion claims and their parallel claim under the California Constitution.

**2. Public Disclosure of Private Facts (Claims 5, 6, 13) and Parallel California Constitution Claim (Claim 3)**

Plaintiffs assert three claims for invasion of privacy on a theory of public disclosure of private facts: claim 5 under California law, claim 6 under Wisconsin law, and claim 13 under Kansas law. (SAC ¶¶ 489-519, 654-71.) Under Wisconsin law, a public disclosure of private facts claim requires adequate allegations supporting the following elements: "(1) a public disclosure of facts regarding the plaintiff; (2) the facts disclosed are private facts; (3) the private matter made public is one which would be highly offensive to a reasonable person of ordinary sensibilities; and (4) the defendant acted either unreasonably or recklessly as to whether there was a legitimate public interest in the matter, or with actual knowledge that none existed." *Pachowitz v. Ledoux*, 265 Wis. 2d 631, 643 (2003). California law has similar elements: "(1) public disclosure, (2) of a private fact, (3) which would be offensive and objectionable to the reasonable person, and (4) which is not of legitimate public concern." *Taus v. Loftus*, 40 Cal. 4th 683, 717 (2007) (internal quotation omitted). Kansas law recognizes a cause of action under Section 652D of the Restatement (Second) of Torts, which states that "One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." *Werner*, 238 Kan. at 295.

Renaissance argues Plaintiffs fail to sufficiently allege (1) public disclosure (2) where the private matter made public is one which would be highly offensive to a reasonable person of ordinary sensibilities (3) which is not of legitimate public concern. (Mot. at 19.)

**a. Public Disclosure**

The level of public disclosure required for an actionable public disclosure of private facts claim "means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Zhu v. St. Francis Health Ctr.*, 150 P.3d 926, at *5 (Kan. Ct. App. 2007) (discussing definition of "publicity," as distinguished from "publication") (quoting *Werner*, 238 Kan. at 296). In this regard, "Comment a. to [Restatement] § 652D distinguishes 'publication'

from 'publicity' and states, ' "publicity" means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.' The comment continues, 'it is not an invasion of the right of privacy to communicate a private fact to a single person or even to a small group of persons.' " *Werner*, 238 Kan. at 296 (cleaned up). California law similarly makes clear that a public disclosure of private facts claim "requires that the actionable disclosure be widely published and not confined to a few persons or limited circumstances." *Hill v. Nat'l Collegiate Athletic Assn.*, 7 Cal. 4th 1, 27, 865 P.2d 633 (1994).

The application of the law to the facts of this case is not simple—it is complicated by factors including evolving technology, evolving corporate power, evolving societal norms, and the fact that the vast majority of the caselaw addresses disclosure of private facts to individuals and not entities. The disclosure in this case falls somewhere between "just a few persons" and "the public at large," and is further complicated by the fact that many of the limited number of recipients of the data are very large and powerful entities. But the court finds that permitting this claim to go forward would redefine a common law public disclosure of private facts claim, opening the doors to a flood of similar claims in this new age of big data, in a way this district court is not comfortable doing.

In this case, "Plaintiffs allege that Renaissance disclosed their data to at least 17 third-party corporate vendors, many of which operate global advertising and marketing platforms along with their other operations, [SAC] ¶¶ 33, 231, 238-51, and at least seven other third-party advertising, marketing, and identity-resolution companies, [SAC] ¶¶ 33, 99-226." (Opp. at 29.) Plaintiffs argue their "extensive allegations of data-sharing with a multitude of third parties, many of which are advertising giants and identity-resolution companies, are more than sufficient to allege the publicity element under Wisconsin, California, and Kansas law." (*Id.* at 28-29.) However, the court does not find that these allegations adequately allege that the disclosures make student data "substantially certain to become one of public knowledge," *Werner*, 238 Kan. at 296; rather, the court finds they are more akin to being "confined to a few persons or limited circumstances." *Hill*, 7 Cal. 4th at 27. Plaintiffs' focus on the size and power of the entities to which Renaissance allegedly disclosed student data—which include Google, Mixpanel, Microsoft Advertising, Xandr, ComScore, Taboola, and Leadfeeder, (Opp. at 28 (collecting SAC references))—does not materially change this analysis, at least under

existing law of which the court is aware. *Cf. Orff v. City of Imperial*, 2017 WL 5569843, at *11 (S.D. Cal. Nov. 17, 2017) ("No matter how malicious the disclosures in this case are alleged to have been, the Court is bound to follow the California Supreme Court's adoption of the Restatement's rule in this area of law. Per the definition adopted by this state's highest court, disclosure limited in scope to two individuals is not 'a communication that reaches, or is sure to reach, the public.' Rather, it is 'confined to a few persons or limited circumstances.' This does not constitute publicity.") (quoting *Hill* and Restatement).

Wisconsin law, as the court addressed in its Prior Order, has the most relaxed view among the relevant jurisdictions of what constitutes sufficient publicity. *See Pachowitz*, 265 Wis. 2d at 645 ("[W]e reject the appellants' assertion that a disclosure of private information to one person can never constitute 'publicity.'"). *Pachowitz* makes clear that what is important is not simply the number of people to which the information was disclosed, but rather "the particular facts of the case together with the nature of the disclosure and the relationships of the individuals involved in assessing whether the publicity element of an invasion of privacy claim was satisfied." *Id.* at 646. For example, "[w]hen a special relationship exists, the public can include one person or small groups such as fellow employees, club members, church members, family or neighbors. An invasion of a plaintiff's right to privacy is important if it exposes private facts to a public whose knowledge of those facts would be embarrassing to the plaintiff." *Id.* at 648 (internal quotation omitted). Here, as explained, Plaintiffs' challenge to Renaissance's disclosure of student data to a limited number of entities for limited purposes is based largely on the power of the entities who received their data and the amount of money to be made off of that data. (*See* Opp. at 28-29.) Again, this argument strikes the court as an expansion of the traditional bounds of a public disclosure of private facts case that the court does not feel comfortable condoning without more direct authority on the issue.

Because the court finds this element of a public disclosure of private facts claim inadequately alleged, dismissal is warranted. Nevertheless, given the complexity of the analysis the court has identified, the court considers the other factors as well.

**b. Highly Offensive**

"California courts have frequently described the scope of the right of action for public disclosure of private facts as protecting against disclosure of 'intimate details of a plaintiff's private life.'" *Reade v. New York Times Co.*, 2022 WL 2396083, at *6 (E.D. Cal. July 1, 2022). "The gravamen of the tort is ordinarily the unwarranted publication by defendant of intimate details of plaintiff's private life." *Coverstone v. Davies*, 38 Cal. 2d 315, 322-23 (1952). "[T]o support a cause of action under the public-disclosure-of-private-facts tort," the challenged disclosure must be "of the kind of sufficiently sensitive or intimate private fact which would be offensive and objectionable to the reasonable person." *Taus v. Loftus*, 40 Cal. 4th 683, 717-18 (2007); *see also Lutfi v. Al Naimi*, 2018 WL 6265082, at *5 (C.D. Cal. Jan. 17, 2018) (explaining that the "highly offensive" inquiry is not whether "the publication of this information was highly offensive," but rather "[t]he proper question is whether there is a disclosure of the kind of sufficiently sensitive or intimate private facts which would be offensive and objectionable to the reasonable person") (internal *Taus* quotation omitted).

The court finds Plaintiffs fail to adequately allege that the student data Renaissance allegedly disclosed to third parties was "of the kind of sufficiently sensitive or intimate private fact which would be offensive and objectionable to the reasonable person." *Taus*, 40 Cal. 4th at 717-18. California cases involving public disclosure of private facts involve, for example, "CHP officers' internet dissemination of photographs of the decapitated corpse of an accident victim (*Catsouras v. Department of California Highway Patrol* (2010) 181 Cal.App.4th 856) and the gratuitous disclosure of a patient's HIV status (*Urbaniak v. Newton* (1991) 226 Cal.App.3d 1128) or the improper use of confidential mental health records (*Susan S. v. Israels* (1997) 55 Cal.App.4th 1290)." *Folgelstrom v. Lamps Plus, Inc.*, 195 Cal. App. 4th 986, 991 (2011), *as modified* (June 7, 2011). As another example, California courts have found "that disclosure of information connecting a person with sexual molestation potentially may offend a reasonable person." *M.G. v. Time Warner, Inc.*, 89 Cal. App. 4th 623, 631 (2001). Another formulation reflecting these examples is that the tort "consists of public disclosure of true, *embarrassing* private facts about the plaintiff." *Urbaniak v. Newton*, 226 Cal. App. 3d 1128, 1137-38 (Ct. App. 1991) (emphasis added).

In this case, although Plaintiffs vigorously argue that the student data reflects the sort of "intimate" details students do not want made public, the court finds the identified data does not rise to the level of "sufficiently sensitive or intimate" such that disclosure "would be offensive and objectionable to a reasonable person," *Taus*, 40 Cal. 4th at 717-18; indeed, the court cannot ignore in assessing the plausibility of this claim the fact that Renaissance obtained that data in the course of Plaintiffs using Renaissance's platforms in school. The vast majority of the allegedly disclosed data reflect "information about how students interact with Renaissance's Products." (SAC ¶ 101; *see id.* ¶ 108 ("When these scripts execute in the browser, they observe and record user actions—such as page visits, content interactions, and video content viewed through the platform—and transmit that information through network requests to external servers operated by the analytics or marketing provider.").) The court recognizes that "[p]rivate is not equivalent to secret," *Moreno v. Hanford Sentinel, Inc.*, 172 Cal. App. 4th 1125, 1130 (2009), *as modified* (Apr. 30, 2009), and that "the claim of a right of privacy is not so much one of total secrecy as it is of the right to *define* one's circle of intimacy—to choose who shall see beneath the quotidian mask." *M.G. v. Time Warner, Inc.*, 89 Cal. App. 4th 623, 632 (2001). The court further recognizes that "[u]nder California law, courts must be reluctant to reach a conclusion at the pleading stage about how offensive or serious the privacy intrusion is." *Riganian*, 791 F. Supp. 3d at 1088 (cleaned up). And the court does not mean to imply that cases with less starkly sensitive information than the above-recited cases cannot proceed. However, the court finds Plaintiffs' allegations that the disclosure of the student data involved in this case to Renaissance's third party business partners falls into the existing body of law regarding public disclosure of private facts is implausible.

The court also observes that there is very little, if any, factual support in the SAC for the notion that any data disclosed to third parties is tied to any particular student's name. Although there are references to "identifying individual users," (SAC ¶ 103), "identifiers," (*id.* ¶¶ 104, 109), and companies being able to "build persistent profiles of those users across devices and services," (*id.* ¶ 103), at the hearing Plaintiffs could only point the court to two paragraphs in the SAC stating that student names were disclosed to third parties, (SAC ¶¶ 195-196), and in response Renaissance pointed out that those allegations were not supported by any particular facts, whereas the SAC contains many allegations supporting anonymized identifiers (*see, e.g.*, SAC ¶¶ 131 ("Google Analytics Client ID"), 155-56, 161 ("Mixpanel Distinct IDs"), 167-68 ("a unique Microsoft user identifier associated with the student's device"), 170, 174, 179 ("a

universally unique user ID associated with that student" for Xandr, Comscore, and Taboola)). Notably, Plaintiffs did not point the court to allegations supporting the idea that the most intimate and personal information Plaintiffs challenge in the SAC—students' "social-emotional or behavioral problems, and [] students' lunch balance and whether students are considered socioeconomically disadvantaged," (SAC ¶ 4)—is disclosed to third parties. That there is no indication in the SAC that Plaintiffs' data has been de-anonymized lends further support to the court's conclusion that Plaintiffs do not plausibly allege a public disclosure of private facts claim under existing law. *See, e.g.*, *Low*, 900 F. Supp. 2d at 1025 ("Although Plaintiffs postulate that these third parties could, through inferences, de-anonymize this data, it is not clear that anyone has actually done so, or what information, precisely, these third parties have obtained."); *Nabeel v. Taylor Swift Prods., Inc.*, 2024 WL 4444483, at *3 (C.D. Cal. July 31, 2024) ("While Plaintiff failed to plausibly allege that the Music Video used his identity, even if he had, disclosing that someone is suffering from mental illness and had family issues would not rise to the level of intimate information required by this test. A reasonable person watching the Music Video would not connect it to Plaintiff's identity, and would also not gather that the Plaintiff is mentally ill or has complex family dynamics from the protagonist's portrayal in the Music Video. Because Plaintiff's allegations of public disclosure of private facts are insufficiently plead, the claim is dismissed.").

Though the parties have not elucidated the issue, it appears that there is a parallel public disclosure of private facts claim under the California Constitution. *See, e.g.*, *Urbaniak v. Newton*, 226 Cal. App. 3d 1128, 1138 (Ct. App. 1991) ("While tortious invasion of privacy requires a 'public disclosure,' a cause of action under article I, section 1, may be based on a more extensive, if still somewhat amorphous, concept of 'improper use of information properly obtained.' "). The court finds the prior analysis also makes dismissal of this parallel claim appropriate. *See id.* (describing situations in which "California decisions have applied the concept of 'improper use of information properly obtained' "—situations the court finds materially different from the situation presented here).

Accordingly, the Motion is **GRANTED** as to Plaintiffs' public disclosure of private facts claims under common law and California Constitution theories.

**B. Federal and State Wiretapping Claims (Claims 1 and 9)**

The court turns to Plaintiffs' federal and state wiretapping claims—claim 1 for violation of the federal Wiretap Act and claim 9 for violation of the WESCL. (*See* SAC ¶¶ 415-38, 569-600.) "The Wiretap Act prohibits the unauthorized 'interception' of an 'electronic communication.' " *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 606-07 (9th Cir. 2020) (quoting 18 U.S.C. § 2511(1)(a)–(e)). Likewise, the WESCL makes liable "whoever . . . [i]ntentionally intercepts, attempts to intercept or procures any other person to intercept or attempt to intercept, any wire, electronic or oral communication." Wis. Stat. Ann. § 968.31(1)(a).

These "statutes contain an exemption from liability for a person who is a 'party' to the communication." *In re Facebook*, 956 F.3d at 606-07; *see Tanner v. Acushnet Co.*, 2023 WL 8152104, at *4 (C.D. Cal. Nov. 20, 2023) ("When a party to a conversation records it, that party is not eavesdropping, but rather is acting as a 'tape-recorder.'"); *Desnick v. Am. Broad. Companies, Inc.*, 44 F.3d 1345, 1353 (7th Cir. 1995) ("The federal and state wiretapping statutes that the plaintiffs invoke allow one party to a conversation to record the conversation unless his purpose in doing so is to commit a crime or a tort or (in the case of the state, but not the federal, law) to do 'other injurious acts.' "). Plaintiffs do not meaningfully argue that the party exemption does not apply here. (*See* Opp. at 15 (noting Renaissance's party-exemption argument and arguing only that an exception to the exemption applies).) Plaintiffs' claim that Renaissance violated the Wiretap Act and WESCL by recording its own interactions with Plaintiffs on its own platforms therefore fails unless some exception to the exemption applies. *See Smith v. Rack Room Shoes, Inc.*, 2025 WL 2210002, at *4 (N.D. Cal. Aug. 4, 2025) ("Plaintiffs do not contest that, as alleged, Rack Room was both a party to the communications, and consented to the interception, triggering the party exception under Section 2511(2)(d). Therefore, the only question is as to whether Plaintiffs have adequately alleged that the crime-tort exception applies, thus rendering the interception unlawful.").

"[W]hile a party to a communication may be exempt (the 'Party Exemption'), there is an exception applied if the interception was carried out for the purpose of committing a criminal or tortious act in violation of the law (the 'Crime-Tort Exception')." *Saedi v. SPD Swiss Precision Diagnostics GmbH*, 2025 WL 1141168, at *12 (C.D. Cal. Feb. 27, 2025). Specifically, the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 8:25-cv-01379-FWS-JDE Date: September 11, 2026
Title: Nicole Reisberg *et al.* v. Renaissance Learning, Inc.

Wiretap Act and the WESCL provide that it is not unlawful for a person "to intercept a wire, electronic or oral communication where the person is a party to the communication or where one of the parties to the communication has given prior consent to the interception unless the communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State," and the WESCL adds, "or for the purpose of committing any other injurious act." 18 U.S.C. § 2511(2)(d); Wis. Stat. Ann. § 968.31(2)(c). "At least in the context of the federal wiretap statute, 18 U.S.C. § 2511(2)(d), courts apply [the] 'crime-tort exception' only 'where the defendant allegedly committed a tortious or criminal act independent from the act of recording itself.'" *Brahm v. Hosp. Sisters Health Sys.*, 2024 WL 3226135, at *5 (W.D. Wis. June 28, 2024). "Courts have applied the ECPA's 'crime-tort exception' where the intentional *disclosure* of private information constituted a further impropriety independent and separate from the *interception* of private information." *Doe v. Tenet Healthcare Corp.*, 789 F. Supp. 3d 814, 849 (E.D. Cal. 2025) (cleaned up) (quoting *R.S. v. Prime Healthcare Servs., Inc.*, 2025 WL 103488, at *6 (C.D. Cal. Jan. 13, 2025)).

Plaintiffs argue they "adequately allege that the crime-tort exception applies by alleging that Renaissance intercepted their communications for the independent purposes of tortiously invading their privacy; disclosing and using their data for advertising, marketing, analytics and other services, and generating profit without their express consent; and procuring unjust enrichment." (Opp. at 16.) "When determining the applicability of the crime-tort exception, the focus is not upon whether the interception itself violated another law; it is upon whether the purpose for the interception—its intended use—was criminal or tortious." *Smith*, 2025 WL 2210002, at *4 (cleaned up). "[A]t the time of the interception, a defendant must have had an independent prohibited purpose beyond the act of interception itself for the crime-tort exception to apply." *Id.*

Renaissance argues that Plaintiffs fail to adequately allege Renaissance's primary motivation in intercepting the data was "to commit a further, independently actionable wrong," such as, as Renaissance characterizes the cases Plaintiffs cite, "the disclosure of protected health or financial information in violation of HIPAA and other privacy rights," and that "[i]nterception for the purpose of financial gain is insufficient." (Reply at 6-7.)

"Courts are divided as to whether a primary financial motivation shields an intercepting party from liability under the ECPA." *Doe*, 789 F. Supp. 3d at 849-50. While "some courts have held that the crime-tort exception is inapplicable where a defendant's primary motivation is to make money rather than to injure plaintiffs tortiously or criminally," "other courts have held that the crime-tort exception applies even when a defendant intercepts data for the purpose of financial gain." *Id.* at 850 (collecting cases) (cleaned up). The court tends to be persuaded by courts that have observed that "committing a tort and seeking a profit are not mutually exclusive (if anything, the latter is often the reason for the former)." *Riganian v. LiveRamp Holdings, Inc.*, 791 F. Supp. 3d 1075, 1090–91 (N.D. Cal. 2025) (collecting cases); *see Mekhail v. N. Mem'l Health Care*, 726 F.Supp.3d 916, 928 n.4 (D. Minn. 2024) ("[T]he [c]ourt has serious doubts that a pecuniary purpose and an injurious purpose can always be so clearly distinguished. And it defies common sense that a clearly harmful act could escape liability as long as it was done for profit.").

So, if Renaissance "unlawfully intercepted, packaged, and sold personal information without consent at scale, that conduct [would] not be excused on the grounds that [Renaissance] acted in pursuit of profit." *Riganian*, 791 F. Supp. 3d at 1090-91 (collecting cases). However, that Renaissance's alleged monetary purpose does not *insulate* Renaissance from liability does not mean the financial motive *subjects* Renaissance to liability absent some other sufficiently-alleged wrongful purpose. And here, the court finds Plaintiffs have failed to plausibly allege some other criminal, tortious, or other wrongful purpose for collecting student data, such as disclosing data "in contradiction the commitments it made in its privacy policy,"[2] *Smith*, 2025 WL 2210002, at *4-5; or disclosing PII/PHI in violation of HIPAA, *Brahm*, 2024 WL 3226135, at *5; *Doe*, 789 F. Supp. 3d at 849; *R.S.*, 2025 WL 103488, at *5-6; *see also Stein v. Edward-Elmhurst Health*, 2025 WL 580556, at *5 (N.D. Ill. Feb. 21, 2025), *motion to certify appeal granted,* 2026 WL 594752 (N.D. Ill. Mar. 3, 2026) ("Courts from coast to coast have recognized that a violation of HIPAA can give rise to the crime-tort exception under the ECPA."). The court's conclusion that Plaintiffs' invasion of privacy claims fail further supports this conclusion. *See* Section III.A., *supra*; *see, e.g.*, *Zocco v. Nelnet, Inc.*, 2026 WL 242037, at

[2] Plaintiffs allege that Renaissance discloses in "its own terms" the fact that "Renaissance also uses and discloses student data in commercial ways that directly benefit Renaissance." (SAC ¶ 235.)

*5 (N.D. Cal. Jan. 29, 2026) (finding crime-tort exception inadequately alleged, explaining "Plaintiffs seem to acknowledge that 'Defendant specifically used the tracking technology provided by Google to track and utilize Plaintiff's and Class members' PII for financial gain' rather for the purpose of committing a crime or tort. More is needed.") (record citation omitted); *Saedi*, 2025 WL 1141168, at *13 ("With respect to the tort of invasion of privacy, the Court has already found that Plaintiff failed to sufficiently state a claim for intrusion upon seclusion. This, therefore, cannot serve as the basis for the Crime-Tort Exception to apply."); *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021) (denying motion to dismiss Wiretap Act claims where "Plaintiffs have adequately alleged that Google's association of their data with preexisting user profiles [without consent] violated state law, including CDAFA, intrusion upon seclusion, and invasion of privacy.").

"Where the Party Exemption is applicable and the plaintiff has failed to sufficiently invoke the Crime-Tort Exception, the defendant is exempt." *Id.* at *14. The court therefore **GRANTS** the Motion as to Plaintiffs' federal and state wiretapping claims.

### C. Unjust Enrichment (Claims 7 and 11)

Renaissance next moves to dismiss Plaintiffs' unjust enrichment claims—claim 7 under Wisconsin law and claim 11 under Kansas law. (Mot. at 20-21.) "The elements of an unjust enrichment claim under Wisconsin law are: (1) a benefit conferred upon the defendant by the plaintiff; (2) knowledge or appreciation of the benefit by the defendant; and (3) acceptance or retention by the defendant of such benefit under such circumstances that it would be inequitable for [the defendant] to retain it without paying the value thereof." *Giasson v. MRA - Mgmt. Ass'n, Inc.*, 777 F. Supp. 3d 913, 939 (E.D. Wis. 2025). Kansas law is similar; "[u]njust enrichment arises when (1) a benefit has been conferred upon the defendant, (2) the defendant retains the benefit, and (3) under the circumstances, the defendant's retention of the benefit is unjust." *Nelson v. Nelson*, 288 Kan. 570, 580 (2009).

The court begins with the first element. "Plaintiffs allege that the benefit received by Renaissance is a wealth of valuable personal and sensitive data." (Opp. at 35 (collecting SAC references).) "To [one district court's] knowledge [in April 2025], no Wisconsin court has answered the question of whether the conferral of PII can itself constitute a benefit for purposes

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 8:25-cv-01379-FWS-JDE Date: September 11, 2026
Title: Nicole Reisberg *et al.* v. Renaissance Learning, Inc.

of unjust enrichment." *Giasson v. MRA - Mgmt. Ass'n, Inc.*, 777 F. Supp. 3d 913, 940 (E.D. Wis. 2025). That court's research revealed that "it appear[ed] that courts applying the laws of other states have largely rejected unjust enrichment claims premised on this theory, particularly where, as [t]here, the plaintiff's allegations as to the alleged benefit are extremely vague." *Id.* Here, the court does not find that Plaintiffs' allegations are as vague as in *Giasson* or some of the cases *Giasson* cites, but the court is still "inclined to agree with the reasoning in those cases" and find that Plaintiffs do not sufficiently allege they conferred on Renaissance a benefit within the meaning of existing unjust enrichment law. *Id.*

Even assuming Plaintiffs adequately allege the first element, the court is not persuaded they adequately allege the third—that the circumstances are such that it would be inequitable for Renaissance to retain the benefit of Plaintiffs' personal information without paying for it. *See Giasson*, 777 F. Supp. 3d at 939; *Nelson*, 288 Kan. at 580. "Even where a person has received a benefit from another, he is liable to pay therefor only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it. The mere fact that a person benefits another is not of itself sufficient to require the other to make restitution therefor." *Puttkammer v. Minth*, 83 Wis. 2d 686, 690 (1978). For the reasons explained throughout this Order, Plaintiffs have not adequately articulated any theory in the SAC that would make Renaissance's taking of student data wrongful, and "where there is no 'actionable wrong,' as currently alleged here, there can be 'no basis for relief'" in an unjust enrichment claim. *Saedi*, 2025 WL 1141168, at *14.

Another factor that makes implausible Plaintiffs' allegation that Renaissance's retention of the benefit is unjust is the reason Renaissance obtained the benefit in the first place: Plaintiffs allege Renaissance has contracts with school districts and collected this data as part of performing on those contracts. (*See* Opp. at 37 ("Plaintiffs' schools, not Plaintiffs, are the contracting parties that choose to purchase Renaissance's products.").) Applying existing law as the court reads it, the court finds the fact that Renaissance received the incidental benefit of Plaintiffs' user data in performing on Renaissance's contracts with Plaintiffs' school districts does not make a plausible unjust enrichment claim. *See Fischer v. Renner*, 348 Wis. 2d 763, at *5 ("The mere fact that there may have been incidental benefit to James, and that James may have known about it, does not require James as a guarantor to make restitution to the investors

of Car Guys; the incidental benefit does not violate fundamental principles of justice, equity, and good conscience.”).

For all of these reasons, the Motion is **GRANTED** as to the unjust enrichment claim.

**D. Remaining Claims**

In the Opposition, Plaintiffs purport to withdraw their remaining claims: claim 2, for violation of California’s Unfair Competition Law; claim 8, for negligence under Wisconsin law; claim 10, for violation of Wisconsin’s Deceptive Trade Practices Act; and claim 14, violation of the Video Privacy Protection Act. (Opp. at 9 n.2.) The court agrees with Renaissance that this withdrawal is procedurally improper, (*see* Reply at 3-5), and the court will dismiss these claims as well rather than treating them as withdrawn.

**E. Leave to Amend**

“Although leave to amend ‘shall be freely given when justice so requires,’ it may be denied” where it “would not serve any purpose because to grant it would be futile in saving the plaintiff’s suit.” *Chinatown Neighborhood Ass’n v. Harris*, 794 F.3d 1136, 1144 (9th Cir. 2015) (quoting Fed. R. Civ. P. 15(a)). Here, the court finds granting Plaintiffs leave to amend would not serve any purpose because to grant it would be futile. *See id.* This is Defendants’ second motion to dismiss Plaintiffs’ claims on very similar bases. (*See generally* Prior Order.) In the Prior Order, the court explained precisely what, in the court’s view, was deficient about Plaintiffs’ claims, and gave Plaintiffs an opportunity to cure the specifically-identified deficiencies. (*See generally* Order.) In response to the Order, Plaintiffs added new allegations in an effort to adequately allege their claims. (*See generally* SAC.) However, the court has now found that despite amendment, Plaintiffs still fail to sufficiently allege their claims.

In the Opposition, Plaintiffs “request leave to amend the SAC” “[t]o the extent necessary” and argue “Plaintiffs have made a good-faith attempt to correct any deficiencies identified in this Court’s Order and have added additional claims and extensive allegations in the SAC.” (Opp. at 38 & n.12.) However, “[n]othing in the record suggests that Plaintiff[s] could allege any new facts that would suffice to plausibly state its claims, and Plaintiff[s] do[]

not offer any explanation regarding how further amendment could cure the identified deficiencies." *Treadstone Servs. v. Blue Shield of California Life & Health Ins. Co.*, 2024 WL 2002999, at *6 (C.D. Cal. Mar. 27, 2024); *see also Vieira v. Mentor Worldwide, LLC*, 392 F. Supp. 3d 1117, 1132-33 (C.D. Cal. 2019), *aff'd,* 845 F. App'x 503 (9th Cir. 2021) ("The Court denies leave to amend because Plaintiffs have not explained how further amendment could cure the pleading deficiencies in their Complaint. As Plaintiffs have had two opportunities to properly plead their claims, the Court concludes that granting further leave to amend would be futile.").

The court's leave to amend analysis is further rooted in the themes it has described throughout this order: in the end, the court finds the conduct Plaintiffs allege to be wrongful does not fit into the legal elements of any cause of action Plaintiffs brought in the First Amended Complaint or the Second Amended Complaint. The Ninth Circuit may conclude the court is being too technical, but this district court is hard-pressed to rule in a way that, in the court's view, would expand the bounds of existing legal claims as they have historically been interpreted. Under this view, granting leave to amend at this stage of the proceedings would be futile and unnecessary. And indeed, "[t]he district court's discretion to deny leave to amend is particularly broad where the court has already given the plaintiff an opportunity to amend his complaint." *Fid. Fin. Corp. v. Fed. Home Loan Bank of San Francisco*, 792 F.2d 1432, 1438 (9th Cir. 1986). For all of these reasons, the court finds it appropriate to exercise its discretion to deny leave to amend.

## IV. Disposition

For the reasons set forth above, the Motion is **GRANTED.** Plaintiffs' SAC is **DISMISSED WITHOUT LEAVE TO AMEND**. The court will enter judgment accordingly.